UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

DONALD S. HUNTER, SR.                    :

           Plaintiff                     :

              vs                         : CIVIL ACTION
                                           NO.04-857(PLF)
COLIN L. POWELL, Secretary               :
United States Department of State
                                         :
           Defendant                     :

- - - - - - - - - - - - - - - - x

                                    June 6, 2005

     PURSUANT TO NOTICE, the following deposition of

FANNIE L. ALLEN was taken before me, Kathleen S.

Wilson, Notary Public, at 501 Third Street, Third

Floor, Washington, D.C., commencing at 12:22

o'clock, p.m., when were present on behalf of the

respective parties:

**ELITE REPORTING COMPANY**
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*

Attachment D

APPEARANCES


      MICHAEL J. SNIDER, ESQUIRE
      Snider & Fischer, LLC
      104 Church Lane
      Suite 201
      Baltimore, Maryland  21208

          On Behalf Of The Plaintiff



      STRATTON C. STRAND, ESQUIRE
      United States Department of Justice
      555 Fourth Street, N.W.
      10th Floor
      Washington, D.C.  20530

          On Behalf Of The Defendant



ALSO PRESENT

      Donald S. Hunter, Sr.



*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066   800-734-3337*

3

I-N-D-E-X

<u>WITNESS</u>

<u>FANNIE L. ALLEN</u>

Examination by Mr. Snider                Page    4

Examination by Mr. Strand                Page  122

Examination Resumed by Mr. Snider        Page  153

Examination Resumed by Mr. Strand        Page  162

<u>EXHIBITS</u>

No. 1    Position Description             Page   19

No. 2    Memo, 6/24/02                    Page   25

No. 3    Grants Policy                    Page  104

(Attached)

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*987-7066   800-734-3337*

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

---

Page 4

1 Whereupon,

2          FANNIE L. ALLEN,

3 was called as a witness by counsel for the

4 Plaintiff, Donald S. Hunter, Sr., and after having

5 first been duly sworn by the Notary Reporter, was

6 examined and testified as follows:

7          THE REPORTER:  Would you state your full

8 name and address for the record, please?

9          THE WITNESS:  Fannie, F-a-n-n-i-e, middle

10 initial L, last name Allen, A-l-l-e-n.

11          My home address?

12          THE REPORTER:  Your work address is fine.

13          THE WITNESS:  301 Fourth Street, S.W.,

14 Suite 524, Washington, D.C. 20547.

15          EXAMINATION

16     BY MR. SNIDER:

17     Q. Ms. Allen, good afternoon.

18     A. Good afternoon.

19     Q. My name is Michael Snider and I'm an

20 attorney for Mr. Hunter in connection with his EEO

21 case.  And have you been deposed before?

---

Page 5

1     A. Yes.

2     Q. So you probably know the ground rules.

3 I'll just briefly -- again, I apologize for my

4 voice.  I'm just getting over something.  I hope

5 I'm getting over it.

6          If you have any questions about -- if a

7 question is not clear, just ask for clarification.

8 If you need a break, let us know.

9          We do need oral responses, a yes or a no,

10 as opposed to a nod of the head, or an uh-huh, or

11 an uh-uh.  Okay?

12     A. Certainly.

13          MR. STRAND:  Speak up, because the court

14 reporter will need to --

15     BY MR. SNIDER:

16     Q. Remember to speak up and counsel may have

17 an objection, so if you just pause briefly before

18 answering, that would be a good idea.  And, aside

19 from privilege, you have to answer every question.

20 Okay?

21     A. Yes.

---

Page 6

1     Q. Okay.  Your race, ma'am?

2     A. I am black.

3     Q. And where are you currently employed?

4     A. U.S. Department of State.

5     Q. And can you tell me what office you're

6 in?

7     A. The Bureau of Educational and Cultural

8 Affairs, Grants Division.

9     Q. What grade are you?

10     A. GS-14.

11     Q. And your position?

12     A. Supervisor, Grants and Management

13 Officer.

14     Q. How many people do you supervise, ma'am?

15     A. Approximately ten.

16     Q. Give their grades, please.

17     A. GS-13's, GS-12's, GS-11's, GS-9's, eight,

18 seven, and three.

19     Q. And how many people did you supervise in

20 2002?

21     A. Approximately ten.

---

Page 7

1     Q. About the same.  And can you give me the

2 numerical distribution of how many 13's, how many

3 12's?

4          MR. STRAND:  Objection.  At the time or

5 now?

6          MR. SNIDER:  At the time.

7          THE WITNESS:  My best guess is four GS-

8 13's, one GS-12, one GS-11, one nine, one eight,

9 one seven, one two -- GS-2 or GS-3.

10          BY MR. SNIDER:

11     Q. And the GS-13's were Ms. Love, Ms. Swann,

12 Ms. Stinson, and Ms. Ahern?

13     A. Correct.

14     Q. The GS-12 was Mr. Hunter?

15     A. Yes.

16     Q. And who was the GS-9?

17     A. The GS-9, to the best of my recollection,

18 was Ms. Julie Johnson.

19     Q. What was her title?

20     A. Grant Specialist.

21     Q. What grade is she now?

---

Elite Reporting Company

Donald S. Hunter, Sr. vs.                      Multi-Page™                    Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                                      06/06/05

---

Page 8

1   A. A GS-12.

2   Q. And her title?

3   A. Grant Specialist.

4   Q. Is she in a career ladder?

5   A. Career ladder to the 12.

6   Q. To the 12. Does she have promotion

7   potential beyond the 12?

8   A. It's a career ladder position.

9   Q. Okay. And when did she get promoted to

10  the 12?

11  A. 2004.

12  Q. Do you know what month?

13  A. I don't remember.

14      2004 or 2005. I can't remember.

15  Q. Okay. And how long have you been chief

16  of the Grants Division?

17  A. Since on or about 1994.

18  Q. Do you know if the department has an

19  affirmative action plan?

20  A. The department should have an affirmative

21  action plan.

---

Page 9

1   Q. Are you familiar with that plan?

2   A. Yes.

3   Q. Does ECA have an affirmative action plan?

4   A. Yes.

5   Q. And what does the affirmative action plan

6   say about what the agency is supposed to do for

7   positions that have a historical imbalance or

8   dearth of —

9   A. Fair and equal treatment. That's

10  basically all I can tell you.

11  Q. Is there anything in there that if a

12  historical problem has occurred for a certain

13  gender, race, religion, nationality, at a certain

14  grade level in a certain position, that the agency

15  will do anything special for those people?

16      MR. STRAND: Objection. Foundation.

17      THE WITNESS: Sir, I do not know that

18  specifically to exist.

19      BY MR. SNIDER:

20  Q. Okay. In around 1999 or 2000, did you

21  request an upgrade of the GS-12 grants specialist

---

Page 10

1   positions in your position to the GS-13?

2   A. In — would you repeat the question,

3   please?

4   Q. 1999 or 2000.

5   A. Did I request?

6   Q. Yes.

7   A. No. Could you complete the question,

8   please?

9   Q. Did you request an upgrade of the GS-12

10  grants specialist positions in your office to the

11  GS-13 position — the GS-13 level?

12  A. The date I cannot confirm. But there

13  were or there was a competitive announcement

14  issued on or about that time for the GS-13 level.

15  Q. Understood. All right. Did you attempt

16  to upgrade — all right. Let me back up.

17      At some date, late '90s or early 2000s,

18  the four GS-13's that you mentioned earlier were

19  GS-12's; is that correct?

20  A. The four?

21  Q. Yes. Some of the four?

---

Page 11

1   A. Some of the four.

2   Q. Which ones?

3   A. By name? Persons who achieved the GS-13

4   level through the competitive announcement was Ms.

5   Love and Ms. Swann.

6   Q. Ms. Stinson and Ms. Ahern got their 13's

7   when?

8   A. It was before I arrived in that position.

9   Q. Were they promoted competitively or non-

10  competitively?

11  A. I do not know, sir.

12  Q. Did you attempt to have Ms. Swann and Ms.

13  Love promoted non-competitively?

14  A. Would you repeat that question again?

15  Q. Did you attempt to have Ms. Swann and Ms.

16  Love promoted non-competitively?

17      MR. STRAND: To the GS-13?

18      MR. SNIDER: To the GS-13 level.

19      THE WITNESS: There was discussion with

20  the then office director to promote these two

21  individuals, and this was prior to Department of

---

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.  
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen  
06/06/05

---

**Page 12**

1 State.

2      BY MR. SNIDER:

3    Q. Can you explain that answer, please?

4    A. I was originally employed by the United

5 States Information Agency. And as a result of a

6 congressional mandate, we were merged with the

7 Department of State in 1999.

8    Q. Go on.

9    A. That's it. We became Department of State

10 in October of 1999.

11    Q. Okay. So this -- I guess you were

12 supervising Ms. Love and Ms. Swann in --

13    A. Since 1994.

14    Q. Since 1994.

15      And Ms. Stinson and Ms. Ahern?

16    A. Since 1994.

17    Q. Okay. So the whole group was swallowed

18 up, supposedly, by State. And you took this --

19 you had discussions with the then -- what was the

20 title?

21    A. Director.

---

**Page 13**

1    Q. Director -- about non-competitive

2 promotions, while it was still under the USIA?

3    A. Promotion, yes.

4    Q. Okay. And who was the then director?

5    A. Mr. Edward Mueller. M-u-l-l-e-r or M-u-

6 e-l-l-e-r.

7    Q. Do you know what Mr. Mueller is doing

8 these days?

9    A. He is employed by the Department of

10 State.

11    Q. Where? In what position?

12    A. It is in an acquisition office. That's

13 as much as I can tell you.

14    Q. What discussions did you have with him

15 about non-competitively upgrading the two

16 individuals?

17    A. I was seeking --

18      MR. STRAND: Objection. Mis-states. Go

19 ahead.

20      THE WITNESS: Would you like to repeat

21 the question, please?

---

**Page 14**

1      BY MR. SNIDER:

2    Q. Explain what your discussions were with

3 Mr. Mueller about Ms. Love and Ms. Swann.

4    A. Looking at competitive advancement of

5 these two individuals.

6    Q. Did you ever discuss non-competitive

7 advancement of those two individuals to the GS-13

8 level?

9    A. Mr. Mueller discussed the possibility of

10 competitive and non-competitive promotion.

11    Q. And what happened after the discussion?

12    A. We were not successful.

13    Q. Who is "we"?

14    A. The office. I was not successful.

15    Q. In doing what?

16    A. There were no promotions under Mr.

17 Mueller's leadership.

18    Q. Do you know why?

19    A. He didn't agree.

20    Q. With what?

21    A. My request. My request was denied by Mr.

---

**Page 15**

1 Mueller.

2    Q. What precisely was your request, ma'am?

3    A. Advancement of those two individuals, as

4 I stated before.

5    Q. Whether competitive or non-competitive,

6 just advancement?

7    A. That was the discussion. Yes, sir.

8    Q. Okay. And did you discuss how it could

9 be achieved, how non-competitive advancement of

10 those two individuals could be achieved?

11    A. We discussed competitive and non-

12 competitive advancement. I was denied.

13    Q. Understood. What was your understanding

14 as far as how an individual could be non-

15 competitively promoted?

16    A. Like Mr. Hunter, who was -- who received

17 his GS-12 through accretion of duties, that is a

18 method. If there are other methods, I do not know

19 them. He received his GS-12 in that manner.

20    Q. Did he have a desk audit before he

21 received his GS-12 through a gradual accretion of

---

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 16

1 duties?

2    A. To my knowledge, no.

3    Q. Do you know if a desk audit is required

4 in order to get a gradual accretion of duties

5 promotion at the Department of State?

6    A. To my knowledge, no.

7    MR. STRAND: Remember to pause before you

8 answer so that I have time to interpose an

9 objection.

10    MR. SNIDER: She's pretty quick.

11    MR. STRAND: Yes. She's very quick.

12    BY MR. SNIDER:

13    Q. Did you believe that Ms. Love and Ms.

14 Swann were performing at the GS-13 level prior to

15 their promotion to the GS-13?

16    A. Pause.

17    (Brief interruption.)

18    THE WITNESS: No.

19    BY MR. SNIDER:

20    Q. You did not? You don't have to say the

21 word "pause," but -- there was a knock at the door

Page 17

1 and an interruption. Let me state the question

2 again.

3    A. Thank you.

4    Q. Did you believe that Ms. Love and Ms.

5 Swann were performing at the GS-13 level prior to

6 their -- prior to your attempts to promote them to

7 the GS-13 level?

8    A. Yes.

9    Q. And for how long?

10    A. For how long?

11    Q. For how long were they performing at the

12 GS-13 level?

13    A. I never quantified the years.

14    Q. Was it more than a year?

15    A. Oh, definitely.

16    Q. Was it more than two or three years?

17    A. Sir, I don't have a definitive answer for

18 you.

19    Q. Okay. And how did you know they were

20 working at the GS-13 level?

21    A. Because of the type of work that they

Page 18

1 were doing.

2    Q. Can you explain that, please?

3    A. For the GS-13's, I require them to do

4 very high-level, complex work; to know the OMB

5 guidance; to know the department or USIA

6 guidance; to be independently responsive to

7 various projects; to be able to independently

8 work with high-level officials, internally and

9 externally; train; provide quality control.

10    Q. Keep going.

11    A. Engage in professional development. To

12 have knowledge and skills of the federal systems

13 process.

14    Q. Anything else?

15    A. Not that I can think of at this time.

16    Q. Where did you get that information that

17 you just stated?

18    A. I've been in the office since 1994. I

19 know the mission of our office, our goals and

20 objectives, the requirements that are handed down

21 to me as manager of the office, the duties as

Page 19

1 assigned.

2    Q. I guess there were GS-13's in the office

3 at that time; right?

4    A. Correct.

5    Q. Ms. Stinson and Ms. Ahern were GS-13's

6 during that time period; correct?

7    A. That is correct.

8    Q. Okay. Do you have any classification

9 experience?

10    A. I do not.

11    Q. So you are not a classification

12 specialist?

13    A. I'm not HR trained.

14    Q. Okay. And you have never held that

15 position; right? You've never held the position

16 of human resources specialist?

17    A. I have not.

18    MR. SNIDER: All right. I'll have this

19 marked. I guess we'll call this Allen One.

20    (Whereupon, Deposition Exhibit Number One

21 was marked for identification.)

**Elite Reporting Company**

Page 16 - Page 19

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

**Page 20**

1    BY MR. SNIDER:
2    Q. Can you review this document, please, and
3 look up when you're done.
4    A. (Perusing document.)
5    Q. You're done?
6    A. I'm not sure what you want.
7    Q. Review the entire document, please.
8    A. Would you like me to read it from
9 beginning to end?
10    Q. Are you familiar with this document?
11    A. I'm familiar -- I'm familiar with this
12 document.
13    Q. Okay. You've seen it before?
14    A. I've seen it before.
15    Q. I just want to make sure that it's a
16 genuine copy of the position description for the
17 GS-13's in your office.
18    A. And if you received this from the HR
19 Department, I'm assuming that it is.
20    Q. Let's not assume anything. If you can
21 read through it here and tell me if this is a PD

**Page 21**

1 that was encumbered by Ms. Love and Ms. Swann.
2    A. I would have to, again, assume that it is
3 from the Department of State, HR Office, based on
4 the cover page, and the material that is included
5 is --
6    Q. Okay. For the record --
7    MR. STRAND: Take a --
8    MR. SNIDER: Take a look at it.
9    MR. STRAND: Take a quick look through it
10 and just make sure that it doesn't look as if
11 anything changed or anything like that.
12    MR. SNIDER: And while you are looking,
13 I'll note for the record this is a document that
14 was provided by the agency, Bates stamp numbered
15 0034 through 0038.
16    THE WITNESS: (Perusing document.)
17    MR. STRAND: You have to let him know
18 when you are ready.
19    THE WITNESS: Okay.
20    MR. SNIDER: Okay. And I should probably
21 let you know, if she is going to take any notes, I

**Page 22**

1 will ask for copies of those after the deposition.
2 I'm not saying she shouldn't. You know, just to
3 let you know that, unless it is a note to your
4 attorney. Okay.
5    MR. STRAND: Let's go off the record for
6 a second.
7    MR. SNIDER: Let's go off the record.
8    (Whereupon, there was a brief recess.)
9    BY MR. SNIDER:
10    Q. Have you had an opportunity to review
11 Exhibit One, ma'am?
12    A. Yes.
13    Q. Does it appear to be an accurate copy of
14 the position description encumbered by Ms. Love
15 and Ms. Swann?
16    A. It appears to be.
17    Q. Okay. And that would be during the time
18 period for Ms. Love from about September of 2000
19 until her retirement in December 2004? Is that
20 accurate?
21    A. Sir, I cannot speak to those dates. She

**Page 23**

1 retired the end of '04.
2    Q. And Ms. Swann retired in April of '05;
3 correct?
4    A. Ms. Swann relocated to a new position on
5 or about April of 2005.
6    Q. Okay. But she is no longer a GS-13 grant
7 specialist in your office?
8    A. Correct.
9    Q. And both of those positions were funded
10 vacant positions at the time they left; right?
11    A. Correct.
12    Q. And when Ms. Love left, you posted her
13 position; is that correct?
14    A. I posted a vacancy position. Yes, I did.
15    Q. And you did not post it at the GS-13
16 level, did you?
17    A. I did not.
18    Q. But when she left, she was performing at
19 the GS-13 level; correct?
20    A. That is correct.
21    Q. Okay. You posted it as an 11/12 career

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

**Page 24**

1 ladder; correct?

2    A. It should have -- to the best of my

3 knowledge, it should have been at the nine,

4 potential to the 12 position.

5    Q. Okay. I would call that a 9/11/12 career

6 ladder.

7        Were there vacancies only at the GS-9

8 level or were they posted at all three levels?

9    A. Nine, with the potential to the 12. An

10 HR specialist would have to give you the

11 mechanics.

12    Q. Okay. And for Ms. Swann, when she left,

13 she was performing at the GS-13 level as well;

14 correct?

15    A. Correct.

16    Q. And you did not post her position at the

17 GS-13 level, did you?

18    A. That is correct.

19    Q. You posted her job also as a 9/11/12

20 career ladder; correct?

21    A. Nine, with the potential to the 12. That

**Page 25**

1 is correct.

2        (Whereupon, Deposition Exhibit Number Two

3 was marked for identification.)

4    BY MR. SNIDER:

5    Q. Okay. Let me show you Allen Two. Would

6 you review this document, ma'am.

7    A. (Perusing document.)

8    Q. You reviewed the document?

9    A. I did.

10    Q. And you've seen this document before?

11    A. I have seen this document before.

12    Q. This appears to be an accurate copy of

13 the document you saw previously?

14    A. It appears to be.

15    Q. Okay. This is a June 24th, 2002

16 information memorandum from Ben Castro, C-a-s-t-r-

17 o, to Donald Hunter; is that correct?

18    A. That is correct.

19    Q. It's two pages, and at the bottom it is

20 -- in capitals and underlined it says,

21 "UNCLASSIFIED"; is that correct?

**Page 26**

1    A. Correct.

2    Q. Did you speak with Mr. Castro before he

3 issued this document to Mr. Hunter?

4    A. I spoke to Mr. Castro. I cannot speak in

5 terms of the dates.

6    Q. Okay. When was the first time you saw

7 this document, ma'am?

8    A. I do not remember the specific date.

9    Q. Were you given a copy at or around the

10 time it was given to Mr. Hunter?

11    A. I was never given a copy of this

12 document.

13    Q. Okay. How did you view the document?

14    A. Mr. Castro shared a copy of the document,

15 if I remember correctly.

16    Q. But he did not give you one?

17    A. He did not give me a copy.

18    Q. He showed it to you and then took it

19 back?

20    A. Showed it to me and took it back.

21    Q. Okay. And did you tell him that you

**Page 27**

1 agreed or disagreed with the document?

2    A. This was Mr. Castro's document.

3    Q. I understand. And Mr. Castro at the time

4 was your first line supervisor?

5    A. That is correct.

6    Q. Did you, in fact, agree or disagree with

7 the document?

8    A. Mr. Castro knew of my -- my response to

9 Mr. Hunter's request for promotion.

10    Q. Which was?

11    A. I denied his request for a promotion.

12    Q. And he states in here, "As Ms. Allen

13 discussed with you previously, your current

14 performance at the GS-12 is excellent, however,

15 she does not believe you are performing at the GS-

16 13 level"; correct?

17    A. That is correct.

18    Q. And that is an accurate statement of what

19 you discussed with Mr. Castro?

20    A. That is an accurate statement.

21    Q. The next line. "We both believe you will

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

---

Page 28

1 be an excellent candidate for the GS-13 if a
2 vacancy became available in the future." Did you
3 agree with that statement?
4    A. That was Mr. Castro's statement.
5    Q. I understand. But he refers to both you
6 and himself. Did you disagree with him?
7    A. I do not disagree with him. He would be
8 a candidate if one was available.
9    Q. Do you disagree with anything in that
10 sentence that Mr. Castro wrote about you and him
11 both believing the same thing?
12    A. No, I do not.
13    Q. In the last sentence, "In the meantime,
14 we will make every effort to give you assignments
15 to prepare you for a GS-13 position." Was that an
16 accurate statement as well?
17    A. Yes.
18    Q. Have you, in fact, made every effort to
19 give Mr. Hunter assignments to prepare him for a
20 GS-13 position?
21    A. I feel that I have.

---

Page 29

1    Q. Okay. Can you tell me which assignments
2 at the GS-13 level you have assigned to Mr. Hunter
3 since June 24th, 2002?
4    MR. STRAND: Objection. Assumes facts
5 not in evidence.
6    THE WITNESS: Mr. Hunter is given the
7 same opportunities as the GS-13's in the office,
8 as well as others, to prepare an IDP for
9 professional development, and to comply with that
10 IDP. They are done annually.
11    He has an opportunity to volunteer for
12 special assignments in the office. I suggest
13 assignments or projects that he should undertake.
14 And on his own, if he sees an opportunity, as
15 others do, he can take that on.
16    August of 2004 -- 2004, we met and
17 discussed his performance, where a number of these
18 items were laid out to him.
19    And from Mr. Hunter we are also looking
20 for -- I -- excuse me. I am looking for an
21 enhanced level of performance.

---

Page 30

1    BY MR. SNIDER:
2    Q. An enhanced?
3    A. Level of performance in his detail work.
4    Q. What do you mean by "detail work"?
5    A. In his daily detail work.
6    Q. Oh, daily.
7    A. I should say daily detail work.
8    Q. Were you finished with your answer to the
9 prior question or do you want to add anything
10 else?
11    A. I'm thinking to see if -- that's my
12 answer at this time.
13    Q. Okay. I believe the original question
14 was what assignments did you give him that were at
15 the GS-13 level. I'm going to ask you a slightly
16 different question now.
17    What assignments did you give him to
18 prepare him for the GS-13 level?
19    MR. STRAND: Objection. Assumes facts
20 not in evidence.
21    MR. SNIDER: If any. I'd like to cure

---

Page 31

1 the objection, if I can.
2    MR. STRAND: Objection. Foundation. I
3 can explain further, if you're interested.
4    MR. SNIDER: Uh-huh.
5    MR. STRAND: I'm trying to think of how
6 to say this without --
7    MR. SNIDER: Do you want to excuse her
8 for a moment?
9    MR. STRAND: Yeah. Yeah. Go ahead.
10    MR. SNIDER: Could you step out for just
11 one moment, ma'am?
12    THE WITNESS: Certainly.
13    MR. SNIDER: Just for the record, the
14 witness steps out for one moment.
15    (Whereupon, the witness left the room.)
16    MR. STRAND: Your question assumes that
17 she makes all the assignments.
18    MR. SNIDER: Okay.
19    (Whereupon, the witness returned to the
20 room.)
21    BY MR. SNIDER:

---

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

**Multi-Page™**

Fannie L. Allen
06/06/05

---

**Page 32**

1    Q. Let me back up for a moment. Okay? How
2    many people assigned Mr. Hunter work between June
3    2002 and the present?
4        A. Work is assigned by two individuals in
5    the office, the two team leaders.
6        Q. Who are they?
7        A. Maggie Ahern and Connie Stinson.
8        Q. Are you kept aware of what assignments
9    are assigned by the team leaders?
10        A. Not in detail. I have delegated to them
11    the responsibility for assigning work in the
12    office.
13        Q. Do you review the work done by GS-12's
14    and GS-13's?
15        MR. STRAND: Objection. Compound. 12's.
16    13's.
17        THE WITNESS: The work --
18        MR. STRAND: I'm sorry.
19        BY MR. SNIDER:
20        Q. Do you review the work -- did you review
21    the work between June of '02 and the present of

---

**Page 33**

1    Mr. Hunter?
2        A. In our office we -- ask the question
3    again, please.
4        Q. Did you review the work of Mr. Hunter
5    between June of '02 and today?
6        A. Yes and no.
7        Q. Please explain.
8        A. The day-to-day work that is performed by
9    Mr. Hunter, as well as other members of the
10    office, is reviewed by the team leaders.
11        Again, the work is assigned by one of the
12    two individuals. Each team leader should review
13    the work of their team members. In the absence of
14    one of the other team leaders, the person on duty
15    will assign. That's the level of quality control.
16        In the absence of those two individuals,
17    I will review work. I could very well review work
18    done on special projects.
19        Q. And do you know how many times both Ms.
20    Ahern and Ms. Stinson were absent during the time
21    period we have discussed?

---

**Page 34**

1        A. I do not know.
2        Q. Do you know how many times they were
3    absent?
4        A. I do not know, without having T&A records
5    in front of me.
6        Q. Have you been out of the office between
7    June 2001 and the present?
8        A. Yes.
9        Q. And you have been out of the office
10    approximately 40 percent of the time?
11        MR. STRAND: Objection. Assumes facts
12    not in evidence.
13        THE WITNESS: I do not have a percentage
14    to give you, sir.
15        BY MR. SNIDER:
16        Q. A lot of your absence from the office was
17    due to military duties?
18        A. I am out on military duty, yes.
19        Q. And how many weeks a year are you on
20    military duty?
21        A. Two weeks, on or about.

---

**Page 35**

1        Q. Have you had more than two weeks a year
2    at any -- during any of those years?
3        A. It could have varied.
4        Q. And you have other responsibilities which
5    take you out of the office, like travel?
6        A. I have limited travel, per the Department
7    of State. And I'm out caring for family members.
8        Q. In Atlanta?
9        A. No.
10        Q. Whereabouts?
11        A. In Overton, Georgia.
12        Q. Georgia. Okay.
13        If you had to give a ball park percentage
14    of time that you were out each year since 2001,
15    what would that be?
16        A. Sir, I do not have a percentage to give
17    you.
18        Q. Okay. That's fair.
19        Did you inform Ms. Ahern about Mr.
20    Castro's June 2002 memo?
21        A. I did not inform them about Mr. Castro's

---

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

---

Page 36

1 June 2002 memo. However, Ms. Ahern and Ms.
2 Stinson know the circumstances surrounding Mr.
3 Hunter's request for promotion. And the idea is
4 to ensure that he gets more involved in the
5 office.
6    Q. Did you instruct either Ms. Ahern or Ms.
7 Stinson to give assignments to Mr. Hunter which
8 would prepare him for the GS-13 position?
9    MR. STRAND: Objection. Asked and
10 answered.
11    THE WITNESS: Sir, those words were not
12 expressed to Ms. Ahern or Ms. Stinson.
13    BY MR. SNIDER:
14    Q. Whose decision was it to -- the grade
15 level at which Ms. Love's old position would be
16 posted?
17    A. The question again, sir.
18    Q. Whose decision was it as to which grade
19 level Ms. Love's old position would be posted?
20    A. It was my decision.
21    Q. Whose decision was it the grade level at

---

Page 37

1 which Ms. Swann's old position would be posted?
2    A. It was my decision. We have an office
3 with very senior persons in the office and we are
4 attempting to get people in that will be in the
5 position to do the work of the office for a period
6 of time.
7    Q. Understood. But you could have posted
8 either one of those at the GS-13 level; correct?
9    A. Sir, it was my decision to post at the GS
10 with the potential to the 12.
11    Q. You could have posted either one at the
12 13 level; correct?
13    A. Sir, it was my decision --
14    MR. STRAND: You have to answer direct --
15    MR. SNIDER: You have to answer my
16 question.
17    THE WITNESS: Yes. It was my decision to
18 post at the GS to 11 -- to the 12 potential, not
19 at the 13.
20    MR. STRAND: Okay. His specific question
21 -- we don't want to be argumentative here. His

---

Page 38

1 specific question is, could you have posted either
2 position at the GS-13 level, if you wanted to?
3    THE WITNESS: Yes. However, there were
4 other extenuating circumstances within the
5 department's organizational chart that would allow
6 me to -- see, I don't know all the technical
7 things associated with this and that's why I
8 didn't want to get into it.
9    MR. STRAND: Well, you just tell what you
10 know and --
11    THE WITNESS: To allow me to reorganize
12 the office in accordance with HR standards.
13    BY MR. SNIDER:
14    Q. Has there been a "reorg" in the last
15 three -- in the last 18 months?
16    A. Take the word "reorganize" out because HR
17 told me not to use that. To restructure the
18 office.
19    Q. Six of one, half a dozen of the other to
20 people like me.
21    Has there been a restructuring or a

---

Page 39

1 reorganization of the office in the last 18
2 months?
3    A. It is in the process.
4    Q. Okay. Has Ms. Swann's position been
5 posted?
6    A. At the GS-9 to 12 level, it has.
7    Q. Okay. Could have posted a GS-13 and if
8 Mr. Hunter posted his job as a
9 9/11/12 career ladder; correct?
10    A. Yes. Correct.
11    Q. Okay. I take it all of -- Ms. Ahern, Ms.
12 Stinson, Ms. Swann, Ms. Love are all female;
13 correct?
14    A. Correct.
15    Q. All, aside from Ms. Ahern, are African-
16 American?
17    A. Aside from --
18    Q. Ms. Ahern.
19    A. -- and did you give another name?
20    Q. No. The other --
21    A. Maybe you should repeat the question,

---

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.                    Multi-Page™                    Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                            06/06/05

Page 40

1 sir, please.

