UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DONALD S. HUNTER, SR.,           ) | |
|               Plaintiff,       ) | |
|       v.                      ) | Civil Action No. 06-326 (PLF) |
| CONDOLEEZZA RICE, Secretary,  ) United States Department of State,  ) | |
|           Defendant.     ) | |

**DEFENDANT'S STATEMENT OF
MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Local Civil Rule 7(h), Defendant respectfully submits this statement of material facts as to which she contends there is no genuine dispute.

**BACKGROUND**

1. Plaintiff was born on May 18, 1958. See Complaint, ¶ 18; Donald S. Hunter's January 9, 2006 Written Notice of Intent to File Suit in 30 Days, ¶ 16, attached hereto as Exhibit D).

Plaintiff's Employment History

2. Plaintiff joined the U.S. Information Agency ("USIA") as a supply clerk, GS-4, in February 1986. See July 6, 2005, Deposition of Donald Hunter ("Pl. Dep. I"), attached hereto as Exhibit A, at 24:12 – 25:1.

3. From July 1986 through August 1992, he worked as a Correspondence Control Clerk, GS-6; a Correspondence Assistant, GS-7, and a Correspondence Assistant, GS-8. See

Exhibit A (Pl. Dep. I) at 25:5 – 28:7.  As a Correspondence Assistant, he performed typing and other clerical duties.  Id. at 25:25 – 26:4.

4. On August 23, 1992, Plaintiff was promoted to the position of Grants Specialist, GS-9, in USIA's Bureau of Management.  He obtained the position by submitting a Standard Form 171 ("SF 171").  This was the first Grants Specialist position he had held.  See Exhibit A (Pl. Dep. I) at 28:13 – 29:1.  At this time, Plaintiff met Fannie Allen (African-American, female), who also was working in the Bureau of Management.  Id. at 57:19 – 58:7; and at 115:14 – 115:17.

5. On March 18, 1993, Plaintiff applied for an auditor position in USIA's Office of Inspector General.  In support of his application, he submitted an SF 171, a true copy of which is attached hereto as Exhibit E, and a Supplemental Qualifications Statement, a true copy of which is attached hereto as Exhibit F.  He signed both under penalty of perjury, acknowledging that: "A false statement on any part of your application may be grounds for not hiring you, or firing you after you begin work."  See Exhibit A (Pl. Dep. I) at 13:13 – 14:5; at 20:5 – 20:24; at 31:7 – 33:6; at 36:20 – 37:4; and at 47:25 – 48:3.

6. On both his SF-171 and his supplemental statement, Plaintiff misrepresented his college education.  Specifically, he certified that he had received a Bachelor of Arts degree from the University of the District of Columbia ("UDC") in December 1991.  In fact, he did not receive his B.A. from UDC until July 1995.  See Exhibit A (Pl. Dep. I) at 14:6 – 15:13; and at 33:7 – 33:21.

7. When asked in deposition why he had misrepresented his college education, Plaintiff responded as follows:

> It's twofold.  One, it was a mistake on my part to do that.  The second part is where I was working, which is the U.S. Information Agency, managers were putting emphasis on having degrees when you apply for jobs and what had happened was I put this on a previous -- if I'm not mistaken a previous application and I just did not remove it from that previous application.  In other words, it was transposed.  When I transposed it, it was left on there by mistake because managers -- I was trying at the time to move from clerical into professional and all I was hearing was you need a degree.  You can't move from a clerical position into a professional position without having a degree.

See Exhibit A (Pl. Dep. I) at 18:23 – 19:13; and at 35:25 – 36:11.  Plaintiff acknowledged that the "mistake" he had made was "lying."  Id. at 36:12 – 36:19; see also id. at 46:15 – 47:4 (acknowledging that the first time he misrepresented his college education on a federal application, he did so intentionally).

      8.      On May 2, 1993, Plaintiff was promoted to the auditor position, GS-9, for which he had submitted the SF-171 and supplemental statement referenced in paragraph 4, above.  See Exhibit A (Pl. Dep. I) at 47:10 – 47:19.

      9.      In November 1993, Plaintiff resigned from his auditor position with USIA's Office of Inspector General.  He did so because the agency had proposed to remove him from his position for falsifying his SF-171.  Specifically, the agency discovered in a security-clearance investigation that Plaintiff had not in fact received a B.A. from UDC in December 1991.  See Exhibit A (Pl. Dep. I) at 48:5 – 50:15.

