1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLUMBIA

 3   - - - - - - - - - - - - - - - - -x

 4   DONALD STEVE HUNTER, SR.,              :

 5              Plaintiff,                  :

 6   vs.                                    :   Civil Action No.

 7   COLIN L. POWELL, Secretary             :   04-857 (PLF)

 8   United States Department of State, :

 9              Defendant.                  :

10   - - - - - - - - - - - - - - - -x

11                                    Washington, D.C.

12                                    Wednesday, July 6, 2005

13   Deposition of:

14              DONALD STEVE HUNTER, SR.,

15   the Deponent, called for examination by counsel for the

16   Defendant, the United States of America, pursuant to

17   notice and agreement as to time and place, at the Office

18   of the United States Attorney, 501 Third Street, N.W.,

19   Washington, D.C., before Dawn M. Cain, a Notary Public in and

20   for the District of Columbia.

21

22

23

24

25
```



13

1   1976 through 1980?

2       A.   Yes.

3       Q.   You were still in college at the time of your

4   termination from the Department of Treasury?

5       A.   It looks as though this was during the summer

6   months for the effective date for -- I was probably ending

7   a semester or coming to the end of a semester around

8   4/9/1980.

9            MR. STRAND:  Off the record for one second.

10           (A recess was taken.)

11           MR. STRAND:  On the record.

12           BY MR. STRAND:

13      Q.   I'm showing you what we will mark as Defendant's

14   Exhibit 5.

15           (Hunter Deposition Exhibit Number 5 was marked

16   for identification.)

17           BY MR. STRAND:

18      Q.   Is that your signature on the last page of the

19   document?

20      A.   It looks to be, yes.

21      Q.   Okay.  Dated March 18, 1993?

22      A.   Yes.

23      Q.   You signed this under penalty of perjury as I

24   understand?

25      A.   Correct.

14

1      Q.   Okay.   This purports to be an application for

2    federal employment, an SF-171.   Does this appear to be a

3    true copy of the application you submitted for federal

4    employment on March 18th, 1993?

5      A.   Yes.   It does.

6      Q.   Is everything you said in this application true?

7      A.   No.   It isn't.

8      Q.   Okay.   What's untrue in here?

9      A.   The -- under college degrees.

10     Q.   Okay.   On Bates page 178, look at the bottom

11   right-hand corner.   There are little numbers there.

12   That's Bates numbering.   This document and others that

13   I'll be showing you are among documents that I provided

14   your counsel in discovery responses and I numbered them so

15   we would be able to refer to them by individual pages so

16   on Bates page 178 under what box, box 28?

17     A.   Yes.

18     Q.   Okay.   What's incorrect there?

19     A.   BS -- excuse me, BA 12/91.

20     Q.   You did not, in fact, receive a bachelor of arts

21   from the University of the District of Columbia in

22   December of 1991?

23     A.   Correct.

24     Q.   Okay.   When did you receive your bachelor of

25   arts from the University of the District of Columbia?

15

1    A.   July 1995.

2    Q.   I'm showing you what we will mark as Defendant's

3  Exhibit 6.

4         (Hunter Deposition Exhibit Number 6 was marked

5  for identification.)

6         BY MR. STRAND:

7    Q.   Can you identify that document for me.

8    A.   Yes.  This is my BS degree from the University

9  of the District of Columbia on July 22nd, 1995.

10   Q.   Okay.  So this July 22nd, 1995, is the true date

11 on which you received your bachelor of arts from the

12 University of the District of Columbia?

13   A.   Yes.

14   Q.   And you received that degree in community and

15 urban planning?

16   A.   Correct.

17   Q.   The second page of Exhibit 6 indicates that your

18 date of enrollment in the University of the District of

19 Columbia -- we'll call it UDC for short -- was August of

20 1978?

21   A.   Yes.

22   Q.   Is that correct?

23   A.   I don't recall.  I thought I enrolled earlier

24 than 1978.

25   Q.   Now, turning your attention back to Exhibit 5,

18

1    Q.    I understand.  I am correct in reading this
2 application -- in this application you state that you did
3 receive the degree -- the AA degree in May 1979?

4          MR. SNIDER:  Objection.  Misstates.

5          BY MR. STRAND:

6    Q.    Am I correct?

7          MR. SNIDER:  Objection.

8          You can answer.

9          THE WITNESS:  Yes.

10          BY MR. STRAND:

11    Q.    Okay.  What you've indicated here about your AA
12 degree may or may not be true and what you've indicated
13 here in Exhibit 5 about your bachelor of arts degree is
14 not true?

15          MR. SNIDER:  Objection.

16          BY MR. STRAND:

17    Q.    Am I correct about that?

18          MR. SNIDER:  Objection.

19          You can answer.

20          BY MR. STRAND:

21    Q.    Am I correct about that?

22    A.    Yes.

23    Q.    Okay.  Can you tell me why it was that in this
24 application you falsely indicated that you had received a
25 bachelor of arts in 1991?

19

1     A.   It's twofold.  One, it was a mistake on my part

2  to do that.  The second part is where I was working, which

3  is the U.S. Information Agency, managers were putting

4  emphasis on having degrees when you apply for jobs and

5  what had happened was I put this on a previous -- if I'm

6  not mistaken a previous application and I just did not

7  remove it from that previous application.

8         In other words, it was transposed.  When I

9  transposed it, it was left on there by mistake because

10  managers -- I was trying at the time to move from clerical

11  into professional and all I was hearing was you need a

12  degree.  You can't move from a clerical position into a

13  professional position without having a degree.

14     Q.   So you indicated on an earlier application that

15  you had a degree because you wanted to improve your

16  chances of moving up the career ladder?

17     A.   Correct, while working on my degree.  I wasn't

18  that far away.  I -- really it was -- there really was an

19  anticipated date that I was thinking I would receive my

20  degree.

21     Q.   Although you didn't actually receive your degree

22  until 1995, correct?

23     A.   Correct.

24     Q.   What was the first application in which you

25  falsely indicated that you had received your BA degree?

20

1    A.    I can't recall.

2    Q.    Do you remember what job it was you were

3    applying for at the time?

4    A.    I cannot recall.

5    Q.    Okay.  In Exhibit 5 dated 1993 -- let me back

6    up.  Exhibit 5 was your application that you signed in

7    March of 1993?

8    A.    Yes.

9    Q.    Do you remember what job you were applying for

10    at that time?

11    A.    I don't understand the question.

12    Q.    This is an application for federal employment,

13    Exhibit 5?

14    A.    Yes.

15    Q.    Okay.  It indicates on the first page of the

16    document that you were applying for an auditor PDM-120-93

17    position?

18    A.    Yes.

19    Q.    Is that correct?

20    A.    Yes.

21    Q.    That was a position you were applying for?

22    A.    Yes.

23    Q.    And what agency was that position in?

24    A.    The U.S. Information Agency.

25    Q.    Okay.  At the time you applied for the auditor

24

1     Q.   As far as we have gotten in your employment

2  history you have never been asked to leave a position; is

3  that right?

4     A.   Correct.

5     Q.   Okay.  The word processing clerk position that

6  you assumed in December of 1980 was with the Geological

7  Survey Bureau in Interior?

8     A.   Correct.

9        (Hunter Deposition Exhibit Number 10 was marked

10  for identification.)

11       BY MR. STRAND:

12     Q.   I'm showing you what has been marked as

13  Defendant's Exhibit 10.  Is it correct that as of

14  February 2nd, 1986, you were appointed to the position of

15  supply clerk in the U.S. Information Agency office of

16  security?

17     A.   Correct.

18     Q.   What caused you to leave Interior and move to

19  USIA?

20     A.   They transferred a function.  The Interior was

21  moving its function to Denver, Colorado.

22     Q.   And you wanted to remain in the District?

23     A.   Correct.

24     Q.   Am I correct that the supply clerk position that

25  you assumed in February of 1986 was a GS-4 position?

24

1      Q.    As far as we have gotten in your employment

2  history you have never been asked to leave a position; is

3  that right?

4      A.    Correct.

5      Q.    Okay.   The word processing clerk position that

6  you assumed in December of 1980 was with the Geological

7  Survey Bureau in Interior?

8      A.    Correct.

9            (Hunter Deposition Exhibit Number 10 was marked

10 for identification.)

11           BY MR. STRAND:

12     Q.    I'm showing you what has been marked as

13 Defendant's Exhibit 10.   Is it correct that as of

14 February 2nd, 1986, you were appointed to the position of

15 supply clerk in the U.S. Information Agency office of

16 security?

17     A.    Correct.

18     Q.    What caused you to leave Interior and move to

19 USIA?

20     A.    They transferred a function.   The Interior was

21 moving its function to Denver, Colorado.

22     Q.    And you wanted to remain in the District?

23     A.    Correct.

24     Q.    Am I correct that the supply clerk position that

25 you assumed in February of 1986 was a GS-4 position?

25

1    A.    Yes.  I think it was.

2         (Hunter Deposition Exhibit Number 11 was marked

3    for identification.)

4         BY MR. STRAND:

5    Q.    I'm showing you what we have marked as

6    Defendant's Exhibit 11.  Is it correct that in July of

7    1986 you were promoted at USIA from supply clerk to

8    correspondence clerk?

9    A.    Correct.

10   Q.    What does CONTR stand for?

11   A.    I'm not...

12   Q.    Correspondence CONTR clerk.

13   A.    Control.

14   Q.    Okay.  As of July 1986, you became a GS-6

15   correspondence control clerk?

16   A.    Yes.

17        (Hunter Deposition Exhibit Number 12 was marked

18   for identification.)

19        BY MR. STRAND:

20   Q.    I'm showing you what we have marked as

21   Defendant's Exhibit 12.  Am I correct that on August 2nd,

22   1987, you were promoted to the position of GS-7,

23   correspondence assistant at USIA?

24   A.    Correct.

25   Q.    Your function as a correspondence assistant was

26

1    typing?

2        A.    Yes.   Some.

3        Q.    Typing and other clerical duties?

4        A.    Correct.

5              (Hunter Deposition Exhibit Number 13 was marked

6    for identification.)

7              BY MR. STRAND:

8        Q.    I'm showing you what we have marked as

9    Defendant's Exhibit 13.   Am I correct that effective

10   October 23, 1988, you were promoted to a position of

11   correspondence assistant, GS-8 at USIA?

12       A.    Correct.

13             MR. STRAND:   Off the record for one second.

14             (Discussion off the record.)

15             BY MR. STRAND:

16       Q.    Your counsel has pointed out to me we may be

17   missing a piece of paper here in the sequence of your

18   promotions.   I would like to clarify, though, that

