UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x

DONALD S. HUNTER, SR.          :

    Plaintiff              :

    vs                     : CIVIL ACTION
                            NO.04-857(PLF)
COLIN L. POWELL, Secretary     :
United States Department of State
                            :
    Defendant
                             :

- - - - - - - - - - - - - - - - - x

**COPY**

June 6, 2005

PURSUANT TO NOTICE, the following deposition of FANNIE L. ALLEN was taken before me, Kathleen S. Wilson, Notary Public, at 501 Third Street, Third Floor, Washington, D.C., commencing at 12:22 o'clock, p.m., when were present on behalf of the respective parties:

*ELITE REPORTING COMPANY*
*67 Saint Andrews Road*
*Severna Park, Maryland  21146*
*410-987-7066    800-734-3337*



GOVERNMENT EXHIBIT I

| Donald S. Hunter, Sr. vs. | Multi-Page™ | Fannie L. Allen |
| Colin L. Powell, Secretary, U.S. Dept. of State | | 06/06/05 |

Page 72

1  is working on may be 13 level work, the method in
2  which he has been performing them, the level of
3  supervision which he requires, is low enough that
4  it still keeps it at the 12 level. Is that
5  accurate?
6      A. I'll try answering it again my way --
7      Q. Okay.
8      A. -- and see if it meets your expectations
9  -- it responds to your question. Excuse me.
10     Q. Okay. I feel like a contractor.
11         MR. STRAND: That is an important
12 distinction.
13         THE WITNESS: The duties of a grants
14 specialist, whether at the lowest grade level or
15 the highest grade level, the process is the same.
16         The distinctions will come, and mainly I
17 can speak for my office -- I have no idea of any
18 other office -- is at the level of complexity, the
19 comprehensiveness, the specific detail
20 requirements of that particular document.
21         The work that is highly complex is

Page 73

1  assigned and executed by those at the higher
2  level.
3          Persons like Mr. Hunter, or at the lower
4  level, for their professional development, is
5  assigned some of that work. Some of those
6  documents that they received could have had work
7  done by a more senior person. And persons, again
8  like Mr. Hunter, will be given an opportunity to
9  work those documents, but they would not have
10 looked at them as an initial document.
11         I say that to say, they would have the
12 familiarity, the exposure to documents such as
13 that, but the basic work, that ground level work,
14 would have been done by a GS-13, a person of
15 higher level.
16         BY MR. SNIDER:
17     Q. Okay. Can you give me an example of
18 highly complex versus less complex?
19     A. We have, excuse me, an organization that
20 has been -- has been working with the department
21 for a number of years. USIA. I can't say with

Page 74

1  the department.
2         Congressional mandate, Organization A
3  gets anywhere from eight to 20 plus million
4  dollars a year. This organization has
5  requirements, over the years, that will require a
6  lot of research, characteristics that have been
7  quite unusual requiring a great deal of research,
8  requiring documents explaining the process, the
9  grants specialist working with legal, other high
10 level officials, just requiring knowledge and
11 skills of federal assistance, that I would find
12 comfort in passing on to those experienced and
13 those at the GS-13 level. That's one.
14        Organization B. Again, an organization
15 we have been dealing with for years. Sole funder
16 of their efforts. We have budgets with multiple,
17 multiple, multiple line items. It has indirect
18 cost.
19        Mr. Hunter is still working through an
20 understanding -- a fully appreciable understanding
21 of indirect cost. The two team leaders have been

Page 75

1  working with him on that.
2         Let's see. I think that summarizes,
3  without going into other multiple organizations,
4  the kinds of things.
5         We are talking research. We're talking
6  understanding. We're talking being able to
7  prepare documents that will express the findings
8  of this research and producing documents in a
9  timely fashion.
10    Q. Okay. Let's move back to the documents
11 that you've tabbed and, actually, there is another
12 bottom tab.
13    A. This just talks about the differentiation
14 between the 12 and the 13.
15    Q. And do you know who authored this
16 document?
17    A. I think I did.
18    Q. And you took this from two different
19 position descriptions?
20    A. Right. It may have even asked that I
21 look at the GS-13 and the GS-12.

Case 1:06-cv-00326-PLF   Document 21-11   Filed 05/11/2007   Page 3 of 5

Donald S. Hunter, Sr. vs.　　　　Multi-Page™　　　　Fannie L. Allen
Colin L. Powell, Secretary, U.S. Dept. of State　　　　　　　　　06/06/05

Page 96

1　　MR. SNIDER: That's fine.
2　　BY MR. SNIDER:
3　Q. Prior to Ms. Love's — attempting to
4 upgrade Ms. Love's position and promoting her, you
5 groomed her for promotion; is that true?
6　A. I groomed Ms. Love. I groom all members
7 of the staff.
8　Q. Okay. Just answer the question.
9　　MR. STRAND: No. Objection. You get to
10 answer fully.
11　　BY MR. SNIDER:
12　Q. The question was, did you groom Ms. Love?
13 Yes or no? If I have to ask yes or no, I will,
14 but it was fully responsive after the yes.
15　　MR. STRAND: Okay. But you can't cut her
16 off if she wants to add to the answer to clarify
17 it. I mean, that's —
18　　MR. SNIDER: Ask a follow-up question.
19　　MR. STRAND: She gets to keep talking.
20　　BY MR. SNIDER:
21　Q. Have you groomed Mr. Hunter for promotion

