## DECLARATION OF FANNIE ALLEN (Witness)

In accordance with the provision of Title 28, United States Code, Section 1746, I, Fannie Allen, make the following declaration to Betty Lou Cox who has identified herself to me as an EEO Investigator, Southwind Enterprises, Inc. assigned by the US Department of State to perform this investigation, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who must have access to this information in order to carry out his or her official duties.

This statement is given in relation to a complaint of discrimination Mr. Donald S. Hunter filed.

*The investigator has made me aware that the accepted claims in this complaint are that because of Mr. Hunter's race (African-American) and sex (male), he was discriminated against when:*

- *On June 24, 2002, he was denied his request for promotion to GS-13;*
- *On May 30, 2002, he requested an increase from $100,000 to $1,000,000 in his signing authority on grants/cooperative agreements; however, his request was not granted;*
- *On May 14, 2002, he was rated ineligible for a GS-14 Financial Management Specialist because he did not meet the time-in-grade requirement at the GS-13 level.*

Q1    Please state for the record your full name.
A     Fannie L. Allen
Q2    Please state your official title and grade.
A     Grants Management Officer – GS-14
Q3    According to the record, you are employed by ECA/IIP/EX/G, United States Department of State (hereinafter "the Department"). Is this accurate? How long have you held your present position?
A     Yes. I was appointed to this position in 1994
Q4    Please state your race and sex.

Initials _JA_

Exhibit ___7___

Page 1 of 11


GOVERNMENT EXHIBIT J

1   A   Black Female
2   Q5  Who is your first level supervisor? Your second level supervisor?
3   A   First level: Mr. Benjamin Castro
4       Second level: Mr. James D. Whitten
5   Q6  What is your work relationship to Donald S. Hunter, Sr?
6   A   Mr. Donald S. Hunter, Sr. is a member of the Grants Staff – I provide general
7   supervision, e.g. leave administration, performance evaluation, training
8   administration, etc. He receives his grant work assignments from the Team Leaders.
9   I become aware of his performance through communication with the Team Leaders
10  and direct work relationship on other grant related assignments.
11  **Claim: Request for promotion to GS-13 denied.**
12  Q7  Is Mr. Hunter in a career ladder position to the grade 13? If so, when did he
13  meet the requirement of one year at the grade 12?
14  A   No. Mr. Hunter is not in a career ladder position.
15  Q8  What are the key job duties to the Grants Specialist GS-12 position? About
16  what percentage of Mr. Hunter's time is devoted to each key job duty?
17  A   See GS-12 Position Description attached – Exhibit A. Estimated percentages:
18  Pre-Award 10%, Award and Post Award 80% and Other 10%.
19  Q9  For _each_ key job duty, please describe the difference between the grade 12
20  performance level and the grade 13 performance level. Please describe specifically
21  the difference in complexity of the work of the two grade levels.
22  A   At the GS-12 level – see position Description Exhibit A.
23      At the GS-13 level – see position Description Exhibit B.
24      At the GS-13 level – see position Description Exhibit C.
25  Note: The Bureau has two different Position Description for the GS-13 level.
26  Also, see analysis of GS-12 and GS-13, Exhibit D.
27  Also, see delegation of authority – responsibilities of GS-13, Exhibit E.
28      At the GS-13 level - - see position Description Exhibit B and C. GS-13s are
29  required to provide training to new staff members. The GS-13s assigned to this