2  Q. Okay.  What is the race of those four

3 individuals?

4    A. Of the four GS-13 positions -- the person

5 in the 13 positions, Ms. Ahern was the only

6 Caucasian.

7  Q. The other three were what race?

8    A. They were black.  They are black.

9  Q. What educational levels did those four

10 individuals have at the time they were

11 competitively selected for the -- I'm sorry.

12 Strike that.

13    What educational level does Ms. Ahern

14 have?

15    A. Ms. Ahern has a high school education.

16 Ms. -- all four?

17  Q. I'll go one at a time.  That's it?  Does

18 she have a Bachelor's Degree?

19    A. She does not.

20  Q. Any advanced degree?

21    A. No.  No advanced degree.

Page 41

1  Q. Ms. Stinson.

2    A. Mrs. Stinson has credits toward an

3 undergraduate degree.

4  Q. Does she have a Baccalaureate Degree?

5    A. She does not.

6  Q. Good luck spelling that one.

7    Did Ms. Love -- what was her educational

8 level?

9    A. She has business school training.

10  Q. What is her highest certification or

11 highest level of education?

12    A. Business school training.

13  Q. All right.  Let me back up.  She has a

14 high school diploma; right?

15    A. Correct.

16  Q. She does not have an Associate's Degree;

17 correct?

18    A. She does not.

19  Q. She does not have a Bachelor's Degree;

20 correct?

21    A. Correct.

Page 42

1    Q. She does not have a Master's Degree;

2 correct?

3    A. That is correct.

4  Q. She has some business school training?

5    A. Correct.

6  Q. Ms. Swann?

7    A. Ms. Swann has college training, but does

8 not have a Baccalaureate Degree.

9  Q. Mr. Hunter?

10    A. Mr. Hunter says that he has a degree in,

11 I think, urban planning and potentially

12 accounting.

13    Q. What type of degree?

14    A. I don't know if it is a BS or a BA.  I

15 don't know.

16    Q. It's a Bachelor's Degree?

17    A. Bachelor's of Art or Bachelor's of

18 Science.

19  Q. Okay.  Does he have any other degrees?

20    A. Not to my knowledge.

21  Q. You are aware Mr. Hunter made a request

Page 43

1 to be promoted to the GS-13 level?

2    A. Yes.

3  Q. Who made -- was a decision made

4 concerning that request?

5    A. Excuse me, please.  Did you say 11?

6  Q. To the 13 level.

7    A. To the 13 level.  And your second

8 question, sir?

9  Q. Second question is, was a decision made

10 about that request?

11    A. By whom, sir?

12  Q. That's my next question.  Do you know

13 whether a decision was made?

14    A. Sir, I made a decision based on his

15 request.

16  Q. That's fine.  Did anybody else make a

17 decision based on his request?

18    A. And based on the document of July -- June

19 24th, 2002, it appears that Mr. Castro made a --

20 made a decision.

21  Q. Can you indicate to me where in Exhibit

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.                     Multi-Page™                     Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                                      06/06/05

---

Page 44

1 Two it appears that Mr. Castro made a decision?
2    A. It appears --
3    Q. Well, all he did was quote that you did
4 not believe he was performing at the GS-13 level;
5 right?  He did not give his own opinion.
6       MR. STRAND: Objection.  Argumentative.
7 Mis-states.
8    BY MR. SNIDER:
9    Q. Can you tell me where in the document
10 what you believe in the document indicates that
11 you believe Mr. Castro also felt that way?
12   A. Sir, all I can say is that it is implied.
13   Q. Where is it implied?
14   A. Sir, that's my answer.
15   Q. Did you give any documents to Mr. Castro
16 for his review in helping him come to that
17 conclusion?
18   A. I did not give any documents to Mr.
19 Castro.
20   Q. Did you give any documents to the HR
21 office in connection with -- was the HR office

---

Page 45

1 involved at all in your decision not to promote
2 Mr. Hunter?
3    A. The HR office was there to provide advice
4 and counsel, but I have nothing from that office
5 of a decision.
6    Q. Did you give anything to that office?
7    A. I did not give anything to that office.
8    Q. Did you consult with the HR office before
9 making your decision?
10   A. Sir, just as I just said, I did consult
11 with the HR office.
12   Q. Well, you said they are there for advice
13 and consultation.  I just wanted to make sure that
14 you, in fact, did.
15      Okay.  Who in the HR office advised you?
16   A. I worked with the specialist -- the
17 specialist, whose name escapes me at this time,
18 and the HR director, Ms. Jackie Hill.
19      Ms. Sandy Painter was the HR specialist.
20   Q. What advice did they give you?
21   A. Would you repeat your question as to what

---

Page 46

1 you're asking for specifically with my response to
2 your question?
3    Q. Well, I don't know exactly what the
4 answer is going to be.  I wanted to know what you
5 discussed with Ms. Painter.
6    A. In regards to?
7    Q. Mr. Hunter's request.
8    A. Request.  Okay.  That's what I needed.
9 Thank you, very much.
10      My desire -- one, I had stated to Mr.
11 Hunter that I did not feel he was functioning at
12 that level and just sought their counsel on that.
13   Q. What does that mean?
14   A. Basically what it says, sir.  I just seek
15 out counsel, whether it's a legal matter or
16 whether it's one of a human resources.  If there
17 is something that I am supposed to do, then I
18 expect that I would get counseled on that.
19   Q. Did you review any documents before
20 coming to your conclusion that he wasn't working
21 at the 13 level?

---

Page 47

1    A. No, I did not.
2    Q. Was anybody --
3    A. I had the experience of working with him.
4    Q. Understood.
5       Was anybody else involved in making the
6 decision, besides the people that you have already
7 mentioned?
8       MR. STRAND: Objection.  If you could
9 specify the decision that you are referring to.
10 Her decision, as opposed to Mr. Castro's decision?
11      MR. SNIDER: Right.
12      THE WITNESS:  Repeat the question,
13 please.
14      BY MR. SNIDER:
15   Q. Was anyone else involved in making the
16 decision not to promote Mr. Hunter besides
17 yourself in consultation and advice from Ms. Hill
18 and Ms. Painter?
19   A. I made -- yes and no.  Yes, I made the
20 decision.  I conveyed that decision to Mr. Hunter.
21 And the decision was made on my personal

---

**Elite Reporting Company**                              Page 44 - Page 47

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 48

1 observations and contact with Mr. Hunter, and his
2 work experiences in the office, and working with
3 team members and team leaders.
4    Q. So I guess the next step would be that,
5 prior to making your decision, you sought input
6 from the team leaders and his other team members;
7 is that correct?
8    A. Prior to my decision. Immediately prior
9 to my decision to convey a negative response to
10 Mr. Hunter, I did not seek the counsel of anyone
11 else.
12        Mr. Hunter and I engage in frequent
13 coaching and monitoring. I receive input from the
14 team leaders. We have weekly status reports. We
15 have weekly meetings. And I'm conscious of all
16 special assignments that we have ongoing in the
17 office.
18    Q. Okay. Was any of the coaching and
19 monitoring that you discussed documented?
20    A. Limited amount, because a lot of it was
21 done privately.

Page 49

1    Q. What was documented, do you know if it
2 has been provided to us in response to our request
3 for production of documents?
4    A. Everything that I had that was requested
5 is part of the package.
6    Q. Did you provide any documents which
7 constituted coaching or monitoring of Mr. Hunter?
8        MR. STRAND: Provide to whom?
9        MR. SNIDER: Well, I don't want to get
10 into any privilege.
11        MR. STRAND: Well, that's what you are
12 doing.
13    BY MR. SNIDER:
14    Q. Can you identify what types of documents
15 would constitute this coaching or monitoring?
16        MR. STRAND: Objection. Mis-states.
17        THE WITNESS: Much of -- sir, much of the
18 coaching that was done was done privately.
19    BY MR. SNIDER:
20    Q. I understand. I asked if any of it was
21 documented. You said "limited." Okay. I'm

Page 50

1 saying, that which was documented, what form did
2 it take?
3    A. I doubt it very seriously, only because
4 -- because of his writing skills, I recommended
5 verbally or may have handed off to him a course
6 that I found on proofreading. Did I keep a copy
7 of that? I did not, sir. I handed it to Mr.
8 Hunter for him to act on it.
9    Q. Okay. Are you aware of any document
10 which would support your statement that there was
11 frequent coaching and monitoring?
12    A. No, sir.
13    Q. Are you aware of any document which
14 exists which would support your statement that
15 there was frequent input into his work?
16    A. That was documented?
17    Q. Yes.
18    A. No. Not that I am aware of at this time.
19    Q. How about the weekly status reports?
20    A. Weekly status reports are produced weekly
21 and provided to the team lead and to me. And,

Page 51

1 again, we have the weekly status meetings. And we
2 have -- ah, correction. We also have our minutes
3 from those meetings.
4    Q. Okay. Do you know whether that
5 information supported your decision not to promote
6 Mr. Hunter?
7    A. Sir, my personal knowledge of Mr. Hunter
8 and his work products, his work effort, status
9 reports, weekly staff meetings -- a few were
10 canceled. Just my direct knowledge of Mr. Hunter
11 assisted me in my decision.
12    Q. Okay. Did you rely on any documents? I
13 believe you mentioned work product, status
14 reports, and those types of things.
15        MR. STRAND: Objection. Asked and
16 answered.
17        MR. SNIDER: Any other documents?
18        THE WITNESS: Sir, I'll have to ask you,
19 please, to restate your question because I feel
20 that I've answered it before. I'm a little
21 confused now with your question. So if you don't

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

**Page 52**

1 mind, please restate it.

2    BY MR. SNIDER:

3    Q. Any documents you have not yet mentioned

4 which you relied upon in making the decision not

5 to promote Mr. Hunter?

6    A. None that I can think of at this time,

7 sir.

8    Q. What work products did you rely upon?

9    A. On occasions I would see grant documents.

10 I would see e-mails that were produced by Mr.

11 Hunter.

12    If there was a special project, I could

13 see a work product from that, whether it be a

14 point paper, a memorandum, or a document in any

15 other form. That about summarizes the types of

16 documents. There could be others that escape me

17 at this time.

18    MR. SNIDER: Let me show you the response

19 to our production of documents and we can go off

20 the record briefly.

21    (Whereupon, there was a brief recess.)

**Page 53**

1    BY MR. SNIDER:

2    Q. While we are off the record, I just want

3 you to briefly go through here and if you can --

4 here are some yellow sticky tabs -- want to mark

5 any of the work products, status reports, or any

6 other document you relied upon that is contained

7 in here that you relied upon not to promote Mr.

8 Hunter. Okay?

9    A. I beg your pardon.

10    Q. You just testified about a number of

11 documents which you relied upon, and I just want

12 to know if they are in the package of paper that

13 I'm about to hand to you, which are Bates stamped

14 001 to 00586. Okay?

15    A. Okay.

16    MR. SNIDER: I hate to do that. That's

17 the only way I can not --

18    MR. STRAND: Well, you also have the --

19    MR. SNIDER: That's true. Look through

20 the ROI.

21    MR. STRAND: Go to the ROI as well.

**Page 54**

1    MR. SNIDER: So before we go off the

2 record, I will also provide you with both -- with

3 both volumes of the ROI.

4    Off now.

5    (Whereupon, there was a brief recess.)

6    MR. STRAND: I want to assert an

7 objection to the foundation for this question. It

8 mis-states the testimony she has already given as

9 to what she relied on in making her determination.

10    MR. SNIDER: Okay. Back off?

11    THE WITNESS: No. Not yet, please.

12 Could you -- I just want you to repeat the

13 question.

14    BY MR. SNIDER:

15    Q. Okay. I believe you testified that you

16 relied on certain documents, including work

17 product, status report, weekly status reports and

18 minutes, and other documents in deciding not to

19 promote Mr. Hunter. Is that accurate?

20    A. Sir, is that the question that I'm

21 supposed to --

**Page 55**

1    Q. That's the question. Is it true that you

2 testified to that?

3    A. (No response.)

4    MR. SNIDER: Let the record reflect a

5 lengthy pause on the part of the deponent.

6    THE WITNESS: Sir --

7    MR. STRAND: Object to the

8 characterization. You can take as much time as

9 you need to respond.

10    MR. SNIDER: She can. I'm not objecting

11 to that. I just want it to reflect that.

12    THE WITNESS: Sir, I think my question

13 was what am I supposed to do with these documents.

14    MR. STRAND: He has asked a new question

15 based on the objection that I just lodged, so

16 answer that question first and then we will get to

17 your question about what he wants you to do.

18    THE WITNESS: Okay. And the question

19 again, sir?

20    BY MR. SNIDER:

21    Q. Did you testify that you relied upon

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

**Page 56**

1 certain documents in deciding not to promote Mr.
2 Hunter, including work product, weekly status
3 reports, minutes, and other such documents?
4    A. That I relied on those types of
5 documents. Yes, sir.
6    Q. Okay. Now I'm going to ask you to
7 identify those documents in the pile of papers in
8 front of you and in the two volumes of the Report
9 of Investigation.
10    MR. STRAND: Objection. Assumes that all
11 the documents she relied on are contained either
12 in one of those two places.
13    MR. SNIDER: Okay. Off the record.
14    (Whereupon, there was a brief recess.)
15    BY MR. SNIDER:
16    Q. Ms. Allen, you have completed going
17 through the documents?
18    A. Yes.
19    Q. So out of the Bates stamped documents you
20 tabbed, it looks like, two items. One is the
21 front page of the official personnel folder, Bates

**Page 57**

1 stamped number 365 to 409. Did you tab that?
2    A. Yes.
3    Q. So I guess your testimony is that you
4 relied on this document somehow in coming to your
5 conclusion?
6    A. Mr. Hunter, since his arrival -- yes.
7 Since his arrival in my office, he is given a
8 performance evaluation.
9    Q. And all of those are contained inside
10 here?
11    A. I did not look at them individually, per
12 page. But, again, I gave him performance
13 evaluations since his arrival in the office, which
14 was, I think, 1997.
15    Q. So did you rely upon the performance
16 evaluations in deciding not to promote Mr. Hunter?
17    A. Yes. I give an evaluation of Mr. Hunter
18 annually.
19    Q. I want to differentiate between your
20 practice and what you relied upon in terms of
21 documents.

**Page 58**

1    Which part of the OPF did you rely upon?
2    MR. STRAND: If I can just object. I
3 think the problem that is coming up here is you
4 are phrasing the question as "What documents did
5 you rely upon?"
6    MR. SNIDER: Right.
7    MR. STRAND: Which my understanding is
8 what she has tabbed is documents that reflect
9 information she had about his performance and his
10 abilities. So you are, I think, artificially
11 limiting and I'm not sure you guys are really on
12 the same page.
13    MR. SNIDER: That may be fair.
14    BY MR. SNIDER:
15    Q. Did Mr. Strand accurately reflect --
16    A. I think so.
17    Q. All right. And I understand there is a
18 difference between relying on sort of the
19 information that may be referenced in a lot of
20 these and relying on the actual document itself.
21    Did you review and rely on any documents

**Page 59**

1 in particular before denying Mr. Hunter's request
2 for promotion?
3    A. Repeat the question, please.
4    Q. Did you review and rely upon any
5 documents in particular before denying his request
6 for promotion?
7    A. No. I had the knowledge of Mr. Hunter's
8 work in the office, his actual grants processing.
9 That's awarding of the agreements. His oral
10 skills, his writing skills, his ability to
11 complete assignments that are given to him,
12 whether he performs them independently or not, and
13 in most cases not, because his work usually
14 requires numerous discussions and editing.
15    Q. Okay. I understand. I apologize, but I
16 am looking for particulars now. And if you are
17 unable to give me particulars, I would appreciate
18 you notifying me of that.
19    I'm going to draw your attention to the
20 Report of Investigation, Exhibit Seven, page four
21 -- actually, pages three and four.

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 60

1    I guess it was broken up. The question
2 was broken up into two -- two pieces. The first
3 part of the question is on page three. This is
4 question 11, lines 17 to 19.
5    MR. STRAND: Hold on. Question 11?
6    MR. SNIDER: Question 11. Lines 17 to
7 19. Describe the difference in complexity.
8    And there is an answer from lines 20
9 through line two of page four of ROI Exhibit
10 Seven.
11    MR. STRAND: Actually, through line
12 seven.
13    BY MR. SNIDER:
14    Q. It appears that the remainder of the
15 question is found at lines three through seven.
16 "Please provide examples. Please list each below
17 and explain specifically."
18    And there is an additional answer, lines
19 eight through ten. Is that fair? That's how it
20 appears. It doesn't say "Q. 11 continued," but
21 that's how it appears to me. And I wanted to

Page 61

1 guess -- ask as you were answering -- let me back
2 up.
3    Are those your initials at the bottom of
4 page three and four?
5    A. Yes.
6    Q. Is that your signature on page 11?
7    A. Yes.
8    Q. And none of these affidavits are dated,
9 but do you remember around what -- when this was
10 completed? No?
11    A. I can remember over the Christmas
12 holidays.
13    Q. Okay. Did you understand lines three
14 through seven on page four of ROI Exhibit Seven to
15 be the remainder of the Question 11? "Please
16 provide examples of Mr. Hunter's works, excerpts
17 of documents. Please list each below and explain
18 specifically how this particular example work
19 demonstrates Grade 12 level work."
20    MR. STRAND: You're asking whether this
21 is the question --

Page 62

1    MR. SNIDER: The remainder of Question
2 11. There appears to be an answer interposed,
3 lines 20 on page three through line two on page
4 four. And this is the last part of Question 11.
5    THE WITNESS: Did I take it as a
6 question?
7    MR. STRAND: Was this, lines three
8 through seven on page four of 11 of your
9 declaration, was this part of the question that
10 the EEO investigator asked you, or was this, lines
11 three through seven, something you drafted?
12    THE WITNESS: It's confusing. It's
13 almost as if it is an answer and a question.
14    A response, not a question.
15    MR. STRAND: Just speak up.
16    MR. SNIDER: If you want to look back on
17 page three. I don't have the original questions
18 given to them, so I can't --
19    MR. STRAND: It looks to me as if she is
20 not sure.
21    THE WITNESS: No. I cannot -- I cannot

Page 63

1 definitely say one way or the other.
2    BY MR. SNIDER:
3    Q. Okay. Let's assume for the moment that
4 lines three through seven on page four of exhibit
5 -- ROI Exhibit Seven is a question. We'll call it
6 Question 11-A. Okay? It asks for providing
7 examples of Mr. Hunter's work, excerpts of
8 documents showing the complexity of his work at
9 the 12 level, listing each below and explaining
10 specifically how this particular example of the
11 work demonstrates Grade 12 level work.
12    Was your response pretty much to see
13 Exhibit 13?
14    MR. STRAND: Objection. Vague.
15    MR. SNIDER: To see Exhibit G?
16    MR. STRAND: Same objection.
17    MR. SNIDER: And response to Question
18 Nine.
19    MR. STRAND: Same objection.
20    THE WITNESS: Mr. Snider, I'm not sure I
21 understand your question.

Donald S. Hunter, Sr. vs.                    Multi-Page™                    Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                                    06/06/05

---

Page 64

1    BY MR. SNIDER:
2    Q. Okay. Let me then just identify for the
3 record which documents you've tabbed. You've
4 already identified the OPF, which was 365 through
5 -- Bates Number 365 through 409. And another
6 document, the policy directive, Bates stamped
7 numbers 587 through 593. Is that correct?
8    A. Correct.
9    Q. Okay. And if we could briefly go through
10 the other documents that you identified. One of
11 them was the Employee Performance Plan, exhibit --
12 it's the Report of Investigation, Exhibit 02-8.
13    A. H.
14    Q. H. I'm running on three hours of sleep.
15 It's bad.
16       Is that something you relied upon or the
17 information contained therein?
18    A. Again, my -- again, my evaluation of Mr.
19 Hunter, yes.
20    Q. Okay.
21       MR. STRAND: And, again, I appreciate

---

Page 65

1 your clarification, the information contained
2 therein.
3    BY MR. SNIDER:
4    Q. Right. If I skip any on the bottom -- is
5 there a difference between tabs on the top or the
6 tabs on the bottom, or is it just -- some tabs are
7 on the top and some you placed on the bottom. Is
8 there a difference in the placement and the
9 significance?
10    A. I was going back to them if -- based on
11 the confusion of your question, and they are to be
12 included.
13    Q. Okay. The next tab is Report of
14 Investigation, 05-E2. Is it the entire 47 pages
15 or just the first two pages?
16    A. Assuming that it is on the same subject,
17 it is the entire section.
18    Q. All 47 pages of 05-E2?
19    A. Because it is a document.
20    Q. Pardon?
21    A. It is a document.

---

Page 66

1    Q. Did you review all 47 pages before
2 tabbing it?
3    A. I flipped through quickly each page.
4    Q. All right. The next one is Report of
5 Investigation, 05-E3. You relied on that or the
6 information?
7    A. As a work product, yes.
8    Q. Okay. And what about that one? Whose
9 notes or handwriting is on that? Do you know?
10    A. I don't know the handwriting, but it is a
11 project -- it relates to a project that Mr. Hunter
12 worked on.
13    Q. What part of this did he do?
14    A. It relates to --
15    Q. It relates to a project --
16    A. Yes. He was on a team.
17    Q. Okay. Was any of that his work product,
18 to your knowledge?
19    A. I cannot say.
20    Q. Okay. 05-E4. Does the entire E4 --
21    A. Right. It's a project Mr. Hunter worked

---

Page 67

1 on.
2    Q. Eight pages.
3       Okay. And what about that document or
4 the information contained therein led you to rely
5 upon it to decide not to promote him?
6    A. This is a work product of Mr. Hunter.
7    Q. Okay.
8    A. And I cannot say that it is this one
9 document. We are talking collectively of his
10 ability to perform at that level, the GS-13 level.
11    Q. Okay. Were there any grammatical or
12 spelling errors in this document?
13    A. Mr. Snider, admittedly, I did not go
14 through this document, line for line, and word for
15 word. Mr. Hunter does have difficulty in that
16 arena and I did not jot down the fact that you
17 wanted me to look at it line for line.
18    Q. Okay.
19    A. And I did speak a moment ago about the
20 oral and the written skills.
21    Q. You did. And I assume that having much

---

**Elite Reporting Company**                                    Page 64 - Page 67

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 68

1  better oral and written skills is something that
2  is important to have at the GS-13 level; correct?
3      A. Correct.
4      Q. And if we inspected the work product of
5  the GS-13's in the office, they would have very
6  few, if any, spelling and grammar errors; correct?
7      A. Very few. Yes.
8      Q. But if there was a lot, then you would
9  say that would not be good GS-13 work; right?
10     A. I would say that's not GS-13 work. But,
11  of course, also I'd have to have, again, a very
12  comprehensive interpretation --
13     Q. Right.
14     A. -- for review on any person in the
15  office, their total work effort.
16     Q. Understood. Do you know which of the
17  duties in Exhibit One that we had introduced or
18  talked about before, Bates stamped 0034 to 0038,
19  do you know which of those duties are grade
20  controlling duties?
21         MR. STRAND: Objection. Foundation.

Page 69

1         BY MR. SNIDER:
2      Q. Do you know what grade controlling duties
3  are?
4      A. Sir, I cannot speak to that.
5      Q. Okay. Let's move back to your tabbed
6  documents. And I believe the next one is a bottom
7  tab, so if you could flip that up. And --
8      A. The PD.
9      Q. This is the GS-12 position description?
10     A. Yes. And I think it is Mr. Hunter's.
11     Q. Okay. ROI Exhibit 7-A, all eight pages.
12     A. (No audible response.)
13         MR. STRAND: You have to say yes or no.
14         THE WITNESS: Yes, please. I'm sorry.
15         BY MR. SNIDER:
16     Q. And is it your testimony that this
17  position description accurately describes the work
18  that Mr. Hunter has done in 2000 - 2001?
19     A. Yes. This is the PD that is -- that Mr.
20  Hunter is governed by.
21     Q. Okay. And this accurately describes his

Page 70

1  major duties and responsibilities and the methods
2  in which he has done them since 2002?
3      A. To my best knowledge and to the knowledge
4  of those that created this PD.
5      Q. And who is that? That's your name.
6      A. We're talking -- we're talking the HR
7  Department and with my input, and PD's are
8  general.
9      Q. So his duties really haven't changed
10  since 2001; is that correct?
11     A. I would say yes and no. Yes from the
12  standpoint that our office is understaffed and we
13  get multiple requirements that no one could have
14  even fathomed, even at the beginning of our
15  experience with the Department of State. So we
16  adapted daily.
17     Q. Being understaffed leads to people having
18  to take on more work than they otherwise would
19  have had to?
20     A. Right. Because not -- in one of these
21  PD's is something that -- that speaks to that

Page 71

1  which we are involved with at this time.
2      Q. Is any of the work Mr. Hunter has
3  performed in the last four years GS-13 level work?
4      A. Mr. Snider, I would have to answer that
5  question by saying I look at not only the work,
6  but the quality of the work. Mr. Hunter, in the
7  grants process, goes through the same process that
8  every grant specialist goes through.
9         Because of some misunderstandings on his
10  part in the work -- in the completion of his work,
11  his team leader developed a checklist to keep him
12  focused in on the specific things that he was to
13  do in that process. Of course, everyone
14  benefitted from the checklist, but that was the
15  reason why it was developed.
16         I don't know if that answers your
17  question. If it did not, please repeat it.
18     Q. Let me try to figure out if I understand
19  your answer. I think you've testified,
20  essentially, that although some of the duties Mr.
21  Hunter is working -- is performing or projects he

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 72

1 is working on may be 13 level work, the method in
2 which he has been performing them, the level of
3 supervision which he requires, is low enough that
4 it still keeps it at the 12 level. Is that
5 accurate?
6    A. I'll try answering it again my way —
7    Q. Okay.
8    A. — and see if it meets your expectations
9 — it responds to your question. Excuse me.
10    Q. Okay. I feel like a contractor.
11       MR. STRAND: That is an important
12 distinction.
13       THE WITNESS: The duties of a grants
14 specialist, whether at the lowest grade level or
15 the highest grade level, the process is the same.
16       The distinctions will come, and mainly I
17 can speak for my office — I have no idea of any
18 other office — is at the level of complexity, the
19 comprehensiveness, the specific detail
20 requirements of that particular document.
21       The work that is highly complex is

Page 73

1 assigned and executed by those at the higher
2 level.
3       Persons like Mr. Hunter, or at the lower
4 level, for their professional development, is
5 assigned some of that work. Some of those
6 documents that they received could have had work
7 done by a more senior person. And persons, again
8 like Mr. Hunter, will be given an opportunity to
9 work those documents, but they would not have
10 looked at them as an initial document.
11       I say that to say, they would have the
12 familiarity, the exposure to documents such as
13 that, but the basic work, that ground level work,
14 would have been done by a GS-13, a person of
15 higher level.
16    BY MR. SNIDER:
17    Q. Okay. Can you give me an example of
18 highly complex versus less complex?
19    A. We have, excuse me, an organization that
20 has been — has been working with the department
21 for a number of years. USIA. I can't say with

Page 74

1 the department.
2       Congressional mandate, Organization A
3 gets anywhere from eight to 20 plus million
4 dollars a year. This organization has
5 requirements, over the years, that will require a
6 lot of research, characteristics that have been
7 quite unusual requiring a great deal of research,
8 requiring documents explaining the process, the
9 grants specialist working with legal, other high
10 level officials, just requiring knowledge and
11 skills of federal assistance, that I would find
12 comfort in passing on to those experienced and
13 those at the GS-13 level. That's one.
14       Organization B. Again, an organization
15 we have been dealing with for years. Sole funder
16 of their efforts. We have budgets with multiple,
17 multiple, multiple line items. It has indirect
18 cost.
19       Mr. Hunter is still working through an
20 understanding — a fully appreciable understanding
21 of indirect cost. The two team leaders have been

Page 75

1 working with him on that.
2       Let's see. I think that summarizes,
3 without going into other multiple organizations,
4 the kinds of things.
5       We are talking research. We're talking
6 understanding. We're talking being able to
7 prepare documents that will express the findings
8 of this research and producing documents in a
9 timely fashion.
10    Q. Okay. Let's move back to the documents
11 that you've tabbed and, actually, there is another
12 bottom tab.
13    A. This just talks about the differentiation
14 between the 12 and the 13.
15    Q. And do you know who authored this
16 document?
17    A. I think I did.
18    Q. And you took this from two different
19 position descriptions?
20    A. Right. It may have even asked that I
21 look at the GS-13 and the GS-12.