      10.     From November 1993 until June 1995, Plaintiff was unemployed.  During this period, he went back to school full-time to complete his UDC degree.  See Exhibit A (Pl. Dep. I) at 51:19 – 52:12.

      11.     On June 25, 1995, as a settlement of Plaintiff's EEO complaint, USIA reinstated him, placing him in the position of Staff Assistant, GS-8, with the International Broadcasting

Bureau ("IBB"). See Exhibit A (Pl. Dep. I) at 52:8 – 52:15. As a Staff Assistant, Plaintiff performed clerical-type duties. Id. at 52:16 – 52:23.

13. On July 17, 1995, Plaintiff was reassigned to the position of Administrative Assistant, GS-8. On August 4, 1996, he received a promotion to Administrative Assistant, GS-9. Plaintiff's Administrative Assistant position was a clerical position. See Exhibit A (Pl. Dep. I) at 53:2 – 54:6.

13. On September 29, 1996, Plaintiff was reassigned to the position of Purchasing Agent, GS-9, with IBB's Contracts and Procurement Division. In this position, Plaintiff purchased supplies and equipment for IBB. See Exhibit A (Pl. Dep. I) at 54:10 – 55:1.

## Plaintiff Joins Grants Division

14. On December 10, 1996, Plaintiff filed a second EEO complaint against USIA, this time claiming retaliation, race, and sex discrimination in connection with his non-selection for a Budget Analyst position, GS-560-11/12/13/14. See Exhibit G (Pl. Disc. Resp. in Civil Action No. 04-857 (PLF)).

15. On November 23, 1997, as a resolution of Plaintiff's second EEO complaint, USIA promoted him "on paper" to the position of Contract Specialist, GS-11, and transferred his budget slot (otherwise known as "Full-Time Equivalent," or "FTE") to the Bureau of Management, Grants Division, of which Ms. Allen was the Chief. On the effective date of his promotion, Plaintiff started work as a Grants Specialist, GS-11, in the Grants Division. See Exhibit A (Pl. Dep. I) at 55:8 – 57:18; and at 63:4 – 64:15.

16. Before Plaintiff started in the Grants Division, he had several conversations with Ms. Allen about his second EEO complaint. See Exhibit A (Pl. Dep. I) at 58:20 – 59:18.

Plaintiff and Ms. Allen had maintained a "friendly coworker relationship" since they met in 1992. Id. at 59:19 – 61:18.

17.     Ms. Allen approved the proposal to bring Plaintiff into her Division as a Grants Specialist, GS-11. At the time Ms. Allen accepted Plaintiff into her Division (November 1997), Plaintiff had never held a GS-11 position and had had only nine months' prior experience as a Grants Specialist. See Exhibit A (Pl. Dep. I) at 64:5 – 64:25.

Function and Organization of Grants Division

18.     When Plaintiff joined the Grants Division in 1997, it still was part of USIA's Bureau of Management. See Exhibit A (Pl. Dep. I) at 64:5 – 64:15. On September 30, 1999, many of the functions of USIA, including the Grants Division, were consolidated into the Department of State. Since the merger, the Grants Division has been part of the Department of State's Bureau of Educational and Cultural Affairs ("ECA"). See Exhibit A (Pl. Dep. I) at 66:1 – 66:8.

19.     The Grants Division administers grant and cooperative agreements ("assistance agreements") for financial awards made by the Department's educational and cultural exchange programs. See Exhibit H (Allen Decl.) at ¶ 2.

20.     Grants Specialists are responsible, among other things, for evaluating grant proposals; drafting assistance agreements that reflect the requirements of the particular program and that comply with applicable federal regulations and circulars; monitoring the performance and reporting of recipient organizations; closing out and reconciling completed assistance agreements; and following up on audit recommendations. In addition, Grants Specialists provide technical guidance to Department program officials and recipient organizations, and perform

outreach through participating in meetings, conducting workshops, attending conferences, and making site visits. See Exhibit H (Allen Decl.) at ¶ 3.

21. Ms. Allen holds the position of Grants Management Officer, GS-14. See Exhibit A (Pl. Dep. I) at 115:14 – 115:16.

22. Connie Stinson and Margaret Ahern hold the positions of Senior Grants Specialists, GS-13. See Exhibit A (Pl. Dep. I) at 115:19 – 115:25. Both Ms. Stinson and Ms. Ahern are team leaders. Their function is to assign work and review completed work, and to provide guidance and supervision to their team members. Id. at 119:7 – 119:18; and at 123:14 – 123:18. They also report to Ms. Allen regarding the performance of their team members. Id. at 121:23 – 122:2.