19   starting with Defendant's Exhibit 11 through Defendant's

20   Exhibit 13, it is correct that your progression was from

21   supply clerk to correspondence control clerk to

22   correspondence assistant.   Those were the three positions

23   that you held over the course of this period of time that

24   is reflected in Exhibits 11 through 13?

25       A.    Yes.

1     Q.   And in the correspondence assistant position you

2  received a career ladder promotion reflected in Exhibit

3  12?

4     A.   I really don't recall.

5     Q.   You don't deny that the document is correct?

6     A.   It could be incorrect.

7     Q.   Is there anything about it that causes you to

8  believe it could be incorrect?

9     A.   My understanding is when I accepted the

10  corresponding control clerk position, it was a 6/7/8

11  position, and I'm confused why it capped me off at the 7

12  as for performance level, Exhibit 13.

13     Q.   Well, that's a different position.

14     A.   No.  It was -- it was all one.  Corresponding

15  control clerk and correspondence assistant was all one

16  position from recollection.  I was in that one position.

17  The title may have --

18     Q.   The title changed?

19     A.   Changed, right.  That's exactly what happened.

20     Q.   All right.  But you don't disagree that these

21  were the titles, your titles reflected in Exhibits 11

22  through 13, that these were the correct titles of the

23  positions that you held?

24     A.   Correct.

25     Q.   Okay.  And you don't dispute that these were the

28

1    correct dates and grade levels that you had in connection

2    with those positions?

3         A.    No.

4         Q.    Okay.  You don't dispute --

5         A.    No, I don't dispute.

6         Q.    Okay.

7         A.    No.

8         Q.    All right.  I'm showing you what we will mark as

9    Defendant's Exhibit 14.

10              (Hunter Deposition Exhibit Number 14 was marked

11   for identification.)

12              BY MR. STRAND:

13        Q.    Am I correct that effective August 23, 1992, you

14   were promoted from the position of correspondence

15   assistant, GS-8, to the position of grants specialist,

16   GS-9, with the USIA?

17        A.    Correct.

18        Q.    This was the first grants specialist position

19   that you had held?

20        A.    Correct.

21        Q.    How did you obtain that position?

22        A.    I applied, sent the SS-171.

23        Q.    SF-171?

24        A.    Mm-hmm.

25        Q.    You have to say yes or no.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1      A.    Yes.

2      Q.    So the first time that you misrepresented your

3   college education would have been in applying for the

4   grants specialist position that you obtained in 1992; is

5   that correct?

6      A.    I don't recall.

7      Q.    It could have been for a previous job?

8      A.    I have been applying for jobs throughout my

9   career in the federal government.  I have over 33 years of

10  service and at that point I had -- we're talking 1992, I

11  had, what 15, 16 years of service.  I applied throughout

12  the federal government, so I can't --

13     Q.    How many times have you misrepresented your

14  college education in federal applications?

15     A.    I know of this one instance.

16     Q.    Well, you have already named two instances?

17     A.    Well, the one that -- yeah, those two.

18     Q.    I don't understand how that squares with what

19  you just told me about the fact that you had been sending

20  out applications everywhere.

21     A.    I'm saying I can't identify the one because I

22  have applied for so many.

23     Q.    Okay.  The grants specialist position that you

24  obtained in 1992?

25     A.    Yes.

1   application, correct?

2        A.   Correct.

3        Q.   Do you recall when the first time was?

4        A.   No.

5        Q.   Do you recall how long before 1993 it was?

6        A.   No.

7        Q.   I'm showing you what we will mark as Defendant's

8   Exhibit 15.

9             (Hunter Deposition Exhibit Number 15 was marked

10  for identification.)

11            BY MR. STRAND:

12       Q.   Look at the second page of Exhibit 15.  Is that

13  your signature dated March 18th, 1993?

14       A.   Yes.

15       Q.   This is a supplemental statement of

16  qualifications that you filed in conjunction with Exhibit

17  5.

18       A.   I see no indication that it was, but if you are

19  saying that, I know -- I don't recall it.  I could have

20  attached this to Exhibit 5 when I submitted the

21  application.  I see no indication that it was.

22       Q.   They are both the exact same date, March 18th,

23  1992.

24       A.   Okay.

25       Q.   That's the indication that I see.

32

1      A.    Mm-hmm.

2      Q.    Are we in agreement that you submitted Exhibit

3  15 along with Exhibit 5?

4      A.    I could have applied for another job on that

5  date.  I don't know.

6      Q.    Okay.  Going back to Exhibit 15, you signed

7  under penalty of perjury that everything you were saying

8  in Exhibit 15 was true, correct?

9      A.    15?

10           MR. SNIDER:  Objection.

11           MR. STRAND:  Exhibit 15.

12           THE WITNESS:  Yes.

13           BY MR. STRAND:

14      Q.    Let's start that again.  Referring your

15  attention to Exhibit 15, you signed Exhibit 15 under

16  penalty of perjury, correct?

17           MR. SNIDER:  Objection.

18           You can answer.

19           THE WITNESS:  Yes.

20           BY MR. STRAND:

21      Q.    You certified that all the statements made in

22  the statement were true, complete and correct to the best

23  of your knowledge and belief and are made in good faith,

24  correct?

25      A.    Correct.

1     Q.   And you also signed below the statement that a

2   false answer to any question in this statement may be

3   grounds for not employing you or for dismissing you after

4   you begin work and may be punishable by fine or

5   imprisonment, correct?

6     A.   Correct.

7     Q.   Now, in this document, you also indicate that

8   you received a bachelor of art from UDC in December 1991,

9   correct?

10     A.   Correct.

11     Q.   That also was not a true statement?

12     A.   Correct.

13     Q.   Is there anything else in Exhibit 15 that was

14   not true?

15     A.   I don't recall.  To the best of my knowledge,

16   everything is -- to the best of my knowledge, everything

17   is correct.

18     Q.   Except for the date of the bachelor of arts

19   degree; is that correct?

20           MR. SNIDER:  Asked and answered.

21           THE WITNESS:  Correct.

22           BY MR. STRAND:

23     Q.   Is it true that you received an associate's

24   degree from UDC in May of 1979?

25     A.   As I stated previously, I know I met the

1  several times since these dates and things get lost.

2      Q.    Because you were referring a minute ago to your

3  documents at home and now you're saying you are not sure

4  you have documents at home?

5      A.    I have documents at home.  I don't know what's

6  in those documents.

7      Q.    Okay.  You do have some documents at home that

8  reflect your educational background?

9      A.    Correct.

10     Q.    Did you receive an associate's degree from P.G.

11 Community College in May of 1992?

12     A.    My recollection -- recollection is that I met

13 the requirements for the associate degree.  I don't recall

14 whether I actually received the actual degree.

15     Q.    Okay.  Why did you misrepresent your college

16 education on Exhibit 15?

17     A.    As I stated, I met the requirements in my mind.

18 Meeting the requirements was my reason for indicating it.

19     Q.    What you indicated here was that you had

20 actually received the degrees.

21     A.    And I could have --

22         MR. SNIDER:  Objection.  Hold on.  Give me a

23 second.

24         BY MR. STRAND:

25     Q.    You've acknowledged that you had not received

36

1  your bachelor of arts degree from UDC as of December 1991;

2  you've already acknowledged that.

3      A.   Correct.

4      Q.   And you've indicated that you're not sure

5  whether you had actually received the associate's degrees

6  that are indicated on Exhibit 15?

7      A.   Correct.

8      Q.   But we are sure that you misrepresented at least

9  one thing on this document and that was your receipt of

10  the bachelor of arts degree from UDC?

11      A.   Correct.

12      Q.   Okay.  Now, that's what I'm asking you.  Why did

13  you misrepresent your UDC degree on this document?

14      A.   As I stated previously, it was a twofold thing

15  where management was requiring degrees to move from

16  clerical positions into professional positions, and I just

17  flat out made a mistake.

18      Q.   And the mistake was lying?

19      A.   Correct.

20      Q.   But now you have indicated that Exhibit 15 --

21  you are not sure what application this goes with?

22      A.   It is more than likely that it is with this one,

23  with the auditor position.  I know I -- the auditor

24  position required that you list your college courses so

25  I'm pretty sure this wasn't -- was attached to the

37

1   application for the auditor.

2       Q.   So do you now believe that Exhibits 5 and 15

3   went together for the auditor's position application?

4       A.   Yes.

5       Q.   The auditor position did require a college

6   degree in order to obtain the position, correct?  That was

7   one of the prerequisites?

8       A.   I don't recall.

9       Q.   But you misrepresented your college education in

10  order to try to obtain the auditor's position?

11          MR. SNIDER:  Objection.  Asked and answered.

12          You can answer.

13          THE WITNESS:  As I stated this was an oversight

14  on my part.

15          BY MR. STRAND:

16      Q.   No.  That's --

17      A.   I was not trying to misrepresent my college

18  degree in order to get this position.

19      Q.   That strikes me as inconsistent with what you

20  just said about management was putting a lot of emphasis

21  on having a degree -- a college degree in order to move up

22  from clerical.  So --

23      A.   I was --

24          MR. SNIDER:  Objection.  There's no answer -- no

25  question.

46

1    Q.   Okay.  Am I correct that at some point during

2  the creation of Exhibits 5 and 15, you did intentionally

3  misrepresent your college degree?

4    A.   No.  It was a mistake.

5    Q.   The first time that you listed May 1991 as the

6  date that you actually received your UDC degree, the first

7  time that you indicated that, you had not in fact received

8  that degree?

9    A.   Correct.

10    Q.   So that could not have been a mistake?

11         MR. SNIDER:  Objection.

12         BY MR. STRAND:

13    Q.   Is that correct?

14    A.   Would you repeat the question?

15    Q.   The first time you indicated on a federal

16  application that you had received your UDC bachelor's

17  degree in 1991, you in fact had not received it?

18    A.   Correct.

19    Q.   So that could not have been a mistake, the first

20  time you indicated that you had received your BA degree;

21  is that correct?

22         MR. SNIDER:  Same objection.

23         THE WITNESS:  Correct.

24         BY MR. STRAND:

25    Q.   Okay.  So the first time you wrote down that