Page 97

1 to the GS-13, ma'am?
2　A. To say I groomed him, I groomed Mr.
3 Hunter for advancement, as I groom each member of
4 the staff for advancement.
5　Q. Did you groom him for promotion to the
6 GS-13?
7　　MR. STRAND: Objection. Asked and
8 answered.
9　　MR. SNIDER: It was asked, not answered.
10　　MR. STRAND: Objection. Asked and
11 answered.
12　　MR. SNIDER: Go ahead.
13　　THE WITNESS: I groomed Mr. Hunter and I
14 groom every member of my staff for advancement.
15　　BY MR. SNIDER:
16　Q. What type of advancement did you groom
17 Mr. Hunter for?
18　A. Mr. Hunter could be perceived to be
19 groomed for a GS-13 in the — in the Department of
20 State or outside of the Department of State, sir.
21　Q. And what have you done to groom Mr.

Page 98

1 Hunter for promotion to the GS-13 level?
2　A. Mr. Hunter, like other members of the
3 staff, have an opportunity for professional
4 development through training provided by the
5 Department of State, training that I approve or
6 disapprove.
7　　I make recommendations beyond that and
8 make suggestions to him to train him.
9　　He is given opportunities in the office,
10 like other members of the staff are given
11 opportunities.
12　　He has the opportunity to volunteer for
13 special projects. Many times he does not. I
14 encourage him. Those private discussions that we
15 have behind closed doors, I'm urging him along.
16 Now, there have been a few that he has, indeed,
17 volunteered on.
18　　Now, all of this adds to professional
19 development.
20　　The review of his work and the quality of
21 his work, suggestions we make to enhancing his

Page 99

1 work, are all, in my opinion, is toward his
2 professional development, is part of grooming —
3 coaching, monitoring, directing, all of that.
4　Q. Coaching and monitoring is part of the
5 grooming process?
6　A. It is, sir. It is a part of our work as
7 grants specialist.
8　Q. Can you give me any specific projects
9 that you gave to Mr. Hunter in order to groom him
10 for promotion to the 13?
11　A. Mr. Hunter was given more authority as a
12 result of his grant warrant increase.
13　　Mr. Hunter was given an opportunity to
14 develop an IDP which is inclusive of training
15 courses that would enhance his knowledge and skill
16 level.
17　　Mr. Hunter was encouraged to take courses
18 outside of the department that would help him
19 develop.
20　　Again, the volunteering on projects.
21 That's it, sir.

Case 1:06-cv-00326-PLF   Document 21-11   Filed 05/11/2007   Page 4 of 5

Donald S. Hunter, Sr. vs.
Colin L. Powell, Secretary, U.S. Dept. of State

Multi-Page™

Fannie L. Allen
06/06/05

Page 120

1 work.
2     MR. STRAND: Did you say "grunt work"
3 that the GS-13's were doing?
4     MR. SNIDER: Right. That's my phrase.
5 In other words, the basic contract --
6     MR. STRAND: Objection. Mis-states.
7     MR. SNIDER: Okay. The basic contract is
8 written by a 13, and then modifications, and
9 additions and extensions, and those types of
10 things, are a lower level analyst type of work.
11    MR. STRAND: So the question is, is that
12 a fair characterization?
13    MR. SNIDER: That's number one.
14    MR. STRAND: Okay. So start with that.
15 I think it is easier to break this up.
16    THE WITNESS: There is a basic process to
17 responding to an audit report. And it would be
18 the same for anyone, whether a nine, 11, 12, or
19 13. That's what I meant when I said the basic
20 process.
21    MR. SNIDER: Understood.

Page 121

1     THE WITNESS: That's -- did that answer
2 your question?
3     MR. SNIDER: Yes.
4     THE WITNESS: Okay. That's the basic
5 work.
6     MR. SNIDER: Okay.
7     (Whereupon, there was a discussion off
8 the record.)
9     MR. SNIDER: How many pages on your ROI,
10 Exhibit 2-H?
11    MR. STRAND: Fourteen.
12    BY MR. SNIDER:
13   Q. Fourteen. Okay. Can you look at that
14 document, ma'am? That's one of the ones that you
15 tabbed; is that correct?
16   A. Yes.
17   Q. Is your signature on the first page,
18 ma'am?
19   A. Yes.
20   Q. And you created -- who wrote the
21 narrative on page four of that document?