Initials *fl*

1  office are experienced and highly trained – institutional memory prevails.
2  Assignments (complex or non-complex) are made by the two senior staff members.
3  Work distribution is made based on experience, dollar value and complexity of
4  work. The high dollar value and more complex packages are assigned to senior staff
5  members – GS-13s.
6  Q10   Please describe Mr. Hunter's level of performance for each key job duty.
7  Please compare his level of performance with the level of performance required at
8  the GS-13 level.
9  A   See response to Question 9. The steps for "pre-award review of processing" a
10 grant are the same for each grants specialist. Each Specialist is required to
11 independently manage their grant package and to ensure that it is completed with
12 the scheduled 15-days of receipt. The steps are the same (see checklist attached –
13 Exhibit F) the complexity lies in the makeup and comprehensiveness of the budget
14 and the dollar value for the various programs. Some of the Programs are
15 congressional earmarks requiring special attention – in-depth independent review,
16 analysis, and monitoring.
17 Q11   Please describe the difference in complexity between specific assignments to
18 Mr. Hunter during the past year and those assigned to grade 13's under your
19 supervision.
20 A   See response to question 9. The work assigned to the GS-13s is more complex
21 – requiring more detail review and analysis, research, interpretation, independent
22 thinking and the grants are high dollar value. GS-12s receive less complex
23 assignments. The GS-13s are often managing multiple projects while providing
24 advice and guidance to junior staff members. Also, see Exhibit E (delegation). Work
25 assigned to personnel, GS-12 and below is less complex – lower dollar value with
26 simpler (routine) budgets. As part of their professional development junior staff
27 members are given more comprehensive assignments/projects. If they are given
28 more complex work a senior team member is assigned to provide guidance and
29 review. Plus, the previous grant model (document) initiated by the GS-13 is

1  transferred to the assigned GS-12. The assigned team leader, or another GS-13 staff
2  member(s) as assigned, reviews Mr. Hunter's work.
3      As attachments to this declaration, please provide examples of Mr. Hunter's
4  work, such as excerpts of documents (see Exhibit G) showing the complexity of his
5  work, which you consider demonstrate he is performing grade 12 work. Please list
6  each below and explain specifically how this particular example of the work
7  demonstrates grade 12 level work.
8      A    Samples of Mr. Hunter's work - - See Exhibit G. See response to
9  question 9. Mr. Hunter has not demonstrated the knowledge and skill required to
10 perform duties normally executed by GS-13s.
11 Q12    Please provide as attachments grade 13 level work samples (see Exhibit H),
12 comparing the complexity as well as the level of performance, particularly in written
13 communication. Please explain the difference between this level work and Mr.
14 Hunter's work that demonstrates he is not ready for promotion to GS-13. Please
15 identify the race and sex of the GS-13 employee who did the work.
16 A    See response to question 9. Sample of GS-13 work - - See Exhibit H.
17     The GS-13s on the staff are as follows: Ms. Maggie Ahern is Caucasian, Ms.
18 Joyce Love, Ms. Connie Stinson, and Ms. Phyllis Swann are Black.
19 Q13    When did Mr. Hunter first request noncompetitive promotion to GS-13?
20 A    2002.
21 Q14    When Mr. Hunter requested promotion to GS-13, what did you tell him he
22 needed to accomplish, if anything, in order to be promoted to that level?
23 A    I expressed to Mr. Hunter that I appreciated his work and his contributions
24 to the office. However, I stated to him that he was not functioning at the GS 13 level.
25 He had not demonstrated that he possessed the knowledge and skill required to
26 perform the level of work normally executed by a GS-13. The necessary knowledge,
27 skill and experience to independently work on the complex activities of the office
28 without an enormous amount of coaching. I also stated that his written (grammar)
29 and oral communication skills needed improvement.

Initials *[signature]*        Page 4 of 11

Q15  According to the counseling report, you find Mr. Hunter's oral communications are at the grade 12, not the grade 13. Please describe specifically the problems you see in Mr. Hunter's oral communications that you find not to meet the requirements of the grade 13. Please give specific examples.

A  Mr. Hunter has difficulty reading and communicating verbally contents of documents. This became quite evident during readings that he has attempted during staff meetings. He does not demonstrate a command of the English language that is expected of someone in a senior level position – GS-13.

In preparation for presentations, team members had to provide Mr. Hunter with extensive coaching. During the presentations, more often than not, Mr. Hunter read his presentation. He lacked familiarization, comfort and confidence in the material presented.

Q16  According to the counseling report, a classification review was being undertaken on Mr. Hunter's position. Has a classification review or desk audit taken place, to your knowledge? If so, who conducted the review?

A  Yes, Mr. Hunter formally requested a desk audit. Mr. Larry Nix of the Department's Human Resource Office conducted it. Mr. Larry Nix was assigned the case. It was my understanding that Mr. Nix and Mr. Hunter met. Mr. Larry Nix interviewed me as part of the process.