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 76

1    Q. Okay. This ROI, Exhibit 7-D, which page
2    or pages? All four pages?
3    A. There are four pages.
4        MR. STRAND: He's asking you did -- did
5    you intend to mark all four pages?
6        THE WITNESS: Yes. The section. The
7    section.
8        BY MR. SNIDER:
9    Q. Okay. And next document. This is ROI
10   Exhibit 7-E, one page. I think that's self-
11   explanatory.
12       The next one is ROI Exhibit 7-G. Did you
13   intend to mark pretty much the entire Exhibit 7-G?
14   A. That was the entire section.
15   Q. Okay.
16       MR. STRAND: Let him finish his question
17   before --
18       THE WITNESS: I'm sorry.
19       MR. STRAND: -- you start answering.
20       THE WITNESS: Yes. Thank you.
21       BY MR. SNIDER:

Page 77

1    Q. Okay. Next is Exhibit 7-H-1. You
2    intended to mark pretty much the entire 7-H-1?
3    A. Yes.
4    Q. And the entire 7-H-2?
5        MR. STRAND: You have to say yes or no.
6        THE WITNESS: Yes.
7        BY MR. SNIDER:
8    Q. The next one that is marked is page five
9    of seven in 7-H -- 7-H-3. Is that the collective
10   bargaining agreement?
11   A. No. It is -- it should be our handbook.
12   Q. Oh, the handbook. Okay.
13       And how did that enter into your
14   decision?
15   A. It's just part of the procedures for the
16   office.
17   Q. Okay. Next is page -- maybe it's the
18   entire thing. Pages one and two of Exhibit 7-I.
19   A. Yes.
20   Q. ROI Exhibit 7-I. And what is this
21   example?

Page 78

1    A. These are just documents created out of
2    our office. This happens to be one of the
3    projects that was initially managed by one of the
4    senior persons in the office. Mr. Hunter asked to
5    be the point of contact on this project. It's
6    called Wye River. And we complied, gave him the
7    opportunity to work this project under the
8    guidance of Ms. Ahern, who was the original
9    project leader.
10   Q. Did he become the project leader on this?
11   A. He did.
12   Q. And that was a GS-12 function?
13   A. It was -- remember, we are trying to give
14   him opportunities and exposure. And this was one
15   of the projects that was passed on to him.
16   Q. Was it something --
17   A. He wanted to be a project leader.
18   Q. Okay. And so is this something that
19   would prepare him for the 13 or something that
20   actually was at the 13 level?
21   A. Prepare him. Because he -- again, it was

Page 79

1    under the guidance of a GS-13.
2    Q. And how close was the guidance that Ms.
3    Ahern was giving to him?
4    A. The idea is a person will work a project.
5    If there were challenges or concerns with the
6    project that, you know, he or she could go to the
7    team leader to seek advice and counsel.
8        If there were documents created as a
9    result of this project, the person who was the --
10   the original owner of the project, the original
11   project leader, would have an opportunity to
12   review the product to see if it, indeed, was in
13   accordance with our office policies and
14   procedures, and in relationship to whatever the
15   guidance we received with the project.
16   Q. In making your decision to deny the
17   promotion of Mr. Hunter, you relied on the
18   information that had been given to you and shared
19   with you and that you observed over a period of
20   time; correct?
21   A. Correct.

Page 80

1    Q. You didn't make any special investigation
2  or questioning of Ms. Ahern or the other team
3  leaders; correct?
4    A. That's not true, sir.
5    Q. Okay. Go ahead.
6      MR. STRAND: I just see this going on
7  forever.
8      MR. SNIDER: We are nearing the end of
9  this stack.
10     MR. STRAND: No. I don't mean it that
11 way. I just mean I can see the disconnect and I
12 want to point it out to you, and I'm not sure if
13 you want me to --
14     MR. SNIDER: Yeah. Go ahead. I don't
15 mind.
16     MR. STRAND: I just think the way you
17 phrased that question, if you could be more
18 specific about the time frame that it focuses on.
19     BY MR. SNIDER:
20   Q. Between receipt of Mr. Hunter's request
21 to be promoted and the decision not to promote

Page 81

1  him, did you make any -- seek any input from the
2  team leaders as to whether he should be promoted
3  or not?
4    A. Yes and no. Okay?
5    Q. Okay.
6    A. I am in receipt of status reports from --
7    Q. Let me back up.
8      MR. STRAND: You didn't understand.
9      BY MR. SNIDER:
10   Q. Aside from your normal interactions with
11 them, did you make any special requests, or have
12 any special meetings, or have any other direct
13 contact with them, specifically about Mr. Hunter's
14 request for a promotion, outside of your normal
15 routines?
16   A. No.
17     MR. SNIDER: Thank you.
18     MR. STRAND: You're welcome.
19     MR. SNIDER: That got us where we can
20 head.
21     BY MR. SNIDER:

Page 82

1    Q. Okay. There is another document you
2  tabbed, which is Exhibit -- ROI Exhibit 7-J. And
3  you tabbed page two. Did you intend to tab --
4    A. The remainder of the document.
5    Q. -- the remainder of the document?
6    A. Yes.
7    Q. From page two to 15?
8    A. Two to 15. Maybe -- we should start with
9  the section. I would start with --
10   Q. You would start with page one. One
11 through 15. Okay.
12     And then there is a number of tabs at the
13 end, all in, I guess, pages -- this is ROI Exhibit
14 10, pages eight, nine, ten, 11, and 12 of 12.
15 Those are the only ones from that section?
16   A. Right. Because I didn't start with
17 someone else's exhibit. It's just that was the
18 documents that were shared.
19   Q. Okay. And those were attached to Ms.
20 Stinson's affidavit?
21   A. Correct. Which were her work products.

Page 83

1    Q. And also you noted the attachments to Ms.
2  Ahern's affidavit, which is Exhibit 11.
3    A. Correct.
4    Q. Pages unstamped, unmarked but,
5  nevertheless, those immediately following her
6  affidavit. Is that correct?
7    A. Correct.
8    Q. Now, did you -- did you meet with Ms.
9  Love to discuss Mr. Hunter's EEO complaint?
10   A. Yes. Ms. Love received a call with
11 regard to Mr. Hunter's complaint and she asked me
12 about it. And my advice to her was, without
13 giving any details, "If they are calling you in,
14 be professional and be factual."
15   Q. That was the entirety of your
16 conversation?
17   A. "Be professional and be factual."
18   Q. Was that the entirety of your
19 conversation?
20   A. Yes.
21   Q. Okay. And you also spoke with the other

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

---

**Page 84**

1  GS-13's about Mr. Hunter's EEO complaint?

2     A. And I shared -- yes, sir. And I shared

3  the same advice.

4     Q. Okay. And all of this was prior to --

5     A. You said complaint; right; sir?

6     Q. Yes, ma'am.

7        Prior to their giving of their

8  affidavits; correct?

9     A. Would you repeat the question? My mind

10  wandered for a moment. Sorry.

11     Q. That's okay. I'm facing the wall, so

12  it's a lot less distracting.

13        Your conversations with the GS-13's about

14  Mr. Hunter's EEO complaint occurred before they

15  gave their affidavits; correct?

16     MR. STRAND: Objection to foundation.

17     THE WITNESS: Yes. I suggested to them,

18  yes, because they were concerned. They had this

19  document. They didn't know what to do.

20  Disturbing. Be professional and be factual.

21     BY MR. SNIDER:

---

**Page 85**

1     Q. Did you review the documents they were

2  given?

3     A. I did not.

4     Q. Did they ask you about the documents?

5     A. Did they ask me about the documents?

6     MR. STRAND: What documents are you

7  talking about?

8     MR. SNIDER: The documents she mentioned.

9  I take it that would be the investigator's

10  questions to each of them?

11     THE WITNESS: Did I review documents?

12  No, sir.

13     MR. SNIDER: Okay.

14     MR. STRAND: I -- can we go off the

15  record for a second.

16     MR. SNIDER: Yes. Off the record.

17        (Whereupon, there was a brief recess.)

18     BY MR. SNIDER:

19     Q. The Exhibit Two -- Deposition Exhibit

20  Allen Two, references on the back that if Mr.

21  Hunter feels he is performing GS-13 level duties,

---

**Page 86**

1  he is entitled to file a classification appeal and

2  directing him to see Jacqueline Hill. Do you

3  remember seeing that?

4     MR. STRAND: He's asking about the second

5  page.

6     THE WITNESS: Oh, the second page. I'm

7  sorry.

8        And your question, sir, is once again?

9     BY MR. SNIDER:

10     Q. Do you recall seeing that at or about the

11  time that it was given to Mr. Hunter?

12     A. I have seen this document. I cannot

13  remember the date.

14     Q. Do you remember a discussion about a desk

15  audit or a classification appeal, that type of

16  stuff?

17     A. Mr. -- because of my involvement, Mr.

18  Hunter apparently requested -- requested a desk

19  audit, which involves classification, and I was

20  interviewed by someone from the main human

21  resource office.

---

**Page 87**

1     Q. Do you remember who that was?

2     A. The last name I think was like Nicks.

3     Q. Okay. And that was after this document

4  was given to Mr. Hunter; correct?

5     A. I cannot remember the date I was

6  interviewed, and I cannot remember the date I saw

7  this document.

8     Q. Did you give any documents to Mr. Nicks?

9     A. I cannot remember if I gave any documents

10  to Mr. Nicks, but I was engaged in a very long Q &

11  A from Mr. Nicks.

12     Q. Do you remember if you sent or received

13  e-mails from him?

14     A. Maybe to set the interview up, but that's

15  all that I can potentially remember.

16     Q. Okay.

17     A. To call or -- or send an e-mail.

18     Q. Is it fair to say, ma'am, that you did

19  not initiate a desk audit for Mr. Hunter; correct?

20     A. I did not.

21     Q. And it's fair to say that he informed you

---

Donald S. Hunter, Sr. vs.                  Multi-Page™                  Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                        06/06/05

---

Page 88

1 that he was -- he believed he was working at the
2 GS-13 level; correct?
3    A. Correct.
4    Q. And he informed you that he believed that
5 his GS-12 position description was not accurate;
6 correct?
7    A. I do not remember a specific conversation
8 about whether the 12 position description was
9 correct or not. I do not remember.
10    Q. All right. Let me show you ROI Exhibit
11 2-G, page one, in front of you. Have you seen
12 that document before? It's a May 9th, 2002 letter
13 from Mr. Hunter to Mr. Whitten and Mr. Castro.
14       MR. STRAND: The question is whether you
15 have seen it.
16       THE WITNESS: Did I --
17       MR. SNIDER: Have you seen that?
18       THE WITNESS: I have seen this document.
19       BY MR. SNIDER:
20    Q. Did you see it on or about May 9th, 2002?
21    A. I cannot say that I saw this document on

---

Page 89

1 May 9th, 2002.
2    Q. Do you believe you saw this document
3 before June 22nd, 2002?
4    A. June --
5       MR. STRAND: June 24th.
6       MR. SNIDER: June 24th, 2002.
7       THE WITNESS: I cannot say. I do not
8 remember, sir.
9       BY MR. SNIDER:
10    Q. The last sentence of the second paragraph
11 in ROI Exhibit 2-G states, "My position
12 description of GS-12 level no longer accurately
13 describes my duties or responsibilities." Is that
14 true?
15    A. That's what's in the document. Yes, sir.
16    Q. Okay. And when you saw that, you did not
17 initiate a desk audit?
18    A. I did not initiate a desk audit, sir.
19    Q. Did you ever notify Mr. Hunter that he
20 could seek a desk audit?
21    A. I do not remember suggesting that he go

---

Page 90

1 for a desk audit. However, I did suggest that he
2 -- if he has any questions, or what have you, to
3 be in touch with HR -- human resources.
4    Q. How closely were Ms. Love and Ms. Swann
5 reviewed from 2001 to 2004?
6    A. Sir --
7       MR. STRAND: Objection.
8       MR. SNIDER: Ms. Love and Ms. Swann.
9       MR. STRAND: I didn't even understand or
10 hear your question.
11       BY MR. SNIDER:
12    Q. How closely were they -- was their work
13 reviewed, Ms. Love and Ms. Swann, between 2001 and
14 2004?
15    A. How closely --
16    Q. Does anybody review their work? Did
17 anybody review their work?
18    A. The office has a quality control
19 component and that is exercised by team leaders
20 that were designated team leaders.
21    Q. Ms. Stinson and Ms. Ahern?

---

Page 91

1    A. Correct.
2    Q. So Ms. Stinson reviewed Ms. Swann's work,
3 and Ms. Ahern reviewed Ms. Love's work?
4    A. Correct.
5    Q. Did they review it for purposes of
6 quality control?
7    A. That's the office focus is on quality
8 control.
9    Q. Did they review it for any other purpose?
10    A. Do you have another -- something to add
11 onto that question, sir?
12    Q. Did they review it for any other purpose
13 besides quality control?
14    A. To my knowledge, no, sir. But I hope
15 they would use their common sense and if they have
16 any other areas to identify, that they would.
17    Q. Who reviewed Ms. Ahern and Ms. Stinson's
18 work?
19    A. They would review each other's work, sir.
20    Q. And all four were GS-13's; right?
21    A. Sir?

---

Donald S. Hunter, Sr. vs.                    Multi-Page™                    Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                                06/06/05

---

Page 92

1  Q. All four of them were GS-13's, at least
2  since 2001?
3  A. Two of them, yes. I cannot remember the
4  exact date for the promotions of Swann and Love.
5  Q. Okay. Is it true that you attempted to
6  upgrade the two female employees, Ms. Swann and
7  Ms. Love, at a time when Mr. Hunter was not
8  eligible for promotion to the GS-13 level?
9  A. Sir?
10 Q. You remember we -- we talked earlier that
11 you had a discussion with your supervisor, Mr.
12 Mueller --
13 A. Correct.
14 Q. -- about competitive and/or non-
15 competitive promotions of Ms. Love and Ms. Swann
16 to the GS-13 level; correct?
17 A. Correct.
18 Q. That was at a time that Mr. Hunter was a
19 GS-12 as well; correct?
20 A. I cannot remember, sir, his grade level
21 at the time I had those discussions.

---

Page 94

1  assumes -- objection. Assumes facts not in
2  evidence, that there was a time in grade that
3  would be applicable to GS-13 -- promotion to GS-
4  13.
5      BY MR. SNIDER:
6  Q. Is there a time in grade requirement for
7  a promotion from a GS-12 to a GS-13?
8  A. I would guess, sir --
9  Q. I don't want you to guess. Is it your
10 understanding that a federal employee has to have
11 52 weeks in grade before promotion --
12 A. It is my understanding that that amount
13 of time is required.
14 Q. Fifty-two weeks?
15 A. A year.
16 Q. Okay. And Mr. Hunter did not have that
17 amount of time in grade as of the time that you
18 were having the discussions about upgrading Ms.
19 Swann and Ms. Love; correct?
20     MR. STRAND: Objection. Asked and
21 answered.

---

Page 93

1  Q. It's true that he was not eligible for
2  promotion to the 13 at that time; is that correct?
3      MR. STRAND: Objection. Foundation, per
4  her last clarification.
5      THE WITNESS: Sir, you will have to
6  repeat that because I thought you had just asked
7  that question, so I may be -- I misunderstood it.
8      BY MR. SNIDER:
9  Q. Well, whether he was a 12 or not, may
10 have previously held a 12 position for a year and
11 that would give him time in grade for a promotion;
12 right?
13 A. Time in grade.
14 Q. So my question was --
15     MR. STRAND: Objection. Mis-states
16 career ladder.
17     MR. SNIDER: Maybe in another federal
18 government agency, he had previously held a 12
19 position. It didn't preclude his eligibility for
20 the 13. They are distinct questions.
21     MR. STRAND: I understand. But it

---

Page 95

1      THE WITNESS: Am I to answer?
2      MR. STRAND: Yes. Whenever I object, you
3  have to answer unless I instruct you not to.
4      THE WITNESS: Sir, I'm going to have to
5  ask you to repeat that question again. Not being
6  argumentative, but I thought I had answered it.
7  I'm not sure what you are looking for.
8      BY MR. SNIDER:
9  Q. My question is whether it was your
10 understanding, at the time you were attempting to
11 upgrade Ms. Swann and Ms. Love to the GS-13 --
12 A. At that time.
13 Q. -- whether at that time it was your
14 understanding that Mr. Hunter was ineligible to be
15 promoted to the GS-13 level due to time in grade
16 issues.
17     MR. STRAND: Objection. Asked and
18 answered.
19     THE WITNESS: Sir, I do not remember Mr.
20 Hunter's status at the time those discussions took
21 place.

---

Donald S. Hunter, Sr. vs.                      Multi-Page™                    Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                                      06/06/05

---

Page 96

1      MR. SNIDER: That's fine.
2      BY MR. SNIDER:
3      Q. Prior to Ms. Love's -- attempting to
4  upgrade Ms. Love's position and promoting her, you
5  groomed her for promotion; is that true?
6      A. I groomed Ms. Love. I groom all members
7  of the staff.
8      Q. Okay. Just answer the question.
9      MR. STRAND: No. Objection. You get to
10 answer fully.
11     BY MR. SNIDER:
12     Q. The question was, did you groom Ms. Love?
13 Yes or no? If I have to ask yes or no, I will,
14 but it was fully responsive after the yes.
15     MR. STRAND: Okay. But you can't cut her
16 off if she wants to add to the answer to clarify
17 it. I mean, that's --
18     MR. SNIDER: Ask a follow-up question.
19     MR. STRAND: She gets to keep talking.
20     BY MR. SNIDER:
21     Q. Have you groomed Mr. Hunter for promotion

---

Page 97

1  to the GS-13, ma'am?
2      A. To say I groomed him, I groomed Mr.
3  Hunter for advancement, as I groom each member of
4  the staff for advancement.
5      Q. Did you groom him for promotion to the
6  GS-13?
7      MR. STRAND: Objection. Asked and
8  answered.
9      MR. SNIDER: It was asked, not answered.
10     MR. STRAND: Objection. Asked and
11 answered.
12     MR. SNIDER: Go ahead.
13     THE WITNESS: I groomed Mr. Hunter and I
14 groom every member of my staff for advancement.
15     BY MR. SNIDER:
16     Q. What type of advancement did you groom
17 Mr. Hunter for?
18     A. Mr. Hunter could be perceived to be
19 groomed for a GS-13 in the -- in the Department of
20 State or outside of the Department of State, sir.
21     Q. And what have you done to groom Mr.

---

Page 98

1  Hunter for promotion to the GS-13 level?
2      A. Mr. Hunter, like other members of the
3  staff, have an opportunity for professional
4  development through training provided by the
5  Department of State, training that I approve or
6  disapprove.
7      I make recommendations beyond that and
8  make suggestions to him to train him.
9      He is given opportunities in the office,
10 like other members of the staff are given
11 opportunities.
12     He has the opportunity to volunteer for
13 special projects. Many times he does not. I
14 encourage him. Those private discussions that we
15 have behind closed doors, I'm urging him along.
16 Now, there have been a few that he has, indeed,
17 volunteered on.
18     Now, all of this adds to professional
19 development.
20     The review of his work and the quality of
21 his work, suggestions we make to enhancing his

---

Page 99

1  work, are all, in my opinion, is toward his
2  professional development, is part of grooming --
3  coaching, monitoring, directing, all of that.
4      Q. Coaching and monitoring is part of the
5  grooming process?
6      A. It is, sir. It is a part of our work as
7  grants specialist.
8      Q. Can you give me any specific projects
9  that you gave to Mr. Hunter in order to groom him
10 for promotion to the 13?
11     A. Mr. Hunter was given more authority as a
12 result of his grant warrant increase.
13     Mr. Hunter was given an opportunity to
14 develop an IDP which is inclusive of training
15 courses that would enhance his knowledge and skill
16 level.
17     Mr. Hunter was encouraged to take courses
18 outside of the department that would help him
19 develop.
20     Again, the volunteering on projects.
21 That's it, sir.

---

**Elite Reporting Company**                                    Page 96 - Page 99

Page 100

1  Q. Have you given him more complex
2  assignments since 2001?
3  A. Mr. Hunter has been assigned work with
4  other organizations that he has not worked with.
5       Mr. Hunter has been reassigned work that
6  was previously administered by other grant
7  specialists that have since left the organization.
8  Q. Like whom?
9  A. Ms. Love left the office. He did not
10  volunteer for any of her work.
11       Ms. Swann has left the office.
12       I think those are the two. No. We had
13  one other person to leave. And whether he
14  received any of that work or not, I'm sure -- Ms.
15  Damon left the office.
16  Q. What grade was she?
17  A. She was a nine.
18  Q. What of Ms. Love's work was reassigned to
19  Mr. Hunter?
20  A. I don't know, sir. The specifics of that
21  was left to the team leaders.

Page 101

1  Q. What work of Ms. Swann has been
2  reassigned to Mr. Hunter?
3  A. What work, sir?
4  Q. What work of Ms. Swann has been
5  reassigned to Mr. Hunter?
6  A. I do not know, sir. I just understand
7  that he did not volunteer for any. A number of
8  the grants officers immediately volunteered for
9  certain projects.
10  Q. Is it possible some of Ms. Love's GS-13
11  projects were assigned to Mr. Hunter?
12  A. There is a possibility, sir, but I cannot
13  answer you authoritatively.
14  Q. Is it true that from the time of Ms. Love
15  and Ms. Swann's promotion to the GS-13 until they
16  retired or left the organization, that he
17  performed the same duties as they did, in the same
18  manner? Is that a true or false statement?
19  A. Repeat that question, sir.
20  Q. From the time that they were promoted to
21  the GS-13, until they left, Ms. Swann and Ms. Love

Page 102

1  were performing the same duties as Mr. Hunter, in
2  the same manner?
3  A. Yes, sir. As I mentioned before, the
4  grants process is the same for all of the grants
5  specialists.
6  Q. The MCID Audit Report was Ms. Love's
7  project or Mr. Hunter's project?
8  A. Ms. Love's project.
9  Q. Okay.
10  A. He was encouraged to take it on to get
11  experience.
12  Q. Okay. And did he, in fact, perform the
13  MCID Audit Report?
14  A. He did.
15  Q. Was that at the GS-13 level of work?
16  A. Based on the findings, yes and no. Yes
17  or no. Based on the findings of the grant
18  specialists, the team leaders, as they reviewed
19  the document at the end, there were some revisions
20  that had to be made. And I gather he made those
21  revisions to the document. That was his team

Page 103

1  leader and the -- and the other team lead.
2  Q. So was Mr. Hunter's work on the project
3  at the GS-13 level?
4  A. Yes. He completed the audit and I would
5  say not at the GS-13 level because of the changes
6  that had to be made at the end.
7  Q. When you have been out of the office
8  since 2001, you delegated your authority as
9  supervisor to all four of those GS-13's; correct?
10  A. Yes, sir.
11  Q. The grant policy, which I'll mark as
12  Exhibit Three, which is the last document that you
13  had tabbed, requires that an employee have a
14  Bachelor's Degree, among other requirements; is
15  that correct?
16       MR. STRAND: Take a look at the document.
17       THE WITNESS: Whether it requires --
18  whether it says it or not, sir, because of the
19  transition from the Department of -- from the
20  Agency for -- United States Information Agency to
21  the Department of State, persons with years of

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

---

Page 104

1  experience were grandfathered in.

2      (Whereupon, Deposition Exhibit Number

3  Three was marked for identification.)

4      BY MR. SNIDER:

5    Q. Okay. So it's a requirement, but one can

6  be grandfathered in; correct?

7    A. Yes, sir.

8    Q. Let me bring your attention to Exhibit

9  Seven. ROI Exhibit Seven. I believe that was

10  your affidavit that we were talking about before.

11  On page four, question 14, do you remember reading

12  and responding to that question?

13    A. Yes, sir. I remember responding to this

14  question.

15    Q. And what did you mean there that "He had

16  not demonstrated he possessed the knowledge and

17  skill to perform the level work normally executed

18  by a" — I'm skipping ahead a little bit --

19  "without an enormous amount of coaching"? Is that

20  the test that you use for a GS-12 versus a GS-13,

21  an enormous amount of coaching?

---

Page 105

1    A. So, once again, sir, your question is?

2    Q. Can you explain what you meant by an

3  "enormous amount of coaching," vis-a-vis the

4  question? In other words, it says slightly less

5  than -- what amount of coaching does one need to

6  have in order to be at the 13 level?

7    A. With the work that Mr. Hunter does, the

8  team leaders identified the fact that they had

9  numerous -- they would have numerous errors. They

10  would work with him, correct the errors, get the

11  document out.

12      It was brought to my attention and, in a

13  conversation with Mr. Hunter, he acknowledged

14  that, "I know it. I was just hoping it wouldn't

15  get caught," or he was working too fast.

16      Those are the kinds of errors that we

17  cannot afford to have and that reflect upon him

18  that we need to provide a lot of coaching.

19    MR. STRAND: And -- I'm sorry. I

20  interrupted. Were you finished?

21      THE WITNESS: Advice is given to Mr.

---

Page 106

1  Hunter. Suggestions are given to Mr. Hunter. He

2  follows them many times when he is ready to follow

3  them. And, blanketly, we talked about it one day

4  and he admitted that he was stubborn.

5      We have a clearance process in our

6  office. And during my absence and others were in

7  charge, he sent his documents out without the

8  quality control check.

9      BY MR. SNIDER:

10    Q. When?

11    A. Sir, I would have to go back to my notes.

12    Q. Okay.

13    A. This lets us know that potentially we

14  could not trust this person, that we would have to

15  coach and monitor the work.

16    Q. This was all prior to making the decision

17  not to promote him?

18    A. This -- these are examples, sir.

19    Q. Okay.

20      MR. STRAND: Can I --

21      MR. SNIDER: Yeah. Go ahead.

---

Page 107

1      MR. STRAND: Can we take a quick break?

2      MR. SNIDER: Yeah. Let's go off the

3  record.

4      (Whereupon, there was a brief recess.)

5      BY MR. SNIDER:

6    Q. Ms. Allen, I'm trying to wrap up a few

7  loose ends and chase -- get to the light at the

8  end of the tunnel here.

9      Can you tell me, do you believe that Mr.

10  Hunter was given progressively more complex

11  assignments since 2001?

12    A. Yes.

13    Q. You reference in your affidavit that Mr.

14  Hunter's written grammar and oral communication

15  skills needed improvement. Can you today give me

16  any examples of errors that were made in his

17  written communication skills?

18    A. Generally he has problems with his

19  initial grammar in making things past tense,

20  plural, subject/verb agreement.

21      In addition, there is for a detailed

---

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 108

1 document, lack of clarity, lack of depth and
2 explanation given for the area that is being
3 discussed or written about.
4    Q. Okay.  How about spelling errors?  He had
5 those as well?
6    A. And spelling errors, yes.
7    Q. Have you made any spelling errors in
8 your --
9    A. Yes.
10   Q. Yes?
11       MR. STRAND:  You've got to let him finish
12 his question before you start answering.
13       BY MR. SNIDER:
14   Q. Have you prepared written documents or
15 sent e-mails that had spelling errors in them?
16   A. Yes.
17   Q. Have you sent e-mails or prepared written
18 documents that had grammar mistakes in them?
19   A. I'm sure I have.
20   Q. And the same is true of the GS-13 grants
21 specialists; correct?

Page 109

1    A. Right.  We're talking -- we're talking
2 frequency.
3    Q. Okay.  And how frequent were Mr. Hunter's
4 written errors during the period 2001 to 2004?
5    A. It is difficult to quantify the
6 frequency, but the fact that he keeps making the
7 same type of errors over and over again.  And I
8 did suggest and he did follow my instructions to
9 take a proofreading course, and we continued to
10 see the same kind.
11   Q. I thought your answer to the last
12 question was that the difference between his
13 errors and those of the 13's was frequency.  I
14 attempted to ask you a question about frequency
15 and you said you can't testify about frequency,
16 but you can say that they are repeated.
17      So is it a mixture of frequency and
18 repeated, or is it just repetition, or is it just
19 frequency?
20      MR. STRAND:  Objection.  Mis-states.
21      THE WITNESS:  Would you like to repeat

Page 110

1 that question again?
2       MR. SNIDER:  Yes.
3       BY MR. SNIDER:
4    Q. You understood the background part?  You
5 just want to hear the question part?
6    A. The question part.
7    Q. Okay.  The problems with his written
8 communication skills -- the frequency, the
9 repetition, or both?
10   A. Sir, I cannot quantify.  I cannot give
11 you a number.  But based on the things that I have
12 coached him on, we continued to see.
13   Q. And Ms. Love's grammatical and other
14 written errors were less --
15   A. Yes.
16   Q. -- frequent?
17   A. Sorry.
18   Q. Same is true of Ms. Swann?
19   A. Less frequent.
20   Q. But you are unable to quantify them?
21   A. Correct, sir.