Ms. Allen's Efforts to Promote Plaintiff's Professional Development

23. Ms. Allen testified that she attempted to groom Plaintiff for advancement—as she did for all her junior grants specialists—by having him assigned more complex work (e.g., grants previously administered by more senior grants specialists); by approving training for him; by making training suggestions to him; by assigning him special projects; by having private discussions with him behind closed doors; and by providing coaching and monitoring of his work. See Exhibit I, Deposition of Fannie Allen ("Allen Dep."), at 72:13 – 73:15; and at 96:21 – 99:7. See also Exhibit J (Allen EEO Decl.) at 3:26 – 4:2; and at 6:18 – 7:11.

24. Plaintiff acknowledged in deposition that Ms. Allen told him she gave him special projects as way of helping in his training and development as a grants specialist. See Exhibit A (Pl. Dep. I) at 101:16 – 101:20.

25.     Among the special projects Ms. Allen assigned Plaintiff were: the "Y2K" project; the Delphi International Office of Inspector General ("OIG") audit; the Grants Financial Management System ("GFMS") project; the Payment Management System ("PMS") Conversion project; and the "Public Law 107108" project. See Exhibit A (Pl. Dep. I) at 85:18 – 86:3; at 99:18 – 101:3; and at 136:11 – 136:20. Plaintiff testified that "there [were] others [special projects]" Ms. Allen also assigned him. Id. at 101:4 – 101:7.

26.     Ms. Allen recommended or approved Plaintiff for several awards in connection with special projects she had assigned him, including:

    a.  Special Act or Service cash award for his work on the Y2K project. See Exhibit H (Allen Decl.) at ¶ 6. See also Exhibit A (Pl. Dep. I) at 84:5 – 84:21 (acknowledging he does not know whether Ms. Allen approved him for this award), and Exhibit 27 thereto (attached hereto as Exhibit H).

    b.  Meritorious Honor cash award for his work on the Delphi OIG audit. See Exhibit A (Pl. Dep. I) at 84:25 – 87:3.

    c.  One Individual Time-Off award and two Group Time-Off awards for his work on the GFMS project. See Exhibit A (Pl. Dep. I) at 90:22 – 92:15; at 93:5 – 93:24; and at 94:3 – 95:7.

27.     On or about June 21, 1999, Ms. Allen recommended Plaintiff for an accretion-of-duties promotion to GS-12. See Exhibit A (Pl. Dep. I) at 111:6 – 111:11. At the time, Plaintiff had roughly 28 months of experience as a grants specialist. See id. at 28:13 – 29:1 and 47:10 – 47:19 (August 23, 1992, through May 2, 1993); and at 55:8 – 57:18 and 63:4 – 64:15 (started under Ms. Allen November 23, 1997).

28.     At Ms. Allen's request, Plaintiff prepared the memorandum recommending the accretion-of-duties promotion to GS-12. See Exhibit A (Pl. Dep. I) at 114:12 – 114:23. A true copy of the memorandum Plaintiff prepared is attached hereto as Exhibit L. Id. at 111:6 – 111:11. Among the accomplishments relied upon in the memorandum to justify the promotion was Plaintiff's work on the Y2K special project Ms. Allen had assigned him. See Exhibit L (6/21/99 Memo.) at 2.

29.     Ms. Allen signed off on the accretion-of-duties memorandum, as did her then-direct supervisor, Edward Muller. David Whitten approved the accretion-of-duties promotion. See Exhibit A (Pl. Dep. I) at 111:6 – 112:7; see also Exhibit L (6/21/99 Memo.) at 1.

30.     Effective November 7, 1999, Plaintiff received his accretion-of-duties promotion to GS-12. See Exhibit A (Pl. Dep. I) at 66:12 – 67:5.

31.     Between 2000 and 2002, Ms. Allen had four or five conversations with Plaintiff about how he could enhance his skills to get to the GS-13 level. See Exhibit A (Pl. Dep. I) at 106:25 – 107:17. Among the suggestions she gave him was that he needed to manage a program. Id. at 102:12 – 103:9. As a result, Plaintiff requested to take over the Wye River project, a project in which two of the GS-13s, Joyce Love and Ms. Ahern, already had prepared and administered the actual grant agreements. Id. at 102:20 – 104:17. In 2001 or 2002, Ms. Allen approved the assignment of the program to Plaintiff to help give him the experience he needed to get to the GS-13 level. Id. at 104:18 – 105:5; and at 105:12 – 105:20.