1   degree for that date it was in fact a lie, an intent to

2   misrepresent.  Thereafter you were simply copying

3   inadvertently the same mistake; is that your testimony?

4       A.    Correct.

5       Q.    I'm showing you what we will mark as Defendant's

6   Exhibit 16.

7              (Hunter Deposition Exhibit Number 16 was marked

8   for identification.)

9              BY MR. STRAND:

10      Q.    Am I correct that effective May 2nd, 1993, you

11  were reassigned from your grants specialist position to an

12  auditor position in USIA?

13      A.    Correct.

14      Q.    That auditor position was the job you had

15  applied for with Exhibits 5 and 15?

16      A.    Correct.

17      Q.    The auditor position you obtained in May 1993

18  was a grade 9, GS-9?

19      A.    Correct.

20      Q.    I'm showing you what we will mark as Defendant's

21  Exhibit 17.

22             (Hunter Deposition Exhibit Number 17 was marked

23  for identification.)

24             BY MR. STRAND:

25      Q.    Am I correct that -- let me strike that.  Let me

1    back up for a second.  The auditor position that you

2    obtained in May 1993 was with the office of inspector

3    general in USIA?

4        A.    Correct.

5        Q.    Now, refer your attention to Exhibit 17.  Am I

6    correct that in November of 1993, you resigned from your

7    position as an auditor with the office of inspector

8    general, USIA?

9        A.    Correct.

10       Q.    Why did you resign?

11       A.    There was a proposal to have me removed.

12       Q.    What was the basis of that proposal?

13            MR. SNIDER:  Could we go off the record for a

14    second.

15            MR. STRAND:  Not while the question is pending.

16            MR. SNIDER:  Okay.  Then I will object.

17            THE WITNESS:  Can you repeat the question?

18            BY MR. STRAND:

19       Q.    What was your understanding of the basis of the

20    proposal to remove you?

21            MR. SNIDER:  Objection.

22            You can answer.

23            THE WITNESS:  Falsifying -- falsification of a

24    document.

25            BY MR. STRAND:

49

1    Q.    What document were you claimed to have

2  falsified?

3    A.    The SF-171.

4    Q.    The SF-171 that we have marked here as Exhibit

5  5?

6    A.    Correct.

7    Q.    And what did your employer claim you had

8  falsified on that document?

9    A.    A degree, claiming a degree, a BS degree.

10    Q.    Okay.  Your testimony is that your employer

11  learned somehow that you had not in fact received your BA

12  degree from UDC in December 1991?

13    A.    Correct.

14    Q.    How did your employer come to learn of the

15  falsification?

16    A.    Through a security investigation.

17    Q.    This was an annual recheck of the security

18  clearances?

19    A.    No.

20    Q.    What was it?

21    A.    It was an upgrade of level.

22    Q.    So you had requested an upgrade in your security

23  clearance and the security investigation discovered that

24  you had misrepresented your college education on your

25  application?

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1      A.    That's incorrect.

2      Q.    And what is incorrect about that?

3      A.    That I requested.  I did not request anything.

4      Q.    Okay.  Somebody -- your employer had requested

5  an upgrade in your security clearance?

6      A.    Correct.

7      Q.    And it was discovered in the security

8  investigation that you had misrepresented your UDC degree?

9      A.    Yes.

10     Q.    On the basis of that information your employer

11  proposed to remove you from your position?

12     A.    Correct.

13     Q.    And instead of being terminated, you decided to

14  resign?

15     A.    Correct.

16     Q.    Why did you decide to resign instead of fighting

17  the termination proposal?

18           MR. SNIDER:  Objection.

19           You can answer.

20           THE WITNESS:  I knew that the proposal was not

21  fair.  Instead of fighting it through the internal process

22  I decided to file an EEO complaint based on the unfairness

23  of the proposal.

24           MR. STRAND:  Off the record for one second.

25           (A recess was taken.)

1          BY MR. STRAND:

2      Q.   Why did you believe that the proposed

3  termination was unfair?

4      A.   Because I knew of other (sic) who were not of

5  African descent who had falsified documents, indicated

6  they had degrees throughout the agency and they were not

7  removed or even proposed to be removed.  In fact they were

8  promoted.

9      Q.   How did you know of these other people?

10     A.   I have been working at this -- I have been

11 employed with this agency for about eight or some -- 1986

12 through '90.  I guess that's about seven years and I got

13 to know a lot of people throughout the agency and

14 employees talk.

15     Q.   So your information about other employees who

16 allegedly falsified their applications comes from what

17 other people told you?

18     A.   Other employees.

19     Q.   You were unemployed -- you left the agency --

20 you left USIA in November of 1993.  What did you do when

21 you left the agency?

22     A.   I went back to school full-time to complete my

23 degree.

24     Q.   Your UDC degree?

25     A.   Correct.

52

1      Q.   Let me ask you something.  Do you believe it is

2  okay that you misrepresented your education because other

3  people have also misrepresented their educations?

4      A.   No.

5           (Hunter Deposition Exhibit Number 18 was marked

6  for identification.)

7           BY MR. STRAND:

8      Q.   I'm showing you what has been marked as Exhibit

9  18.  Am I correct that as of June 25, 1995, you were

10  reinstated to the U.S. Information Agency as a GS-8 staff

11  assistant?

12      A.   Correct.

13      Q.   Your staff assistant position was with the

14  International Broadcasting Bureau?

15      A.   Correct.

16      Q.   Your duties as a staff assistant were what?

17      A.   Were similar to the position of

18  correspondence -- what was the title of that position,

19  correspondence...

20      Q.   Control clerk?

21      A.   Correct.

22      Q.   So it was clerical-type duties?

23      A.   Correct.

24           (Hunter Deposition Exhibit Number 19 was marked

25  for identification.)

53

1    BY MR. STRAND:

2    Q.   I'm showing you what has been marked as

3  Defendant's Exhibit 19.  Am I correct that effective

4  July 17th, 1995, you were reassigned from the position of

5  staff assistant to the position of administrative

6  assistant with the Voice of America, Africa Division?

7    A.   Correct.

8    Q.   Was Voice of America the same thing as

9  International Broadcasting Bureau?

10   A.   Yes.

11   Q.   I know that one name came first and then another

12  name came later.  Did it start off as Voice of America and

13  later become IBB or did it become IBB -- start off as IBB

14  and become Voice of America?

15   A.   It was Voice of America.  Then it was converted

16  to International Broadcasting Bureau.

17   Q.   Okay.  Your administrative assistant position

18  with the Voice of America was a GS-8 position?

19   A.   Correct.

20       (Hunter Deposition Exhibit Number 20 was marked

21  for identification.)

22       BY MR. STRAND:

23   Q.   I'm showing you what has been marked as

24  Defendant's Exhibit 20.  Am I correct that effective

25  August 4th, 1996, this is your promotion at USIA from the

54

1   position of administrative assistant GS-8 to the position

2   of administrative assistant GS-9?

3        A.   Correct.

4        Q.   Your administrative assistant position also was

5   a clerical position?

6        A.   Yes.

7             (Hunter Deposition Exhibit Number 21 was marked

8   for identification.)

9             BY MR. STRAND:

10       Q.   I'm showing you what has been marked as

11  Defendant's Exhibit 21.  Am I correct that effective

12  September 29th, 1996, you were reassigned from your

13  administrative assistant position with Voice of America to

14  a purchasing agent position with the International

15  Broadcasting Bureau's contracts and procurement division?

16       A.   Correct.

17       Q.   And what were the duties of the purchasing agent

18  position?

19       A.   It was a junior contracting officer's job

20  basically purchasing supplies and equipment for the

21  broadcasting board -- or the broadcasting bureau.

22       Q.   Let's refer to it as IBB for short.

23       A.   Okay.   IBB.

24       Q.   Okay.   Your grade level in that position when

25  you first started it was a grade 9?

55

1    A.    Correct.

2    Q.    September 1996 was the first time that you had

3  worked in the contracts and procurement division of IBB?

4    A.    Correct.

5    Q.    Did Fannie Allen work in the contracts and

6  procurement division at IBB?

7    A.    No.

8    Q.    I'm showing you what we'll mark as Exhibit 22.

9          (Hunter Deposition Exhibit Number 22 was marked

10  for identification.)

11         BY MR. STRAND:

12   Q.    Am I correct that you received a promotion from

13  your purchasing agent position to the position of contract

14  specialist with IBB's contract and procurement division

15  effective November 23, 1997?

16   A.    On paper, correct.

17   Q.    Your grade level in that position was grade

18  level 11?

19   A.    Correct.

20   Q.    You received that through a competitive

21  promotion?

22   A.    No.

23   Q.    How did you receive that position?

24   A.    From complaints.

25   Q.    What complaints?

56

1      A.    That I was being treated unfairly.

2      Q.    Can you be more specific when you say

3  complaints.  What type of complaints?

4      A.    I had a case in court at the time.  I had filed

5  the EEO complaint.

6      Q.    This was your EEO complaint alleging that you

7  should have received a budget analyst promotion?

8      A.    Correct.

9      Q.    Sorry.  I crumbled over myself and you jumped

10  in.  I apologize.  This was your complaint that you had

11  applied for a budget analyst position, GS-11, and the

12  position had been filled by Elizabeth Lee?

13      A.    Correct.

14      Q.    Okay.  And you and other employees filed a class

15  action lawsuit over that in 1997?

16      A.    Correct.

17      Q.    And that lawsuit was settled?

18      A.    Dismantled.

19      Q.    What does dismantled mean?

20      A.    It means that the agency officials brought off

21  or satisfied the class agents and no one else stepped up

22  to become class agents.

23      Q.    Were you a class agent?

24      A.    No.

25      Q.    Is it your testimony that you received the GS-11

57

 1   contract specialist position as a settlement of your

 2   federal lawsuit?

 3       A.   We were in the informal stage of my EEO

 4   complaint.  This made the informal stage of the EEO

 5   complaint go away.

 6       Q.   Your placement into the GS-11 contract

 7   specialist position was a resolution of your EEO

 8   complaint?

 9       A.   Correct.

10       Q.   What were your duties as contract specialist?

11       A.   I never performed any duties.

12       Q.   I understand it was at this time that your FTE

13   was transferred over to Ms. Allen's grants division?