Page 122

1    A. I wrote the narrative.
2    Q. You wrote that. And he was rated
3 excellent on each of the critical job element
4 descriptions on page two and three?
5    A. The question is again?
6    Q. You rated him excellent on each critical
7 job element on pages two and three of that
8 exhibit?
9    A. Correct.
10   MR. SNIDER: Okay. Nothing further.
11        EXAMINATION
12   BY MR. STRAND:
13   Q. My name is Stratton Strand. I represent
14 the government in this case. I have some follow-
15 up questions for you.
16       You testified that when Ms. Love and Ms.
17 Swann left the grants division, you posted their
18 positions at the 9/11/12 level; is that correct?
19 Did you testify to that?
20   A. Yes. That is correct.
21   Q. Why did you post their positions at that

Page 123

1 level?
2    A. It's two-fold. One, I wanted to bring
3 the structure of the office in line with the
4 structure of the department.
5       And, two, I wanted to bring in some
6 potentially younger candidates, younger in the
7 sense of career, not necessarily age, giving them
8 the opportunity and, hopefully, they would stay in
9 the office for a period of time, looking for
10 longevity.
11   Q. Did you --
12   A. Am I in a position to give an addendum to
13 that question?
14   Q. Sure.
15   A. With my determination, I had the right to
16 be able to do that. It was an option that I had
17 to look at the office in that vein. My decision.
18   Q. You were not trying to get younger people
19 into that position. You were trying to get people
20 who would stay there for longer? Is that what you
21 just said?

Case 1:06-cv-00326-PLF    Document 21-11    Filed 05/11/2007    Page 5 of 5

| Donald S. Hunter, Sr. vs. | Multi-Page™ | Fannie L. Allen |
| Colin L. Powell, Secretary, U.S. Dept. of State | | 06/06/05 |

### Page 148

1 suggested that he enroll in Toastmasters to give
2 him a comfort level in presentations. This was
3 consistently done, but it went — my request went
4 — he did not participate in such until much
5 later.
6     And I finally asked him one day why he
7 didn't do it early on. And he just indicated that
8 he was stubborn.
9     I also justified — it's hard to get a
10 course outside of the department -- at that time,
11 hard to get a course outside of the government
12 structure. They wanted you to take in-house
13 courses. So I wrote a justification for him to
14 take a written course — a writing course at P.G.
15 Community College. It was approved and he did
16 take the course.
17   Q. Did you also have coaching -- private
18 coaching sessions with him about his research
19 abilities?
20   A. Yes. Many times he would do some work
21 and then come in with a product. I would read it

### Page 149

1 and I would have questions. And those are the
2 kinds of questions that should have been answered
3 in the document before he presented it to me,
4 which also meant that he had to go back to the
5 drawing board. So the level of depth and research
6 was not there.
7   Q. Is it true that your understanding of his
8 abilities comes not just — or came, at the time
9 you made the decision on the accretion of duties
10 request, your understanding of his abilities came
11 both from your own personal observations of his
12 work product and his interactions with other
13 members of the Department of State, and also from
14 reports to you by the team leaders and the other
15 GS-13's?
16   A. Would you ask that question one more
17 time?
18   Q. Very well. Is it true that your
19 understanding of his abilities -- and I'm focusing
20 your attention on the time that you made the
21 decision on the GS-13 accretion of duties request

### Page 150

1 -- your understanding of his abilities came both
2 from own personal observations and from
3 information given to you by the team leaders?
4   A. Exactly. Yes.
5   Q. You testified, I believe, that from the
6 time Ms. Love and Ms. Swann received their
7 promotions to GS-13, they and Mr. Hunter performed
8 the same type of work, in terms of the process
9 that they went through. Do you believe that Mr.
10 Hunter at any time performed the same complexity
11 of work as Ms. Love and Swann, and performed it at
12 the same level that they performed it, in terms of
13 how well they performed?
14     MR. SNIDER: Continuing objection over
15 here, but go ahead.
16     MR. STRAND: Continuing objection —
17     MR. SNIDER: Yes.
18     MR. STRAND: -- to?
19     MR. SNIDER: To the leading nature of
20 every — pretty much every question.
21     MR. STRAND: "Pretty much every question"

### Page 151

1 doesn't give us a real specific idea. Let me
2 rephrase it in response to the objection.
3     BY MR. STRAND:
4   Q. Do you believe that Mr. Hunter performed
5 the same complexity of work as Ms. Love and Ms.
6 Swann?
7   A. No, he didn't.
8   Q. Do you believe that he performed his work
9 to the same degree of competence that they did?
10   A. No, he did not.
11   Q. When you advertised the vacant positions
12 that Ms. Love and Ms. Swann had held, did you
13 advertise them as GS-9/11/12's, in order to
14 prevent Mr. Hunter from getting — from having the
15 ability to apply for those positions?
16   A. No.
17   Q. Since Ms. Love and Ms. Swann obtained
18 their GS-13's, has Mr. Hunter handled grants at as
19 high dollar levels as they have handled?
20   A. No, he has not.
21     MR. STRAND: I'd like to mark her