Q17  If a classification review has taken place, have you received the results of the review? If so, what were the results of the review?

A  According to the ECA Bureau Human Resource Director, the desk audit of Mr. Hunter's position was cancelled by Mr. Hunter, himself, before the final decision was released. I have never received the results of any review.

Q18  Is there a vacant GS-13 Grants Specialist position in your organizational unit? If so, how long has it been vacant?

A  No.

Q19  What were Mr. Hunter's summary performance ratings for the past three years?

1  A   1999 Highly Successful 2000 Highly Successful 2001 Excellent

2  Q20  Is there anything you would like to add to your statement on this claim?

3  A   No.

4  Q21  According to a June 24, 2002, memo from Mr. Castro to Mr. Hunter regarding
5  his request for promotion, Mr. Castro said you and he would "make every effort to
6  give (Mr. Hunter) assignments to prepare him for a GS-13 position." Have you
7  given Mr. Hunter assignments to prepare him for a GS-13 position? If so, please give
8  specific examples. If not, why?

9  A   Yes. Mr. Hunter has been assigned work a grant audit that he is working on
10 to enhance his ability to handle complex assignments. This is under the guidance of
11 a GS-13.

12 Q22  Mr. Hunter lists some activities that he contends support his accretion of
13 duties to the grade 13. The first of these is that in June/July 2002, he was assigned
14 the East-West Center (East Timor Scholarship) and IIE (Contemporary Issues
15 Fellowship) programs that were previously administered by GS-13's. Are these GS-
16 13 level assignments? What leads you to that conclusion? What percentage of Mr.
17 Hunter's time will these assignments take?

18 A   Yes, these assignments were previously assigned to GS-13s in the office.
19 They were assignments that were complex in nature — requiring detailed review
20 and analysis, and unusual reporting requirements. The GS-13's in the office,
21 because of the heavy workload, handle a variety of assignments -- complex and
22 programs that are not so complex.
23      Grants like, the East-West Center (East Timor Scholarship) and IIE
24 (Contemporary Issues Fellowship) programs that were previously administered by
25 GS-13s were assigned to Mr. Hunter and other members of the office. The GS-12's
26 are given more challenging work to enhance their professional development. The
27 GS-13s of record are assigned as coaches and the junior specialist is given the base
28 document as a guide.
29      Mr. Hunter was given the above-mentioned assignments. EWC (East Timore
30 Scholarship) award and an IIE award. Again, the GS-13s of record were assigned as
31 coaches and the junior specialist is given the base document as a guide. The junior
32 specialist does not have to start from scratch because the senior specialist has
33 worked all of the detailed complex administrative details out. Therefore, the junior
34 specialist had time to review what has been – acquainting them with the complex
35 nature of the award, confirming the guidelines previously negotiated. As a result,

Initials /lu                                                                    Page 6 of 11

less time was required in order to work up the new award or amendments to the grant. In the case of Mr. Hunter, he did not carefully review the award. He was reported to have made changes in the document with out review (reading the agreement) and consultation with the GS-13 record. His team leader discovered this during the review. He was advised to go back to the GS-13 or record to confirm the changes. Mr. Hunter, after review and consultation deleted the changes he had made to the grant.

Percentage of Time: The time for Mr. Hunter was significantly reduced because the bulk of the base work was accompanied by the GS-13. The GS-12 awarded the new agreement with less work. The GS-12 had an opportunity to become familiar with the award and evaluate the complex nature of the award.

Q23   He lists a March 2002 off site training in Roanoke, VA that he conducted with the GS-13 Grants Specialists for Community Connections grant recipients. What was Mr. Hunter's role in the training? Did he prepare the training materials or act as lead? What is the difference, if any, between his role in the training and the roles of the GS-13's who also participated in this assignment?

A   Mr. Hunter was a team member and he was required to make a presentation at the conference. Additionally, he was required to assist in the preparation of a workshop presentation. One of the GS-13s was designated the Team Leader. This was another component of professional development; this was Mr. Hunter's first conference and his first TDY assignment.