Page 111

1    Q. And I take it, were Ms. Swann's and Ms.
2 Love's grammatical and other written errors also
3 repeated?
4       MR. STRAND:  Objection.  Assumes facts
5 not in evidence.
6       THE WITNESS:  Sir, the type of errors
7 that I was speaking of with regard to Mr. Hunter
8 are not the type of errors that are consistently
9 repeated by Love and Swann.
10      BY MR. SNIDER:
11   Q. For example?
12   A. Spelling errors.  Changing the tense.
13 Those kinds of errors.
14   Q. Can you give me any documents or dates
15 that those occurred on?
16   A. There are some examples, sir, that are in
17 here.
18   Q. Some of the ones that you identified
19 earlier?
20   A. That I identified or that others
21 identified.

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

**Page 112**

1  Q. Okay.

2      MR. STRAND: She was -- let the record

3  reflect she was touching the Report of

4  Investigation when she said the examples she

5  identified "in here."

6      BY MR. SNIDER:

7      Q. How many employees does ECA employ? Do

8  you know?

9      A. I do not know, sir.

10     Q. Are there any African-American males in a

11 supervisory or managerial position in ECA?

12     MR. STRAND: Other than herself?

13     MR. SNIDER: African-American males.

14     MR. STRAND: Oh, males.

15     THE WITNESS: He said males. Not to my

16 knowledge.

17     BY MR. SNIDER:

18     Q. There are none to your knowledge?

19     A. There are none to my knowledge.

20     Q. Do you know how many African-American

21 males --

**Page 113**

1      A. Excuse me. There could be project

2  leaders, but I don't know otherwise.

3      Q. Okay. How many African-American males

4  are there at the GS-13 or above in ECA?

5      A. I do not know, sir.

6      Q. Do you know if there are any?

7      A. I do not know, sir.

8      Q. Did you have to request a specific waiver

9  for the grants specialists who lacked the

10 Bachelor's Degree requirement, or were they

11 automatically grandfathered in under the policy

12 directive that's Exhibit Three?

13     A. It was automatic, sir. There were no

14 challenges provided to us.

15     Q. Okay. Are you aware that Mr. Hunter

16 applied in 2002 for a financial management

17 specialist position in the Grants Management

18 Division, Office of Global Financial Service,

19 Bureau of Resource Management?

20     A. Through questioning I found that out,

21 sir. Yes.

**Page 114**

1      Q. Do you know who Arnold Lee is?

2      A. I beg your pardon?

3      Q. Do you know who Arnold Lee is?

4      A. Yes.

5      Q. Do you know who made the selection for

6  that position?

7      A. I do not know, sir.

8      Q. Did Mr. Lee speak with you prior to

9  having -- making any decisions in relation to

10 that?

11     MR. STRAND: Objection. Assumes facts

12 not in evidence.

13     THE WITNESS: Mr. Lee did not contact me,

14 sir.

15     BY MR. SNIDER:

16     Q. Did you speak with Mr. Lee about Mr.

17 Hunter, in relation to the financial management

18 specialist GS-13/14 position?

19     A. I did not. No. I did not speak to him.

20     Q. Okay. Was Mr. Hunter the project leader

21 in your office for management of the Department of

**Page 115**

1  Health and Human Service payment management

2  system?

3      A. He was.

4      Q. And how long had ECA been using this

5  method of paying grants recipients?

6      A. For some of our grantees, it has been

7  years. How many, I do not know.

8      Q. Who would you consider the department

9  expert in managing DHHS Payment Management System?

10     A. Probably the expert in our office would

11 be Ms. Sarah Swann. Sarah Smith, now Swann.

12     Q. That's not the same Ms. Swann that we

13 talked about earlier?

14     A. No. This young lady is the grants

15 coordinator.

16     Q. And what grade is she?

17     A. GS-8.

18     Q. And she would be the subject matter

19 expert on the payment management system?

20     A. Correct.

21     Q. And does Mr. Hunter have the same level

**Elite Reporting Company**

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 116

1 of expertise in that system as she does?

2    A. They have expertise -- yes and no. I

3 have to answer the question yes and no.

4    Ms. Swann -- Ms. Smith, at that time, has

5 been operating in that system for a number of

6 years and paying our grantees.

7    Mr. Hunter accepted this project based on

8 a requirement that we had from the department to

9 change the system. So he sought out to cost out

10 what it would take for us to transition more of

11 our grantees over.

12    So as Ms. Smith was receiving documents

13 from OBM, from the Department of State, these were

14 the documents that we were attempting to comply

15 with.

16    Because we have a significant number of

17 payments to be made in the organization, this took

18 a great burden off of Ms. Swann and Ms. Smith's

19 plate, so that we could get the funding we needed

20 from our executive director to fund this effort

21 and comply with the guidance that we had been

Page 117

1 given.

2    So Ms. Smith is the real subject matter

3 expert.

4    Q. At the GS-8 level?

5    A. At the GS-8 level. This is what she does

6 on a daily basis.

7    Q. Was Mr. Hunter's work on the MCID program

8 at grant -- I guess it was a report; right -- was

9 that the basic work -- is that a type of basic

10 work that you had discussed earlier as being the

11 groundwork that a GS-13 might work on? If you

12 need to look at a document, I can show that to

13 you.

14    MR. STRAND: Objection. Vague.

15    THE WITNESS: I think you've asked this

16 question before, but I'm not sure, so would you

17 ask it again?

18    MR. SNIDER: Certainly.

19    BY MR. SNIDER:

20    Q. You testified that a GS-13 would work on

21 basic complete documents and that 12's and lower

Page 118

1 grades might work on addendums and renewals, that

2 type of stuff. Some of those are my words, but

3 from my basic lack of information about grants.

4 And then my question was whether the work Mr.

5 Hunter did on the MCID was of that type of nature

6 of the basic structural working together

7 formulating it, as opposed to the later addenda

8 and -- and modifications?

9    A. It's the basic work is to review the

10 work, response -- send out a request to the

11 organization to let them know that he was

12 reviewing it, and to get a response from them.

13    Q. That's the 13 level work, or that's what

14 he was doing?

15    A. That's -- this is, sir --

16    MR. STRAND: You interrupted her. Go

17 ahead and finish.

18    MR. SNIDER: Oh, I thought you were done.

19    THE WITNESS: This is the basic work.

20 The real work comes in of evaluating, analyzing,

21 and researching based on the response that was

Page 119

1 received, and reacting to it, and giving a

2 determination.

3    Some of those areas, indeed, are areas

4 that Mr. Hunter needs additional work on.

5    BY MR. SNIDER:

6    Q. In the MCID project that he was working

7 on?

8    A. With the researching; correct.

9    Q. So in the MCID project that he was

10 working on, he did not do the real work that a 13

11 would be doing; is that correct?

12    A. What do you mean when you say "real

13 work," sir?

14    Q. I'm using your definition. I thought you

15 had testified earlier about basic work and that

16 that was the higher level stuff, the grunt work

17 that the 13's would do, and the lower level

18 analysts would be able to do extensions or

19 modifications, or those types of things. And --

20    MR. STRAND: Sorry.

21    MR. SNIDER: It was her use of basic

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 120

1 work.

2    MR. STRAND: Did you say "grunt work"

3 that the GS-13's were doing?

4    MR. SNIDER: Right. That's my phrase.

5 In other words, the basic contract —

6    MR. STRAND: Objection. Mis-states.

7    MR. SNIDER: Okay. The basic contract is

8 written by a 13, and then modifications, and

9 additions and extensions, and those types of

10 things, are a lower level analyst type of work..

11    MR. STRAND: So the question is, is that

12 a fair characterization?

13    MR. SNIDER: That's number one.

14    ·MR. STRAND: Okay. So start with that.

15 I think it is easier to break this up.

16    THE WITNESS: There is a basic process to

17 responding to an audit report. And it would be

18 the same for anyone, whether a nine, 11, 12, or

19 13. That's what I meant when I said the basic

20 process.

21    MR. SNIDER: Understood.

Page 121

1    THE WITNESS: That's — did that answer

2 your question?

3    MR. SNIDER: Yes.

4    THE WITNESS: Okay. That's the basic

5 work.

6    MR. SNIDER: Okay.

7    (Whereupon, there was a discussion off

8 the record.)

9    MR. SNIDER: How many pages on your ROI,

10 Exhibit 2-H?

11    MR. STRAND: Fourteen.

12    BY MR. SNIDER:

13    Q. Fourteen. Okay. Can you look at that

14 document, ma'am? That's one of the ones that you

15 tabbed; is that correct?

16    A. Yes.

17    Q. Is your signature on the first page,

18 ma'am?

19    A. Yes.

20    Q. And you created — who wrote the

21 narrative on page four of that document?

Page 122

1    A. I wrote the narrative.

2    Q. You wrote that. And he was rated

3 excellent on each of the critical job element

4 descriptions on page two and three?

5    A. The question is again?

6    Q. You rated him excellent on each critical

7 job element on pages two and three of that

8 exhibit?

9    A. Correct.

10    MR. SNIDER: Okay. Nothing further.

11    EXAMINATION

12    BY MR. STRAND:

13    Q. My name is Stratton Strand. I represent

14 the government in this case. I have some follow-

15 up questions for you.

16    You testified that when Ms. Love and Ms.

17 Swann left the grants division, you posted their

18 positions at the 9/11/12 level; is that correct?

19 Did you testify to that?

20    A. Yes. That is correct.

21    Q. Why did you post their positions at that

Page 123

1 level?

2    A. It's two-fold. One, I wanted to bring

3 the structure of the office in line with the

4 structure of the department.

5    And, two, I wanted to bring in some

6 potentially younger candidates, younger in the

7 sense of career, not necessarily age, giving them

8 the opportunity and, hopefully, they would stay in

9 the office for a period of time, looking for

10 longevity.

11    Q. Did you —

12    A. Am I in a position to give an addendum to

13 that question?

14    Q. Sure.

15    A. With my determination, I had the right to

16 be able to do that. It was an option that I had

17 to look at the office in that vein. My decision.

18    Q. You were not trying to get younger people

19 into that position. You were trying to get people

20 who would stay there for longer? Is that what you

21 just said?

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 124

1     MR. SNIDER: Objection. Leading. You
2 can answer.
3     THE WITNESS: I said that.
4     MR. SNIDER: The record will speak for
5 itself. "Not necessarily age," she said.
6     MR. STRAND: I'll ask the question again
7 since there has been some question raised.
8     BY MR. STRAND:
9     Q. You weren't trying to get younger people
10 into that position; is that correct?
11    MR. SNIDER: Objection.
12    THE WITNESS: Correct.
13    MR. SNIDER: If you could pause, please,
14 before because I have a right to object to his
15 questions, especially if they are leading, which I
16 would ask you to avoid.
17    MR. STRAND: I can lead on cross
18 examination.
19    MR. SNIDER: You can, but it is your own
20 witness and she is a management witness, and it --
21    MR. STRAND: This is cross examination.

Page 125

1 This is cross examination.
2     MR. SNIDER: Ask any judge in the
3 country. They'll tell you you can't cross examine
4 your own witness as leading, even if they are
5 called by someone -- it's a management -- all I'm
6 saying is, I'm going to object if it's leading.
7     MR. STRAND: I disagree with that
8 analysis.
9     MR. SNIDER: That's fine. And if you are
10 going to continue leading, I'm going to have a
11 continuing objection, rather than clutter the
12 record.
13    MR. STRAND: That's fine.
14    MR. SNIDER: But it's not fair that she
15 is answering quickly before I have a chance to
16 object. That's not fair.
17    MR. STRAND: Yes. You do need to let him
18 register his objection before you start speaking,
19 particularly since you guys will wind up talking
20 over each other and the court reporter won't be
21 able to get it down. Let me start again.

Page 126

1     BY MR. STRAND:
2     Q. In posting those positions as 9/11/12's,
3 am I correct that you were not trying to get
4 younger people into those positions?
5     MR. SNIDER: Objection. Leading.
6     MR. STRAND: Is that correct?
7     THE WITNESS: That is correct.
8     BY MR. STRAND:
9     Q. You were the one who granted Mr. Hunter
10 an accretion of duties promotion to the GS-12
11 level; is that correct?
12    A. Yes.
13    Q. Had you done anything to assist in his
14 professional development prior to the time that
15 you granted him the GS-12 accretion of duties
16 promotion?
17    A. Yes. I can say that I did, from the
18 standpoint of in-house training, professional
19 development through courses from -- or training
20 from the outside, personal behind-the-scenes
21 coaching, encouraging him to volunteer for

Page 127

1 projects, helping him prepare for meetings, and
2 ensuring that his team leader was also providing
3 support for him also.
4     Q. And even before he got the accretion of
5 duties to GS-12, were you trying to ensure that he
6 got assignments -- higher level assignments to
7 help prepare him for that higher level?
8     A. Yes. Beyond the grants processing,
9 because the requirements in the office, there were
10 opportunities for me to give him other projects --
11 we call them special projects -- where he would be
12 the team leader or project leader for that
13 project.
14    Q. Have you continued to assign him special
15 projects since his promotion to GS-12 to help
16 prepare him for the GS-13 level?
17    A. Yes. I have asked him to take on certain
18 projects that would provide him with additional
19 training and support.
20    Q. Did you assign him the Year 2000 project
21 -- special project?

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

**Multi-Page™**

Fannie L. Allen
06/06/05

---

Page 128

1  A. I did.

2  Q. Can you give me some other examples of

3  special projects that you have given him to help

4  prepare him for the GS-13 level?

5  A. The encouragement to take on the MCID

6  audit, under the supervision of one of the senior

7  team members.

8  He had the PMS project. We worked with

9  him closely on that.

10  Q. You assigned him the PMS project?

11  A. That one I can't remember if he

12  volunteered for or I assigned. I have to be

13  honest with you on that one. I do not know. But

14  it was definitely encouraged.

15  I can't think of any others at this time.

16  We have ongoing projects.

17  Q. Did you inform -- who was his team

18  leader?

19  A. Connie Stinson.

20  Q. Did you inform Connie Stinson that you

21  wanted Mr. -- you wanted Mr. Hunter to receive

---

Page 130

1  questions. How did you first learn of his desire

2  for a promotion to GS-13?

3  A. Mr. Hunter approached me in a meeting in

4  my office.

5  Q. How many conversations did you have with

6  Mr. Hunter about that request?

7  A. We had several conversations.

8  Q. Did you tell him in the first

9  conversation that you believed he was not ready

10  for the GS-13?

11  A. I did. It was in a verbal conversation

12  and I suggested to him or stated to him that he

13  was not functioning at that level.

14  Q. Did you give him an opportunity

15  thereafter to demonstrate to you that he was

16  performing at the GS-13 level, to provide some

17  further justification?

18  A. I asked him to provide for me what he

19  considered to be the justification for his taking

20  -- his being promoted to the GS-13 level. And I

21  cannot remember the document, but it was not

---

Page 129

1  progressively more responsible work from the time

2  he became a GS-12 on?

3  A. Yes. In fact, I asked him to participate

4  on a project out of town. It was his first TDY

5  with our organization. And we worked with him to

6  be a trainer, to actually deliver training at one

7  of our training sites.

8  Q. When you say "we," you are referring to

9  you and Ms. Stinson?

10  A. Yes.

11  So I suggested that he take the project

12  and Ms. Stinson worked with him specifically to

13  prepare him for that.

14  Q. I'm showing you what Mr. Snider marked as

15  Exhibit Two, which is the June 24, 2002 memo to

16  Mr. Hunter from Mr. Castro regarding Mr. Hunter's

17  request for promotion.

18  Can you tell me the chronology of events

19  related to Mr. Hunter's request for an accretion

20  of duties promotion to GS-13? How did you first

21  learn of his -- and I will take it in specific

---

Page 131

1  enough for me to feel comfortable in -- or he did

2  not prove to me that he was functioning at that

3  level.

4  Q. So am I correct that you denied his

5  initial request for an accretion of duties

6  promotion to a GS-13?

7  A. I denied his initial request.

8  Q. Did you inform him that if he disagreed

9  with your -- with your decision, he could take his

10  request up the chain of command?

11  A. Yes, I did.

12  Q. Who did you tell him he could make his

13  request to above you?

14  A. My first level is -- was Mr. Ben Castro.

15  Q. So you told Mr. Hunter that if he

16  disagreed with your determination, he could make

17  the same request to Mr. Castro?

18  A. Exactly. Exercising --

19  Q. Is it your understanding --

20  A. Exercising the chain of command.

21  Q. Okay. Is it your understanding that he

---

**Elite Reporting Company**

**Page 132**

1 did make a request to Mr. Castro for an accretion
2 of duties promotion to the GS-13?
3    A. Yes.
4    Q. And your understanding is that
5 Plaintiff's Exhibit Two is -- is it your
6 understanding that Plaintiff's Exhibit Two is Mr.
7 Castro's decision on Mr. Hunter's request to Mr.
8 Castro?
9    A. It is.
10    Q. And do you see the first paragraph that
11 says, "I have reviewed your request for an
12 accretion of duties promotion. After review and
13 consultation with your supervisor, Ms. Fannie
14 Allen, and the Human Resources office I cannot
15 concur with your request"? Do you see that
16 language?
17    A. Yes, I do.
18    Q. Is that the language that you take to
19 mean that Mr. Castro is independently denying the
20 request?
21    A. Yes.

**Page 133**

1    MR. SNIDER: Objection. Leading.
2    MR. STRAND: You have to wait for his
3 objection before you answer. I didn't hear your
4 answer. What was your answer?
5    THE WITNESS: My answer is yes.
6    BY MR. STRAND:
7    Q. Is it your understanding that Mr. Castro
8 made a separate determination on the -- on Mr.
9 Hunter's request for a GS-13 accretion of duties
10 separate, that is, from your own initial
11 determination?
12    A. Yes.
13    MR. STRAND: Objection. Foundation and
14 leading.
15    MR. STRAND: Okay. You, again, spoke at
16 the time he was objecting, so please give your
17 answer again.
18    THE WITNESS: Yes. It was an independent
19 observation. Yes.
20    BY MR. STRAND:
21    Q. Do you see on the second page of

**Page 134**

1 Plaintiff's Exhibit Two there is a paragraph that
2 says, "If you feel you are currently performing
3 duties that are classifiable at the GS-13 level,
4 you are entitled to file a classification appeal.
5 If you decide to appeal the classification, please
6 see Ms. Jacqueline Hill in ECA-IIP/EX/HR"? Is it
7 your understanding that after receiving Mr.
8 Castro's decision on his request for promotion,
9 Mr. Hunter did in file -- did, in fact, file a
10 classification appeal?
11    A. It is my understanding that an appeal --
12 excuse me -- that a classification request was
13 made. The timing I'm not sure of, but that there
14 was a classification review.
15    Q. Is a classification review similar to a
16 desk audit?
17    A. A classification review is similar to a
18 desk audit, as I understand it.
19    Q. Are there some examples in the Report of
20 Investigation of what you consider to be complex
21 grant work performed by the GS-13's?

**Page 135**

1    A. Yes.
2    Q. Can you show me those examples?
3    A. I would say that the audit of MCID, from
4 the perspective of the level of independence that
5 the senior grants officers would perform.
6    Q. Let me stop you there. What do you mean
7 by that?
8    A. An audit of this nature, a senior grants
9 specialist would be able to conduct from beginning
10 to end, (I) going through the basic process, but
11 also on the other end, after completing the basic
12 process, being able to go in to do the research,
13 knowing indirect cost and how to apply it, if
14 there are any extenuating circumstances, being
15 able to take those extenuating circumstances, do
16 the research, consult with whatever applicable
17 parties. It's just that the level of independence
18 is expected at the GS-13 level.
19    Q. So you have testified that Mr. Hunter did
20 work on the MCID audit project.
21    A. Yes. Under the supervision of a GS-13.

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

**Page 136**

1    Q. So the reason that his work on that
2  particular project was not at the GS-13 level was
3  because he was under the supervision of a GS-13?
4    A. In this case, he was definitely under the
5  supervision of a GS-13 and there were issues,
6  according to the team leaders, that needed to be
7  massaged before the report actually left the
8  office.
9    Q. So in your evaluation of whether a
10 particular project -- whether Mr. Hunter performed
11 a particular project at the GS-13 level, do I
12 understand you to say that there are two factors?
13 One is the nature of the project, the degree of
14 supervision required -- the complexity of the
15 project, dollar amount, degree of supervision
16 required, and the other is how well the project is
17 performed?
18    A. How well the project is performed.
19    Q. Is the dollar value of the project one of
20 the factors that determines in your mind whether
21 it is a GS-13 or a GS-12 duty?

**Page 137**

1    A. It can be dollar value and it could be
2  the magnitude of the areas in question.
3    MR. SNIDER: Could you just state which
4  exhibit -- did you state which exhibit she was
5  referencing that time?
6    MR. STRAND: Thank you. I did not do
7  that. We were referencing ROI Exhibit 05-E-2.
8    BY MR. STRAND:
9    Q. Are the documents attached as Exhibit 7-
10 H-1, 7-H-2, and 7-H-3 examples of the highly
11 complex work that the GS-13's performed?
12    A. Yes.
13    Q. Are the documents attached as ROI Exhibit
14 07-G examples of complex work that originally was
15 done by GS-13's and then passed on to Mr. Hunter
16 for the subsequent year work?
17    A. Exactly. Yes. And in doing this, this
18 is a way of giving a person at Mr. Hunter's level,
19 and we have other persons in the office, giving
20 them an opportunity to get acquainted with our
21 highly complex grant agreements.

**Page 138**

1  ·   In this case, the initial document was
2  done by a GS-13 and the work done by Mr. Hunter
3  and others, they merely followed the initial
4  document that was prepared in order to do the next
5  agreement. They did not get into the heavy budget
6  analysis and all that went into the original
7  document.
8    Q. Okay. So the Contemporary Issues
9  Fellowship Program Award is an example of one of
10 the developmental assignments that were -- that
11 was given to Mr. Hunter?
12    A. Yes. Yes.
13    Q. And the East Timor Scholarship Program is
14 another example of one of the developmental career
15 development programs that was given to Mr. Hunter?
16    A. Yes.
17    Q. And the distinction you've drawn is that
18 in both of those -- in both of those awards, the
19 GS-13 did the initial award and Mr. Hunter, when
20 it was assigned to him, was able to use the
21 templates that the GS-13's had prepared in order

**Page 139**

1  to do the follow-on agreements?
2    A. That is correct.
3    Q. Did he work, when he was assigned both of
4  these awards, the Contemporary Issues Fellowship
5  Program and the East Timor Scholarship Program,
6  did he continue -- in performing those
7  assignments, did he work under the supervision of
8  a GS-13?
9    A. He did.
10    Q. In ROI Tab 7-H-3, you tabbed -- in
11 response to one of Mr. Snider's questions, you
12 tabbed Part 13, "Agreements, special provisions,
13 and other miscellaneous information." Is this
14 document a -- is this document from a policy
15 manual?
16    A. It is our internal handbook for the
17 grants division, operational.
18    Q. Okay. It is your internal handbook.
19 This is Part 13 of your internal handbook?
20    A. Yes.
21    Q. Who drafted Part 13?

Case 1:06-cv-00326-PLF    Document 9-5    Filed 06/02/2006    Page 38 of 55

Donald S. Hunter, Sr. vs.                    Multi-Page™                    Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                            06/06/05

Page 140

1    A. The original handbook that was prepared
2  was done by Ms. Connie Stinson, the team leader
3  for Mr. Hunter.  And team members provided
4  opinions and other input to the document to make
5  it a concise document to be distributed.
6    Q. Is this an example of high level work
7  that you would expect from a GS-13?
8    A. It is.
9    Q. You testified earlier, I believe, that
10 Mr. Hunter was assigned the Wye River project; is
11 that correct?
12   A. That is correct.
13   Q. Was the Wye River project one of the
14 developmental assignments that he was given?
15   A. It was one of the developmental
16 assignments.  He worked with Ms. Ahern, one of the
17 other team members that actually had this project
18 from the beginning.
19   Q. Is this another example of a project in
20 which one of the GS-13's did the initial research
21 analysis, drafting, and it was passed on to Mr.

Page 141

1  Hunter?
2    A. She oversaw the project and she and, if
3  I'm not mistaken, one of the other GS-13's,
4  actually did the initial grants associated with
5  that project, if I'm not mistaken.
6      But we -- because of these high level
7  projects, we always have one person to follow it
8  from beginning to end so that there is consistency
9  in responding to upper level management.
10   Q. So Mr. Hunter worked on the Wye River
11 project under the supervision of Ms. Ahern?
12   A. Ms. Ahern.
13   Q. In ROI Exhibit 7-J, the first document is
14 dated January 15, 2002.  It appears to be a
15 memorandum for Ben Castro from Donald Hunter.  Was
16 this Mr. Hunter's draft of the memorandum
17 recommending that all ECA grant recipients be
18 placed onto the DHHS/PMS payment method?
19   A. Yes.
20   Q. Is this the final version of the memo
21 that went to Mr. Castro?

Page 142

1    A. It is not.
2    Q. So pages two of 15 through four of 15 --
3  I'm sorry -- two of 15 through six of 15 are the
4  draft that Mr. Hunter prepared; is that correct?
5    A. That is correct.
6    Q. And in the same ROI exhibit, pages eight
7  of 15 through nine of 15, do those represent the
8  final version of the memo that Mr. Hunter had
9  drafted about the transition to the DHHS/PMS
10 payment system?
11   A. It appears to be the final version.
12   Q. Do you know who -- is it correct -- I'll
13 establish the proper foundation.
14     Have you seen both documents?
15   A. Yes, I have.
16   Q. Is it true that there are significant
17 changes between the two documents, between the
18 draft and the final?
19   A. There are.
20   Q. Do you know who did the edits --
21   A. I -- I'm sorry.

Page 143

1    Q. Do you know who did the edits of Mr.
2  Hunter's draft, to put it into final form?
3    A. His team leader, Ms. Connie Stinson.
4    Q. Does Mr. Hunter's January 15th, 2002
5  draft memorandum represent some of the types of
6  problems that you found with his writing,
7  research, and analysis?
8    A. Yes.
9    Q. In the same ROI exhibit, pages ten, 11,
10 12, 13, 14, and 15, do those represent some of the
11 types of grammatical errors that you've testified
12 that Mr. Hunter frequently made in his
13 communications?
14   A. Yes.
15   Q. On page ten of 15, what was the error?
16   A. Wrong verb use.
17   Q. On page 11, what was your --
18   A. Spelling.
19   Q. The errors are circled; is that correct?
20   A. It appears.
21   Q. On page 12, what was the error?

Donald S. Hunter, Sr. vs.                     Multi-Page™                    Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                              06/06/05

---

**Page 144**

1    A. Spelling.

2    Q. Page 13 there are two portions

3 highlighted. What were the errors there?

4    A. Did not show possession in the first

5 word. And the second, he did not make a complete

6 sentence.

7    Q. What was the error on page 14?

8    A. Again, not showing possession.

9    Q. What was the error on -- error or errors

10 on page 15?

11    A. One was that it was a run-on sentence.

12 He did not show that a certain word was plural.

13    Q. Which word is that?

14    A. "Organization."

15    Q. It should have been plural?

16    A. Should have been plural.

17    Q. Okay. Did you ever discuss with Mr.

18 Hunter your concern that he frequently had grammar

19 and spelling mistakes in his written work?

20    MR. SNIDER: Objection. Foundation.

21 Mis-states.

---

**Page 145**

1    BY MR. STRAND:

2    Q. Were you concerned -- is it true that you

3 were concerned that Mr. Hunter frequently had

4 grammar and spelling mistakes in his written work

5 product?

6    MR. SNIDER: Objection. Leading.

7    MR. STRAND: Is that true?

8    THE WITNESS: Yes. That is true.

9    BY MR. STRAND:

10    Q. Did you discuss that concern with him?

11    A. Yes, I did.

12    Q. Did you discuss that with him on more

13 than one occasion?

14    A. Yes, I did. A bad reflection on him and

15 a bad reflection on the office.

16    Q. I believe you testified, in fact, that

17 you specifically recommended that he take a

18 proofreading class; is that correct?

19    A. That is correct.

20    Q. Was that in response to the concerns you

21 had about his written work product?

---

**Page 146**

1    A. Yes.

2    Q. Did you notice that he continued to make

3 the same types of errors, even after the

4 proofreading class?

5    A. Yes. He continues to make the same kinds

6 of errors.

7    Q. You mentioned that you have been involved

8 in coaching him to attempt to improve his level of

9 performance. How frequently would you estimate

10 that you have held private coaching sessions with

11 him from the Year 2000 onward?