32.     Ms. Allen also had two or three conversations with Plaintiff about areas of his performance where she thought he could improve. See Exhibit A (Pl. Dep. I) at 107:18 – 107:22. As early as 1999/2000, Ms. Allen said he needed to improve his communication skills,

both oral and written.  Id. at 107:23 – 108:5.  Ms. Allen recommended that Plaintiff do the following to enhance his communication skills:  take a course at Prince George's Community College on basic English; take an internal agency course on public writing; participate in Toastmasters; and use a device to help him practice pronouncing words.  Id. at 108:6 – 110:10.  Plaintiff followed each of Ms. Allen's recommendations.  Id.

33.     Ms. Allen recommended an increase in Plaintiff's warrant authority to $500,000, for which he was approved in May 2003.  See Exhibit J (Allen EEO Decl.) at 10:23 – 10:29.  See also Exhibit B (Pl. Jan. 4, 2006 Dep.) at 20:25 – 21:11.

Plaintiff Receives Promotion to GS-13 Grants Specialist Position

34.     In 2006, plaintiff applied for and was selected for a GS-13 level in a Grants Specialist position located in the Bureau of Administration.  He was promoted to a GS-13 Grants Specialist position effective June, 2006, and plaintiff currently occupies this position.  See Exhibit C (Pl. March 26, 2007 Dep.) at 38-39.

<strong>CHANGES IN PERSONNEL IN GRANTS SPECIALIST POSITIONS<br>IN ECA IN 2004-2005</strong>

35.     Joyce Love, a GS-13 Grants Specialist, retired from the State Department on January 3, 2004.  See Exhibit C (Pl. March 26, 2007 Dep.) at 12; see also Complaint, ¶ 5.

36.     On February 17, 2004, plaintiff submitted a memorandum requesting that he be promoted non-competitively into what he described as Ms. Love's unoccupied GS-13 level position.  See Exhibit M (Feb. 17, 2004 Memorandum From Donald S. Hunter to Acting Executive Director of ECA); see also Complaint, ¶ 7.

37. Ms. Allen testified that she did not believe Mr. Hunter performed his work to the same degree of competence as Ms. Love performed hers. See Exhibit I (Allen Dep.) at 151:8 – 10.

38. On March 4, 2004, Ms. Allen requested that Human Resources post a vacancy announcement for a GS-11/12 Grants Specialist for the position previously occupied by Joyce Love. See Exhibit N (March 4, 2004 Memorandum From Fannie Allen to Jacqueline Hill re Request to fill vacancy); Exhibit O [Vacancy Announcement Number AR188963].

39. Plaintiff never spoke to anyone, including Ms. Allen, regarding the decision to post the vacancy created by Ms. Love's departure at a lower GS-level. See Exhibit C (Pl. March 26, 2007 Dep.) at 18.

40. Ms. Allen selected Julie Johnson for a GS-11 Grants Specialist position in ECA in or around April, 2004. Complaint, ¶ 9; see also Exhibit P (Certificate of Eligibles Issued April 22, 2004); Exhibit Q (Standard Form 50 effective May 16, 2004 for Julie Johnson).

41. Plaintiff did not apply for the Grants Specialist position that Ms. Johnson accepted because he was already working at the GS-12 level. See Exhibit C (March 26, 2007 Dep.) at 15-16, 18-19.

42. At the time Ms. Johnson accepted the position at the GS-11 level, plaintiff knew that she was under the age of 40. See Exhibit C (March 26, 2007 Dep.) at 20, 22.

43. On May 7, 2004, Mr. Hunter filed a grievance concerning the lack of a favorable response to his request for promotion to the GS-13 position formerly occupied by Ms. Love. See Exhibit C (March 26, 2007 Dep.) at 13-14. Mr. Hunter did not file an EEO complaint concerning his February 17, 2004 request to be promoted. Id. at 15:2-5; 51-53.

44. In responding to Mr. Hunter's grievance, the Department informed Mr. Hunter that Ms. Allen had decided to fill the vacant position at the GS-11/12 level to meet the needs of the organization. See Exhibit R (June 17, 2004 Memorandum from ECA to AFGE Local 1534 re Response to Step 2 Grievance of Donald Hunter); Exhibit S (Sept. 22, 2004 Letter to Lawrence Williams, AFGE Local 1534 Representative from State Department containing the Department's written decision on Mr. Hunter's grievance).

45. Deborah Thompson was selected for a GS-9 Grants Specialist position in ECA in March, 2005. See Exhibit C (Pl. March 26, 2007 Dep.) at 22-23.