14       A.   Correct.

15       Q.   Okay.  Tell me how that came to pass.

16       A.   I received a call from personnel maybe a couple

17   of days before the effective date telling me to report to

18   Fannie Allen's office.

19       Q.   When did you first meet Fannie Allen?

20       A.   During my first position in the office in 1992,

21   1993 -- 1992, when I was a grants specialist.

22       Q.   So you met her on or about August of 1992 when

23   you first became a grants specialist in the grants

24   division of the Bureau of Management at USIA?

25       A.   Correct.

58

1    Q.    What position did she hold in the grants

2  division at that time?

3    A.    She was in the contracts office.  Under the

4  contracts office there were two divisions, the contract

5  side and the grant side.  Fannie worked on the contracts

6  side.  She was a contract specialist or contract officer,

7  but we were all located in one central location.

8    Q.    So you worked with her from roughly August of

9  1992 through May of 1993?

10    A.    I am not sure what you mean when you say worked

11  with her.  We were in the same location, not --

12    Q.    You worked in the same office of contracts?

13    A.    Correct.

14         MR. STRAND:  Counsel has handed me a note.  Let

15  me take a look at this.

16         Off the record.

17         (A recess was taken.)

18         MR. STRAND:  Back on the record.

19         BY MR. STRAND:

20    Q.    Isn't it true that you had a conversation with

21  Fannie Allen before you came to her shop as a grants

22  specialist in November of 1997?

23    A.    I had several conversations with Fannie.

24    Q.    Okay.  What did those conversations consist of?

25    A.    I made her aware of my EEO complaint that I had

59

1  filed against the agency.  I made her aware of the class

2  action suit that was being put together by employees.  I

3  mean, we had several conversations along those lines of

4  those two issues of the class action and my individual

5  complaint.

6      Q.   Why were you making her aware of that

7  information?

8      A.   We talked.  She was a coworker and we talked as

9  I talk with numerous other people throughout the agency

10 about issues.

11     Q.   But she was in a different bureau altogether

12 from you at that time?

13     A.   Correct.

14     Q.   You were in IBB and she was in bureau of

15 management?

16     A.   Uh-huh.

17     Q.   Is that a yes?

18     A.   Yes.

19     Q.   Okay.  So is it your testimony that you and she

20 were friends from the time 1992/1993 when you were

21 coworkers that you have been friends from that period

22 forward?

23     A.   Coworkers, yes.

24     Q.   Had you remained in touch with her since that

25 1992/1993 period when you were both in the office of

1   contracts?

2       A.   Remaining?  I'm not understanding your question.

3   Sorry.

4       Q.   You left the office of contracts in May of 1993,

5   correct?

6       A.   Correct.

7       Q.   She stayed there?

8       A.   Correct.

9       Q.   Did you keep in touch with her on any sort of

10  regular basis after you left the office of contracts in

11  May of 1993?

12      A.   No regular basis, no.

13      Q.   Between May of 1993 when you left the office of

14  contracts and November of 1997 when you joined Ms. Allen's

15  grants division, how many times would you say you spoke to

16  her?

17      A.   I think we pass each other -- I mean, what are

18  you talking about?  Are you talking about actual -- I

19  mean, I see her all the time in passing and will say, Hi,

20  have a two-minute conversation, move on, see her again

21  later in the day, have a conversation.  I am not sure what

22  you are asking.

23      Q.   You had a friendly relationship with her from

24  1992 onward; is that correct?

25      A.   I had a coworker relationship.

61

1       Q.    A coworker relationship that's entailed saying,
2   Hello in the hallways, having conversations here and
3   there, you wouldn't describe that as a friendly coworker
4   relationship?
5       A.    Correct.
6       Q.    You would or you wouldn't?
7       A.    I would.
8       Q.    Okay.
9       A.    A friendly coworker relationship, yes.
10      Q.    You're telling me you weren't doing stuff
11  outside the office with her, but in the office when you
12  saw each other you would say, Hello, chat, whatever?
13      A.    Correct.
14      Q.    And that was the case from 1992 through 1997?
15      A.    Correct.
16      Q.    Even though you were working in separate
17  bureaus?
18      A.    Correct.
19      Q.    So around the time of November 1997, you called
20  her and started telling her about these EEO complaints you
21  had?
22      A.    I didn't call -- no, I didn't call her.  No.
23      Q.    Okay.  Where did you have those conversations?
24      A.    It could have been in the hallway, in her
25  office, at one of the local eating places.

63

1    Q.    Okay.  Because she was in a management position

2  and she was an African-American?

3    A.    Correct.

4    Q.    Now, isn't it the case that you specifically

5  requested that she take your FTE into her division as part

6  of the resolution of your EEO complaint?

7    A.    No.

8    Q.    What's wrong about that?

9    A.    It was the EEO officials -- the office of civil

10  rights officials who proposed it.

11    Q.    Okay.  And then you passed on the proposal to

12  Fannie?

13    A.    No.

14    Q.    Did you ever discuss with her the possibility of

15  your joining her division?

16    A.    No.  It was proposed to me to go to her

17  division.

18    Q.    Who proposed it to you?

19    A.    The office of civil rights' official.

20    Q.    Who was that?

21    A.    At the time her name was Delia Johnson.

22    Q.    How do you spell the first name?

23    A.    I'm not sure.  Delia, Delia.  I'm not sure.

24    Q.    Okay.  It sounds like D-E-L-I-A, something like

25  that?

64

1      A.    Yes.   Yes.   Delia.

2      Q.    So Delia proposed it to you and you agreed to

3  the proposal?

4      A.    Correct.

5      Q.    Is it your understanding that Ms. Allen approved

6  the proposal to bring you into her division?

7      A.    Correct.

8      Q.    You were brought into her division as a GS-11

9  grants specialist?

10     A.    Correct.

11     Q.    In the grants division of the bureau of

12  management?

13     A.    Correct.

14     Q.    USIA?

15     A.    Correct.

16     Q.    You had never before functioned at the GS-11

17  level?   Strike that.

18           You had never before held a GS-11 position?

19     A.    Correct.

20     Q.    And at the time she accepted you into the grants

21  division, November of 1997, your previous experience as a

22  grants specialist had consisted of one nine-month period

23  when you had been a grants specialist in the office of

24  contracts from 1992 to 1993?

25     A.    Correct.

1    Q.   Do you believe Ms. Allen was discriminating

2    against you on the basis of your sex when she accepted you

3    into her grants division as a grants specialist from

4    November of 1997?

5    A.   Could you repeat the question?

6    Q.   Do you believe that Ms. Allen was discriminating

7    against you on the basis of your sex when she accepted you

8    into the grants division in November of 1997?

9    A.   I don't know the answer to that.

10   Q.   You are not alleging that she was discriminating

11   against you by that act of accepting you into the

12   division?

13   A.   Correct.

14   Q.   I'm showing you what we will mark as Defendant's

15   Exhibit 23.

16         (Hunter Deposition Exhibit Number 23 was marked

17   for identification.)

18         BY MR. STRAND:

19   Q.   This is the document, is it not, that reflects

20   your reassignment from the IBB to the bureau of management

21   in November of 1997?

22   A.   Correct.

23         (Hunter Deposition Exhibit Number 24 was marked

24   for identification.)

25         BY MR. STRAND:

1      Q.   I'm showing you what has been marked as

2  Defendant's Exhibit 24.  Am I correct that as of

3  September 30, 1999, the USIA ceased to exist and all of

4  USIA employees were transferred to the Department of

5  State?

6      A.   Correct.

7      Q.   You along with them?

8      A.   Correct.

9           (Hunter Deposition Exhibit Number 25 was marked

10  for identification.)

11           BY MR. STRAND:

12      Q.   I'm showing you what has been marked as

13  Defendant's Exhibit 25.  Am I correct that effective

14  November 7th, 1999, you were promoted from the position of

15  grants specialist GS-11 to the position of grants

16  specialist GS-12 in Ms. Allen's division?

17      A.   Correct.

18      Q.   Am I correct that that promotion was through a

19  desk audit accretion of duties process?

20      A.   No.

21      Q.   What was it?

22      A.   It was a written justification for an accretion

23  of duty.

24      Q.   Okay.  It was an accretion of duties promotion?

25      A.   Correct.

1    Q.    You did not apply for a competitive promotion?

2    A.    Correct.

3    Q.    The accretion of duties promotion was

4    recommended by Ms. Allen?

5    A.    Correct.

6    Q.    I take it you do not allege that Ms. Allen was

7    discriminating against you on the basis of race when she

8    recommended your accretion of duties promotion from GS-11

9    to GS-12?

10    A.    I don't know the answer to that.

11    Q.    I'm asking what you allege.  You do know the

12    answer to that question.  Let me rephrase it.

13    A.    Okay.

14    Q.    Am I correct that you are not alleging that

15    Ms. Allen discriminated against you on the basis of your

16    sex when she recommended your accretion of duties

17    promotion from GS-11 to GS-12?

18    A.    I believe that she did.

19    Q.    How did she discriminate against you in

20    approving your accretion of duties from GS-11 to GS-12?

21    A.    Everyone else in the office she promoted through

22    competitive procedures.  I was the only one she promoted

23    through noncompetitive procedures.

24    Q.    All right.  Well, let's break this down.

25    A.    Okay.

1        A.    Correct.

2              (Hunter Deposition Exhibit Number 27 was marked

3   for identification.)

4              BY MR. STRAND:

5        Q.    I'm showing you what has been marked as

6   Defendant's Exhibit 27.  Am I correct that effective

7   September 24th, 2000, you received a special act or a

8   service award?

9        A.    Correct.

10       Q.    That award was approved by Ms. Allen?

11       A.    I don't know to be honest with you.

12       Q.    Who else might it have been?

13       A.    I was at the time the Y2K team leader and I

14  worked with the contractor that the department had hired

15  to make sure we were Y2K ready and I also worked with the

16  IT office, the director of that office.  It could have

17  come from him.  I received numerous accolades from both

18  the IT director and the contractor that was hired.

19       Q.    You don't know one way or another whether

20  Ms. Allen approved the special award, correct?

21       A.    Correct.

22             (Hunter Deposition Exhibit Number 28 was marked

23  for identification.)

24             BY MR. STRAND:

25       Q.    I am showing you what has been marked as

85