Each person (three person team – one GS-12 and two GS-13s) on the team was required to make a presentation during the concurrent sessions at the Conference. Mr. Hunter collaborated on the focus/agenda of the Conference. He was responsible for developing his presentation and to rehearse it alone, and later with the Conference Team. Mr. Hunter's Team Leader, Ms. Connie Stinson, after listening to the first rehearsal realized that Mr. Hunter needed assistance. She provided (one-on-one) assistance in the text of the subject matter and the rehearsal of his oral presentation.

Q24   Mr. Hunter says that, October 2001, he managed/monitored the special program funds for the congressionally earmarked Wye River project. What was the level of complexity of this assignment and what specifically did it require him to do?

A   Wye River: This project was originally assigned to a GS-13. Mr. Hunter volunteered to manage this project to gain experience. This project was assigned to



him under the guidance of a GS-13. His questions would be directed to the GS-13. It was originally believed that millions of dollars would be made available for domestic awards for this project and there would be a large number of grant awards, which would require coordination between the program office and the grant office to work out details.

A Project Leader was responsible for the administration of the assigned project. He was responsible for working with the assigned Program Officer – providing feedback to the Division, going to meetings, etc.

As it turned out, there were only three domestic awards made because the majority of the funding was awarded to overseas organizations and the Office of Logistics Management in Rosslyn administers those awards. There is no ECA-IIP/EX/G involvement in the administration of overseas awards. As a result, the remaining work required is deemed not complex. Also, see Exhibit I.

Q25  Mr. Hunter says in May 2001 he was assigned the MCID's Office of Inspector General audit with findings and $1.2 million in questionable costs to resolve. What was the level of complexity of this assignment and what specifically did it require him to do?

A  Audit Resolution for Mississippi Consortium: This audit was originally assigned to one of the GS-13s. It is not considered a complex audit. Mr. Hunter volunteered to respond to the audit findings. His request was honored with the understanding that this project would be administered under the guidance of the GS-13. He works with the grantee to gather data in order to reach a final determination. The audit resolution is in process. The Grants Officer of record will review Mr. Hunter's work, before it is reviewed and cleared by me. The amount in dispute is in excess of $800K.

Q26  Mr. Hunter states he was assigned as the Project Leader for converting ECA's grant recipients to the DHHS Payment Method System to comply with Public Law 106-107. What was the level of complexity of this assignment and what specifically did it require him to do? Is this project still going on?

A  PMS Conversion: Mr. Hunter volunteered as project leader for converting all ECA grant recipients to PMS by the end of FY-2002. Requirement: He consulted with the in-house Grants Coordinator and representatives from Health and Human Services. After his data gathering, he drafted a letter (see Exhibit J) that was to be used by all GOs to inform grantees of this change. His letter, however, required substantial edits (see Exhibit I). Once a letter was agreed upon, individual grant officers mailed out the letter to potential grantees as they were awarded new grants. Each grants specialist/officer was responsible for providing all forms and ensuring those forms were returned in a timely fashion and processed by the Division's Grants Coordinator.

1   Mr. Hunter also prepared a draft memorandum to Mr. Ben Castro outlining
2   the cost that would be involved in converting all grantees to PMS. Again, this
3   document required substantial edits. Sample documents not available). It is office
4   practice to return corrected documents to the author. After all corrections are made,
5   the drafts are trashed.
6   Conversion of ECA grantees to PMS is an on-going project for the Division.
7   Q27   Are there any witnesses whom you would like to suggest who have direct
8   knowledge of the level of Mr. Hunter's performance in comparison to those at the
9   grade 13 level in your branch? If so, please state the name and a contact number for
10   each.
11   A   Yes, Ms. Connie Stinson (202-205-8383), Ms. Maggie Ahern (202-205-9410),
12   Ms. Phyllis Swann Smith (202-205-8881) and Ms. Joyce Love (202-205-8590).
13   **Claim  Request to increase warrant denied**
14   Q28   Has Mr. Hunter suffered any employment harm by not management denying
15   him an increase in his sign off authority (warrant) from $100,000 to $1 million?
16   A   I have no way of determining that.
17   Q29   Do any GS-12 Grants Specialists under your supervision have warrants for $1
18   million? If so, please identify them, give the race and sex, and explain why they
19   have warrants of $1 million while Mr. Hunter does not.
20   A   No. Mr. Hunter is the only GS-12 on the staff.
21   Q30   What are the criteria for a grants specialist to be permitted a $1 million sign
22   off authority?
23   A   The office practice is for GS-12s to gain authority up to $500,000 and GS-13s
24   up to $1 Million or above. At that grade level the Grants Specialist demonstrate that
25   he/she possesses a knowledge, skill and experience to perform federal assistance
26   actions with a satisfactory level of quality within a reasonable time. He/she must
27   also demonstrate ability to communicate appropriately with Government and non-
28   Government personnel and to exercise consistently sound and fair business
29   judgment. The Specialist should have developed functional knowledge of the laws,
30   policies, procedures, and methods pertaining to Federal assistance to enable a
31   Specialist to operate effectively in managing the full range of basic awards up to