12    A. The frequency is hard to actually

13 quantify. But what I would do is, whenever I

14 would notice something, I would immediately bring

15 it to his attention. In order to make him aware,

16 I asked him to print out the document, read it out

17 loud and, if necessary, read it backwards, in

18 order to be able to pick up on those kinds of

19 things.

20    Q. Did you ever have coaching sessions with

21 him about issues other than his written work

---

**Page 147**

1 product?

2    A. Yes.

3    Q. What types of other issues did you

4 discuss with him in your private coaching

5 sessions?

6    A. We talked about professional development,

7 of course. And we talked about the oral -- his

8 oral presentation. And with the oral

9 presentation, I found that, as I heard him reading

10 out loud in staff meetings, that I discovered that

11 he had a reading problem.

12    I suggested that -- and in preparing for

13 training for our program officers and in the

14 presentations, he would have to read his

15 presentation and a grants specialist, being in the

16 field and in the field for a long time, knowing

17 the work, should not have to read. The level of

18 familiarization was not evident.

19    I tried to handle this in two ways. One,

20 to consistently give him opportunities to be up

21 and in front of people, talking, and also I

---

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

---

Page 148

1 suggested that he enroll in Toastmasters to give
2 him a comfort level in presentations. This was
3 consistently done, but it went — my request went
4 -- he did not participate in such until much
5 later.
6        And I finally asked him one day why he
7 didn't do it early on. And he just indicated that
8 he was stubborn.
9        I also justified — it's hard to get a
10 course outside of the department — at that time,
11 hard to get a course outside of the government
12 structure. They wanted you to take in-house
13 courses. So I wrote a justification for him to
14 take a written course — a writing course at P.G.
15 Community College. It was approved and he did
16 take the course.
17     Q. Did you also have coaching -- private
18 coaching sessions with him about his research
19 abilities?
20     A. Yes. Many times he would do some work
21 and then come in with a product. I would read it

---

Page 149

1 and I would have questions. And those are the
2 kinds of questions that should have been answered
3 in the document before he presented it to me,
4 which also meant that he had to go back to the
5 drawing board. So the level of depth and research
6 was not there.
7     Q. Is it true that your understanding of his
8 abilities comes not just -- or came, at the time
9 you made the decision on the accretion of duties
10 request, your understanding of his abilities came
11 both from your own personal observations of his
12 work product and his interactions with other
13 members of the Department of State, and also from
14 reports to you by the team leaders and the other
15 GS-13's?
16     A. Would you ask that question one more
17 time?
18     Q. Very well. Is it true that your
19 understanding -- and I'm focusing
20 your attention on the time that you made the
21 decision on the GS-13 accretion of duties request

---

Page 150

1 -- your understanding of his abilities came both
2 from own personal observations and from
3 information given to you by the team leaders?
4     A. Exactly. Yes.
5     Q. You testified, I believe, that from the
6 time Ms. Love and Ms. Swann received their
7 promotions to GS-13, they and Mr. Hunter performed
8 the same type of work, in terms of the process
9 that they went through. Do you believe that Mr.
10 Hunter at any time performed the same complexity
11 of work as Ms. Love and Swann, and performed it at
12 the same level that they performed it, in terms of
13 how well they performed?
14        MR. SNIDER: Continuing objection over
15 here, but go ahead.
16        MR. STRAND: Continuing objection —
17        MR. SNIDER: Yes.
18        MR. STRAND: — to?
19        MR. SNIDER: To the leading nature of
20 every — pretty much every question.
21        MR. STRAND: "Pretty much every question"

---

Page 151

1 doesn't give us a real specific idea. Let me
2 rephrase it in response to the objection.
3     BY MR. STRAND:
4     Q. Do you believe that Mr. Hunter performed
5 the same complexity of work as Ms. Love and Ms.
6 Swann?
7     A. No, he didn't.
8     Q. Do you believe that he performed his work
9 to the same degree of competence that they did?
10     A. No, he did not.
11     Q. When you advertised the vacant positions
12 that Ms. Love and Ms. Swann had held, did you
13 advertise them as GS-9/11/12's, in order to
14 prevent Mr. Hunter from getting — from having the
15 ability to apply for those positions?
16     A. No.
17     Q. Since Ms. Love and Ms. Swann obtained
18 their GS-13's, has Mr. Hunter handled grants at as
19 high dollar levels as they have handled?
20     A. No, he has not.
21        MR. STRAND: I'd like to mark her

---

**Elite Reporting Company**

Page 148 - Page 151

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 152

1 declaration as an exhibit, if you don't mind.

2      MR. SNIDER:  I figured we'd probably

3 attach the entire ROI to -- make some type of a

4 joint appendix or something because we've all

5 pretty much referenced every exhibit in there.

6      MR. STRAND:  That makes sense to me.

7      MR. SNIDER:  Yeah.  So to avoid

8 duplication of stuff -- I know some of mine are

9 duplicative also, but -- I know it is Exhibit

10 Seven and she has -- I have asked her questions

11 about it.  So whatever you want to do, no problem.

12      MR. STRAND:  Okay.

13      MR. SNIDER:  But I was intending on

14 attaching the entire ROI.  We can just make that a

15 joint --

16      BY MR. STRAND:

17   Q. I'm showing you what I believe to be a

18 copy of the Exhibit Seven to the ROI, which

19 purports to be your declaration of 11 pages long.

20      MR. SNIDER:  Are you going to be a lot

21 longer because --

Page 153

1      MR. STRAND:  No.  This is the last

2 question.

3      MR. SNIDER:  Okay.

4      BY MR. STRAND:

5   Q. Does that appear to be a true and correct

6 copy of the declaration you submitted as part of

7 the Report of Investigation?

8   A. It appears.

9   Q. Is everything that you said in that

10 declaration true?

11   A. Yes.

12      MR. STRAND:  I have no further questions

13 at this time.

14      MR. SNIDER:  Just a few questions.

15      EXAMINATION RESUMED

16      BY MR. SNIDER:

17   Q. Are the team leaders in your organization

18 bargaining unit employees?

19   A. I do not know.  I don't think so.

20   Q. Ms. Julie Johnson's age?

21   A. I do not know.

Page 154

1   Q. Under 40?

2   A. Under 40.

3   Q. That's correct?

4   A. Under 40.

5   Q. She is --

6   A. Yes, under 40.

7   Q. Okay.  And she was the one selected when

8 you posted Ms. Love's position?

9   A. That is correct.

10   Q. Who was selected for the posting more

11 recently of Ms. Swann's position?

12   A. Ms. Debbie Thompson.  Deborah Thompson.

13   Q. And do you know her age?

14   A. I do not.

15   Q. Does she appear to be under 40?

16   A. I'm not sure.

17   Q. Do you believe that Mr. Hunter has a

18 learning disability?

19      MR. STRAND:  Objection.  Foundation.

20      THE WITNESS:  Excuse me for a second.

21 Can I refuse to answer that because I don't know

Page 155

1 that.  I think it would take an expert.

2      BY MR. SNIDER:

3   Q. Do you believe that he has a learning

4 disability?

5      MR. STRAND:  Same objection.

6      THE WITNESS:  Mr. Snider, I -- I don't

7 feel qualified to answer that question.

8      MR. SNIDER:  Please answer the question.

9      BY MR. SNIDER:

10   Q. Do you believe -- I'm not asking you for

11 an expert opinion.  Do you believe Mr. Hunter has

12 a learning disability?

13      MR. STRAND:  Objection.  Foundation.

14      THE WITNESS:  Mr. Snider, I have no basis

15 to respond to that question.

16      BY MR. SNIDER:

17   Q. You testified that you believe he had

18 substantial problems in pronouncing words,

19 reading, writing, other similar issues.  I believe

20 there is a basis if you -- do you have a belief,

21 such a belief.

Donald S. Hunter, Sr. vs.                    Multi-Page™                    Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                                06/06/05

---

Page 156

1    My question is do you, have you at any
2  time in the past five years, believed that Mr.
3  Hunter had a learning disability?
4        MR. STRAND: Objection. Argumentative.
5  Objection. Asked and answered.
6        THE WITNESS: Mr. Snider, I have no
7  expert knowledge in order to respond to your
8  question.
9        MR. STRAND: She has answered it.
10        MR. SNIDER: She hasn't answered it.
11        MR. STRAND: She said she has no basis.
12        MR. SNIDER: That's not exactly -- that
13  was the third time she answered it. I've gotten
14  four different --
15        MR. STRAND: That was the --
16        MR. SNIDER: Four different answers.
17        MR. STRAND: That was the third time you
18  asked the question. You keep asking it --
19        MR. SNIDER: If I get the same answer
20  every time, I would agree with asked and answered.
21  If I get a different answer every time, it's not

Page 157

1  asked and answered.
2        MR. STRAND: I believe she has given the
3  same answer every time, which is that she doesn't
4  know, and she --
5        MR. SNIDER: That would be an acceptable
6  answer. She hasn't said that.
7        MR. STRAND: Okay. I'm sorry. That's
8  what I interpreted her to be saying.
9        BY MR. SNIDER:
10    Q. Do you believe that you do not know if
11  Mr. Hunter has a learning disability?
12    A. I do not know. I have no expert
13  knowledge of that.
14    Q. That's fine. And the next question here
15  is, Ms. Johnson is a GS-12; correct?
16    A. Correct.
17    Q. And she is performing at the GS-12 level;
18  right?
19    A. Yes.
20    Q. But she has errors in her grammar and
21  spelling as well; correct?

Page 158

1        MR. STRAND: Objection. Mis-states --
2  I'm sorry. Objection. Assumes facts not in
3  evidence.
4        MR. SNIDER: Is that correct?
5        THE WITNESS: I have picked up a typo or
6  two. Yes, sir.
7        BY MR. SNIDER:
8    Q. Okay. In fact, in the exact same ROI,
9  Exhibit Seven -- I believe it is an attachment to
10  your declaration, it is an e-mail -- page seven, I
11  believe, is an e-mail from Ms. Johnson which
12  states, in the first sentence -- can you pick out
13  an error there?
14        MR. STRAND: Objection. Assumes facts
15  not in evidence.
16        BY MR. SNIDER:
17    Q. Is this an e-mail from Ms. Johnson to Mr.
18  Hunter?
19    A. It could be that --
20    Q. And it is part of Exhibit 7-J of the ROI.
21  Doesn't the question mark belong inside the

Page 159

1  quotation marks?
2        MR. STRAND: Let me make my objection
3  before you answer. You are assuming that that is
4  an error. Objection. Assumes facts not in
5  evidence.
6        MR. SNIDER: That's fine.
7        BY MR. SNIDER:
8    Q. Do you believe that that is an error,
9  that the question mark should belong inside the --
10    A. Period and question mark inside the
11  quote.
12    Q. Okay. She says, "I made a few changes
13  but only to section that contained some of my
14  wording." That's a plural error; is that correct?
15        MR. STRAND: Objection.
16        MR. SNIDER: It should be "sections"?
17        MR. STRAND: Objection. You are
18  testifying.
19        MR. SNIDER: Is that correct?
20        MR. STRAND: Objection. You're
21  testifying.

---

**Elite Reporting Company**                          Page 156 - Page 159

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 160

1    MR. SNIDER: You can answer.
2    THE WITNESS: I agree.
3    BY MR. SNIDER:
4    Q. And she also has an incomplete sentence
5 on the last line; is that correct?
6    MR. STRAND: Same objection.
7    THE WITNESS: And are you referring to
8 the "you can"?
9    MR. SNIDER: Correct. Is that correct?
10    MR. STRAND: Same objection.
11    THE WITNESS: In — yes, with
12 qualification. In the sending of an e-mail, that
13 could stand in terms of expressing her point.
14    BY MR. SNIDER:
15    Q. It appears that she started a sentence,
16 ended it, and then started the same sentence
17 afterwards. Isn't that true? The "you can"
18 really is out of place and is not in —
19    A. Excuse me, please. I must take this
20 call.
21    (Telephone interruption.)

Page 161

1    MR. SNIDER: All right. We'll go off the
2 record.
3    (Whereupon, there was a brief recess.)
4    MR. STRAND: Objection. She can't
5 testify to your assumptions as to what that —
6    MR. SNIDER: That's fair. Withdrawn.
7    BY MR. SNIDER:
8    Q. Julie Johnson is Caucasian; is that
9 correct?
10    A. She is.
11    Q. And she was promoted from the GS-9 level
12 up to the 12 level between 2001 and today?
13    A. From the time that she arrived, which I
14 cannot remember the time, she has been. However,
15 she was a different — she came in at a different
16 status.
17    Q. She was a term employee for one year;
18 right?
19    A. For more than one year, if I remember
20 correctly.
21    Q. At the GS-9 level?

Page 162

1    A. At the GS-9 level.
2    Q. You had to go out and get an FTE for her
3 in order for her to be promoted in as an 11;
4 right?
5    A. I did not go out and get an FTE. The
6 department, the bureau made a determination that
7 25 to 30 of their employees, of which we only had
8 two, would be converted competitively, through a
9 competitive process, not just my team members, but
10 the team members within the Department of State.
11 So she applied and competed for the position.
12    Q. And you have never suggested to her that
13 she go to grammar courses; is that correct?
14    A. That is correct.
15    MR. SNIDER: Nothing further.
16    MR. STRAND: Okay. I have a couple
17 follow-ups.
18    EXAMINATION RESUMED
19    BY MR. STRAND:
20    Q. In your experience, does Mr. Hunter make
21 errors in his written work much more frequently

Page 163

1 than Ms. Johnson?
2    A. That is correct.
3    MR. SNIDER: Objection. Leading.
4    THE WITNESS: I'm sorry.
5    MR. STRAND: Okay. Let's get that answer
6 again, because you were talking over the
7 objection.
8    BY MR. STRAND:
9    Q. Is it your experience that Mr. Hunter
10 makes errors in his written work far more
11 frequently than Ms. Johnson does?
12    MR. SNIDER: Objection. Leading.
13    THE WITNESS: Correct.
14    BY MR. STRAND:
15    Q. Is it your experience that Mr. Hunter
16 makes errors in his written work far more often
17 than any member of your staff?
18    MR. SNIDER: Same objection.
19    THE WITNESS: Yes. May I clarify?
20    MR. STRAND: Yes.
21    THE WITNESS: Any member of my

Donald S. Hunter, Sr. vs.                    Multi-Page™                    Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State                            06/06/05

Page 164

1 professional staff.

2    BY MR. STRAND:

3    Q. Were Mr. Hunter's errors -- grammatical,

4 spelling errors, typos in his written work -- the

5 only reason that you decided not to grant him the

6 GS-13 accretion of duties?

7    MR. SNIDER: Objection. Asked and

8 answered. You went way over all of that. You

9 spent 40 minutes asking her why she didn't.

10    BY MR. STRAND:

11    Q. Were his -- were Mr. Hunter's problems

12 with spelling, grammar the only reason that you

13 decided not to give him the GS-13 accretion of

14 duties promotion?

15    A. No. Those are not the only reasons. We

16 are looking at --

17    Q. You don't have to answer further. We

18 have gone over the other reasons. I just wanted to

19 establish that --

20    A. I felt like I was repeating myself.

21    Q. -- that was not the sole reason.

Page 165

1    MR. STRAND: I have nothing further.

2    MR. SNIDER: Okay. We are off the

3 record.

4    (Whereupon, there was a discussion off

5 the record.)

6    (Whereupon, at 4:48 p.m., the deposition

7 was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Page 166

CERTIFICATE OF NOTARY REPORTER

I, Kathleen S. Wilson, a Notary Reporter, in
and for the State of Maryland, County of Anne
Arundel, do hereby certify that the Witness whose
testimony appears in the foregoing transcript was
first duly sworn by me; that the testimony of
said witness was taken by me and thereafter
reduced to typewriting by me or under my
direction; that said transcript is a true and
accurate record of the testimony given to the best
of my ability; that I am neither counsel for,
related to nor employed by any of the parties to
the action in which this deposition was taken; and
further, that I am not a relative or employee of
any attorney or counsel employed by the parties
hereto, nor financially or otherwise interested in
the outcome of this action.

_____

Kathleen S. Wilson

Notary Reporter

My Commission Expires March 1, 2006

**Elite Reporting Company**

## CERTIFICATE OF NOTARY REPORTER

I, Kathleen S. Wilson, a Notary Reporter, in and for the State of Maryland, County of Anne Arundel, do hereby certify that the Witness whose testimony appears in the foregoing transcript was first duly sworn by me; that the testimony of said witness was taken by me and thereafter reduced to typewriting by me or under my direction; that said transcript is a true and accurate record of the testimony given to the best of my ability; that I am neither counsel for, related to nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Kathleen S Wilson*
Kathleen S. Wilson
Notary Reporter

My Commission Expires March 1, 2006

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland 21146*
*410-987-7066   800-734-3337*

Donald S. Hunter, Sr. vs.                     Multi-Page™                          '02 - assigning
Colin L. Powell, Secretary, U.S. Dept. of State                                    Fannie L. Allen

**-'-**

'02 [2] 32:21 33:5
'04 [1] 23:1
'05 [1] 23:2
'90s [1] 10:17

**-0-**

001 [1] 53:14
0034 [2] 21:15 68:18
0038 [2] 21:15 68:18
00586 [1] 53:14
02-8 [1] 64:12
05-E-2 [1] 137:7
05-E2 [2] 65:14,18
05-E3 [1] 66:5
05-E4 [1] 66:20
07-G [1] 137:14

**-1-**

1 [2] 135:10 166:21
10 [1] 82:14
11 [18] 37:18 43:5 60:4,5
60:6,20 61:6,15 62:2,4,8
82:14 83:2 120:18 143:9
143:17 152:19 162:3
11-A [1] 63:6
11/12 [1] 122:1
12 [25] 8:5,6,7,10 24:4,9
24:21 37:10,18 39:6
61:19 63:9,11 72:4 75:14
82:14,14 88:8 93:9,10
93:18 120:18 143:10,21
161:12
12's [3] 7:3 32:15 117:21
13 [26] 27:16 37:12,19
40:5 43:6,7 46:21 63:13
72:1 75:14 78:19,20 93:2
93:20 94:4 99:10 105:6
118:13 119:10 120:8,19
139:12,19,21 143:10
144:2
13's [6] 7:2,8 11:6 32:16
109:13 119:17
14 [3] 104:11 143:10
144:7
15 [13] 82:7,8,11 141:14
142:2,2,3,3,7,7 143:10
143:15 144:10
15th [1] 143:4
17 [2] 60:4,6
18 [2] 38:15 39:1
19 [2] 60:4,7
1994 [5] 8:17 12:13,14
12:16 18:18
1997 [1] 57:14
1999 [4] 9:20 10:4 12:7
12:10

**-2-**

2-G [2] 88:11 89:11

2-H [1] 121:10
20 [3] 60:8 62:3 74:3
2000 [6] 9:20 10:4 22:18
69:18 127:20 146:11
2000s [1] 10:17
2001 [12] 34:7 35:14
69:18 70:10 90:5,13 92:2
100:2 103:8 107:11 109:4
161:12
2002 [17] 6:20 25:15 29:3
32:3 35:20 36:1 43:19
70:2 88:12,20 89:1,3,6
113:16 129:15 141:14
143:4
2004 [8] 8:11,14 22:19
29:16,16 90:5,14 109:4
2005 [2] 8:14 23:5
2006 [1] 166:21
20547 [1] 4:14
22nd [1] 89:3
24 [1] 129:15
24th [1] 25:15 29:3 43:19
89:5,6
25 [1] 162:7

**-3-**

30 [1] 162:7
301 [1] 4:13
365 [3] 57:1 64:4,5

**-4-**

40 [7] 34:10 154:1,2,4,6
154:15 164:9
409 [1] 57:1 64:5
47 [3] 65:14,18 66:1
4:48 [1] 165:6

**-5-**

52 [1] 94:11
524 [1] 4:14
587 [1] 64:7
593 [1] 64:7

**-7-**

7 [1] 137:9
7-A [1] 69:11
7-D [1] 76:1
7-E [1] 76:10
7-G [2] 76:12,13
7-H [1] 77:9
7-H-1 [2] 77:1,2
7-H-2 [2] 77:4 137:10
7-H-3 [1] 77:9 137:10
139:10
7-I [2] 77:18,20
7-J [3] 82:2 141:13
158:20

**-9-**

9/11/12 [4] 24:5,19 39:9
122:18
9/11/12's [1] 126:2
9th [1] 88:12,20 89:1

**-A-**

A-l-l-e-n [1] 4:10
abilities [6] 58:10 148:19
149:8,10,19 150:1
ability [4] 59:10 67:10
151:15 166:11
able [10] 18:7 75:6 119:18
123:16 125:21 135:9,12
135:15 138:20 146:18
above [2] 113:4 131:13
absence [4] 33:13,16
34:16 106:6
absent [2] 33:20 34:3
acceptable [1] 157:5
accepted [1] 116:7
accordance [2] 38:12
79:13
according [1] 136:6
accounting [1] 42:12
accretion [15] 15:17,21
16:4 126:10,15 127:4
129:19 131:5 132:1,12
133:9 149:9,21 164:6,13
accurate [10] 22:13,20
25:12 27:18,20 28:16
54:19 72:5 88:5 166:10
accurately [4] 58:15
69:17,21 89:12
achieved [3] 11:3 15:9
15:10
acknowledged [1]
105:13
acquainted [1] 137:20
acquisition [1] 13:12
act [1] 50:8
action [6] 8:19,21 9:3,5
166:13,17
actual [2] 58:20 59:8
adapted [1] 70:16
add [3] 30:9 91:10 96:16
addenda [1] 118:7
addendum [1] 123:12
addendums [1] 118:1
addition [1] 107:21
additional [3] 60:18
119:4 127:18
additions [1] 120:9
address [3] 4:8,11,12
adds [1] 98:18
administered [1] 100:6
admitted [1] 106:4
admittedly [1] 67:13
advanced [2] 40:20,21
advancement [10] 14:4
14:7 15:3,6,9,12 97:3,4
97:14,16

advertise [1] 151:13
advertised [1] 151:11
advice [8] 45:3,12,20
47:17 79:7 83:12 84:3
105:21
advised [1] 45:15
Affairs [1] 6:8
affidavit [5] 82:20 83:2
83:6 104:10 107:13
affidavits [3] 61:8 84:8
84:15
afford [1] 105:17
African [1] 39:15
African-American [4]
112:10,13,20 113:3
afternoon [4] 4:17,18
afterwards [1] 160:17
again [32] 5:3 11:14 17:2
21:2 33:3,11 36:17 51:1
55:19 57:12 64:18,18,21
68:11 72:6 73:7 74:14
78:21 86:8 95:5 99:20
105:1 109:7 110:1 117:17
122:5 124:6 125:21
133:15,17 144:8 163:6
age [4] 123:7 124:5
153:20 154:13
agency [7] 9:6,14 12:5
21:14 93:18 103:20,20
ago [1] 67:19
agree [5] 14:19 27:6 28:3
156:20 160:2
agreed [1] 27:1
agreement [3] 77:10
107:20 138:5
agreements [4] 59:9
137:21 139:1,12
ahead [9] 13:19 31:9
80:5,14 97:12 104:18
106:21 118:17 150:15
Ahern [25] 7:12 11:6
12:15 19:5 32:7 33:20
35:19 36:1,6,12 39:11
39:15,18 40:5,13,15 78:8
79:3 80:2 90:21 91:3,17
140:16 141:11,12
Ahern's [1] 83:2
Allen [10] 4:2,10,17
19:19 25:5 27:12 56:16
85:20 107:6 132:14
allow [2] 38:5,11
almost [1] 62:13
along [1] 98:15
always [1] 141:7
American [1] 39:16
among [1] 103:14
amount [8] 48:20 94:12
94:17 104:19,21 105:3,5
136:15
analysis [4] 125:8 138:6
140:21 143:7
analyst [1] 120:10
analysts [1] 119:18

analyzing [1] 118:20
Anne [1] 166:3
announcement [2]
10:13 11:4
annually [2] 29:10 57:18
answer [43] 5:19 12:3
16:8 17:17 30:8,12 37:14
37:15 44:14 46:4 55:16
60:8,18 62:2,13 71:4,19
95:1,3 96:8,10,16 101:13
109:11 116:3 121:1 124:2
133:3,4,4,5,17 154:21
155:7,8 156:19,21 157:3
157:6 159:3 160:1 163:5
164:17
answered [17] 36:10
51:16,20 94:21 95:6,18
97:8,9,11 149:2 156:5,9
156:10,13,20 157:1 164:8
answering [6] 5:18 61:1
72:6 76:19 108:12 125:15
answers [2] 71:16 156:16
apologize [3] 5:3 59:15
appeal [6] 86:1,15 134:4
134:5,10,11
appear [2] 22:13 153:5
154:15
appendix [1] 152:4
applicable [2] 94:3
135:16
applied [2] 113:16
162:11
apply [2] 135:13 151:15
appreciable [1] 74:20
appreciate [2] 59:17
64:21
approached [1] 130:3
approve [1] 98:5
approved [1] 148:15
April [2] 23:2,5
area [1] 108:2
areas [4] 91:16 119:3,3
137:2
arena [1] 67:16
argumentative [4]
37:21 44:6 95:6 156:4
Arnold [2] 114:1,3
arrival [3] 57:6,7,13
arrived [2] 11:8 161:13
Art [1] 42:17
artificially [1] 58:10
Arundel [1] 166:4
aside [4] 5:18 39:15,17
81:10
asks [1] 63:6
assert [1] 54:6
assign [2] 33:15 127:14
127:20
assigned [15] 19:1 29:2
32:2,4,9 33:11 73:1,5
100:3 101:11 128:10,12
138:20 139:3 140:10
assigning [1] 32:11

Donald S. Hunter, Sr. vs.                    **Multi-Page™**                    assignments - contained
Colin L. Powell, Secretary, U.S. Dept. of State                                Fannie L. Allen

**assignments** [20] 28:14 28:19 29:1,12,13 30:14 30:17 31:17 32:8 36:7 48:16 59:11 100:2 107:11 127:6,6 138:10 139:7 140:14,16

**assist** [1] 126:13

**assistance** [1] 74:11

**assisted** [1] 51:11

**Associate's** [1] 41:16

**associated** [2] 38:7 141:4

**assume** [4] 20:20 21:2 63:3 67:21

**assumes** [12] 29:4 30:19 31:16 34:11 56:10 94:1 94:1 111:4 114:11 158:2 158:14 159:4

**assuming** [2] 20:19 65:16 159:3

**assumptions** [1] 161:5

**Atlanta** [1] 35:8

**attach** [1] 152:3

**attached** [3] 82:19 137:9 137:13

**attaching** [1] 152:14

**attachment** [1] 158:9

**attachments** [1] 83:1

**attempt** [4] 10:15 11:12 11:15 146:8

**attempted** [2] 92:5 109:14

**attempting** [4] 37:4 95:10 96:3 116:14

**attempts** [1] 17:6

**attention** [5] 59:19 104:8 105:12 146:15 149:20

**attorney** [3] 4:20 22:4 166:15

**audible** [1] 69:12

**audit** [19] 15:20 16:3 86:15,19 87:19 89:17,18 89:20 90:1 102:6,13 103:4 120:17 128:6 134:16,18 135:3,8,20

**August** [1] 29:16

**authored** [1] 75:15

**authoritatively** [1] 101:13

**authority** [2] 99:11 103:8

**automatic** [1] 113:13

**automatically** [1] 113:11

**available** [2] 28:2,8

**avoid** [2] 124:16 152:7

**award** [2] 138:9,19

**awarding** [1] 59:9

**awards** [2] 138:18 139:4

**aware** [7] 32:8 42:21 50:9,13,18 113:15 146:15

-B-

**B** [1] 74:14

**BA** [1] 42:14

**Baccalaureate** [2] 41:4 42:8

**Bachelor's** [7] 40:18 41:19 42:16,17,17 103:14 113:10

**background** [1] 110:4

**backwards** [1] 146:17

**bad** [3] 64:15 145:14,15

**ball** [1] 35:13

**bargaining** [2] 77:10 153:18

**based** [11] 21:3 43:14,17 43:18 55:15 65:10 102:16 102:17 110:11 116:7 118:21

**basic** [17] 73:13 117:9,9 117:21 118:3,6,9,19 119:15,21 120:5,7,16,19 121:4 135:10,11

**basis** [4] 117:6 155:14 155:20 156:11

**Bates** [7] 21:14 53:13 56:19,21 64:5,6 68:18

**became** [3] 12:9 28:2 129:2

**become** [1] 78:10

**beg** [2] 53:9 114:2

**beginning** [5] 20:9 70:14 135:9 140:18 141:8

**behind** [1] 98:15

**behind-the-scenes** [1] 126:20

**belief** [2] 155:20,21

**believing** [1] 28:11

**belong** [2] 158:21 159:9

**below** [3] 60:16 61:17 63:9

**Ben** [3] 25:16 131:14 141:15

**benefitted** [1] 71:14

**best** [5] 7:7,17 24:2 70:3 166:10

**better** [1] 68:1

**between** [14] 32:2,21 33:5 34:6 57:19 58:18 65:5 75:14 80:20 90:13 109:12 142:17,17 161:12

**beyond** [3] 8:7 98:7 127:8

**bit** [1] 104:18

**black** [3] 6:2 40:8,8

**blanketly** [1] 106:3

**board** [1] 149:5

**bottom** [7] 25:19 61:3 65:4,6,7 69:6 75:12

**break** [3] 5:8 107:1 120:15

**brief** [8] 16:17 22:8 52:21

54:5 56:14 85:17 107:4 161:3

**briefly** [5] 5:3,17 52:20 53:3 64:9

**bring** [4] 104:8 123:2,5 146:14

**broken** [1] 60:1,2

**brought** [1] 105:12

**BS** [1] 42:14

**budget** [1] 138:5

**budgets** [1] 74:16

**burden** [1] 116:18

**bureau** [3] 6:7 113:19 162:6

**business** [3] 41:9,12 42:4

-C-

**C-a-s-t-r** [1] 25:16

**canceled** [1] 51:10

**candidate** [2] 28:1,8

**candidates** [1] 123:6

**cannot** [23] 10:12 22:21 26:4 62:21,21 66:19 67:8 69:4 86:12 87:5,6,9 88:21 89:7 92:3,20 101:12 105:17 110:10,10 130:21 132:14 161:14