46. Plaintiff had not applied for the position for which Ms. Thompson was selected. See Exhibit C (Pl. March 26, 2007 Dep.) at 24.

47. Plaintiff believed that Ms. Thompson was under the age of 40 at the time of her selection in early 2005. See Exhibit C (Pl. March 26, 2007 Dep.) at 24.

48. Phyllis Swann, a GS-13 Grants Specialist in ECA, accepted a position outside of ECA in or around May, 2005. See Complaint, ¶ 6; Exhibit C (Pl. March 26, 2007 Dep.) at 34; Exhibit T (Standard Form 50 effective April 3, 2005 for Ms. Swann for promotion from GS-13 Grants Specialist in the Office of the Assistant Secretary to a GS-14 Grants Specialist in the Bureau of Administration).

49. Unlike in 2004 when Ms. Love retired, after Ms. Swann left in 2005 Plaintiff did not request to be promoted to the GS-13 level. See Exhibit C (Pl. March 26, 2007 Dep.) at 54-55.

50. Ms. Allen selected Kenyetta Gunther for a GS-9 Grants Specialist position in ECA in August, 2005. See Exhibit C (Pl. March 26, 2007 Dep.) at 27; Complaint, ¶ 10.

51.     Plaintiff had not applied for the position for which Ms. Gunther was selected in 2005.  See Exhibit C (Pl. March 26, 2007 Dep.) at 28-29.

52.     Plaintiff believed Ms. Gunther was under 40 years of age when she began working in ECA in August, 2005.  See Exhibit C (Pl March 26, 2007 Dep.) at 31.

## **BASIS FOR MS. ALLEN'S DECISION**

53.     Prior to Ms. Love's retirement in early 2004, there were four GS-13 Grants Specialists in the Grants Division of ECA:  Ms. Stinson and Ms. Ahern, the team leaders; and Phyllis Swann and Joyce Love.  See Exhibit A (Pl. Dep. I) at 115:4 – 116:13; see also Exhibit U (Def.'s Response to Pl.'s Interrog. No. 10).

54.     Ms. Stinson, Ms. Ahern and Ms. Swann occupied substantially similar GS-13 Grants Specialist positions.  See Exhibit C (Pl. March 26, 2007 Dep.) at 25: 14-23.

55.     Ms. Allen detailed her reasons for not posting the GS-13 Grants Specialist positions in 2004 and 2005 as follows:

> . . . Joyce C. Love, a GS-13 Grants Specialist in the Grants Division, retired on January 3, 2004.  When she retired, Ms. Fannie Allen was the Chief of the Grants Division.  Ms. Allen first discussed her options about what to do about filling the position that Joyce Love would vacate with the Human Resources Division, and in particular, Jacqueline Hill.  The Human Resources Division advised Ms. Allen that she, as the Chief of the Division, could decide how she wanted to use and fill the position, and that she was not required to post the position at the GS-13 level.  In general, she was advised that when a position is vacated, management can reprogram or reclassify a position in any manner they deem appropriate to accomplish the work of the organization.  As the supervisor, Ms. Allen understood that she had the responsibility to determine how to best use her organization's resources to meet the organization's needs.

With that understanding, Ms. Allen considered the organizational structure of the Division. It consisted of the following grants specialists at that time:

Division Chief – Fannie Allen (GS-14)

| | |
|---|---|
| Senior Grants Specialist (GS-13) Team Leader Connie Stinson | Senior Grants Specialist (GS-13) Team Leader Margaret Ahern |
| GS-13 Grants Specialist Phyllis Swann-Smith | GS-13 Grants Specialist Joyce Love |
| GS-12 Grants Specialist Donald Hunter | GS-11 Grants Specialist Janet Yates |
| GS-11 Grants Specialist Julie Johnson | |

Although the position vacated when Ms. Love retired was filled and classified as a GS-13 Grants Specialist, Ms. Allen did not believe that filling the position at the GS-13 level would be in the Division's best long-term interests. First, Ms. Allen did not want to fill the position at the GS-13 level because of her desire to restructure the Division consistent with the Department's organizational policy and objectives. In that regard, the Foreign Affairs Manual ("FAM") 1 FAM 014.1 regulations on General Organizational Objectives are pertinent. That section provides that organizational structures should strive to achieve a proper balance among Mission needs, efficiency of operations, and effective employee utilization. It further provides that organizational planning be guided by: (1) meeting Department priorities; (2) improving service delivery; and (3) improving internal management.