```
 1  Defendant's Exhibit 28.  Am I correct that Ms. Allen
 2  recommended you for a meritorious honor award on
 3  April 19th, 2002?
 4       A.   Correct.
 5       Q.   Have you seen Exhibit 28 before?
 6       A.   Yes, I have.
 7       Q.   When did you see it?
 8       A.   It was given to me probably a few weeks after
 9  the date of 4/19/2002.
10       Q.   The second page of Exhibit 28 is Ms. Allen's
11  write-up; is that correct?
12       A.   Yes.  To my knowledge.
13       Q.   This merit award was recommended in connection
14  with your work on the Delphi Project?
15       A.   Yes.
16       Q.   D-E-L-P-H-I?
17       A.   Yes.
18       Q.   And your work on this consisted of helping to
19  resolve outstanding audits for Delphi International?
20       A.   Correct.
21       Q.   For the years 1992, 1994 and for the 2001
22  novation request?
23       A.   Correct.
24       Q.   Was it Ms. Allen who recommended that you
25  volunteer for the Delphi International Project?
```

1    A.   No.

2    Q.   Who was it?

3    A.   Ms. Allen assigned this audit to me.

4    Q.   You notice that on the first page of this

5    document Ms. Allen says -- and by the way the first page

6    also to you appears to be Ms. Allen's write-up?

7    A.   Yes.

8    Q.   And it is continued on the second page?

9    A.   Yes.

10   Q.   On the first page Ms. Allen writes, Donald

11   accepted and/or willingly volunteered for a number of

12   special projects within the grants division.  His most

13   notable undertaking was the resolution of outstanding

14   audits for Delphi International.

15       The way she phrases it there, you would agree,

16   it makes it sound as if you volunteered for Delphi

17   International, correct?

18   A.   Could you repeat the question?

19   Q.   If you read the first two sentences under other

20   duties as assigned, do you agree with me that the way she

21   has written those two sentences it sounds as if you

22   volunteered for the Delphi International Project?

23   A.   It has the word "accepted," so that would

24   indicate that something was given to or assigned to, but

25   the word "volunteer" is also there.

87

1    Q.   You did in fact receive a meritorious honor cash

2  award of $1,000 based on this write-up, correct?

3    A.   Yes.

4    Q.   Do you believe Ms. Allen was discriminating

5  against you on the basis of your gender when she

6  recommended you for this meritorious honor award?

7    A.   Yes.

8    Q.   Why?

9    A.   Because she -- this is her way of eliminating me

10  from getting a quality step increase which I had asked her

11  for numerous times.

12    Q.   And why do you say that?

13    A.   I requested a quality step the day I arrived;

14  conversations with Ms. Allen about having the money on my

15  paycheck instead of receiving a cash award.

16    Q.   You asked Ms. Allen to approve you for a quality

17  step increase?

18    A.   Yes, I have.

19    Q.   You have?

20    A.   I have.

21    Q.   When have you done that?

22    A.   2000, 2001.

23    Q.   You are not sure of the dates, though, are you?

24    A.   I am telling you the years that I have asked her

25  for a quality step increase.

1      A.    She said a bunch of accurate things about me,

2  yes, about my performance, yes.

3      Q.    They were also nice things?

4      A.    Yes, they were.

5      Q.    She was complimenting your performance in this

6  document, correct?

7      A.    She was stating the truth, yes.

8      Q.    And she was complimenting your performance in

9  this document, wasn't she?

10     A.    Yes.  Yes.

11     Q.    Let's have direct answers to my questions.

12     A.    Okay.

13     Q.    Let's not play games.

14           MR. SNIDER:   Objection.

15           BY MR. STRAND:

16     Q.    Now, are you aware of anyone else in the grants

17  division who received a meritorious cash award in 2002?

18     A.    No.

19           (Deposition Exhibit Number 29 was marked for

20  identification.)

21           BY MR. STRAND:

22     Q.    I am showing you what has been marked as

23  Defendant's Exhibit 29.   Am I correct that you received a

24  group time-off award effective August 18th, 2002?

25     A.    Yes.

1       Q.    What projects or work was that in connection

2   with?

3       A.    If I am not mistaken, this is when we started

4   our new database.  A contractor was hired to develop a

5   grant management database for the office and we all as

6   team members were a part of the development stage of that

7   system.

8       Q.    We all as team members, who are your referring

9   to?

10       A.    My other team members in the office, the other

11   grant specialists in the office.

12       Q.    Who would they be?

13       A.    Connie Stinson, Maggie Ahern, Phyllis Swann,

14   Joyce Love, myself, if Julie Johnson was there at the

15   time, and some of the support staff that was working in

16   the office, some of the grants coordinators -- I am not

17   sure of their titles -- office assistants, which would be

18   Sarah Smith and Lana Muck.

19       Q.    Lana, L-A-N-A?

20       A.    Yes.

21       Q.    Muck, M-U-C-K?

22       A.    Yes.

23       Q.    All of those people worked on the project you

24   just described?

25       A.    Correct.

1    Q.   And is there a short title for that project?  It

2  was the --

3    A.   GFMS, Grants Financial Management System.

4    Q.   It's a new financial management system that was

5  being instituted to keep track of the grants that came in

6  and out -- came through your office?

7    A.   Correct.

8        MR. STRAND:  Off the record for a second.

9        (Discussion off the record.)

10       MR. STRAND:  Back on the record.

11       BY MR. STRAND:

12   Q.   Ms. Allen was the one who recommended you along

13  with the others for the group time-off award reflected in

14  Exhibit 29?

15   A.   Correct.

16       (Hunter Deposition Exhibit Number 30 was marked

17  for identification.)

18       BY MR. STRAND:

19   Q.   I'm showing you what has been marked as

20  Defendant's Exhibit 30.  Am I correct that effective

21  September 8, 2002, you received an individual cash award

22  of $1,000?  That's the end of the question.

23   A.   Yes.  I'm sorry.

24   Q.   Okay.  Do you know whether that is the same

25  award as is reflected in Exhibit 28?