Initials *[signature]*   Page 9 of 11

1   $500,000. As Chief of the Division, I recommend the warrant authority and the
2   Department's Procurement Executive is the official authorized to select, appoint and
3   terminate federal assistance warrants.
4       Mr. Hunter's warrant had been delayed because his Team Leader indicated
5   that he did not exercise care in the processing of grant awards. Errors in processing
6   were repeatedly made. Mr. Hunter acknowledged this was happening. He was
7   encouraged to take time and review his work carefully before submitting it for
8   review.
9   Q31   Do all the GS-13 Grants Specialists in your organizational unit have $1
10  million warrants?
11  A   Yes.
12  Q32   Would the increase in Mr. Hunter's sign authority to $1 million be sufficient
13  in and of itself to raise the grade of his position to GS-13?
14  A   No. To qualify for a GS-13 there are more factors to be considered.
15  Q33   What is the difference in complexity of work within a $100,000 warrant and a
16  $500,000 warrant?
17  A   Specialists must demonstrate knowledge, skill and the ability to handle work.
18  See response to question 30.
19  Q34   What is the difference complexity of the work within a $500,000 warrant in
20  comparison to a $1 million warrant?
21  A   See response to question 30. Generally, Grants Specialist with high
22  monetary value controls accountability.
23  Q35   According to the counseling report, you said you were willing to raise Mr.
24  Hunter's sign off authority to $500,000. Has that been done or progress made
25  toward that goal?
26  A   I have agreed to recommend an increase of Mr. Hunter's signing authority to
27  $500,000.00. At my request, he has submitted paperwork to support this increase.
28  Mr. Hunter paperwork along with that of three others will be completed and
29  forwarded for approval and award by OPE.

Initials _/s/_                                                          Page 10 of 11

| | | |
|---|---|---|
| 1 | Q36 | Is there anything you would like to add to your statement on this claim? |
| 2 | A | No. |
| 3 | Q37 | Are there any witnesses whom you would like to suggest who have direct |
| 4 | | knowledge of this claim? If so, please state the name and a contact number for each. |
| 5 | A | Ms. Connie Stinson (202-205-8383) is Mr. Hunter's Team Leader. She, along |
| 6 | | with Ms. Maggie Ahern, the other team leader, assigns (and reviews) work to grants |
| 7 | | specialists in the office. |

**Claim Rated ineligible to compete based on time in grade**

Q38   According to the counseling report, Mr. Hunter does not dispute the accuracy of the Personnel Specialist's finding that he did not meet time in grade requirements for the GS-14 Financial Management Specialist position. Rather, he contends that, had management promoted him to the grade 13 a year ago when he first requested promotion, he would have been eligible to compete for the GS-14 position this year. When the decision was made not to promote Mr. Hunter non-competitively to the grade 13, was there any intent in doing so to prevent him being eligible to compete for grade 14 positions this year?

A   No.

Q39   Is there anything you would like to add to your statement on this claim?

A   No.

Q40   Are there any witnesses whom you would like to suggest who have direct knowledge of this claim? If so, please state the name and a contact number for each.

A   See response to Question 27.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this day, (date).

*[signature]*

Fannie Allen

Initials *[initials]*