**capitals** [1] 25:20

**career** [10] 8:4,5,8 23:21 24:5,20 39:9 93:16 123:7 138:14

**caring** [1] 35:7

**case** [4] 4:21 122:14 136:4 138:1

**cases** [1] 59:13

**Castro** [23] 25:16 26:2,4 26:14 27:3,8,19 28:10 43:19 44:1,11,15,19 88:13 129:16 131:14,17 132:1,8,19 133:7 141:15 141:21

**Castro's** [7] 27:2 28:4 35:20,21 47:10 132:7 134:8

**Caucasian** [2] 40:6 161:8

**caught** [1] 105:15

**certain** [8] 9:12,13,14 54:16 56:1 101:9 127:17 144:12

**Certainly** [3] 5:12 31:12 117:18

**CERTIFICATE** [1] 166:1

**certification** [1] 41:10

**certify** [1] 166:4

**chain** [2] 131:10,20

**challenges** [1] 79:5 113:14

**chance** [1] 125:15

**change** [1] 116:9

**changed** [2] 21:11 70:9

**changes** [3] 103:5 142:17 159:12

**Changing** [1] 111:12

**characteristics** [1] 74:6

**characterization** [2] 55:8 120:12

**charge** [1] 106:7

**chart** [1] 38:5

**chase** [1] 107:7

**check** [1] 106:8

**checklist** [2] 71:11,14

**chief** [1] 8:15

**Christmas** [1] 61:11

**chronology** [1] 129:18

**circled** [1] 143:19

**circumstances** [4] 36:2 38:4 135:14,15

**clarification** [3] 5:7 65:1 93:4

**clarify** [2] 96:16 163:19

**clarity** [1] 108:1

**class** [2] 145:18 146:4

**classifiable** [1] 134:3

**classification** [21] 19:8 19:11 86:1,15,19 134:4 134:5,10,12,14,15,17

**clear** [1] 5:7

**clearance** [1] 106:5

**close** [1] 79:2

**closed** [1] 98:15

**closely** [4] 90:4,12,15 128:9

**clutter** [1] 125:11

**coach** [1] 106:15

**coached** [1] 110:12

**coaching** [20] 48:13,18 49:7,15,18 50:11 99:3,4 104:19,21 105:3,5,18 126:21 146:8,10,20 147:4 148:17,18

**collective** [1] 77:9

**collectively** [1] 67:9

**college** [2] 42:7 148:15

**comfort** [2] 74:12 148:2

**comfortable** [1] 131:1

**coming** [3] 46:20 57:4 58:3

**command** [2] 131:10,20

**Commission** [1] 166:21

**common** [1] 91:15

**communication** [3] 107:14,17 110:8

**communications** [1] 143:13

**Community** [1] 148:15

**competed** [1] 162:11

**competence** [1] 151:9

**competitive** [10] 10:13 11:4 14:4,10 15:5,11,12 92:14,15 162:9

**competitively** [5] 11:9

**changes** [3] 103:5 142:17

11:10 15:15 40:11 162:8

**complaint** [5] 83:9,11 84:1,5,14

**complete** [4] 10:7 59:11 117:21 144:5

**completed** [3] 56:16 61:10 103:4

**completing** [1] 135:11

**completion** [1] 71:10

**complex** [10] 18:4 72:21 73:18,18 100:1 107:10 134:20 137:11,14,21

**complexity** [6] 60:7 63:8 72:18 136:14 150:10 151:5

**complied** [1] 78:6

**comply** [3] 29:9 116:14 116:21

**component** [1] 90:19

**Compound** [1] 32:15

**comprehensive** [1] 68:12

**comprehensiveness** [1] 72:19

**concern** [2] 144:18 145:10

**concerned** [3] 84:18 145:2,3

**concerning** [1] 43:4

**concerns** [2] 79:5 145:20

**concise** [1] 140:5

**concluded** [1] 165:7

**conclusion** [3] 44:17 46:20 57:5

**concur** [1] 132:15

**conduct** [1] 135:9

**confirm** [1] 110:12

**confused** [1] 51:21

**confusing** [1] 62:12

**confusion** [1] 65:11

**congressional** [2] 12:6 74:2

**connection** [2] 4:20 44:21

**Connie** [5] 32:7 128:19 128:20 140:2 143:3

**conscious** [1] 48:15

**consider** [2] 115:8 134:20

**considered** [1] 130:19

**consistency** [1] 141:8

**consistently** [3] 111:8 147:20 148:3

**constitute** [1] 49:15

**constituted** [1] 49:7

**consult** [2] 45:8,10 135:16

**consultation** [3] 45:13 47:17 132:13

**contact** [4] 48:1 78:5 81:13 114:13

**contained** [1] 53:6 56:11

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Contemporary - easier
Fannie L. Allen

57:9 64:17 65:1 67:4
159:13

**Contemporary** [2]
138:8 139:4

**continue** [2] 125:10
139:6

**continued** [5] 60:20
109:9 110:12 127:14
146:2

**continues** [1] 146:5

**continuing** [3] 125:11
150:14,16

**contract** [2] 120:5,7

**contractor** [1] 72:10

**control** [7] 18:9 33:15
90:18 91:6,8,13 106:8

**controlling** [2] 68:20
69:2

**conversation** [6] 83:16
83:19 88:7 105:13 130:9
130:11

**conversations** [3] 84:13
130:5,7

**converted** [1] 162:8

**convey** [1] 48:9

**conveyed** [1] 47:20

**coordinator** [1] 115:15

**copies** [1] 22:1

**copy** [10] 20:16 22:13
25:12 26:9,11,14,17 50:6
152:18 153:6

**correct** [113] 7:13 10:19
19:4,6,7 23:3,8,11,13,19
23:20 24:1,14,15,18,20
25:1,17,18,21 26:1 27:5
27:16,17 37:8,12 39:9
39:10,13,14 41:15,17,20
41:21 42:2,3,5 48:7 64:7
64:8 68:2,3,6 70:10
79:20,21 80:3 82:21 83:3
83:6,7 84:8,15 87:4,19
88:2,3,6,9 91:1,4 92:13
92:16,17,19 93:2 94:19
103:9,15 104:6 105:10
108:21 110:21 115:20
119:8,11 121:15 122:9
122:18,20 124:10,12
126:3,6,7,11 131:4 139:2
140:11,12 142:4,5,12
143:19 145:18,19 153:5
154:3,9 157:15,16,21
158:4 159:14,19 160:5,9
160:9 161:9 162:13,14
163:2,13

**correction** [1] 51:2

**correctly** [2] 26:15
161:20

**cost** [4] 74:18,21 116:9
135:13

**counsel** [9] 4:3 5:16 45:4
46:12,15 48:10 79:7
166:11,15

**counseled** [1] 46:18

**country** [1] 125:3

**County** [1] 166:3

**couple** [1] 162:16

**course** [10] 50:5 68:11
71:13 109:9 147:7 148:10
148:11,14,16

**courses** [5] 99:15,17
126:19 148:13 162:13

**court** [2] 5:13 125:20

**cover** [1] 21:4

**created** [4] 70:4 78:1
79:8 121:20

**credits** [1] 41:2

**critical** [2] 122:3,6

**cross** [4] 124:17,21 125:1
125:3

**Cultural** [1] 6:7

**cure** [1] 30:21

**current** [1] 27:13

**cut** [1] 96:15

**-D-**

**D.C** [1] 4:14

**daily** [5] 30:5,6,7 70:16
117:6

**Damon** [1] 100:15

**date** [7] 10:12,17 26:8
86:13 87:5,6 92:4

**dated** [2] 61:8 141:14

**dates** [3] 22:21 26:5
111:14

**day-to-day** [1] 33:8

**days** [1] 13:8

**deal** [1] 74:7

**dealing** [1] 74:15

**dearth** [1] 9:8

**Debbie** [1] 154:12

**Deborah** [1] 154:12

**December** [1] 22:19

**decide** [2] 67:5 134:5

**decided** [2] 164:5,13

**deciding** [3] 54:18 56:1
57:16

**decision** [42] 36:14,18
36:20,21 37:2,9,13,17
43:3,9,13,14,17,20 44:1
45:1,5,9 47:6,9,10,10,16
47:20,20,21 48:5,8,9
51:5,11 52:4 77:14 79:16
80:21 106:16 123:17
131:9 132:7 134:8 149:9
149:21

**decisions** [1] 114:9

**declaration** [6] 62:9
152:1,19 153:6,10 158:10

**definitely** [4] 17:15 63:1
128:14 136:4

**definition** [1] 119:14

**definitive** [1] 17:17

**degree** [17] 40:18,20,21
41:3,4,16,19 42:1,8,10
42:13,16 103:14 113:10
136:13,15 151:9

**degrees** [1] 42:19

**delegated** [2] 32:10
103:8

**deliver** [1] 129:6

**demonstrate** [1] 130:15

**demonstrated** [1]
104:16

**demonstrates** [2] 61:19
63:11

**denied** [5] 14:21 15:12
27:11 131:4,7

**deny** [1] 79:16

**denying** [3] 59:1,5
132:19

**department** [31] 6:4
8:18,20 11:21 12:7,9
13:9 16:5 18:5 20:19
21:3 35:6 70:7,15 73:20
74:1 97:19,20 98:5 99:18
103:19,21 114:21 115:8
116:8,13 123:4 148:10
149:13 162:6,10

**department's** [1] 38:5

**deponent** [1] 55:5

**deposed** [1] 4:21

**deposition** [7] 19:20
22:1 25:2 85:19 104:2
165:6 166:13

**depth** [2] 108:1 149:5

**Describe** [1] 60:7

**describes** [3] 69:17,21
89:13

**description** [7] 20:16
22:14 69:9,17 88:5,8
89:12

**descriptions** [2] 75:19
122:4

**designated** [1] 90:20

**desire** [2] 46:10 130:1

**desk** [11] 15:20 16:3
86:14,18 87:19 89:17,18
89:20 90:1 134:16,18

**detail** [6] 30:3,4,5,7
32:10 72:19

**detailed** [1] 107:21

**details** [1] 83:13

**determination** [7] 54:9
119:2 123:15 131:16
133:8,11 162:6

**determines** [1] 136:20

**develop** [2] 99:14,19

**developed** [2] 71:11,15

**development** [10] 18:11
29:9 73:4 98:4,19 99:2
126:14,19 138:15 147:6

**developmental** [4]
138:10,14 140:14,15

**DHHS** [1] 115:9

**DHHS/PMS** [2] 141:18
142:9

**difference** [5] 58:18 60:7
65:5,8 109:12

**different** [7] 30:16 75:18
156:14,16,21 161:15,15

**differentiate** [1] 57:19

**differentiation** [1]
75:13

**difficult** [1] 109:5

**difficulty** [1] 67:15

**diploma** [1] 41:14

**direct** [3] 37:14 51:10
81:12

**directing** [2] 86:2 99:3

**direction** [1] 166:9

**directive** [2] 64:6 113:12

**director** [6] 11:20 12:21
13:1,4 45:18 116:20

**disability** [5] 154:18
155:4,12 156:3 157:11

**disagree** [5] 27:6 28:6,7
28:9 125:7

**disagreed** [3] 27:1 131:8
131:16

**disapprove** [1] 98:6

**disconnect** [1] 80:11

**discovered** [1] 147:10

**discuss** [7] 14:6 15:8
83:9 144:17 145:10,12
147:4

**discussed** [10] 14:9
15:11 27:13,19 29:17
33:21 46:5 48:19 108:3
117:10

**discussion** [7] 11:19
14:11 15:7 86:14 92:11
121:7 165:4

**discussions** [8] 12:19
13:14 14:2 59:14 92:21
94:18 95:20 98:14

**distinct** [1] 93:20

**distinction** [2] 72:12
138:17

**distinctions** [1] 72:16

**distracting** [1] 84:12

**distributed** [1] 140:5

**distribution** [1] 7:2

**Disturbing** [1] 84:20

**division** [5] 6:8 8:16
113:18 122:17 139:17

**document** [73] 20:2,4,7
20:10,12 21:13,16 25:6
25:7,8,10,11,13 26:3,7
26:12,13,14 27:1,2,7
43:18 44:9,10 50:9,13
52:14 53:6 57:4 58:20
64:6 65:19,21 67:3,9,12
67:14 72:20 73:10 75:16
76:9 82:1,4,5 84:19
86:12 87:3,7 88:12,18
88:21 89:2,15 102:19,21
103:12,16 105:11 108:1
117:12 121:14,21 130:21
138:1,4,7 139:14,14
140:4,5 141:13 146:16
149:3

**documented** [5] 48:19
49:1,21 50:1,16

**documents** [63] 44:15

44:18,20 46:19 49:3,6
49:14 51:12,17 52:3,9
52:16,19 53:11 54:16,18
55:13 56:1,3,5,7,11,17
56:19 57:21 58:4,8,21
59:5 61:17 63:8 64:3,10
69:6 73:6,9,12 74:8 75:7
75:8,10 78:1 79:8 82:18
85:1,4,5,6,8,11 87:8,9
106:7 108:14,18 111:14
116:12,14 117:21 137:9
137:13 142:14,17

**doesn't** [5] 21:10 60:20
151:1 157:3 158:21

**dollar** [4] 136:15,19
137:1 151:19

**dollars** [1] 74:4

**Donald** [3] 4:4 25:17
141:15

**done** [20] 20:3,5 29:10
32:13 33:18 48:21 49:18
49:18 69:18 70:2 73:7
73:14 97:21 118:18
126:13 137:15 138:2,2
140:2 148:3

**door** [1] 16:21

**doors** [1] 98:15

**doubt** [1] 50:3

**down** [3] 18:20 67:16
125:21

**dozen** [1] 38:19

**draft** [5] 141:16 142:4
142:18 143:2,5

**drafted** [3] 62:11 139:21
142:9

**drafting** [1] 140:21

**draw** [1] 59:19

**drawing** [1] 149:5

**drawn** [1] 138:17

**due** [2] 34:17 95:15

**duly** [2] 4:5 166:6

**duplication** [1] 152:8

**duplicative** [1] 152:9

**during** [6] 19:6 22:17
33:20 35:2 106:6 109:4

**duties** [30] 15:17 16:1,4
18:21 34:17 68:17,19,20
69:2 70:1,9 71:20 72:13
85:21 89:13 101:17 102:1
126:10,15 127:5 129:20
131:5 132:2,12 133:9
134:3 149:9,21 164:6,14

**duty** [4] 33:14 34:18,20
136:21

**-E-**

**e-l-l-e-r** [1] 13:6

**e-mail** [5] 87:17 158:10
158:11,17 160:12

**e-mails** [4] 52:10 87:13
108:15,17

**E4** [1] 66:20

**early** [2] 10:17 148:7

**easier** [1] 120:15

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

East - grade
Fannie L. Allen

**East** [1] 138:13 139:5
**ECA** [6] 9:3 112:7,11
113:4 115:4 141:17
**ECA-IIP/EX/HR** [1]
134:6
**editing** [1] 59:14
**edits** [2] 142:20 143:1
**education** [2] 40:15
41:11
**educational** [4] 6:7 40:9
40:13 41:7
**Edward** [1] 13:5
**EEO** [5] 4:20 62:10 83:9
84:1,14
**effort** [5] 28:14,18 51:8
68:15 116:20
**efforts** [1] 74:16
**eight** [8] 6:17 7:8 60:19
67:2 69:11 74:3 82:14
142:6
**either** [5] 36:6 37:8,11
38:1 56:11
**element** [2] 122:3,7
**eligibility** [1] 93:19
**eligible** [2] 92:8 93:1
**employ** [1] 112:7
**employed** [5] 6:3 12:4
13:9 166:12,15
**employee** [5] 64:11
94:10 103:13 161:17
166:14
**employees** [4] 92:6
112:7 153:18 162:7
**encourage** [1] 98:14
**encouraged** [3] 99:17
102:10 128:14
**encouragement** [1]
128:5
**encouraging** [1] 126:21
**encumbered** [2] 21:1
22:14
**end** [10] 20:9 23:1 80:8
82:13 102:19 103:6 107:8
135:10,11 141:8
**ended** [1] 160:16
**ends** [1] 107:7
**engage** [2] 18:11 48:12
**engaged** [1] 87:10
**enhance** [1] 99:15
**enhanced** [2] 29:21 30:2
**enhancing** [1] 98:21
**enormous** [3] 104:19,21
105:3
**enroll** [1] 148:1
**ensure** [2] 36:4 127:5
**ensuring** [1] 127:2
**enter** [1] 77:13
**entire** [11] 20:7 65:14,17
66:20 76:13,14 77:2,4
77:18 152:3,14
**entirety** [2] 83:15,18
**entitled** [2] 86:1 134:4

**equal** [1] 9:9
**error** [9] 143:15,21 144:7
144:9,9 158:13 159:4,8
159:14
**errors** [31] 67:12 68:6
105:9,10,16 107:16 108:4
108:6,7,15 109:4,7,13
110:14 111:2,6,8,12,13
143:11,19 144:3,9 146:3
146:6 157:20 162:21
163:10,16 164:3,4
**escape** [1] 52:16
**escapes** [1] 45:17
**especially** [1] 124:15
**essentially** [1] 71:20
**establish** [2] 142:13
164:19
**estimate** [1] 146:9
**evaluating** [1] 118:20
**evaluation** [4] 57:8,17
64:18 136:9
**evaluations** [2] 57:13
57:16
**events** [1] 129:18
**evidence** [9] 29:5 30:20
34:12 94:2 111:5 114:12
158:3,15 159:5
**evident** [1] 147:18
**exact** [2] 92:4 158:8
**exactly** [5] 46:3 131:18
137:17 150:4 156:12
**examination** [7] 4:15
122:11 124:18,21 125:1
153:15 162:18
**examine** [1] 125:3
**examined** [1] 4:6
**example** [9] 61:18 63:10
73:17 77:21 111:11 138:9
138:14 140:6,19
**examples** [12] 60:16
61:16 63:7 106:18 107:16
111:16 112:4 128:2
134:19 135:2 137:10,14
**excellent** [4] 27:14 28:1
122:3,6
**excerpts** [2] 61:16 63:7
**excuse** [5] 29:20 31:7
43:5 72:9 73:19 113:1
134:12 154:20 160:19
**executed** [2] 73:1 104:17
**executive** [1] 116:20
**exercised** [1] 90:19
**Exercising** [2] 131:18
131:20
**exhibit** [56] 19:20 22:11
25:2 43:21 59:20 60:9
61:14 63:4,5,13,15 64:11
64:12 68:17 69:11 76:1
76:10,12,13 77:1,18,20
82:2,2,13,17 83:2 85:19
85:19 88:10 89:11 103:12
104:2,8,9 113:12 121:10
122:8 129:15 132:5,6
134:1 137:4,4,7,9,13

**F-a-n-n-i-e** [1] 4:9
**facing** [1] 84:11
**fact** [11] 27:6 28:18 45:14
77:16 102:12 105:8 109:6
129:3 134:9 145:16 158:8
**factors** [2] 136:12,20
**facts** [9] 29:4 30:19 34:11
94:1 111:4 114:11 158:2
158:14 159:4
**factual** [2] 83:14,17
84:20
**fair** [10] 9:9 35:18 58:13
60:19 87:18,21 120:12
125:14,16 161:6
**false** [1] 101:18
**familiar** [4] 9:1 20:10
20:11,11
**familiarity** [1] 73:12
**familiarization** [1]
147:18
**family** [1] 35:7
**Fannie** [3] 4:2,9 132:13
**far** [3] 15:14 163:10,16
**fashion** [1] 75:9
**fast** [1] 105:15
**fathomed** [1] 70:14
**federal** [4] 18:12 74:11

**feels** [1] 85:21
**Fellowship** [2] 138:9
139:4
**felt** [2] 44:11 164:20
**female** [2] 39:12 92:6
**few** [7] 51:9 68:6,7 98:16
107:6 153:14 159:12
**field** [2] 147:16,16
**Fifty-two** [1] 94:14
**figure** [1] 71:18
**figured** [1] 152:2
**file** [4] 86:1 134:4,9,9
**final** [5] 141:20 142:8,11
142:18 143:2
**finally** [1] 148:6
**financial** [3] 113:16,18
114:17
**financially** [1] 166:16
**findings** [3] 75:7 102:16
102:17
**fine** [7] 4:12 43:16 96:1
125:9,13 157:14 159:6
**finish** [3] 76:16 108:11
118:17
**finished** [2] 30:8 105:20
**first** [17] 4:5 26:6 27:4
55:16 60:2 65:15 121:17
129:4,20 130:1,8 131:14
132:10 141:13 144:4
158:12 166:6
**five** [2] 77:8 156:2
**flip** [1] 69:7
**flipped** [1] 66:3
**focus** [1] 91:7
**focused** [1] 71:12
**focuses** [1] 80:18
**focusing** [1] 149:19
**folder** [1] 56:21
**follow** [4] 106:2 109:8
122:14 141:7
**follow-on** [1] 139:1
**follow-up** [1] 96:18
**follow-ups** [1] 162:17
**followed** [1] 138:3
**following** [1] 83:5
**follows** [2] 4:6 106:2
**foregoing** [1] 166:5
**forever** [1] 80:7
**form** [3] 50:1 52:15
143:2
**formulating** [1] 118:7
**found** [5] 50:6 60:15
113:20 143:6 147:9
**foundation** [11] 9:16
31:2 54:7 68:21 84:16
93:3 133:13 142:13
144:20 154:19 155:13
**four** [10] 7:7 10:18,20,21
11:1 40:2,4,9,16 59:20
59:21 60:9 61:4,14 62:4

**62:8 63:4 71:3 76:2,3,5**
91:20 92:1 103:9 104:11
121:21 142:2 156:14,16
**Fourteen** [1] 121:11,13
**Fourth** [1] 4:13
**frame** [1] 80:18
**frequency** [9] 109:2,6
109:13,14,15,17,19 110:18
146:12
**frequent** [6] 48:12 50:11
50:15 109:3 110:16,19
**frequently** [6] 143:12
144:18 145:3 146:9
162:21 163:11
**front** [5] 34:5 56:8,21
88:11 147:21
**FTE** [2] 162:2,5
**full** [1] 4:7
**fully** [3] 74:20 96:10,14
**function** [1] 78:12
**functioning** [3] 46:11
130:13 131:2
**fund** [1] 116:20
**funded** [1] 23:9
**funder** [1] 74:15
**funding** [1] 116:19
**future** [1] 28:2

**-G-**

**G** [1] 63:15
**gather** [1] 102:20
**gender** [1] 9:13
**general** [1] 70:8
**Generally** [1] 107:18
**genuine** [1] 20:16
**Georgia** [2] 35:11,12
**given** [30] 26:9,10,11
29:6 54:8 57:7 59:11
62:18 73:8 79:18 85:2
86:11 87:4 98:9,10 99:11
99:13 100:1 105:21 106:1
107:10 108:2 117:1 128:3
138:11,15 140:14 150:3
157:2 166:10
**giving** [7] 79:3 83:13
84:7 119:1 123:7 137:18
137:19
**Global** [1] 113:18
**goals** [1] 18:19
**goes** [2] 71:7,8
**gone** [1] 164:18
**good** [5] 4:17,18 5:18
41:6 68:9
**governed** [1] 69:20
**government** [3] 93:18
122:14 148:11
**grade** [23] 6:9 7:21 9:14
36:14,18,21 61:19 63:11
68:19 69:2 72:14,15
92:20 93:11,13 94:2,6
94:11,17 95:15 100:16
115:16

**Elite Reporting Company**

Case 1:06-cv-00326-PLF    Document 9-5    Filed 06/02/2006    Page 50 of 55

Donald S. Hunter, Sr. vs.                    Multi-Page™                    grades - justified
Colin L. Powell, Secretary, U.S. Dept. of State                            Fannie L. Allen

**grades** [2] 6:16 118:1
**gradual** [1] 15:21 16:4
**grammar** [9] 68:6
107:14,19 108:18 144:18
145:4 157:20 162:13
164:12
**grammatical** [5] 67:11
110:13 111:2 143:11
164:3
**grandfathered** [3]
104:1,6 113:11
**grant** [14] 7:20 8:3 23:6
52:9 71:8 99:12 100:6
102:17 103:11 117:8
134:21 137:21 141:17
164:5
**granted** [2] 126:9,15
**grantees** [3] 115:6 116:6
116:11
**grants** [27] 6:8,12 8:16
9:21 10:10 59:8 71:7
72:13 74:9 99:7 101:8
102:4,4 108:20 113:9,17
115:5,14 118:3 122:17
127:8 135:5,8 139:17
141:4 147:15 151:18
**great** [2] 74:7 116:18
**groom** [8] 96:6,12 97:3
97:5,14,16,21 99:9
**groomed** [7] 96:5,6,21
97:2,2,13,19
**grooming** [2] 99:2,5
**ground** [2] 5:2 73:13
**groundwork** [1] 117:11
**group** [1] 12:17
**grunt** [2] 119:16 120:2
**GS** [5] 7:7 27:15 37:9,18
94:3
**GS-11** [1] 7:8
**GS-11's** [1] 6:17
**GS-12** [25] 7:8,14 8:1
9:21 10:9 15:17,19,21
27:14 69:9 75:21 78:12
88:5 89:12 92:19 94:7
104:20 126:10,15 127:5
127:15 129:2 136:21
157:15,17
**GS-12's** [3] 6:17 10:19
32:13
**GS-13** [59] 10:1,11,11
10:14 11:3,17,18 14:7
16:14,15 17:5,7,12,20
23:6,15,19 24:13,17 28:1
28:15,20 29:2 30:15,18
36:8 37:8 38:2 39:7 40:4
43:1 44:4 67:10 68:2,9
68:10 71:3 73:14 74:13
75:21 79:1 85:21 88:2
92:8,16 94:3,7 95:11,15
97:1,6,19 98:1 101:10
101:15,21 102:15 103:3
103:5 104:20 108:20
113:4 117:11,20 127:16
128:4 129:20 130:2,10
130:16,20 131:6 132:2
133:9 134:3 135:18,21

136:2,3,5,11,21 138:2
138:19 139:8 140:7
149:21 150:7 164:6,13
**GS-13's** [24] 6:17 7:11
10:18 18:3 19:2,5 20:17
29:7 32:14 68:5 84:1,13
91:20 92:1 103:9 120:3
134:21 137:11,15 138:21
140:20 141:3 149:15
151:18
**GS-13/14** [1] 114:18
**GS-14** [1] 6:10
**GS-2** [1] 7:9
**GS-3** [1] 7:9
**GS-8** [3] 115:17 117:4,5
**GS-9** [7] 7:16,17 24:7
39:6 161:11,21 162:1
**GS-9's** [1] 6:17
**GS-9/11/12's** [1] 150:13
**guess** [12] 7:7 12:11 19:2
19:19 48:4 57:3 60:1
61:1 82:13 94:8,9 117:8
**guidance** [7] 18:5,6 78:8
79:1,2,15 116:21
**guys** [2] 58:11 125:19

**-H-**

**H** [2] 64:13,14
**H-1** [1] 137:10
**half** [1] 38:19
**hand** [1] 53:13
**handbook** [6] 77:11,12
139:16,18,19 140:1
**handed** [3] 18:20 50:5,7
**handle** [1] 147:19
**handled** [2] 151:18,19
**handwriting** [1] 66:9
66:10
**hard** [3] 146:12 148:9,11
**hate** [1] 53:16
**head** [2] 5:10 81:20
**Health** [1] 115:1
**hear** [3] 90:10 110:5
133:3
**heard** [1] 147:9
**heavy** [1] 138:5
**held** [6] 19:14,15 93:10
93:18 146:10 151:12
**help** [4] 99:18 127:7,15
128:3
**helping** [2] 44:16 127:1
**hereby** [1] 166:4
**hereto** [1] 166:16
**herself** [1] 112:12
**high** [6] 40:15 41:14 74:9
140:6 141:6 151:19
**high-level** [2] 18:4,8
**higher** [5] 73:1,15 119:16
127:6,7
**highest** [3] 41:10,11
72:15