As part of the restructuring envisioned by Ms. Allen, the Division would have improved internal management with the clearer reporting requirements through the team structure and team leadership of two GS-13 Senior Grants Specialists. Grants Specialists from the trainee to journeyman level (GS-9 to GS-12) would report to the two GS-13 Team Leaders and these two Team Leaders would report to Ms. Allen. Ms. Allen understood that a true team structure would consist of the two GS-13 Team Leaders, with 2 GS-12s and a lower grade (GS-11 or GS-9) reporting to each team leader. This is the structure that Ms. Allen wanted to move towards. Ms. Allen's decision to recruit this position at a lower grade level was based on her restructuring vision for the efficient and effective operation of the Grants Division, the mission of the Division, the capability of GS-12, GS-11 and GS-9 Grants Specialists to do the lion's share of the work, and what made sense with two GS-13 Team Leaders.

  In addition, Ms. Allen was anticipating the future needs of the Division. Ms. Allen was mindful of a *Government Executive* article she had read previously about workforce planning. Several points in the article resonated with her. The article discussed depletion of experienced personnel from the Federal Government. The point that Ms. Allen inferred from this article was that managers should have plans in place, including the training and development of lower level staff, to ensure that there were seasoned employees in the organization to accomplish the work.

  Finally, Ms. Allen desired to provide for a career ladder in order to attract qualified candidates who would be motivated by the possibility of advancement and professional development opportunities in the Grants Division. With such opportunities to rise to the journeyman level, Ms. Allen believed that employees would be more likely to stay, which would further benefit the Division.

See Exhibit U (Def.'s Response to Pl.'s Interrogatory No. 10).

## GS-14 SUPERVISORY BUDGET ANALYST POSITION

56. Plaintiff did not apply for the GS-14 level Supervisory Budget Analyst position in the Budget Division of ECA in or around February, 2006. See Exhibit C (Pl. March 26, 2007 Dep.) at 57-58.

57. In February, 2006, plaintiff lacked the necessary time in grade at the GS-13 level to be eligible for the GS-14 Supervisory Budget Analyst position. Id. at 58.

## PLAINTIFF'S EFFORTS TO EXHAUST ADMINISTRATIVE REMEDIES

58. Plaintiff first believed he was being discriminated against based on his age in 2002, particularly when Ms. Julie Johnson, Darcy Damon, and a third female joined ECA. See Exhibit C (Pl. March 26, 2007 Dep.) at 49-50.

59. Plaintiff did not file an EEO complaint when management did not agree to his February 14, 2004 request to be promoted to the then-vacant Grant Specialist position in ECA at the GS-13 level. See Exhibit C (Pl. March 26, 2007 Dep.) at 15:2-5.

60. Plaintiff attended the deposition of Ms. Fannie Allen on June 6, 2005, in connection with Hunter v. Rice, Civil Action No. 04-857 (PLF). See Exhibit C (Pl. March 26, 2007 Dep.) at 49.

61. On August 25, 2005, plaintiff sent an e-mail to Jacqueline A. Canton and Arlene Brandon in the State Department's Office of Civil Rights. See Exhibit C (Pl. March 26, 2007 Hunter Dep.) at 32. Plaintiff raised a complaint about Ms. Gunther's selection and that the position she got was downgraded to a GS-9/11/12. Id. at 33; see also Exhibit V (Pl.'s Aug. 25, 2005 e-mail and attachments).

62. Plaintiff sent a follow-up e-mail approximately one month after his August 25, 2005 e-mail. See Exhibit C (Pl. March 26, 2007 Dep.) at 36-37. Although the Office of Civil Rights indicated that plaintiff's complaint would be processed, plaintiff never heard anything further about it and did not engage in any informal counseling. Id. at 37-38.

63. Plaintiff sent a letter dated January 9, 2006 to the Equal Employment Opportunity Commission giving notice of an intent to sue the Department of State within 30 days for alleged age discrimination. See Exhibit C (Pl. March 26, 2007 Dep.) at 42; Exhibit D. He provided a copy to the Department of State's Office of Civil Rights. Id. at 42-43.

64. Plaintiff filed this action on February 24, 2006. See Docket Entry No. 1.

Dated: May 11, 2007.

                Respectfully submitted,

                _____
                JEFFREY A. TAYLOR, D.C. Bar # 498610
                United States Attorney

   /s/
_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


   /s/
_____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W - Room E4822.
Washington, D.C.  20530
(202) 514-7161
(202) 514-8780 (facsimile)