```
 1      A.   Yes, it is.

 2           (Hunter Deposition Exhibit Number 31 was marked

 3  for identification.)

 4           BY MR. STRAND:

 5      Q.   I am showing you what has been marked as

 6  Defendant's Exhibit 31.  Am I correct that effective

 7  September 21st, 2003, you received an individual time-off

 8  award of 16 hours?

 9      A.   Yes.

10      Q.   Ms. Allen recommended you for that award?

11      A.   Yes.

12      Q.   What work or project was that in connection

13  with?

14      A.   If I am not mistaken, it is for the continuation

15  of the new grants data system -- grants management system,

16  I'm sorry.  It's a continuation of the new database system

17  that we were working on along with my regular duties.

18      Q.   Do you believe that Ms. Allen was discriminating

19  against you on the basis of your gender when she

20  recommended you for the group time-off award reflected in

21  Exhibit 29 and the individual time-off award reflected in

22  Exhibit 31?

23      A.   I can't answer that.  No.  No.  No.  No, I am

24  not able to.  No.

25           (Hunter Deposition Exhibit Number 32 was marked
```

94

1  for identification.)

2          BY MR. STRAND:

3     Q.   I'm showing you what has been marked as

4  Defendant's Exhibit 32.   Am I correct that effective

5  August 22nd, 2004, you received a group time-off award of

6  24 hours?

7     A.   Yes.

8     Q.   Ms. Allen recommended you for that?

9     A.   Yes.

10     Q.   That was in connection with what work or

11  project?

12     A.   The grants financial management system.   It is

13  an ongoing project along with my regular duties.

14     Q.   And again other people from your division were

15  also involved in that project?

16     A.   Everyone.

17     Q.   Were you the office's point-of-contact for that

18  project?

19     A.   No.

20     Q.   Who was the office's point-of-contact?

21     A.   Julie -- well, it started off with Phyllis Swann

22  and Julie Johnson took over.

23     Q.   And you contend that Ms. Allen was

24  discriminating against you on the basis of your gender

25  when she recommended you for the group time-off award

```
 1  reflected in Exhibit 32?

 2       A.   Would you repeat your question?

 3       Q.   Do you contend that Ms. Allen was discriminating

 4  against you on the basis of your gender when she

 5  recommended you for the group time-off award reflected in

 6  Exhibit 32?

 7       A.   No.

 8            (Hunter Deposition Exhibit Number 33 was marked

 9  for identification.)

10            BY MR. STRAND:

11       Q.   I'm showing you what has been marked as

12  Defendant's Exhibit 33.  Is that your signature on the

13  first page of the document dated June 30th, 2000?

14       A.   Yes.

15       Q.   Is that your signature on the last page of the

16  document dated February 28th, 2001?

17       A.   Yes.

18       Q.   Does Exhibit 33 appear ·to be a true and correct

19  copy of the performance evaluation you received for the

20  period from October 1st, 1999 through December 31st, 2000?

21       A.   I'm sorry.  Would you repeat the question.

22       Q.   Does Exhibit 33 appear to be a true and correct

23  copy of the performance evaluation you received for the

24  period from October 1st, 1999 through December 31st, 2000?