**highlighted** [1] 144:3
**highly** [4] 72:21 73:18
137:10,21
**Hill** [4] 45:18 47:17 86:2
134:6
**himself** [1] 28:6
**historical** [2] 9:7,12
**Hold** [1] 60:5
**holidays** [1] 61:12
**home** [1] 4:11
**honest** [1] 128:13
**hope** [2] 5:4 91:14
**hopefully** [1] 123:8
**hoping** [1] 105:14
**hours** [1] 64:14
**HR** [16] 19:13 20:18 21:3
24:10 38:12,16 44:20,21
45:3,8,11,15,18,19 70:6
90:3
**human** [6] 19:16 46:16
86:20 90:3 115:1 132:14
**Hunter** [134] 4:4,20 7:14
15:16 25:17 26:3,10
28:19 29:2,6,19 32:2
33:1,4,9 36:7 39:8 42:9
42:10,21 45:2 46:11
47:16,20 48:1,10,12 49:7
50:8 51:6,7,10 52:5,11
53:8 54:19 56:2 57:6,16
57:17 64:19 66:11,21
67:6,15 69:18 70:2 71:2,6
71:21 73:3,8 74:19 78:4
79:17 85:21 86:11,18
87:4,19 88:13 89:19 92:7
92:18 94:16 95:14 96:21
97:3,13,17,18 98:1,2
99:9,11,13,17 100:3,5
100:19 101:2,5,11 102:1
105:7,13 106:1,1 107:10
111:7 113:15 114:17,20
115:21 116:7 118:5 119:4
126:9 128:21 129:16
130:3,6 131:15 134:9
135:19 136:10 137:15
138:2,11,15,19 140:3,10
141:1,10,15 142:4,8
143:12 144:18 145:3
150:7,10 151:4,14,18
154:17 155:11 156:3
157:11 158:18 162:20
163:9,15
**Hunter's** [30] 27:9 36:3
46:7 59:1,7 61:16 63:7
69:10 80:20 81:13 83:9
83:11 84:1,14 95:20
102:7 103:2 107:14 109:3
117:7 129:16,19 132:7
133:9 137:18 141:16
143:2,4 164:3,11

**-I-**

**idea** [5] 5:18 36:3 72:17
79:4 151:1
**identification** [3] 19:21
25:3 104:3
**identified** [7] 64:4,10

105:8 111:18,20,21 112:5
**identify** [4] 49:14 56:7
64:2 91:16
**IDP** [3] 29:8,10 99:14
**imbalance** [1] 9:7
**immediately** [4] 48:8
83:5 101:8 146:14
**implied** [2] 44:12,13
**important** [2] 68:2
72:11
**improve** [1] 146:8
**improvement** [1]
107:15
**in-house** [2] 126:18
148:12
**included** [2] 21:4 65:12
**including** [3] 54:16 56:2
**inclusive** [1] 99:14
**incomplete** [1] 160:4
**increase** [1] 99:12
**indeed** [3] 79:12 98:16
119:3
**independence** [2] 135:4
135:17
**independent** [1] 133:18
**independently** [4] 18:6
18:7 59:12 132:19
**indicate** [1] 43:21
**indicated** [1] 148:7
**indicates** [1] 44:10
**indirect** [3] 74:17,21
135:13
**individual** [1] 15:14
**individually** [1] 57:11
**individuals** [11] 11:21
13:16 14:5,7 15:3,10
32:4 33:12,16 40:3,10
**ineligible** [1] 95:14
**inform** [5] 35:19,21
128:17,20 131:8
**information** [15] 12:5
18:16 25:16 51:5 58:9
58:19 64:17 65:1 66:6
67:4 79:18 103:20 118:3
139:13 150:3
**informed** [2] 87:21 88:4
**initial** [11] 4:10 73:10
107:19 131:5,7 133:10
138:1,3,19 140:20 141:4
**initials** [1] 61:3
**initiate** [3] 87:19 89:17
89:18
**input** [4] 48:5,13 50:15
70:7 81:1 140:4
**inside** [4] 57:9 158:21
159:9,10
**inspected** [1] 68:4
**instruct** [2] 36:6 95:3
**instructions** [1] 109:8
**intend** [3] 76:5,13 82:3
**intended** [1] 77:2
**intending** [1] 152:13

**interactions** [2] 81:10
149:12
**interested** [2] 31:3
166:16
**internal** [3] 139:16,18
139:19
**internally** [1] 18:8
**interpose** [1] 16:8
**interposed** [1] 62:2
**interpretation** [1] 68:12
**interpreted** [1] 157:8
**interrupted** [2] 105:20
118:16
**interruption** [3] 16:17
17:1 160:21
**interview** [1] 87:14
**interviewed** [2] 86:20
87:6
**introduced** [1] 68:17
**investigation** [7] 56:9
59:20 64:12 65:14 66:5
80:1 112:4 134:20 153:7
**investigator** [1] 62:10
**investigator's** [1] 85:9
**involved** [6] 36:4 45:1
47:5,15 71:1 146:7
**involvement** [1] 86:17
**involves** [1] 86:19
**issued** [2] 10:14 26:3
**issues** [7] 95:16 136:5
138:8 139:4 146:21 147:3
155:19
**items** [3] 29:18 56:20
74:17
**itself** [2] 58:20 124:5

**-J-**

**Jackie** [1] 45:18
**Jacqueline** [2] 86:2
134:6
**January** [2] 141:14
143:4
**job** [4] 24:19 39:8 122:3
122:7
**Johnson** [7] 7:18 157:15
158:11,17 161:8 163:1
163:11
**Johnson's** [1] 153:20
**joint** [2] 152:4,15
**jot** [1] 67:16
**judge** [1] 125:2
**Julie** [3] 7:18 153:20
161:8
**July** [1] 43:18
**June** [14] 25:15 29:3 32:2
32:21 33:5 34:7 35:20
36:1 43:18 89:3,4,5,6
129:15
**justification** [3] 130:17
130:19 148:13
**justified** [1] 148:9

Donald S. Hunter, Sr. vs.   Multi-Page™   Kathleen – next
Colin L. Powell, Secretary, U.S. Dept. of State   Fannie L. Allen

### -K-

**Kathleen** [2] 166:2,19
**keep** [5] 18:10 50:6 71:11 96:19 156:18
**keeps** [2] 72:4 109:6
**kept** [1] 32:8
**kind** [1] 109:10
**kinds** [6] 75:4 105:16 111:13 146:5,18 149:2
**knew** [1] 27:8
**knock** [1] 16:21
**knowing** [2] 135:13 147:16
**knowledge** [20] 16:2,6 18:12 24:3 42:20 51:7 51:10 59:7 66:18 70:3,3 74:10 91:14 99:15 104:16 112:16,18,19 156:7 157:13

### -L-

**L** [2] 4:2,10
**lack** [3] 108:1,1 118:3
**lacked** [1] 113:9
**ladder** [8] 8:4,5,8 24:1,6 24:20 39:9 93:16
**lady** [1] 115:14
**laid** [1] 29:18
**language** [2] 132:16,18
**last** [14] 4:10 28:13 38:14 38:15 39:1 62:4 71:3 87:2 89:10 93:4 103:12 109:11 153:1 160:5
**late** [1] 10:17
**lead** [3] 50:21 103:1 124:17
**leader** [15] 33:12 71:11 78:9,10,17 79:7,11 103:1 114:20 127:2,12,12 128:18 140:2 143:3
**leaders** [20] 32:5,9 33:10 33:14 48:3,6,14 74:21 80:3 81:2 90:19,20 100:21 102:18 105:8 113:2 136:6 149:14 150:3 153:17
**leadership** [1] 14:17
**leading** [12] 124:1,15 125:4,6,10 126:5 133:1 133:14 145:6 150:19 163:3,12
**leads** [1] 70:17
**learn** [2] 129:21 130:1
**learning** [5] 154:18 155:3,12 156:3 157:11
**least** [1] 92:1
**leave** [1] 100:13
**led** [1] 67:4
**Lee** [5] 114:1,3,8,13,16
**left** [14] 23:10,12,18 24:12 31:15 100:7,9,11

100:15,21 101:16,21 122:17 136:7
**legal** [2] 46:15 74:9
**lengthy** [1] 55:5
**less** [5] 73:18 84:12 105:4 110:14,19
**lets** [1] 106:13
**letter** [1] 88:12
**level** [112] 9:14 10:11,14 11:4,18 14:8 16:14 17:5 17:7,12,20 23:16,19 24:8 24:13,17 27:16 29:2,21 30:3,15,18 33:15 36:15 36:19,21 37:8,12 38:2 39:6 40:13 41:8,11 43:1 43:6,7 44:4 46:12,21 61:19 63:9,11 67:10,10 68:2 71:3 72:1,2,4,14,15 72:18 73:2,4,13,15 74:10 74:13 78:20 85:21 88:2 89:12 92:8,16,20 95:15 98:1 99:16 102:15 103:3 103:5 104:17 105:6 115:21 117:4,5 118:13 119:16,17 120:10 122:18 123:1 126:11 127:6,7,16 128:4 130:13,16,20 131:3 131:14 134:3 135:4,17 135:18 136:2,11 137:18 140:6 141:6,9 146:8 147:17 148:2 149:5 150:12 157:17 161:11,12 161:21 162:1
**levels** [3] 24:8 40:9 151:19
**light** [1] 107:7
**limited** [3] 35:6 48:20 49:21
**limiting** [1] 58:11
**line** [12] 27:4,21 60:9,11 62:3 67:14,14,17,17 74:17 123:3 160:5
**lines** [10] 60:4,6,8,15,18 61:13 62:3,7,10 63:4
**list** [2] 60:16 61:17
**listing** [1] 63:9
**lodged** [1] 55:15
**longer** [4] 23:6 89:12 123:20 152:21
**longevity** [1] 123:10
**look** [14] 20:3 21:8,9,10 53:19 57:11 62:16 67:17 71:5 75:21 103:16 117:12 121:13 123:17
**looked** [1] 73:10
**looking** [8] 14:4 21:12 29:19,20 59:16 95:7 123:9 164:16
**looks** [2] 56:20 62:19
**loose** [1] 107:7
**loud** [2] 146:17 147:10
**Love** [36] 7:11 11:5,13 11:16 12:12 14:3 16:13 17:4 21:1 22:14,18 23:12 39:12 41:7 83:9,10 90:4 90:8,13 92:4,7,15 94:19

95:11 96:6,12 100:9 101:14,21 111:9 122:16 150:6,11 151:5,12,17
**Love's** [12] 36:15,19 91:3 96:3,4 100:18 101:10 102:6,8 110:13 111:2 154:8
**low** [1] 72:3
**lower** [4] 73:3 117:21 119:17 120:10
**lowest** [1] 72:14
**luck** [1] 41:6

### -M-

**M-u** [1] 13:5
**M-u-l-l-e-r** [1] 13:5
**ma'am** [12] 6:1,14 15:2 22:11 25:6 26:7 31:11 84:6 87:18 97:1 121:14 121:18
**Maggie** [1] 32:7
**magnitude** [1] 137:2
**main** [1] 86:20
**major** [1] 70:1
**makes** [4] 31:17 152:6 163:10,16
**males** [6] 112:10,13,14 112:15,21 113:3
**managed** [1] 78:3
**management** [12] 6:12 113:16,17,19 114:17,21 115:1,9,19 124:20 125:5 141:9
**manager** [1] 18:21
**managerial** [1] 112:11
**managing** [1] 115:9
**mandate** [2] 12:6 74:2
**manner** [3] 15:19 101:18 102:2
**manual** [1] 139:15
**March** [1] 166:21
**mark** [9] 53:4 76:5,13 77:2 103:11 151:21 158:21 159:9,10
**marked** [6] 19:19,21 25:3 77:8 104:3 129:14
**marks** [1] 159:1
**Maryland** [1] 166:3
**massaged** [1] 136:7
**Master's** [1] 42:1
**material** [1] 21:4
**matter** [3] 46:15 115:18 117:2
**may** [12] 5:16 50:5 58:13 58:19 72:1 75:20 88:12 88:20 89:1 93:7,9 163:19
**MCID** [9] 102:6,13 117:7 118:5 119:6,9 128:5 135:3,20
**mean** [9] 30:4 46:13 80:10,11 96:17 104:15 119:12 132:19 135:6

**meant** [3] 105:2 120:19 149:4
**meantime** [1] 28:13
**mechanics** [1] 24:11
**meet** [1] 83:8
**meeting** [1] 130:3
**meetings** [7] 48:15 51:1 51:3,9 81:12 127:1 147:10
**meets** [1] 72:8
**member** [4] 97:3,14 163:17,21
**members** [14] 33:9,13 35:7 48:3,6 96:6 98:2,10 128:7 140:3,17 149:13 162:9,10
**memo** [5] 35:20 36:1 129:15 141:20 142:8
**memorandum** [5] 25:16 52:14 141:15,16 143:5
**mentioned** [7] 10:18 47:7 51:13 52:3 85:8 102:3 146:7
**merely** [1] 138:3
**merged** [1] 12:6
**met** [1] 29:16
**method** [4] 15:18 72:1 115:5 141:18
**methods** [2] 15:18 70:1
**Michael** [1] 4:19
**middle** [1] 4:9
**might** [2] 117:11 118:1
**military** [3] 34:17,18,20
**million** [1] 74:3
**mind** [5] 52:1 80:15 84:9 136:20 152:1
**mine** [1] 152:8
**minutes** [4] 51:2 54:18 56:3 164:9
**mis-states** [9] 13:18 44:7 49:16 54:8 93:15 109:20 120:6 144:21 158:1
**miscellaneous** [1] 139:13
**mission** [1] 18:19
**mistaken** [2] 141:3,5
**mistakes** [3] 108:18 144:19 145:4
**misunderstandings** [1] 71:9
**misunderstood** [1] 93:7
**mixture** [1] 109:17
**modifications** [3] 118:8 119:19 120:8
**moment** [7] 31:8,11,14 32:1 63:3 67:19 84:10
**monitor** [1] 106:15
**monitoring** [7] 48:13 48:19 49:7,15 50:11 99:3 99:4
**month** [1] 8:12
**months** [2] 38:15 39:2

**meant** ... **most** [1] 59:13
**move** [2] 69:5 75:10
**Mrs** [1] 41:2
**Ms** [157] 4:17 7:11,11,12 7:12,18 11:4,5,6,6,12,12 11:15,15 12:12,12,15,15 14:3,3 16:13,13 17:4,4 19:5,5 21:1,1 22:14,15 22:18 23:2,4,12 24:12 27:12 33:19,20 35:19 36:1,1,6,6,12,12,15,19 37:1 39:4,11,11,12,12 39:15,18 40:5,13,15,16 41:1,7 42:6,7 45:18,19 46:5 47:17,18 56:16 78:8 79:2 80:2 82:19 83:1,8 83:10 90:4,4,8,8,13,13 90:21,21 91:2,2,3,3,17 91:17 92:6,7,15,15 94:18 94:19 95:11,11 96:3,4,6 96:12 100:9,11,14,18 101:1,4,10,14,15,21,21 102:6,8 107:6 110:13,18 111:1,1 115:11,12 116:4 116:4,12,18,18 117:2 122:16,16 129:9,12 132:13 134:6 140:2,16 141:11,12 143:3 150:6,6 150:11 151:5,5,12,12,17 151:17 153:20 154:8,11 154:12 157:15 158:11,17 163:1,11
**Mueller** [6] 13:5,7 14:3 14:9 15:1 92:12
**Mueller's** [1] 14:17
**multiple** [5] 70:13 74:16 74:17,17 75:3
**must** [1] 160:19

### -N-

**name** [9] 4:8,10,19 11:3 39:19 45:17 70:5 87:2 122:13
**narrative** [2] 121:21 122:1
**nationality** [1] 9:13
**nature** [4] 118:5 135:8 136:13 150:19
**nearing** [1] 80:8
**necessarily** [2] 123:7 124:5
**necessary** [1] 146:17
**need** [8] 5:8,9,14 55:9 105:5,18 117:12 125:17
**needed** [4] 46:8 107:15 116:19 136:6
**needs** [1] 119:4
**negative** [1] 48:9
**neither** [1] 166:11
**never** [5] 17:13 19:14,15 26:11 162:12
**nevertheless** [1] 83:5
**new** [2] 23:4 55:14
**next** [13] 27:21 43:12 48:4 65:13 66:4 69:6

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Nicks - posted
Fannie L. Allen

76:9,12 77:1,8,17 138:4 157:14
**Nicks** [4] 87:2,8,10,11
**nine** [9] 7:8 24:3,9,21 63:18 82:14 100:17 120:18 142:7
**nod** [1] 5:10
**non** [4] 11:9 15:11,14 92:14
**non-competitive** [5] 13:1 14:6,10 15:5,9
**non-competitively** [3] 11:13,16 13:15
**none** [4] 52:6 61:8 112:18 112:19
**nor** [2] 166:12,16
**normal** [2] 81:10,14
**normally** [1] 104:17
**Notary** [4] 4:5 166:1,2 166:20
**note** [2] 21:13 22:3
**noted** [1] 83:1
**notes** [3] 21:21 66:9 106:11
**nothing** [4] 45:4 122:10 162:15 165:1
**notice** [2] 146:2,14
**notify** [1] 89:19
**notifying** [1] 59:18
**now** [11] 7:5,21 30:16 51:21 54:4 56:6 59:16 83:8 98:16,18 115:11
**number** [14] 19:20 25:2 29:17 53:10 57:1 64:5 73:21 82:12 101:7 104:2 110:11 116:5,16 120:13
**numbered** [1] 21:14
**numbers** [1] 64:7
**numerical** [1] 7:2
**numerous** [3] 59:14 105:9,9

**-O-**

**o** [1] 25:17
**object** [6] 55:7 58:2 95:2 124:14 125:6,16
**objecting** [2] 55:10 133:16
**objection** [72] 5:17 7:4 9:16 13:18 16:9 29:4 30:19 31:1,2 32:15 34:11 36:9 44:6 47:8 49:16 51:15 54:7 55:15 56:10 63:14,16,19 68:21 84:16 90:7 93:3,15 94:1,20 95:17 96:9 97:7,10 109:20 111:4 114:11 117:14 120:6 124:1,11 125:11,18 126:5 133:1,3 133:13 144:20 145:6 150:14,16 151:2 154:19 155:5,13 156:4,5 158:1 158:2,14 159:2,4,15,17 159:20 160:6,10 161:4

163:3,7,12,18 164:7
**objectives** [1] 18:20
**OBM** [1] 116:13
**observation** [1] 133:19
**observations** [3] 48:1 149:11 150:2
**observed** [1] 79:19
**obtained** [1] 151:17
**occasion** [1] 145:13
**occasions** [1] 52:9
**occurred** [3] 9:12 84:14 111:15
**October** [1] 12:10
**off** [18] 22:5,7 50:5 52:19 53:2 54:1,4,10 56:13 85:14,16 96:16 107:2 116:18 121:7 161:1 165:2 165:4
**office** [73] 6:5 10:10 11:20 13:12 14:14 18:18 18:19,21 19:2 20:17 21:3 23:7 29:7,12 32:5,12 33:2,10 34:6,9,16 35:5 36:5 37:2,3,5 38:12,18 39:1 44:21,21 45:3,4,6,7 45:8,11,15 48:2,17 57:7 57:13 59:8 68:5,15 70:12 72:17,18 77:16 78:2,4 79:13 86:21 90:18 91:7 98:9 100:9,11,15 103:7 106:6 113:18 114:21 115:10 123:3,9,17 127:9 130:4 132:14 136:8 137:19 145:15
**Officer** [1] 6:13
**officers** [3] 101:8 135:5 147:13
**official** [1] 56:21
**officials** [2] 18:8 74:10
**often** [1] 163:16
**old** [3] 36:15,19 37:1
**OMB** [1] 18:4
**once** [2] 86:8 105:1
**one** [75] 7:8,8,8,8,9,9 19:19,20 22:11 26:16 28:8 31:11,14 33:11,14 37:8,11 38:19 40:17 41:6 46:10,16 56:12,20 63:1 64:10 66:4,8 67:8 68:17 69:6 70:13,20 74:13 76:10,12 77:8,18 78:2,3 78:14 82:10,10 88:11 100:13 104:5 105:5 106:3 120:13 121:14 123:2 126:9 128:6,11,13 129:6 136:13,19 138:9,14 139:11 140:13,15,16,20 141:3,7 144:11 145:13 147:19 148:6 149:16 154:7 161:17,19
**ones** [4] 11:2 82:15 111:18 121:14
**ongoing** [2] 48:16 128:16
**onto** [2] 91:11 141:18
**onward** [1] 146:11

**operating** [1] 116:5
**operational** [1] 139:17
**OPF** [2] 58:1 64:4
**opinion** [3] 44:5 99:1 155:11
**opinions** [1] 140:4
**opportunities** [6] 29:7 78:14 98:9,11 127:10 147:20
**opportunity** [12] 22:10 29:11,14 73:8 78:7 79:11 98:3,12 99:13 123:8 130:14 137:20
**opposed** [3] 5:10 47:10 118:7
**option** [1] 123:16
**oral** [8] 5:9 59:9 67:20 68:1 107:14 147:7,8,8
**order** [10] 16:4 99:9 105:6 138:4,21 146:15 146:18 151:13 156:7 162:3
**organization** [12] 73:19 74:2,4,14,14 100:7 101:16 116:17 118:11 125:5 144:14 153:17
**organizational** [1] 38:5
**organizations** [2] 75:3 100:4
**original** [7] 30:13 62:17 78:8 79:10,10 138:6 140:1
**originally** [2] 12:4 137:14
**otherwise** [3] 70:18 113:2 166:16
**outcome** [1] 166:17
**outside** [6] 81:14 97:20 99:18 126:20 148:10,11
**oversaw** [1] 141:2
**Overton** [1] 35:11
**own** [7] 29:14 44:5 124:19 125:4 133:10 149:11 150:2
**owner** [1] 79:10

**-P-**

**P.G** [1] 148:14
**p.m** [1] 165:6
**package** [2] 49:5 53:12
**page** [38] 21:4 56:21 57:12 58:12 59:20 60:3 60:9 61:4,6,14 62:3,3,8 62:17 63:4 66:3 76:1,10 77:8,17 82:3,7,10 86:5,6 88:11 104:11 121:17,21 122:4 133:21 143:15,17 143:21 144:2,7,10 158:10
**pages** [22] 25:19 59:21 65:14,15,18 66:1 67:2 69:11 76:2,2,3,5 77:18 82:7 142:6,8 143:4 121:9 122:7 142:2,6 143:9 152:19

**Painter** [3] 45:19 46:5 47:18
**paper** [2] 52:14 53:12
**papers** [1] 56:7
**paragraph** [3] 89:10 132:10 134:1
**pardon** [2] 53:9 65:20 114:2
**park** [1] 35:13
**part** [20] 49:5 55:5 58:1 60:3 62:4,9 66:13 71:10 77:15 99:2,4,6 110:4,5,6 139:12,19,21 153:6 158:20
**participate** [2] 129:3 148:4
**particular** [8] 59:1,5 61:18 63:10 72:20 136:2 136:10,11
**particularly** [1] 125:19
**particulars** [2] 59:16 59:17
**parties** [3] 135:17 166:12 166:15
**passed** [3] 78:15 137:15 140:21
**passing** [1] 74:12
**past** [2] 107:19 156:2
**pause** [6] 5:17 16:7,16 16:21 55:5 124:13
**paying** [1] 115:5 116:6
**payment** [5] 115:1,9,19 141:18 142:10
**payments** [1] 116:17
**PD** [4] 20:21 69:8,19 70:4
**PD's** [2] 70:7,21
**people** [13] 6:14,19 9:15 32:2 37:4 38:20 47:6 70:17 123:18,19 124:9 126:4 147:21
**per** [3] 35:6 57:11 93:3
**perceived** [1] 97:18
**percent** [1] 34:10
**percentage** [2] 34:13 35:13,16
**perform** [4] 67:10 102:12 104:17 135:5
**performance** [10] 27:14 29:17,21 30:3 57:8,12 57:15 58:9 64:11 146:9
**performed** [15] 33:8 71:3 101:17 134:21 136:10,17,18 137:11 150:7,10,11,12,13 151:4 151:8
**performing** [15] 16:14 17:5,11 23:18 24:13 27:15 44:4 71:21 72:2 85:21 102:1 130:16 134:2 139:6 157:17
**performs** [1] 59:12
**period** [8] 19:6 22:18 33:21 37:5 79:19 109:4 123:9 159:10

**person** [11] 33:14 40:4 68:14 73:7,14 79:4,9 100:13 106:14 137:18 141:7
**personal** [5] 47:21 51:7 126:20 149:11 150:2
**personnel** [1] 56:21
**persons** [7] 11:3 37:3 73:3,7 78:4 103:21 137:19
**perspective** [1] 135:4
**Perusing** [3] 20:4 21:16 25:7
**phrase** [1] 120:4
**phrased** [1] 80:17
**phrasing** [1] 58:4
**pick** [2] 146:18 158:12
**picked** [1] 158:5
**pieces** [1] 60:2
**pile** [1] 56:7
**place** [2] 95:21 160:18
**placed** [2] 65:7 141:18
**placement** [1] 65:8
**places** [1] 56:12
**Plaintiff** [1] 4:4
**Plaintiff's** [3] 132:5,6 134:1
**plan** [6] 8:19,21 9:1,3,5 64:11
**planning** [1] 42:11
**plate** [1] 116:19
**plural** [5] 107:20 144:12 144:15,16 159:14
**plus** [1] 74:3
**PMS** [2] 128:8,10
**point** [4] 52:14 78:5 80:12 160:13
**policies** [1] 79:13
**policy** [4] 64:6 103:11 113:11 139:14
**portions** [1] 144:2
**position** [44] 6:11 8:8 9:14 10:1,11 11:8 13:11 19:15,15 20:16 22:14 23:4,13,14 24:4,16 28:15 28:20 36:8,15,19 37:1,5 38:2 39:4 69:9,17 75:19 88:5,8 89:11 93:10,19 96:4 112:11 113:17 114:6 114:18 123:12,19 124:10 154:8,11 162:11
**positions** [13] 9:7 10:1 10:10 23:9,10 40:4,5 122:18,21 126:2,4 151:11 151:15
**possessed** [1] 104:16
**possession** [2] 144:4,8 101:12
**possibility** [2] 14:9 101:12
**possible** [1] 101:10
**post** [15] 23:15 24:16 37:9 37:18 122:21
**posted** [16] 23:12,14,21

Elite Reporting Company

Case 1:06-cv-00326-PLF    Document 9-5    Filed 06/02/2006    Page 53 of 55

Donald S. Hunter, Sr. vs.                    Multi-Page™                         posting - review
Colin L. Powell, Secretary, U.S. Dept. of State                                  Fannie L. Allen

24:8,19 36:16,19 37:1,7
37:11 38:1 39:5,7,8
122:17 154:8
**posting** [2] 126:2 154:10
**potential** [6] 8:7 24:4,9
24:21 37:10,18
**potentially** [4] 42:11
87:15 106:13 123:6
**practice** [1] 57:20
**precisely** [1] 15:2
**preclude** [1] 93:19
**prepare** [13] 28:15,19
29:8 30:1 8 36:8 75:7
78:19,21 127:1,7,16
128:4 129:13
**prepared** [6] 108:14,17
138:4,21 140:1 142:4
**preparing** [1] 147:12
**present** [3] 32:3,21 34:7
**presentation** [3] 147:8
147:9,15
**presentations** [2]
147:14 148:2
**presented** [1] 149:3
**pretty** [7] 16:10 63:12
76:13 77:2 150:20,21
152:5
**prevent** [1] 151:14
**previously** [5] 25:13
27:13 93:10,18 100:6
**print** [1] 146:16
**private** [4] 98:14 146:10
147:4 148:17
**privately** [2] 48:21 49:18
**privilege** [2] 5:19 49:10
**problem** [6] 9:12 58:3
147:11 152:11
**problems** [5] 107:18
110:7 143:6 155:18
164:11
**procedures** [2] 77:15
79:14
**process** [16] 18:13 39:3
71:7,7,13 72:15 74:8
99:5 102:4 106:5 120:16
120:20 135:10,12 150:8
162:9
**processing** [2] 59:8
127:8
**produced** [2] 50:20
52:10
**producing** [1] 75:8
**product** [14] 51:13 52:13
54:17 56:2 66:7,17 67:6
68:4 79:12 145:5,21
147:1 148:21 149:12
**production** [2] 49:3
52:19
**products** [4] 51:8 52:8
53:5 82:21
**professional** [13] 18:11
29:9 73:4 83:14,17 84:20
98:3,18 99:2 126:14,18
147:6 164:1