25       A.   Yes.
```

 1  since November of 1997.  Okay.  So you had had somewhat

 2  longer than two years of experience as a grants specialist

 3  as of the 1999/2000 rating year, correct?

 4      A.   Correct.

 5      Q.   And as of that time Ms. Ahern had been a

 6  contracts specialist since at least 1985, correct?

 7      A.   I don't know the answer to that.

 8      Q.   I am correct that she had much more experience

 9  than you did as a grants specialist in terms of length and

10  experience, correct?

11      A.   Yes.

12      Q.   And the same is true for Ms. Stinson, correct?

13      A.   Yes.

14      Q.   And the same is true for Ms. Swann?

15      A.   Yes.

16      Q.   And the same is true for Ms. Love?

17      A.   Yes.

18      Q.   Exhibit 33 references several times your work on

19  the Y2K conversion project; do you see that?

20      A.   Yes.

21      Q.   It was Ms. Allen who recommended that you

22  volunteer for that project, wasn't it?

23      A.   It was assigned to me by Ms. Allen.

24      Q.   And you accepted the assignment?

25      A.   Correct.

1      Q.    And it was a special duty-type assignment,

2  correct?

3      A.    Correct.  Called Special Projects.

4      Q.    Special Projects.  Okay.  We have discussed now

5  two special projects that Ms. Allen assigned you, the GFMS

6  Project and the Y2K Project?

7      A.    Correct.

8      Q.    What other special projects has Ms. Allen

9  assigned you since you joined her staff in November of

10 1997?

11     A.    The payment management -- well, HHS, Department

12 of Health and Human Services Payment Management System,

13 the conversion of our grantees onto that payment method,

14 to convert our grantees into -- to using that payment

15 method.

16     Q.    Okay.  When did she assign you that?

17     A.    It was -- I started in 2002.

18     Q.    What other special projects has Ms. Allen

19 assigned you?

20     A.    Well, I started off with the Public Law 107108

21 Project which grew into the GFMIS.  It was just one of

22 several projects that come out of Public Law 107108.

23     Q.    So Ms. Allen assigned you to the Public Law

24 107108 special project?

25     A.    Correct.

1    Q.   And then that grew into the GFMS Special Project

2  to which she also assigned you?

3    A.   Correct.

4    Q.   What other special projects did she assign you

5  to?

6    A.   At this time I can't recall.  There are others,

7  but I can't recall them right now.

8    Q.   Am I correct that she has made it explicit to

9  you that in giving you special projects she is attempting

10  to give you career enhancement-type projects?  I finished

11  the question.

12    A.   No.  I'm sorry.  I am just thinking of your

13  question.

14    Q.   Would you like for me to rephrase it?

15    A.   Please.

16    Q.   Okay.  Am I correct that Ms. Allen has told you

17  that her purpose in giving you special projects is to help

18  in your training and development as a grants specialist

19  professional?

20    A.   Yes.

21    Q.   Am I correct that she has also on various

22  occasions recommended that you volunteer for specific

23  special projects?

24    A.   No.

25    Q.   She has simply assigned them to you as opposed

1    to recommending that you volunteer for them; is that your

2    testimony?

3        A.    Correct.

4        Q.    It is also correct that you and Ms. Allen have

5    had a number of conversations over the years about your

6    performance as a grant specialist, correct?

7        A.    Yes.  We have had some conversations, yes.

8        Q.    Okay.  And those conversations have consisted of

9    her -- I'm talking private conversations, right?  Am I

10   correct?

11       A.    Yes.

12       Q.    Okay.  These private conversations have

13   consisted of Ms. Allen counselling you about ways that you

14   can improve your performance and grow as a professional?

15       A.    No.

16       Q.    What have those conversations consisted of?

17       A.    About assignments that would lead me to

18   receiving a promotion.

19       Q.    Could you be more specific.

20       A.    Yeah.  The Wye River Project -- one of the

21   conversations that we had, I went to Ms. Allen's office,

22   made it very clear that I was trying to move to the next

23   grade level, a GS-13, and she stated that I was not

24   managing a program, one of the department's or the

25   bureau's program which was -- example, the IV Program.  We

1    have the Fulbright Program.

2            Those are actual programs where we issue grants

3    underneath of those programs so I was not the main contact

4    or the person managing that project, so she said at that

5    time I was not doing it so she could not promote me so I

6    took the initiative on my own and went out into the office

7    and spoke with my other team members and asked about a

8    particular program that was not being managed or that had

9    just come into the office and I took it over.

10        Q.    What was the Wye River Project?

11        A.    What was it?

12        Q.    Yeah.

13        A.    I'm not sure of your question.

14        Q.    Let me be more specific.  You were working on

15    the Wye River Project?

16        A.    No, initially I was not.

17        Q.    Okay.  You were brought into it after someone

18    else handled it initially?

19        A.    Correct.

20        Q.    You brought up the Wye River Project in your

21    answer to my last question.

22        A.    Correct.

23        Q.    I was just trying to understand why you brought

24    it up.

25        A.    Because it was a program that I took over as a

1  manager and that was one of the elements that Ms. Allen

2  said that I was lacking to be promoted, that I was not

3  managing a program.

4      Q.   Did she explain to you that the Wye River

5  Project or Program didn't count because you had taken it

6  over from someone else who had set it up first?

7      A.   No, she didn't.  She approved me taking it over.

8  It had just -- it was just a matter of a few weeks.  The

9  program had just -- it was a Congressional earmark program

10  so the program had just come into the bureau and was just

11  going through the process of assigning grants and I took

12  it over maybe a couple of weeks after the initial grant

13  officers assigned or prepared and administered the actual

14  grant agreements.

15      Q.   Who were they?

16      A.   If I'm not mistaken, Joyce Love and Maggie

17  Ahern.

18      Q.   So Ms. Allen approved you taking over the Wye

19  River Project --

20      A.   Correct.

21      Q.   -- as a career development project?

22      A.   I left the meeting as it was one of the elements

23  that was needed to be promoted.  You want to call it

24  career enhancement, I left the meeting as it was what you

25  were lacking for being promoted.

1    Q.    Was it your understanding that she approved you

2  for -- to take over the Wye River Project in an effort to

3  help give you the experience you needed to get to the

4  GS-13 level?

5    A.    Correct.

6    Q.    Were there any other projects that fell within

7  that category, projects that she gave you to help give you

8  the experience necessary to get you to the GS-13 level?

9    A.    Audits, OIG audits.

10   Q.    Office of Inspector General audits?

11   A.    Correct.

12   Q.    When did she give you -- let me back up.  When

13  did she approve you to take over the Wye River Project?

14   A.    2002.

15   Q.    Do you remember when in 2002?

16   A.    It may have been 2001, because it was on my --

17  she evaluated me in 2002, so it may have started in

18  2002 -- excuse me -- 2001 is when I took it over.

19   Q.    You're not completely sure about this?

20   A.    No, I am not.

21   Q.    You said that the OIG audit project fell in the

22  same category.  When did she assign you the OIG audit

23  project?

24   A.    Well, Delphi -- the Delphi -- it was assigned to

25  me in 2001, I think.  That was my first OIG audit.

1    Q.    Okay.  So the OIG audit is the same thing as the

2  Delphi project?

3    A.    Yes.  The Delphi was the organization and it was

4  an audit -- an OIG audit on Delphi.

5    Q.    Any other projects she gave you in order to help

6  you gain the experience to get to the GS-13 level?

7    A.    I would say the Y2K also.

8    Q.    How about the GFMS?

9    A.    The Public Law 107108.  Initially, I thought she

10  was giving that to me to help enhance me -- my ability to

11  move to the GS-13, but as I stated after reading that

12  public law, it kind of branched out and different things

13  came about from reading that public law and GFMIS was one

14  of the things that came out of Public Law 107108.

15    Q.    Okay.  So the Public Law 107108 project was one

16  of the projects you understood her to be assigning you for

17  career enhancement purposes?

18    A.    Correct.

19    Q.    And when you say -- you have been saying GFMS

20  and also GFMIS.

21    A.    Okay.  It's GF -- grants financial management

22  system.

23    Q.    Okay.  So there's no I in there?

24    A.    No.

25    Q.    How many conversations would you estimate you

1    had with Ms. Allen about how you could enhance your skills

2    and get to the GS-13 level?

3         A.    Between 2000 and 2002, four, maybe five.

4         Q.    In all those conversations she was talking to

5    you about things you could do to enhance your career?

6         A.    I would like to use the wording things I needed

7    to do in order to be promoted.  That's what -- those are

8    the words I heard.

9         Q.    To get to the GS-13 level?

10        A.    Correct.

11        Q.    Okay.  So she was giving you guidance in those

12    conversations?

13        A.    She was giving me requirements for getting to a

14    GS-13.

15        Q.    She was explaining to you what you needed to do

16    to get there?

17        A.    Correct.

18        Q.    Now, you also had conversations with her

19    about -- private conversations with her about areas of

20    your performance that she thought you could improve,

21    correct?

22        A.    I recall a few, yes.

23        Q.    Tell me about those conversations.

24        A.    Well, I know Ms. Allen mentioned improving on my

25    communication skills, both written and oral.

1      Q.   Okay.  When do you recall her mentioning that?

2      A.   1999/2000.

3      Q.   Okay.  How many conversations did you have about

4   the communication issue?

5      A.   A few, two or three.

6      Q.   What other -- let me back up a second.  Did she

7   recommend anything you could do to help enhance your

8   communication skills?

9      A.   Yes.  She recommended a course at P.G. Community

10  College and also some internal training courses.

11     Q.   Did you take the course she had recommended at

12  P.G. Community College?

13     A.   Yes, I did.

14     Q.   And what was that called?

15     A.   It was called -- I think it was Basic English,

16  Writing -- I don't recall.  Basic -- it was the basic

17  English course.

18     Q.   Okay.  So it was grammar and syntax and the

19  punctuation and things like that?

20     A.   Correct.  Correct.  Correct.

21     Q.   When did take you take that course?

22     A.   I don't recall.  Maybe in 2000.

23     Q.   What internal training did she recommend for you

24  to address the communications issues?

25     A.   Introduction to public writing.  I don't recall

109

```
 1  the course.  They are listed in my resume or I don't
 2  recall the names of the courses.
 3      Q.   I haven't seen a copy of your resume.
 4      A.   It should be throughout the ROI.
 5      Q.   Okay.  See if we can locate that.  Oh, yes.
 6  Okay.  Let me just finish this one line of questioning.
 7           Did she also recommend that you participate in
 8  toastmasters?
 9      A.   Yes, yes, she did.
10      Q.   Did you participate in toastmasters?
11      A.   Yes.  I am still currently a member of
12  toastmasters.
13      Q.   When did you start participating in toastmasters
14  at her suggestion?
15      A.   Whatever year we discussed it, within a month
16  after we discussed it.
17      Q.   As early as 1999 or 2000?
18      A.   If that's when we discussed it, yes.  I would
19  think it was in 2000/2001.
20      Q.   Did she also recommend that you buy a particular
21  kind of device that you could use at home to practice
22  with?
23      A.   We had a conversation about a device that I
24  purchased for my sons.
25      Q.   What was that?
```

1     A.   I don't recall what it's called.  It's like a

2 telephonic thing where my -- I had young sons at the time

3 and this machine would help them with their

4 communications, in pronouncing words and things like that.

5     Q.   And she recommended that you practice on this as

6 well?

7     A.   I recall her saying something along those lines,

8 yes.

9     Q.   Did you?

10     A.   Yes.  I used to work with my sons on it.  Yes.

11     Q.   What other aspects of your performance did she

12 discuss with you in terms of improving performance?

13     A.   I don't recall.

14     Q.   There were other aspects?

15     A.   I recall -- no.  Not with -- no.  Ms. Allen --

16 Ms. Allen seemed to have -- she was mostly talking with me

17 about communication skills, oral and written

18 communications.

19        MR. STRAND:  Okay.  This is a good time for a

20 lunch break.

21        Let's go off the record.

22        (Whereupon, at 12:46 p.m., a lunch recess was

23 taken.)

24

25

111

```
 1                        AFTERNOON SESSION

 2                                (1:52 p.m.)

 3              (Hunter Deposition Exhibit Number 34 was marked

 4   for identification.)

 5              BY MR. STRAND:

 6       Q.    Does this appear to you to be a true and correct

 7   copy of the memorandum that Fannie Allen wrote on

 8   June 21st, 1999, recommending an accretion of duties

 9   promotion for you to the level of GS-12?

10       A.    One correction.  I wrote this.  Fannie Allen

11   signed it.

12       Q.    You drafted the text that appears here?

13       A.    Every word of it.

14       Q.    Every single word of it?

15       A.    Mm-hmm.

16       Q.    You're sure every word of it?  You're sure she

17   didn't change anything?

18       A.    She edited.

19       Q.    Okay.  You provided the substance and she did

20   some editing?

21       A.    Correct.

22       Q.    Okay.  And that does appear to be her signature

23   on the first page?