**program** [6] 117:7 138:9
138:13 139:5,5 147:13
**programs** [1] 138:15
**progressively** [2]
107:10 129:1
**project** [49] 52:12 66:11
66:11,15,21 78:5,7,9,10
78:17 79:4,6,9,10,11,15
102:7,7,8 103:2 113:1
114:20 116:7 119:6,9
127:12,13,20,21 128:8
128:10 129:4,11 135:20
136:2,10,11,13,15,16,18
136:19 140:10,13,17,19
141:2,5,11
**projects** [19] 18:7 29:13
33:18 71:21 78:3,15
98:13 99:8,20 101:9,11
127:1,10,11,15,18 128:3
128:16 141:7
**promote** [13] 11:20 17:6
45:1 47:16 51:5 52:5
53:7 54:19 56:1 57:16
67:5 80:21 106:17
**promoted** [3] 8:9 11:9
11:13,16 15:15 43:1
80:21 81:2 95:15 101:20
130:20 161:11 162:3
**promoting** [1] 96:4
**promotion** [35] 8:6 13:3
14:10 16:5,15 27:9,11
36:3 59:2,6 79:17 81:14
92:8 93:2,11 94:3,7,11
96:5,21 97:5 98:1 99:10
101:15 126:10,16 127:15
129:17,20 130:2 131:6
132:2,12 134:8 164:14
**promotions** [5] 13:2
14:16 92:4,15 150:7
**pronouncing** [1] 155:18
**proofreading** [4] 50:6
109:9 145:18 146:4
**proper** [1] 142:13
**prove** [1] 131:2
**provide** [11] 18:9 45:3
49:6,8 54:2 60:16 61:16
105:18 127:18 130:16,18
**provided** [6] 21:14 49:2
50:21 98:4 113:14 140:3
**providing** [2] 63:6 127:2
**provisions** [1] 139:12
**purports** [1] 152:19
**purpose** [2] 91:9,12
**purposes** [1] 91:5
**put** [1] 143:2

**-Q-**

**qualification** [1] 160:12
**qualified** [1] 155:7
**quality** [9] 18:9 33:15
71:6 90:18 91:6,7,13
98:20 106:8
**quantified** [1] 17:13
**quantify** [4] 109:5

110:10,20 146:13
**questioning** [2] 80:2
113:20
**questions** [14] 5:6 62:17
85:10 90:2 93:20 122:15
124:15 130:1 139:11
149:1,2 152:10 153:12
153:14
**quick** [4] 16:10,11 21:9
107:1
**quickly** [2] 66:3 125:15
**quite** [1] 74:7
**quotation** [1] 159:1
**quote** [2] 44:3 159:11

**-R-**

**race** [4] 6:1 9:13 40:2,7
**raised** [1] 124:7
**rated** [2] 122:2,6
**rather** [1] 125:11
**reacting** [1] 119:1
**read** [7] 20:8,21 146:16
146:17 147:14,17 148:21
**reading** [4] 104:11 147:9
147:11 155:19
**ready** [3] 21:18 106:2
130:9
**real** [5] 117:2 118:20
119:10,12 151:1
**really** [3] 58:11 70:9
160:18
**reason** [5] 71:15 136:1
164:5,12,21
**reasons** [2] 164:15,18
**reassigned** [4] 100:5,18
101:2,5
**receipt** [2] 80:20 81:6
**receive** [2] 48:13 128:21
**received** [11] 15:16,19
15:21 20:18 73:6 79:15
83:10 87:12 100:14 119:1
150:6
**receiving** [2] 116:12
134:7
**recently** [1] 154:11
**recess** [7] 22:8 52:21
54:5 56:14 85:17 107:4
161:3
**recipients** [1] 115:5
141:17
**recollection** [1] 7:17
**recommendations** [1]
98:7
**recommended** [2] 50:4
145:17
**recommending** [1]
141:17
**record** [23] 4:8 21:6,13
22:5,7 31:13 52:20 53:2
54:2 55:4 56:13 64:3
85:15,16 107:3 112:2
121:8 124:4 125:12 161:2
165:3,5 166:10

**records** [1] 34:4
**reduced** [1] 166:8
**reference** [1] 107:13
**referenced** [2] 58:19
152:5
**references** [1] 85:20
**referencing** [2] 137:5,7
**referring** [3] 47:9 129:8
160:7
**refers** [1] 28:5
**reflect** [6] 55:4,11 58:8
58:15 105:17 112:3
**reflection** [2] 145:14,15
**refuse** [1] 154:21
**regard** [2] 83:11 111:7
**regarding** [1] 129:16
**regards** [1] 46:6
**register** [1] 125:18
**related** [2] 129:19 166:12
**relates** [3] 66:11,14,15
**relation** [2] 114:9,17
**relationship** [1] 79:14
**relative** [1] 166:14
**relied** [14] 52:4 53:6,7
53:11 54:9,16 55:21 56:4
56:11 57:4,20 64:16 66:5
79:17
**religion** [1] 9:13
**relocated** [1] 23:4
**rely** [8] 51:12 52:8 57:15
58:1,5,21 59:4 67:4
**relying** [2] 58:18,20
**remainder** [5] 60:14
61:15 62:1 82:4,5
**remember** [32] 5:16
8:13,14 16:7 26:8,15
61:9,11 78:13 86:3,13
86:14 87:1,5,6,9,12,15
88:7,9 89:8,21 92:3,10
92:20 95:19 104:11,13
128:11 130:21 161:14,19
**renewals** [1] 118:1
**reorg** [1] 38:14
**reorganization** [1] 39:1
**reorganize** [2] 38:11,16
**repeat** [14] 10:2 11:14
13:20 39:21 45:21 47:12
54:12 59:3 71:17 84:9
93:6 95:5 101:19 109:21
**repeated** [4] 109:16,18
111:3,9
**repeating** [1] 164:20
**repetition** [1] 109:18
110:9
**rephrase** [1] 151:2
**report** [14] 54:17 56:8
59:20 64:12 65:13 66:4
102:6,13 112:3 117:8
120:17 134:19 136:7
153:7
**reporter** [8] 4:5,7,12
5:14 125:20 166:1,2,20

**reports** [10] 48:14 50:19
50:20 51:9,14 53:5 54:17
56:3 81:6 149:14
**represent** [4] 122:13
142:7 143:5,10
**request** [42] 9:21 10:5,9
14:21,21 15:2 27:9,11
36:3 42:21 43:4,10,15
43:17 46:7,8 49:2 59:1,5
80:20 81:14 113:8 118:10
129:17,19 130:6 131:5,7
131:10,13,17 132:1,7,11
132:15,20 133:9 134:8
134:12 148:3 149:10,21
**requested** [3] 49:4 86:18
86:18
**requests** [1] 81:11
**require** [2] 18:3 74:5
**required** [4] 16:3 94:13
136:14,16
**requirement** [4] 94:6
104:5 113:10 116:8
**requirements** [6] 18:20
70:13 72:20 74:5 103:14
127:9
**requires** [4] 59:14 72:3
103:13,17
**requiring** [2] 74:7,8,10
**research** [10] 74:6,7 75:5
75:8 135:12,16 140:20
143:7 148:18 149:5
**researching** [2] 118:21
119:8
**resource** [2] 86:21
113:19
**resources** [4] 19:16
46:16 90:3 132:14
**respond** [3] 55:9 155:15
156:7
**responding** [4] 104:12
104:13 120:17 141:9
**responds** [1] 72:9
**response** [16] 27:8 46:1
48:9 49:2 52:18 55:3
62:14 63:12,17 69:12
118:10,12,21 139:11
145:20 151:2
**responses** [1] 5:9
**responsibilities** [3] 35:4
70:1 89:13
**responsibility** [1] 32:11
**responsible** [1] 129:1
**responsive** [1] 18:6
96:14
**restate** [2] 51:19 52:1
**restructure** [1] 38:17
**restructuring** [1] 38:21
**result** [3] 12:5 79:9 99:12
**RESUMED** [2] 153:15
162:18
**retired** [3] 23:1,2 101:16
**retirement** [1] 22:19
**returned** [1] 31:19
**review** [32] 20:2,7 22:10

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

**Multi-Page™**

reviewed - supposedly
Fannie L. Allen

25:6 32:13,20,20 33:4
33:12,17,17 44:16 46:19
58:21 59:4 66:1 68:14
79:12 85:1,11 90:16,17
91:5,9,12,19 98:20 118:9
132:12 134:14,15,17
**reviewed** [9] 25:8 33:10
90:5,13 91:2,3,17 102:18
132:11
**reviewing** [1] 118:12
**revisions** [2] 102:19,21
**right** [33] 10:15,16 19:3
19:15,18 23:10 41:13,14
44:5 47:11 58:6,17 65:4
66:4,21 68:9,13 70:20
75:20 82:16 84:5 88:10
91:20 93:12 109:1 117:8
120:4 123:15 124:14
157:18 161:1,18 162:4
**River** [4] 78:6 140:10,13
141:10
**ROI** [28] 53:20,21 54:3
60:9 61:14 63:5 69:11
76:1,9,12 77:20 82:2,13
88:10 89:11 104:9 121:9
137:7,13 139:10 141:13
142:6 143:9 152:3,14,18
158:8,20
**room** [2] 31:15,20
**routines** [1] 81:15
**rules** [1] 5:2
**run-on** [1] 144:11
**running** [1] 64:14

**-S-**

**S** [3] 4:4 166:2,19
**S.W** [1] 4:13
**Sandy** [1] 45:19
**Sarah** [2] 115:11,11
**saw** [6] 25:13 26:6 87:6
88:21 89:2,16
**says** [5] 25:20 42:10
46:14 103:18 105:4
132:11 134:2 159:12
**Scholarship** [2] 138:13
139:5
**school** [5] 40:15 41:9,12
41:14 42:4
**Science** [1] 42:18
**second** [10] 22:6 43:7,9
85:15 86:4,6 89:10
133:21 144:5 154:20
**section** [7] 65:17 76:6,7
76:14 82:9,15 159:13
**sections** [1] 159:16
**see** [20] 30:11 38:6 52:9
52:10,13 63:12,15 72:8
75:2 79:12 80:6,11 86:2
88:20 109:10 110:12
132:10,15 133:21 134:6
**seeing** [2] 86:3,10
**seek** [5] 46:14 48:10 79:7
81:1 89:20
**seeking** [1] 13:17

**sees** [1] 29:14
**selected** [4] 39:8 40:11
154:7,10
**selection** [1] 114:5
**self** [1] 76:10
**send** [2] 87:17 118:10
**sending** [1] 160:12
**senior** [6] 37:3 73:7 78:4
128:6 135:5,8
**sense** [3] 91:15 123:7
152:6
**sent** [4] 87:12 106:7
108:15,17
**sentence** [9] 28:10,13
89:10 144:6,11 158:12
160:4,15,16
**separate** [2] 133:8,10
**September** [1] 22:18
**seriously** [1] 50:3
**Service** [2] 113:18 115:1
**sessions** [4] 146:10,20
147:5 148:18
**set** [1] 87:14
**seven** [19] 6:18 7:9 59:20
60:10,12,15 61:14,14
62:8,11 63:4,5 77:9
104:9,9 152:10,18 158:9
158:10
**several** [1] 130:7
**shared** [5] 26:14 79:18
82:18 84:2,2
**show** [7] 25:5 52:18
88:10 117:12 135:2 144:4
144:12
**showed** [2] 26:18,20
**showing** [4] 63:8 129:14
144:8 152:17
**signature** [2] 61:6
121:17
**significance** [1] 65:9
**significant** [2] 116:16
142:16
**similar** [3] 134:15,17
155:19
**sites** [1] 129:7
**six** [2] 38:19 142:3
**skill** [2] 99:15 104:17
**skills** [10] 18:12 50:4
59:10,10 67:20 68:1
74:11 107:15,17 110:8
**skip** [1] 65:4
**skipping** [1] 104:18
**sleep** [1] 64:14
**slightly** [2] 30:15 105:4
**Smith** [4] 115:11 116:4
116:12 117:2
**Smith's** [1] 116:18
**Snider** [189] 4:16,19 5:15
7:6,10 9:19 11:18 12:2
14:1 16:10,12,19 19:18
20:1 21:8,12,20 22:7,9
25:4 30:1,21 31:4,7,10
31:13,18,21 32:19 34:15

36:13 37:15 38:13 44:8
47:11,14 49:9,13,19
51:17 52:2,18 53:1,16
53:19 54:1,10,14 55:4
55:10,20 56:13,15 58:6
58:13,14 60:6,13 62:1
62:16 63:2,5,17,20 64:1
65:3 67:13 69:1,15 71:4
73:16 76:8,21 77:7 80:8
80:14,19 81:9,17,19,21
84:21 85:8,13,16,18 86:9
88:17,19 89:6,9 90:8,11
93:8,17 94:5 95:8 96:1,2
96:11,18,20 97:9,12,15
104:4 106:9,21 107:2,5
108:13 110:2,3 111:10
112:6,13,17 114:15
117:18,19 118:18 119:5
119:21 120:4,7,13,21
121:3,6,9,12 122:10
124:1,4,11,13,19 125:2
125:9,14 126:5 129:14
133:1 137:3 144:20 145:6
150:14,17,19 152:7,13
152:20 153:3,14,16 155:2
155:6,8,9,14,16 156:6
156:10,12,16,19 157:5,9
158:4,7,16 159:6,7,16
159:19 160:1,3,9,14
161:1,6,7 162:15 163:3
163:12,18 164:7 165:2
**Snider's** [1] 139:11
**sole** [2] 74:15 164:21
**someone** [3] 82:17 86:20
125:5
**sorry** [14] 32:18 40:11
69:14 76:18 84:10 86:7
105:19 110:17 119:20
142:3,21 157:7 158:2
163:4
**sort** [1] 58:18
**sought** [3] 46:12 48:5
116:9
**speak** [13] 5:13,16 22:21
26:2,4 62:15 67:19 69:4
72:17 114:8,16,19 124:4
**speaking** [2] 111:7
125:18
**speaks** [1] 70:21
**special** [14] 9:15 29:12
33:18 48:16 52:12 80:1
81:11,12 98:13 127:11
127:14,21 128:3 139:12
**specialist** [19] 7:20 8:3
9:21 10:10 19:12,16 23:7
24:10 45:16,17,19 71:8
72:14 74:9 99:7 113:17
114:18 135:9 147:15
**specialists** [5] 100:7
102:5,18 108:21 113:9
**specific** [11] 26:8 37:20
38:1 71:12 72:19 80:18
88:7 99:8 113:8 129:21
151:1
**specifically** [8] 9:18
46:1 60:17 61:18 63:10
81:13 129:12 145:17
**specifics** [1] 100:20

**specify** [1] 47:9
**spelling** [15] 41:6 67:12
68:6 108:4,6,7,15 111:12
143:18 144:1,19 145:4
157:21 164:4,12
**spent** [1] 164:9
**spoke** [3] 26:4 83:21
133:15
**Sr** [1] 4:4
**stack** [1] 80:9
**staff** [9] 51:9 96:7 97:4
97:14 98:3,10 147:10
163:17 164:1
**stamp** [1] 21:14
**stamped** [5] 53:13 56:19
57:1 64:6 68:18
**stand** [1] 160:13
**standards** [1] 38:12
**standpoint** [2] 70:12
126:18
**start** [9] 76:19 82:8,9,10
82:16 108:12 120:14
125:18,21
**started** [2] 160:15,16
**state** [22] 4:7 6:4 12:1,7
12:9,18 13:10 16:5 17:1
21:3 35:7 70:15 97:20
97:20 98:5 103:21 116:13
137:3,4 149:13 162:10
166:3
**statement** [8] 27:18,20
28:3,4,16 50:10,14
101:18
**states** [2] 12:5 27:12
89:11 103:20 158:12
**status** [13] 48:14 50:19
50:20 51:1,8,13 53:5
54:17,17 56:2 81:6 95:20
161:16
**stay** [2] 123:8,20
**step** [2] 31:10 48:4
**steps** [1] 31:14
**sticky** [1] 53:4
**still** [3] 13:2 72:4 74:19
**Stinson** [20] 7:12 11:6
12:15 19:5 32:7 33:20
36:2,7,12 39:12 41:1,2
90:21 91:2 128:19,20
129:9,12 140:2 143:3
**Stinson's** [2] 82:20
91:17
**stop** [1] 135:6
**Strand** [160] 5:13 7:4
9:16 11:17 13:18 16:7
16:11 21:7,9 22:5
29:4 30:19 31:2,5,9,16
32:15,18 34:11 36:9
37:14,20 38:9 44:6 47:8
49:8,11,16 51:15 53:18
53:21 54:6 55:7,14 56:10
58:2,7,15 60:5,11 61:20
62:7,15,19 63:14,16,19
64:21 68:21 69:13 72:11
76:4,16,19 77:5 80:6,10
80:16 81:8,18 84:16 85:6

85:14 86:4 88:14 89:5
90:7,9 93:3,15,21 94:20
95:2,17 96:9,15,19 99:7
97:10 103:16 105:19
106:20 107:1 108:11
109:20 111:4 112:2,12
112:14 114:11 117:14
118:16 119:20 120:2,6
120:11,14 121:11 122:12
122:13 124:6,8,17,21
125:7,13,17 126:1,6,8
133:2,6,13,15,20 137:6
137:8 145:1,7,9 150:16
150:18,21 151:3,21 152:6
152:12,16 153:1,4,12
154:19 155:5,13 156:4,9
156:11,15,17 157:2,7
158:1,14 159:2,15,17,20
160:6,10 161:4 162:16
162:19 163:5,8,14,20
164:2,10 165:1
**Stratton** [1] 122:13
**Street** [1] 4:13
**Strike** [1] 40:12
**structural** [1] 118:6
**structure** [3] 123:3,4
148:12
**stubborn** [2] 106:4 148:8
**stuff** [4] 86:16 118:2
119:16 152:8
**subject** [3] 65:16 115:18
117:2
**subject/verb** [1] 107:20
**submitted** [1] 153:6
**subsequent** [1] 137:16
**substantial** [1] 155:18
**successful** [2] 14:12,14
**such** [4] 56:3 73:12 148:4
151:21
**suggest** [3] 29:12 90:1
109:8
**suggested** [6] 84:17
129:11 130:12 147:12
148:1 162:12
**suggesting** [1] 89:21
**suggestions** [3] 98:8,21
106:1
**Suite** [1] 4:14
**summarizes** [2] 52:15
75:2
**supervise** [2] 6:14,19
**supervising** [1] 12:12
**supervision** [9] 72:3
128:6 135:21 136:3,5,14
136:15 139:7 141:11
**supervisor** [5] 6:12 27:4
92:11 103:9 132:13
**supervisory** [1] 112:11
**support** [4] 50:10,14
127:3,19
**supported** [1] 51:5
**supposed** [4] 9:6 46:17
54:21 55:13
**supposedly** [1] 12:18

Donald S. Hunter, Sr. vs.                    **Multi-Page™**                surrounding - yourself
Colin L. Powell, Secretary, U.S. Dept. of State                              Fannie L. Allen

**surrounding** [1] 36:2

**swallowed** [1] 12:17

**Swann** [41] 7:11 11:5,12
11:15 12:12 14:3 16:14
17:5 21:1 22:15 23:2,4
24:12 39:12 42:6,7 90:4
90:8,13 92:4,6,15 94:19
95:11 100:11 101:1,4,21
110:18 111:9 115:11,11
115:12 116:4,18 122:17
150:6,11 151:6,12,17

**Swann's** [6] 37:1 39:4
91:2 101:15 111:1 154:11

**sworn** [2] 4:5 166:6

**system** [7] 115:2,9,19
116:1,5,9 142:10

**systems** [1] 18:12

---

**-T-**

**T&A** [1] 34:4

**tab** [6] 57:1 65:13 69:7
75:12 82:3 139:10

**tabbed** [11] 56:20 58:8
64:3 69:5 75:11 82:2,3
103:13 121:15 139:10,12

**tabbing** [1] 66:2

**tabs** [5] 53:4 65:5,6,6
82:12

**taking** [1] 130:19

**talks** [1] 75:13

**TDY** [1] 129:4

**team** [39] 32:5,9 33:10
33:12,13,14 48:3,3,6,6
48:14 50:21 66:16 71:11
74:21 79:7 80:2 81:2
90:19,20 100:21 102:18
102:21 103:1 105:8 127:2
127:12 128:7,17 136:6
140:2,3,17 143:3 149:14
150:3 153:17 162:9,10

**technical** [1] 38:6

**Telephone** [1] 160:21

**templates** [1] 138:21

**ten** [6] 6:15,21 60:19
82:14 143:9,15

**tense** [2] 107:19 111:12

**term** [1] 161:17

**terms** [5] 26:5 57:20
150:8,12 160:13

**test** [1] 104:20

**testified** [14] 4:6 53:10
54:15 55:2 71:19 117:20
119:15 122:16 135:19
140:9 143:11 145:16
150:5 155:17

**testify** [4] 55:21 109:15
122:19 161:5

**testifying** [2] 159:18,21

**testimony** [6] 54:8 57:3
69:16 166:5,6,10

**Thank** [5] 17:3 46:9
76:20 81:17 137:6

**thereafter** [2] 130:15
166:7

**therein** [3] 64:17 65:2
67:4

**thinking** [1] 30:11

**third** [2] 156:13,17

**Thompson** [2] 154:12
154:12

**thought** [5] 93:6 95:6
109:11 118:18 119:14

**three** [21] 6:18 17:16 24:8
38:15 40:7 59:21 60:3
60:15 61:4,13 62:3,7,11
62:17 63:4 64:14 103:12
104:3 113:12 122:4,7·

**through** [37] 11:4 15:17
15:21 20:21 21:9,15 53:3
53:19 56:17 60:9,11,15
60:19 61:14 62:3,8,11
63:4 64:4,5,7,9 66:3
67:14 71:7,8 74:19 82:11
98:4 113:20 126:19
135:10 142:2,3,7 150:9
162:8

**timely** [1] 75:9

**times** [5] 33:19 34:2
98:13 106:2 148:20

**timing** [1] 134:13

**Timor** [2] 138:13 139:5

**title** [3] 7:19 8:2 12:20

**Toastmasters** [1] 148:1

**today** [3] 33:5 107:15
161:12

**together** [1] 118:6

**too** [1] 105:15

**took** [6] 12:18 26:18,20
75:18 95:20 116:17

**top** [2] 65:5,7

**total** [1] 68:15

**touch** [1] 90:3

**touching** [1] 112:3

**toward** [2] 41:2 99:1

**town** [1] 129:4

**train** [2] 18:9 98:8

**trained** [1] 19:13

**trainer** [1] 129:6

**training** [15] 41:9,12
42:4,7 98:4,5 99:14
126:18,19 127:19 129:6
129:7 147:13

**transcript** [2] 166:5,9

**transition** [3] 103:19
116:10 142:9

**travel** [2] 35:5,6

**treatment** [1] 9:9

**tried** [1] 147:19

**true** [21] 53:19 55:1 80:4
89:14 92:5 93:1 96:5
101:14,18 108:20 110:18
142:16 145:2,7,8 149:7
149:18 153:5,10 160:17
166:9

**trust** [1] 106:14

**try** [2] 71:18 72:6

**trying** [8] 31:5 78:13

**107:6** 123:18,19 124:9
126:3 127:5

**tunnel** [1] 107:8

**two** [52] 7:9 11:20 13:15
14:5,7 15:3,10 17:16
25:2,5,19 32:4,5 33:12
33:16 34:21 35:1 44:1
56:8,12,20 60:2,2,9 62:3
65:15 74:21 75:18 77:18
82:3,7,8 85:19,20 92:3,6
100:12 122:4,7 123:5
129:15 132:5,6 134:1
136:12 142:2,3,17 144:2
147:19 158:6 162:8

**two-fold** [1] 123:2

**type** [13] 17:21 42:13
86:15 97:16 109:7 111:6
111:8 117:9 118:2,5
120:10 150:8 152:3

**types** [10] 49:14 51:14
52:15 56:4 119:19 120:9
143:5,11 146:3 147:3

**typewriting** [1] 166:8

**typo** [1] 158:5

**typos** [1] 164:4

---

**-U-**

**U.S** [1] 6:4

**unable** [2] 59:17 110:20

**UNCLASSIFIED** [1]
25:21

**under** [17] 13:2 14:16
78:7 79:1 113:11 128:6
135:21 136:3,4 139:7
141:11 154:1,2,4,6,15
166:8

**undergraduate** [1] 41:3

**underlined** [1] 25:20

**understaffed** [2] 70:12
70:17

**understand** [14] 27:3
28:5 49:20 58:17 59:15
61:13 63:21 71:18 81:8
90:9 93:21 101:6 134:18
136:12

**understood** [7] 10:15
15:13 37:7 47:4 68:16
110:4 120:21

**undertake** [1] 29:13

**unit** [1] 153:18

**United** [2] 12:4 103:20

**unless** [1] 22:3 95:3

**unmarked** [1] 83:4

**unstamped** [1] 83:4

**unusual** [1] 74:7

**up** [24] 5:13,16 10:16
12:18 20:3 32:1 41:13
58:3 60:1,2 61:2 62:15
69:7 81:7 87:14 107:6
120:15 122:15 125:19
131:10 146:18 147:20
158:5 161:12

**upgrade** [6] 9:21 10:9
10:16 92:6 95:11 96:4

**upgrading** [2] 13:15
94:18

**upper** [1] 141:9

**urban** [1] 42:11

**urging** [1] 98:15

**USIA** [3] 13:2 18:5 73:21

**using** [2] 115:4 119:14

**usually** [1] 59:13

---

**-V-**

**vacancies** [1] 24:7

**vacancy** [2] 23:14 28:2

**vacant** [2] 23:10 151:11

**Vague** [2] 63:14 117:14

**value** [2] 136:19 137:1

**varied** [1] 35:3

**various** [1] 18:7

**vein** [1] 123:17

**verb** [1] 143:16

**verbal** [1] 130:11

**verbally** [1] 50:5

**version** [3] 141:20 142:8
142:11

**versus** [2] 73:18 104:20

**view** [1] 26:13

**vis-a-vis** [1] 105:3

**voice** [1] 5:4

**volumes** [2] 54:3 56:8

**volunteer** [5] 29:11
98:12 100:10 101:7
126:21

**volunteered** [3] 98:17
101:8 128:12

**volunteering** [1] 99:20

---

**-W-**

**wait** [1] 133:2

**waiver** [1] 113:8

**wall** [1] 84:11

**wandered** [1] 84:10

**wants** [2] 55:17 96:16

**warrant** [1] 99:12

**Washington** [1] 4:14

**ways** [1] 147:19

**weekly** [9] 48:14,15
50:19,20,20 51:1,9 54:17
56:2

**weeks** [5] 34:19,21 35:1
94:11,14

**welcome** [1] 81:18

**Whereabouts** [1] 35:10

**Whitten** [1] 88:13

**whole** [1] 12:17

**Wilson** [2] 166:2,19

**wind** [1] 125:19

**Withdrawn** [1] 161:6

**within** [2] 38:4 162:10

**without** [6] 31:6 34:4
75:3 83:12 104:19 106:7

**witness** [83] 4:3,9,13 7:7
9:17 11:19 13:20 16:18
21:16,19 29:6 31:12,14
31:15,19 32:17 34:13
36:11 37:17 38:3,11
47:12 49:17 51:18 54:11
55:6,12,18 62:5,12,21
63:20 69:14 72:13 76:6
76:18,20 77:6 84:17
85:11 86:6 88:16,18 89:7
93:5 95:1,4,19 97:13
103:17 105:21 109:21
111:6 112:15 114:13
117:15 118:19 120:16
121:1,4 124:3,12,20,20
125:4 126:7 133:5,18
145:8 154:20 155:6,14
156:6 158:5 160:2,7,11
163:4,13,19,21 166:4,7

**word** [7] 16:21 38:16
67:14,15 144:5,12,13

**wording** [1] 159:14

**words** [6] 36:11 105:4
118:2 120:5 155:18

**worked** [9] 45:16 66:12
66:21 100:4 128:8 129:5
129:12 140:16 141:10

**works** [1] 61:16

**wrap** [1] 107:6

**writing** [5] 50:4 59:10
143:6 148:14 155:19

**written** [21] 67:20 68:1
107:14,17 108:3,14,17
109:4 110:7,14 111:2
120:8 144:19 145:4,21
146:21 148:14 162:21
163:10,16 164:4

**Wrong** [1] 143:16

**wrote** [5] 28:10 121:20
122:1,2 148:13

**Wye** [4] 78:6 140:10,13
141:10

---

**-Y-**

**year** [12] 17:14 34:19
35:1,14 74:4 93:10 94:15
127:20 137:16 146:11
167:17,19

**years** [11] 17:13,16 35:2
71:3 73:21 74:5,15
103:21 115:7 116:6 156:2

**yellow** [1] 53:4

**yet** [2] 52:3 54:11

**young** [1] 115:14

**younger** [5] 123:6,6,18
124:9 126:4

**yourself** [1] 47:17