24       A.    Yes.

25       Q.    And that appears to be Mr. Muller's signature?
```

112

1        A.    Yes.

2        Q.    And the accretion of duties was approved by Dave

3   Whitten?

4        A.    Yes.

5        Q.    And so recommended by Fannie Allen, recommended

6   by Mr. Muller, Whitten approves?

7        A.    Correct.

8        Q.    On the second page it says, Mr. Hunter holds a

9   BS degree in urban and community planning from the

10  University of the District of Columbia so by 1999, that

11  was true?

12       A.    Correct.

13       Q.    Where he double-majored in accounting?  I hadn't

14  seen anything on any of your others -- SF-171s mentioning

15  accounting?

16       A.    Yes.  I indicated that I had some accounting

17  courses.

18       Q.    Okay.  But did you complete the requirements for

19  a major in accounting?

20       A.    From what I recall I needed 40 hours of

21  accounting and I completed that, yes.  I am not sure of

22  the exact number if it was 40 -- 40 to 50 range, and I

23  completed those number of hours.

24       Q.    Did you receive a degree in accounting?

25       A.    No.

114

1      Q.   Okay.  Look at the last paragraph before

2  recommendation on page 2 of Exhibit 34.  You and Ms. Allen

3  indicate here that Mr. Hunter inclusive of previous time

4  in the office of contracts, grants division has over 24

5  months of experience in the federal assistance process.

6  What is the federal assistance process?

7      A.   It is when a federal agency awards a grant or

8  corporate agreement to conduct a program.

9      Q.   Okay.  So the work that you do as a grants

10 specialist is known as the federal assistance process?

11     A.   Correct.

12     Q.   Okay.  You knew at the time you wrote this, this

13 June 21, 1999 memorandum that Ms. Allen signed, that you

14 were specifically writing up a request for an accretion of

15 duties promotion?

16     A.   Yes.  After Ms. Allen asked me to prepare it.

17     Q.   And you agreed to prepare it?

18     A.   Correct.

19     Q.   You were pleased that she had asked you to

20 prepare it because you thought there was a good chance

21 that it would mean you would get a promotion to the GS-12,

22 correct?

23     A.   At the time, yes.

24     Q.   I'm showing you what we will mark as Defendant's

25 Exhibit 35.

115

1          (Hunter Deposition Exhibit Number 35 was marked

2     for identification.)

3          BY MR. STRAND:

4     Q.    This purports to be a listing of the workforce

5     supervised by Benjamin Castro including both the grants

6     division and the public diplomacy budget branch.  Is this,

7     Exhibit 35, an accurate representation of people who made

8     up the grants division as of 2002?

9     A.    Yes.

10    Q.    Okay.  And to be even more specific as of the

11    time that's at issue in this complaint as of May and June

12    of 2002?

13    A.    Yes.

14    Q.    So Ms. Allen was the GS-14 grants management

15    officer?

16    A.    Yes.

17    Q.    And she was black?

18    A.    Yes.

19    Q.    Margaret Ahern was a GS-13 senior grants

20    specialist?

21    A.    Yes.

22    Q.    She was white?

23    A.    Yes.

24    Q.    Connie Stinson was a GS-13 senior grants

25    specialist?

116

```
 1      A.   Yes.

 2      Q.   She was black?

 3      A.   Yes.

 4      Q.   She was your team leader as well, correct?

 5      A.   Yes.

 6      Q.   Joyce Love was a GS-13 grants specialist?

 7      A.   Yes.

 8      Q.   She was black?

 9      A.   Yes.

10      Q.   Phyllis Swann was a GS-13 grants specialist?

11      A.   Yes.

12      Q.   She was black?

13      A.   Yes.

14      Q.   You were a GS-12?

15      A.   Yes.

16      Q.   And that was not a position that had a career

17 ladder to a GS-13, correct?

18      A.   Correct.

19      Q.   Janet Yates was a GS-11?

20      A.   Yes.

21      Q.   What position did she hold?

22      A.   Grants specialist.

23      Q.   The same position you held just at a lower

24 grade?

25      A.   Correct.
```

119

1        A.   Correct.

2        Q.   You were the only male in the grants division?

3        A.   Yes.

4        Q.   That was the case both when you arrived in the

5   grants division in 1997 and in 2002?

6        A.   Correct.

7        Q.   I want to talk to you about the organization of

8   the office and how the work got done in the grants

9   division during the time frame that we are focusing on

10  here, say the 2001, 2002 period.  There were two team

11  leaders in the grants division, correct?

12       A.   Correct.

13       Q.   They were Connie Stinson and Margaret Ahern?

14       A.   Correct.

15       Q.   What was your understanding of the function of

16  the team leader?

17       A.   To assign the work and review the completed

18  work.

19       Q.   So your team leader, Connie Stinson, assigned

20  work directly to you and she also reviewed the work that

21  you produced before it got sent out?

22            MR. SNIDER:  Objection.  Compound.

23            You can answer it.

24            THE WITNESS:  Not totally true.  Both team

25  leaders, Ahern and Stinson, would assign work to all, not

121

1       Q.    But Stinson was your team leader in the sense

2  that she was the one who reviewed the work that you

3  produced?

4       A.    Correct.

5       Q.    Okay.  Did Ahern also review the work that you

6  produced?

7       A.    Yes.  When Stinson was not in the office.

8       Q.    Okay.  I understand.  On occasion we have

9  already discussed Fannie Allen also assigned work directly

10 to her employees, correct?

11      A.    Depends on what work you are talking about.  The

12 most that I know of Ms. Allen would assign special

13 projects.

14      Q.    Okay.  Ms. Allen, as we've discussed this,

15 assigned a number of special projects to you?

16      A.    Correct.

17      Q.    And she assigned special projects to other

18 people as well --

19      A.    Yes.

20      Q.    And you sometimes worked directly with Ms. Allen

21 on work in the division, correct?

22      A.    Special projects, yes.

23      Q.    So going back to the organization of the

24 division, Stinson and Ahern reported to Allen regarding

25 the performance of their team members?

122

1    A.    That was my understanding.  I really don't know.

2  That was my understanding.

3    Q.    Okay.  So Ms. Allen would have known of your

4  work performance through direct interactions with you on

5  special projects and also through whatever was reported to

6  her by Stinson and Ahern?

7    A.    Correct.

8    Q.    We discussed that Fannie Allen assigned you a

9  number of special projects to help you gain experience.

10    A.    To prepare me for a GS-13.

11    Q.    Correct.  And when I say to help you gain

12  experience, that's what I mean.  That will just be

13  shorthand.  To help you gain experience will mean to help

14  you gain the experience necessary to get to the next

15  level, GS-13, okay?

16    A.    Okay.

17    Q.    All right.  When she assigned you these special

18  projects, in each case she assigned a GS-13 to be

19  available to you to give you guidance while you were

20  working on the special project, correct?

21    A.    No.

22    Q.    Can you name any special projects she gave you

23  where you were not working under the guidance of a GS-13?

24    A.    All that I previously mentioned, Y2K, PMS

25  Project, the Public Law Project, the audits.  I was never

123

1    under the supervision of anyone.  Those were done totally

2    independent.

3         Q.   You never sought guidance, advice, bounced off

4    ideas from any of the GS-13s on any of those projects?

5         A.   I had discussions, talks, but --

6         Q.   I am correct, am I not, that the GS-13s, part of

7    their duties was to be available to provide advice and

8    guidance to the more junior people in the office, correct?

9         A.   The way our office is set up, we were assisting

10   each other no matter what the grade level was.

11        Q.   I understand that.  Was my statement also

12   correct?

13        A.   To a certain degree.

14        Q.   And the team leaders explicitly had the

15   responsibility of providing guidance and supervision to

16   the people underneath them; that is why they were team

17   leaders, correct?

18        A.   That was my understanding, yes.

19             MR. STRAND:  Okay.  Off the record for one

20   second.

21             (A recess was taken.)

22             MR. STRAND:    Back on the record.

23             BY MR. STRAND:

24        Q.   Is it true that Ms. Allen assigned you the

25   East-West Center East Timor Scholarship Project?

136

1    Q.    And you don't know one way or another to what

2    extent how closely they looked at it, do you?

3    A.    No, I don't.

4    Q.    Okay.    But you do know because you've told me

5    that they -- that Love sent it up to Allen, and then Allen

6    sent it back down to Love and then the same thing happened

7    with Stinson and on and on.    You don't know in any of the

8    steps of that process how careful a review the GS-13s and

9    Ms. Allen did, do you?

10    A.    No, I don't.

11    Q.    Okay.    About the PMS Conversion Project -- PMS

12    again stands for the Payment Management System?

13    A.    Correct.

14    Q.    And that's what you had described to me

15    previously, the conversion of the grantees to the payment

16    system used by Health and Human services?

17    A.    Correct.

18    Q.    And the project was to convert all grantee grant

19    recipients to PMS by the end of FY 2002, correct?

20    A.    Correct.

21    Q.    Let me finish my question before you -- I know

22    you're trying to be helpful for the record.

23    A.    Sorry.

24    Q.    Is it true that you drafted a letter in

25    connection with that project that was to be used by all of

140

1      A.   If I'm not mistaken, it was excellent, also.

2      Q.   Not highly successful?

3      A.   Not that I'm aware of.

4      Q.   You're not sure?

5      A.   I don't recall receiving any highly successful.

6  I've always received excellents from Ms. Allen.

7      Q.   That's your signature on the final page dated

8  March 28th, 2002?

9      A.   Yes.

10     Q.   I'm showing you what we will mark as Defendant's

11 Exhibit 40.

12          (Hunter Deposition Exhibit Number 40 was marked

13 for identification.)

14          BY MR. STRAND:

15     Q.   Does that appear to be a true and correct copy

16 of the position description for your GS-12 grant

17 specialist position?

18          MR. SNIDER:  Objection as to time.

19          THE WITNESS:  It looks to be.

20          BY MR. STRAND:

21     Q.   Okay.  And this was the position description

22 that covered your position at the time you requested an

23 accretion of duties promotion in 2002?

24     A.   It looks to be, yes.

25     Q.   I'm showing you what we will mark as Defendant's