```
                    UNITED STATES DISTRICT COURT

 1                 FOR THE DISTRICT OF COLUMBIA


 2   - - - - - - - - - - - - - - - -x

     DONALD STEVE HUNTER, SR.            :

 3             Plaintiff                 :

        vs.                             :    Case No: 06-326 (PLF)

 4   CONDOLEEZZA RICE, SECRETARY         :

     U.S. DEPARTMENT OF STATE            :

 5             Defendant                 :

     - - - - - - - - - - - - - - - -x

 6

                                   Washington, D.C.

 7                                 Monday, March 26, 2007


 8

     Deposition of:

 9             DONALD STEVE HUNTER, SR.

     the Deponent, called for examination by counsel for the

10   Defendant, pursuant to notice and agreement as to time and

     place, at 501 3rd Street, N.W., Washington, D.C., before

11   Heather Kilbourne, a Notary Public in and for the District of

     Columbia.

12

                    FREE STATE REPORTING, INC.

13                Court Reporting   Depositions

                   D.C. Area (301) 261-1902

14               Balt. & Annap. (410) 974-0947


15
```

1

2 APPEARANCES:

On Behalf of the Plaintiff:

3 Pro Se

4 On Behalf of the Defendant:

JANE M. LYONS, ESQUIRE

5 Assistant United States Attorney

555 4th Street, N.W.

6 Room E4822

Washington, D.C.  20530

7 (202) 514-7161

8 On Behalf of the Department of State:

KATHRYN SKIPPER, ESQUIRE

9 Office of the Legal Advisor

2201 C Street, N.W.

10 Washington, D.C.  20520

(202) 647-4278

11

12

FREE STATE REPORTING, INC.

13 Court Reporting   Depositions

D.C. Area (301) 261-1902

14 Balt. & Annap. (410) 974-0947

15

3

1

2

3                               I N D E X

WITNESS:                 EXAMINATION:                    PAGE:

4   Donald Hunter        Direct - Ms. Lyons                5


5                           E X H I B I T S

EXHIBIT NO.:              DESCRIPTION:                    PAGE:

6       1        E-mail dated August 25, 2005             32

        2        Submission to EEOC dated                 41

7                January 9, 2006

        3        Motion sent to EEOC dated                44

8                August 25, 2005

        4        Order denying Motion to Consolidate      45

9       5        Letter dated March 21, 2006 from the     47

                 Department of State

10      6        Third Step Grievance                     89

        7        Response to Step 1 Grievance             90

11      8        Response to Step 2 Grievance             91

        9        Documents relating to grievance          98

12

                      FREE STATE REPORTING, INC.

13                   Court Reporting   Depositions

                      D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947


15

4

|    |                                              |     |
|----|----------------------------------------------|-----|
| 10 | SF-50 for Ms. Swann                          | 99  |
| 11 | SF-50 for Ms. Gunther                        | 100 |
| 12 | Complaint                                    | 101 |
| 13 | Documents relating to Certificate of Eligibles | 108 |
| 14 | Certificate of Eligibles                     | 109 |

(Exhibits continue on the following page.)

(Exhibits continued from previous page.)

|    |                                              |     |
|----|----------------------------------------------|-----|
| 15 | Certificate of Eligibles                     | 111 |
| 16 | Cert for Budget Analyst Position             | 136 |

FREE STATE REPORTING, INC.

Court Reporting   Depositions

D.C. Area (301) 261-1902

Balt. & Annap. (410) 974-0947

P R O C E E D I N G S

1                                          (1:06 p.m.)

Whereupon,

2                    DONALD STEVE HUNTER, SR.

was called as a witness and after having been first duly

3  sworn, was examined and testified as follows:)

DIRECT EXAMINATION

4         BY MS. LYONS:

        Q.   Good afternoon, sir.  Would you state your name?

5         A.   Donald Steve Hunter, Sr.

        Q.   Mr. Hunter, you are the Plaintiff in a lawsuit

6  against the Secretary of State in Civil Action Number 06-326

in the District of Columbia, is that correct?

7         A.   Yes.

        Q.   And we're here today to take your deposition which

8  we've been talking a little bit about off the record before we

start right now.  I know you've been deposed before in an

9  earlier action, but that wasn't by me, and I just want to go

over a few of the ground rules with you for a deposition to

10  make sure that we get a good, clear record today of what we're

doing.  Is that okay?

11        A.   That's fine.

        Q.   The first ground rule you're doing well with which

12
                    FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                   D.C. Area (301) 261-1902

14                 Balt. & Annap. (410) 974-0947

15

is you have to give verbal answers to my questions because the

1  court reporter can't take down a nod or a shake of the head.

You understand that, right?

2      A.   Yes.

       Q.   The second ground rule is that you can take a break

3  whenever you want to for any reason or no reason at all.  Just

ask me, and the only thing I'll ask is that you finish the

4  answer of the question that's pending before we take a break.

 Does that seem fair?

5      A.   Yes.

       Q.   Another ground rule we need to observe, we're doing

6  pretty well with so far, is that I need to finish my question

before you answer it, and I need to let you finish your answer

7  before I ask the next question.  So I'm going to do my very

best to do that, but if I interrupt you, I want you to tell me

8  that I've interrupted you so that you can complete your

answer.  And if you would, even if you know what -- you think

9  you know what I'm going to ask you, please wait for me to

finish so the court reporter can get it down.  Can you do that

10  with me?

       A.   Yes.

11      Q.   Thank you.  Perhaps the most important ground rule

of all is that I don't want you to answer any question I ask

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

unless you completely understand the question.  I might ask it

1  badly.  I might choose a word that for whatever reason you

don't understand in the way I'm using it or I may just ask a

2  very badly asked -- worded question, and I don't want you to

answer those.  I want you only to answer the questions that

3  you understand.  So if I do that, please tell me and we'll

work out whatever problems we have with the question itself.

4  We talked about that a little bit before we started today.

Are you comfortable with that?

5      A.    Yes, I am.

       Q.    Okay.  Do you have any questions for me before we

6  begin?

       A.    Not at this time, no.

7      Q.    Great.  All right.  The lawsuit that we're here to

talk about today concerns your complaint of age

8  discrimination, is that right?

       A.    Yes.

9      Q.    Now I'm going to go back in time with you a little

bit over the events to make sure I have a clear understanding

10  of what happened and when you did what you did, okay?

       A.    Okay.

11     Q.    According to my calculations, you would have turned

40 years of age in or around May of 1998, is that right?

12

FREE STATE REPORTING, INC.

13                 Court Reporting   Depositions

D.C. Area (301) 261-1902

14                 Balt. & Annap. (410) 974-0947

15

A.    May -- yes.

1    Q.    You had to think about that for a minute.

A.    Yes, correct.

2    Q.    Okay.  When did you start working at the Department

of State?  Well, I know you were -- I know there's a --

3    A.    1999.

Q.    And before that you were employed by the --

4    A.    U.S. Information Agency.

Q.    And when did you start working there at the U.S.

5    Information Agency?

A.    '86, 1986, February 1986.

6    Q.    Okay.  And you're a Grant Specialist, correct?

A.    Yes.

7    Q.    Were you a Grant Specialist when you were originally

employed with the USIA?

8    A.    No.

Q.    Okay.  Most of your background history is all in

9    your prior deposition and I don't need to go over that with

you here today, so we're going to --

10    A.    I agree.

Q.    -- we're going to jump over this.

11    A.    Okay.  I agree.

Q.    I'm not that concerned about exactly what jobs

12

1    you've had and what titles you've had today.  I need to get to
     the more important things.  When did Ms. Fannie Allen become
     your supervisor?

2        A.   November 1997.

         Q.   So that was while you were both employed by the U.S.

3    Information Agency, is that right?

         A.   Correct.

4        Q.   And when Ms. Allen became your supervisor in
     November of 1997, what kind of job did you have?

5        A.   Coming under Fannie Allen's supervision?

         Q.   Yes.

6        A.   A Grant Specialist position.

         Q.   And what GS level were you in November of 1997?

7        A.   11, GS-11.

         Q.   Had you known Ms. Allen before she became your

8    supervisor?

         A.   Yes.

9        Q.   How did you know her before then?

         A.   I had worked in the Contracts Office of USIA in 1992

10   and Ms. Allen was an employee in that office at that time.

         Q.   So you'd known her for about five years as a

11   colleague before she became your supervisor?

         A.   Correct.

12

                          FREE STATE REPORTING, INC.

13                      Court Reporting    Depositions

                          D.C. Area (301) 261-1902

14                      Balt. & Annap. (410) 974-0947

15

10

Q.   How would you characterize your relationship with

1   her between 1992 and 1997?

A.   As colleagues.

2   Q.   Just colleagues.

A.   Work colleagues.

3   Q.   Okay.  Did you ever have any problems with her

before she became your supervisor?

4   A.   I didn't have much dealings with her.  She was on

the contract side.  At that time I worked on the grant side,

5   so I didn't have much contact.  She was just -- we were all in

one office setting.  The Contracts and the Grants Office was

6   in one office, so --

Q.   How many people were in that office approximately?

7   A.   Counting both sections, 35, 40.

Q.   Okay.  Isn't it true that Ms. Allen recommended that

8   you receive a cash award of a thousand dollars in April of

2002?

9   A.   That sounds about right, yes.

Q.   Without getting too tight of a date which might be

10   hard for you in time, it's true that Ms. Allen's recommended

you for cash awards, correct?

11   A.   That $1,000 one, yes.

Q.   Okay.  Let's talk about the section you were working

12

FREE STATE REPORTING, INC.

13   Court Reporting   Depositions

D.C. Area (301) 261-1902

14   Balt. & Annap. (410) 974-0947

15

11

in under Ms. Allen's supervision at the beginning of January

1   2004, okay?

        A.    Okay.

2       Q.    In January 2004 you had been promoted to a GS-12,

    correct?

3       A.    Yes.

        Q.    When were you promoted to GS-12, if you remember?

4       A.    '99, 1999.

        Q.    So Ms. Allen was your supervisor when you were

5   promoted to GS-12?

        A.    Correct.

6       Q.    What actions did she take to get your promoted to

    GS-12?

7       A.    Acceleration of duty promotion.

        Q.    Is that like an accretion of duties?

8       A.    I'm sorry, accretion -- for the record, accretion of

    duties promotion.

9       Q.    Okay.  What does that mean, that she gave you duties

    at the next higher level of the GS-12 so that you could get

10  promoted?

        A.    I was performing those duties.  I can't recall

11  whether she initiated giving me those duties.  Well, she had

    to.  She was the supervisor, so yes, in my day to day routine

12

                          FREE STATE REPORTING, INC.

13                       Court Reporting    Depositions

                         D.C. Area (301) 261-1902

14                       Balt. & Annap. (410) 974-0947

15

of working from '97 through '99 my responsibilities and duties

1  increased in that two year period.

   Q.   So is it fair to say that Ms. Allen supported your

2  promotion from GS-11 to GS-12?

   A.   Yes.  She had to sign off on it, yes.

3     Q.   Okay.  All right.  So Ms. Allen was the supervisor

   -- and this is all in -- we haven't got this on the record,

4  but the -- oh, boy, ECA --

   A.   Yes.

5     Q.   What does that stand for?

   A.   Bureau of Educational and Cultural Affairs.

6     Q.   Okay.  If I refer to it as ECA, you'll know what I'm

   talking about?

7     A.   Yes.

   Q.   You don't work in that section any more, correct?

8     A.   Correct.

   Q.   All right.  We'll get to that point.  It's a couple

9  years down the road, but I'd like to go chronologically if you

   don't mind.  Okay.  So in January of 2004 another Grant

10 Specialist by the name of Joyce Love retired, right?

   A.   Yes.

11    Q.   And she was a GS-13?

   A.   Correct.

12

                        FREE STATE REPORTING, INC.

13                    Court Reporting    Depositions

                        D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

Q.   And you applied for the position that she had

1   vacated, right?

A.   Correct.

2   Q.   But at the time that you submitted an application

there was no vacancy announcement out, right?

3   A.   Correct.

Q.   Do you believe it would have been fair for you to be

4   placed in a GS-13 position without any competition?

A.   Yes.

5   Q.   Why do you believe that?

A.   Because of the past history and the fact that my

6   workload had increased.  I was given more responsibility

between when I was promoted in 1999 to when Ms. Love retired

7   in 2004.  I was performing the same exact duties as Ms. Love

when she retired, and I had numerous discussions with Fannie

8   Allen starting as early as 2000 concerning the accretion in my

duties and wanting to be promoted.

9   Q.   Who were the other GS-12 Grant Specialists in ECA in

January 2004?

10   A.   I don't know -- if there was one, I'm not sure of

this, but it would have been Julie Johnson.  I don't know.

11   No, excuse me, she was not -- she was an 11 --

Q.   Okay.

12

FREE STATE REPORTING, INC.

13                Court Reporting   Depositions

D.C. Area (301) 261-1902

14                Balt. & Annap. (410) 974-0947

15

14

         A.    -- so I was the only GS-12 at that time, June of --

1   I'm sorry, what date did you say, January?

         Q.    January.

2        A.    January 2004 when Love retired I was the only GS-12

    in the office at that time.

3        Q.    There were other Grant Specialists working for the

    Department of State, though, correct?

4        A.    Correct.

         Q.    And some of them were probably GS-12s in January of

5   2004?

         A.    Probably, yes.

6        Q.    Okay.  But you still think it would have been fair

    for you to just be promoted into the position without any

7   competition?

         A.    Correct --

8        Q.    Okay.

         A.    -- because of the work that I was performing at that

9   time.

         Q.    Your application for a GS-13 position without

10  competition was rejected, correct?

         A.    It was never responded to.

11       Q.    You're holding something in your hand, Mr. Hunter.

    I wonder what it is.

12

                        FREE STATE REPORTING, INC.

13                   Court Reporting    Depositions

                       D.C. Area (301) 261-1902

14                   Balt. & Annap. (410) 974-0947


15

A.    It's a memo from HR/G, Ms. Joanna M. Lishman, in

1   response to a grievance I filed concerning the promotion that

we're discussing, the application for the GS-13 that we're

2   discussing.

Q.    Okay.

3       A.    And in this document it says that management failed

to respond to my application.

4       Q.    Okay.  That would confirm what you just told me.

A.    Correct.

5       Q.    Let me back you up then and ask you a couple

questions about that document you're holding.  When did you

6   file a grievance concerning the lack of a response or lack of

a favorable response to your request to be put into the GS-13

7   grant position vacated by Joyce Love?

A.    May 7th, 2004.

8       Q.    What is the status of that grievance today?

A.    It's dead.  No action was taken.  No request for a

9   arbitrator was requested.

Q.    So the union didn't request arbitration?

10      A.    We didn't pursue it.  I should say the union did not

pursue it.  Maybe that's a better choice of words.

11      Q.    Did you file an EEO complaint over management's

failure to respond to your February 14th, 2004 application for

12

FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

the Grant Specialist position at the GS-13 level?

1    A.   I didn't file an EEO complaint on that issue, no.

     Q.   Okay.  I just wanted to be sure.

2    A.   Right.

     Q.   I didn't think you had, but I wanted to be sure.

3    A.   Not on that issue, no.

     Q.   Okay.  At some point you became aware that ECA did

4 put a vacancy announcement out for a Grant Specialist position

in the section, correct?

5    A.   Yes.

     Q.   Do you know when you became aware of that?

6    A.   Probably, if my memory serves me correctly, is when

Ms. Allen made an announcement in a staff meeting that Julie

7 Johnson has been selected for the position.

     Q.   Oh, so you didn't know that it had gone out?

8    A.   Yes.

     Q.   How did -- did you ever become aware of where the

9 announcement was posted?

     A.   No.

10    Q.   Okay.  The position was advertised at the GS-11 or

12 level, correct?

11    A.   Correct.

     Q.   And so you wouldn't have applied for that position

12

15

anyway because you were already at the GS-12 position, right?

1      A.    Correct.

       Q.    Did you have any discussions with anybody in ECA or

2  Human Resources about the decision to make the position at the

   GS-11 or 12 level?

3      A.    Yes.

       Q.    Who did you talk to?

4      A.    Head of the Human Resources, Jackie Hill.

       Q.    Jackie Hill?

5      A.    Jackie Hill, Jacqueline Hill.  She was the Human

   Resource Chief at the time.

6      Q.    When did you talk to her about that?

       A.    Around the date of my memo to her which was February

7  the 17th of 2004.

       Q.    And what did you say to Ms. Hill?

8      A.    I first had discussions about a motion [sic] to the

   GS-13 level and how that could come about or how ECA could

9  promote me to a GS-13 level.

       Q.    Was that even before Ms. Love retired that you were

10 having --

       A.    It was after.

11     Q.    -- those discussions?

       A.    That was after.

12
                        FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

                        D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947


15

Q.    After, okay.

1      A.    I probably had discussions with Ms. Hill before Ms. Love retired about being promoted to a GS-13.

2      Q.    And what had she told you in that regard?

A.    If I recall, Ms. Allen --

3      Q.    Well, what did Ms. Hill tell you?

A.    That Ms. Allen --

4      Q.    Okay.

A.    -- needs to do certain things in order for me to be promoted.

5      Q.    What kinds of things?

6      A.    Advertise the position.

Q.    She needs to have a vacancy?

7      A.    Vacancy announcement.  A position must be vacant, correct, advertise the position.

8      Q.    Okay.

A.    We just had general discussions of the process.

9      Q.    Okay.  Was ECA fully staffed with Grant Specialists in early 2004, to your knowledge?

10     A.    I can't recall.  To be honest, I don't know because I didn't have access to their staffing pattern, so I don't know the answer to that question.

11     Q.    Okay.  That's perfectly fair.  What did Ms. Hill

12

FREE STATE REPORTING, INC.

13                     Court Reporting   Depositions

D.C. Area (301) 261-1902

14                     Balt. & Annap. (410) 974-0947

15

tell you about -- well, did you mean to tell me a minute ago

1   that you and Ms. Hill discussed specifically advertising the
    position, the GS-11/12 level?

2       A.   No, just promoting me --
        Q.   Promoting you.

3       A.   -- to a 13, what it would take to promote me to a 13
    level.

4       Q.   Okay.  I think my question was did you ever speak to
    anyone either in ECA or in Human Resources concerning the

5   decision to post the vacancy at the GS-11 or 12 level as
    opposed to the GS-13?

6       A.   No.
        Q.   You never talked to anybody about that?

7       A.   No, not that I can recall, no.
        Q.   You never spoke to Ms. Allen about that?

8       A.   No.
        Q.   Okay.  So the first time you knew that Ms. Love's

9   position was filled was when Ms. Allen announced at a staff
    meeting that Julie Johnson had been selected?

10      A.   Correct.
        Q.   And did you know at what GS level Ms. Johnson would

11  be placed?
        A.   No.  I took a guess in thinking it was at the 12

12
                    FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947


15

level because she was an 11 previously.

1     Q.   Did you ever come to find out whether you were correct or not?

2     A.   Yeah.

      Q.   Were you correct?

3     A.   Yes, I was.

      Q.   So I have that date as April 2004.  Is that

4 consistent with your memory that Ms. Johnson was selected?

      A.   Yes.

5     Q.   Okay.  Did you know Ms. Johnson before she was selected?

6     A.   Yes.

      Q.   How long had you known her?

7     A.   Two years.  Maybe two years she's been employed with us.

8     Q.   So in April of 2004 you had already known her for a couple of years?

9     A.   Correct.

      Q.   Okay.  How well did you know her?

10    A.   As a coworker, colleague.

      Q.   Was ECA organized in teams of Grant Specialists?

11    A.   Yes.

      Q.   Was she on your team?

12

A.    Yes.

1    Q.    Okay.  So did you work on projects together?

A.    Some, yes.  Very few, but yes.

2    Q.    Okay.  But you had worked on projects with her?

A.    Yes, I had.

3    Q.    Did you have an impression of her work?

A.    Depends.

4    Q.    What does it depend on?

A.    What aspect of the work you're talking about.

5    Q.    I'm just asking if based on the projects that you

worked on together, whether you -- first of all, let me ask

6    you whether you were able to make any assessment of her work

abilities?

7    A.    I'm aware of her work abilities, yes.  I'm aware of

them.

8    Q.    And how would you generally describe them?

A.    I'm not a supervisor.  I was not a supervisor.  If

9    you want me to put on a supervisor's hat at this time, I can

go back -- I can look back and do a retroactive thinking and

10    --

Q.    I'm really not trying to ask you a complicated

11    question, Mr. Hunter.  Was she good at her job?

A.    She was learning.  She was still learning.

12

FREE STATE REPORTING, INC.

13    Court Reporting   Depositions

D.C. Area (301) 261-1902

14    Balt. & Annap. (410) 974-0947

15

22

Q.   Okay.  That's fair.

1       A.   She was learning.

Q.   Okay.  That's perfectly fair.  Did you know her well

2  enough in April of 2004 to have some idea of how old she was?

A.   Yes.

3       Q.   Did you know whether she was over or under 40?

A.   I knew she was under 40.

4       Q.   Okay.  Do you know how many people applied for the

position that she received in April of 2004 total?

5       A.   Are we talking today?

Q.   No, at the time.

6       A.   At the time, no.

Q.   You didn't know then?

7       A.   No.

Q.   So you didn't know any of the other applicants in

8  April of 2004?

A.   I was under the assumption that Sara Swann who

9  worked in our office as the Program Coordinator would be

applying for the job.

10      Q.   Is a Program Coordinator different from a Grant

Specialist?

11      A.   Yes, it is.  They're support staff.  Program

Coordinator supports the Grant Specialists.

12

FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

Q.   What GS level was Sara Swann in April of 2004?

1    A.   GS-8.

Q.   And I take it Ms. Swann is over the age of 40?

2    A.   Yes, she is.

Q.   Or was in April of 2004?

3    A.   Yes, she was.

Q.   Okay.  So you thought you knew of one other

4 applicant who was over the age of 40 who had probably applied?

A.   Yes.

5    Q.   But you told --

A.   I knew of several.  Are we talking ECA as a whole or

6 just within my office?

Q.   I'm trying to get a sense of what you knew about the

7 applicant pool for the position that Ms. Johnson got in April

of 2004.

8    A.   The actual applicants, I don't know.

Q.   Okay.

9    A.   I know of people within ECA who wanted or may have

applied for a Grant Specialist position.  I don't know whether

10 they applied at that time or not --

Q.   Okay.

11   A.   -- but in speaking with these employees and them

expressing their desire to become Grant Specialists, I knew

12

FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

when one of the positions became available they would be

1  applying.

Q.   Okay.  And I take it you've had discussions with

2  these folks since April of 2004?

A.   Yes, I have.

3  Q.   Okay.  That's fine.  I'm just trying to get a sense

of what you knew in April of 2004.  And I take it that you

4  knew Ms. Johnson had been selected and that she was under the

age of 40?

5  A.   Correct.

Q.   Okay.  I think the next thing that happens that's

6  relevant to your suit, this one, is in March of 2005 when Ms.

Allen selected a woman named Deborah Thompson as another Grant

7  Specialist --

A.   Yes.

8  Q.   -- is that right?

A.   Um-hum.

9  Q.   And that was to fill a position vacated by another

employee, correct?

10  A.   I don't know.  I better not speak on that.  I recall

Ms. Allen stating that she would be having some new Grant

11  Specialist positions becoming available.

Q.   In early 2005?

12

FREE STATE REPORTING, INC.

13                    Court Reporting    Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

A.    Yeah, yeah, yes.

1    Q.    Oh, wait.  Hold on here.  Now I am confused.  In March of 2005, Deborah Thompson was selected as Grant

2    Specialist, but only at the GS-9 level.  Does that sound right?

3    A.    Sounds about right.

Q.    Do you know Deborah Thompson?

4    A.    Just from an employee around the building.

Q.    Do you know what her position was prior to her

5    selection?

A.    I was under the assumption she was a Program

6    Assistant or a Program Coordinator in one of the Bureau's Program Office -- the ECA's Program Office.

7    Q.    So she had occupied a similar position to that of Sara Swann?

8    A.    Yes.

Q.    Okay.

9    A.    That was my assumption.

Q.    Do you know how old Ms. Thompson was in March of

10    2005 when she was selected to be a Grant Specialist?

A.    In seeing her, she was under 40.

11    Q.    Okay.  You didn't apply for the position that Ms. Thompson got, correct?

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

A.    No, I did not.

1    Q.    But you were aware that Ms. Allen had selected her?

A.    Well, Ms. Allen made the announcement, yes.

2    Q.    Okay.  Do you have any reason to doubt that Ms. Allen also made the selection?

3    A.    Yes, I do.

Q.    Why?

4    A.    Ms. Allen is influenced by Ms. Connie Stinson and Maggie Ahern in her selection or hiring process.

5    REPORTER:  Could you spell their names, please?

WITNESS:  Stinson is S-T-I-N-S-O-N.

6    REPORTER:  Okay.

WITNESS:  Ahern, A-H-E-R-N-S [sic].  Maggie Ahern,

7    Connie Stinson.

REPORTER:  Thank you.

8    BY MS. LYONS:

Q.    Why do you believe that Ms. Allen is influenced by

9    Ms. Stinson or Ms. Ahern in making selections, and what do you mean by that?

10    A.    Ms. Allen depended -- and I can go as far to say Phyllis Swann also.  Those were the three that she relied on

11    to -- she consulted them.  She consulted those employees in the office as to what went on in the office or -- I'm not

12

FREE STATE REPORTING, INC.

13    Court Reporting   Depositions

D.C. Area (301) 261-1902

14    Balt. & Annap. (410) 974-0947

15

explaining this good.  Ms. Allen depended on these three

1   employees to give her guidance on the hiring and selection

process because I truly believe Ms. Allen didn't know our work

2   process.

Q.   Let me ask you some questions to help develop this

3   idea.

A.   Okay.

4   Q.   Ms. Stinson, Ms. Ahern and Ms. Swann, do they occupy

substantially similar positions?

5   A.   Yes, they do.

Q.   What is that position?

6   A.   The GS-13 Grant Specialists in the office.

Q.   So they are subordinates of Ms. Allen's?

7   A.   Correct.

Q.   And are they each sort of the team leaders from what

8   you were describing?

A.   Correct.

9   Q.   Which one of them was your team leader in --

A.   Stinson had been my team leader the duration --

10   Q.   Okay.

A.   -- that I was there.

11   Q.   Okay.  So if I'm understanding you correctly, Ms.

Allen relied on, I think you said, these three people to

12

15

provide feedback on the employees in the section?

1      A.    Correct, and the hiring process.  These employees sit in on the interview process.

2      Q.    Okay.  Do Ms. Stinson, Ms. Ahern or Ms. Swann have the authority to make selections?

3      A.    Not that I'm aware of, no.

       Q.    To your knowledge, is Ms. Allen the only person with

4 that authority?

       A.    Yes.

5      Q.    Okay.  But you're saying that she would consult with and have them help with interviewing candidates for positions

6 in your section?

       A.    Correct.

7      Q.    What's wrong with that?  Is there anything wrong with that?

8      A.    No.

       Q.    Okay.  How old is Ms. Stinson?

9      A.    Over 40.

       Q.    And was she over 40 in 2004?

10     A.    I think so, yes.

       Q.    How about Ms. Ahern?

11     A.    Yes, over 40.

       Q.    Thank you.  I didn't make that clear at all.  And

12

Ms. Swann, how old was she?

1    A.   Under -- I really don't know, but I'm going to take a guess and say under 40.

2    Q.   Okay.  Fair to say she might be kind of near 40?

A.   Yes.

3    Q.   You're not sure?

A.   Yes, yes, I think so, near 40.

4    Q.   Okay.  We won't pin you down.

A.   Okay.

5    Q.   We don't want to get you in trouble.

A.   All right.

6    Q.   When Ms. Allen selected Julie Johnson April of 2004 for the Grant Specialist position, whose team was Julie

7  Johnson working on at that time, if you know?

A.   I think it was Ahern, but after the selection she

8  moved to Stinson's team.

Q.   Okay.  Did you ever discuss with Ms. Ahern or Ms.

9  Allen the selection of Ms. Johnson?

A.   No.

10   Q.   In August of 2005, Ms. Allen made a selection for another vacant Grant Specialist position.  Do you recall that?

11   A.   Yes.

Q.   And that selectee was Kenyetta Gunther?

12

FREE STATE REPORTING, INC.

13            Court Reporting   Depositions

D.C. Area (301) 261-1902

14          Balt. & Annap. (410) 974-0947

15

A.    Yes.

1       Q.    K-E-N-Y-E-T-T-A?

A.    I think that's it, yes.

2       Q.    So this is August of 2005 when that selection was

made --

3       A.    Yes, yes.

Q.    -- or there abouts?

4       A.    Um-hum.

Q.    Did you know Ms. Gunther before she was selected?

5       A.    No.

Q.    Where did she come from, if you know?

6       A.    I just know outside of the Department of State.

Q.    How did you find out that Ms. Gunther had been

7   selected?

A.    Ms. Allen announced it at a staff meeting.

8       Q.    Did you know what GS level Ms. Gunther had accepted

the Grant Specialist position at?

9       A.    Eventually I came to find out, but not at the time,

no.

10      Q.    Did you apply for the position that Ms. Gunther

received?

11      A.    No.

Q.    What GS level did you eventually come to understand

12

FREE STATE REPORTING, INC.

13                     Court Reporting   Depositions

D.C. Area (301) 261-1902

14                     Balt. & Annap. (410) 974-0947

15

she got it at?

1    A.    A GS-9.

     Q.    Okay.  You wouldn't have applied for a GS-9

2    position, correct?  You were already at a GS-12.

     A.    Correct.  This is something I need to hear.  I want

3    to make sure this is on the record, that there was no

     announcement for Ms. Gunther's job.

4    Q.    How do you know that?

     A.    Through discovery of documents that were provided by

5    the Agency.

     Q.    It would be two different things, wouldn't you

6    agree, if there was no vacancy announcement or there were no

     documents produced to you during discovery regarding a vacancy

7    announcement, right?  Those are two different things?

     A.    Could you repeat your question?

8    Q.    Well, you're saying that there was no vacancy

     announcement, right?

9    A.    Correct.

     Q.    And you're basing that on the fact that apparently

10   to your understanding you weren't provided copies of the

     documents in discovery from the Defendant?

11   A.    There's a note in the file saying that Ms. Gunther

     was selected from a previous cert.

12
                         FREE STATE REPORTING, INC.

13                     Court Reporting   Depositions

                          D.C. Area (301) 261-1902

14                     Balt. & Annap. (410) 974-0947


15

Q.    Oh, that's right.  I remember that now.  You're

1   right.  She had been an applicant when, I think, Ms. -- for

the same vacancy that Ms. Thompson's selection was made from?

2       A.    She was selected from that cert, yes.

Q.    Right.  So it's the same cert that got used, right,

3   to your understanding?

A.    To my understanding, yes.

4       Q.    Okay.  Do you know how many of the people on that

cert list were over 40?

5       A.    Now?

Q.    Yes, do you know now?

6       A.    Two that I'm aware of.

Q.    And how many applicants total were on the cert list?

7       A.    Can I refer to the document or do you want me to

take a guess?

8       Q.    Your best recollection's fine for right now.

A.    Seven.

9       Q.    Okay.  I'm not --

A.    Okay.

10      Q.    The documents will obviously contain the information

of the total.

11      A.    Correct.

Q.    I was just interested to know.

12

FREE STATE REPORTING, INC.

13                      Court Reporting   Depositions

D.C. Area (301) 261-1902

14                      Balt. & Annap. (410) 974-0947

15

33

A.    Seven.

1        Q.    To your understanding, was Ms. Allen permitted to
select somebody who wasn't on the cert list for these

2   positions?

A.    Could you repeat your question?

3        Q.    Based on your understanding of the procedures for
making a selection, was Ms. Allen permitted to choose somebody

4   not on the list?

A.    Was she permitted to choose someone not on the list?

5        Q.    Right.

A.    Could you rephrase the question?

6        Q.    I can try --

A.    All right.

7        Q.    -- and I admit I'm not doing terribly well with it.
Let me try it this way.  To your knowledge, when Ms. Allen

8   receives a cert list with nine names on it, does she have to
pick somebody on that list to fill a position?

9        A.    No.  My understanding, no.

Q.    What is your understanding of what she can do?

10       A.    That she can go back out and ask for another list of
candidates, that she doesn't have to choose from that list,

11  and re-advertise the position and get a new pool of
candidates.

12
FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

Q.    Okay.  So when Ms. Kenyetta Gunther came to work in

1  your section in August of 2005, could you make a guess at how

old she was?

2    A.    Yes.

Q.    And did you believe she was under 40?

3    A.    Yes, I did.  Yes, I did.

Q.    And is that what motivated you in August of 2005 to

4  file an EEO complaint?

A.    Motivated me?  I'm not sure of your question.

5    Q.    Okay.  Let's try this.

(Whereupon, the document that was referred to as Exhibit

6  Number 1 was marked for identification.)

BY MS. LYONS:

7    Q.    Mr. Hunter, I'm handing you what's been marked as

Exhibit Number 1.  This is an e-mail that you sent on August

8  25th, 2005, correct?

A.    Yes.

9    Q.    Have you seen this document before?

A.    Yes, I have.

10    Q.    And you sent this e-mail, right?

A.    Yes, I did.

11    Q.    Who is Jacqueline A. Canton?

A.    The EEO manager in the Office of Civil Rights for

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

the Department of State.

1  Q. And who is Arlene Brandon?

  A. A EEO Specialist in the Office of Civil Rights for

2 the Department of State.

  Q. And you sent them this e-mail with the two documents

3 that are attached to it, correct?

  A. Correct.

4  Q. And the first document, which is the second page of

 this exhibit, it says it's a complaint based on a variety of

5 things, and it's dated August of 2005, right?

  A. Correct.

6  Q. And one of the things that -- under Dates of

 Allegations, one of the things that you were complaining about

7 was Ms. Gunther's selection as a Grant Specialist?

  A. Correct.

8  Q. And the next part of that sentence says that what

 you're complaining about is that the position was downgraded

9 to a GS-9/11/12.  Do you see that part?

  A. Yes, I do.

10  Q. And that's what you were complaining about in August

 of 2005?

11  A. Correct.

  Q. Just with regard to Ms. Gunther's selection?

12

       FREE STATE REPORTING, INC.

13      Court Reporting   Depositions

       D.C. Area (301) 261-1902

14     Balt. & Annap. (410) 974-0947

15

A.    Correct.

1       Q.    But you had been aware of that back in 2004 when Ms. Johnson was selected, right?

2       A.    Aware of what?  I'm not sure --

Q.    Well, aware that the position had been downgraded.

3       A.    You're talking two different positions.  In 2004, it was Love's position that was downgraded.

4       Q.    Right.

A.    This is Swann's.

5       Q.    Right.  I'm sorry.  I got confused before because I couldn't remember Swann's name.

6       A.    Okay.

Q.    Okay.  Well, when Ms. Swann retired, did you have any discussions with Ms. Allen or anybody else about how that

7  position would be filled?

8       A.    No, because it was done so quickly.

Q.    When did Ms. Swann retire?

9       A.    Ms. Swann received a position in another bureau, a promotion to another position in another bureau within the

10  Department of State.

Q.    Oh, she didn't retire?

11      A.    No.

Q.    She went somewhere else?

12

FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

A.    She received a promotion.

1    Q.    Okay.  So her position became vacant when?

A.    Phyllis maybe left in June -- May, June.  I'm not

2    sure.

Q.    It was 2005?

3    A.    Correct.

Q.    Okay.

4    A.    A month or two before -- no.  It was probably --

let's say several months before Gunther was selected Swann

5    left.

Q.    Okay.  So --

6    A.    Three or four months.

Q.    Okay.  That's fine.  So when Ms. Swann vacated her

7    position, did you approach Ms. Allen to see if you could be

promoted to the GS-13 position that she had left?

8    A.    No, because Ms. Allen made an announcement probably

less than a month after Ms. Swann had left that she had made a

9    selection for Ms. Swann's position.

Q.    I think I've got it now.  There was no vacancy

10    announcement, so you didn't apply?

A.    Correct.

11    Q.    Okay.

A.    Correct.  Didn't even know this action was being

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

taken, that a selection was being made for Ms. Swann's

1   position.

        Q.   Wait a minute.  I thought you just said she did say

2   --

        A.   She made that announcement that she made a

3   selection.

        Q.   What did she say after Ms. -- within a month of Ms.

4   Swann retiring?  What did Ms. Allen say?

        A.   That she had selected someone to fill Ms. Swann's

5   position.

        Q.   She'd already selected someone?

6       A.   Correct.

        Q.   And it probably took a few months for Ms. Gunther to

7   come on board if she was from outside the Agency?

        A.   Correct.

8       Q.   Was she from outside the federal government?

        A.   I think so.

9       Q.   Okay.  So to the best of your knowledge when did you

    know that Ms. Swann's replacement had been selected?

10      A.   A month after she left.

        Q.   A month after Ms. Swann left?

11      A.   Correct.

        Q.   And you didn't find out that it was Ms. Gunther

12

                        FREE STATE REPORTING, INC.

13                   Court Reporting   Depositions

                        D.C. Area (301) 261-1902

14                   Balt. & Annap. (410) 974-0947


15

until August of 2005?

1    A.    When she came on board.

Q.    And when you met her, you knew she was under 40?

2    A.    Correct.

Q.    And that's part of what you included in the

3  complaint that you sent on August 25th, 2005 with this e-mail?

A.    Correct.

4    Q.    Were you ever contacted concerning this complaint by

the EEO Office?

5    A.    Good question.  No -- yes.  I may have -- excuse me,

I'm sorry.

6    Q.    That's okay.

A.    I sent a follow-up e-mail asking for a reply to this

7  and one of the EEO Specialists sent me an e-mail back saying

that they would be processing the complaint, and that was the

8  last thing I heard on this complaint.

Q.    When did you send that follow-up e-mail?

9    A.    I don't -- probably a month after this date,

somewhere in September or first of October.

10    Q.    Who did you contact with the follow-up e-mail?

A.    I want to say Ms. Brandon, but it may have been

11  someone else.  Another name is -- I can't think of her name at

this time.

12
                    FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                   D.C. Area (301) 261-1902

14                 Balt. & Annap. (410) 974-0947

15

40

Q.    Okay.  Did you receive a response to your follow-up
1  e-mail?  I think you said you did.

A.    Yes, I did, saying that she would have someone
2  process it.

Q.    So it was essentially in a que to be processed --
3  A.    Correct.

Q.    -- the last time you heard about it?
4  A.    Correct.

Q.    You never did any informal counseling about it?
5  A.    No.

Q.    You never were interviewed about the allegations on
6  the complaint?

A.    Correct.

Q.    And you don't have any other documentation
7  associated with the complaint, do you?

8  A.    What documentation?

Q.    Like a Report of Investigation?
9  A.    No, no Report of Investigation.

Q.    Okay.
10  A.    It was eventually sent over to EEOC.

Q.    Well, we're going to get to that in a minute --
11  A.    Okay.

Q.    -- because I have more documents concerning at least

12

13

14

15

some of the content --

1      A.    Right.

       Q.    -- but I wanted to close off and make sure that the

2  gap I find here really exists.  So you sent the e-mail

   complaint and you sent a follow-up e-mail to which you got a

3  response that said it is in the process.

       A.    It will be processed.

4      Q.    It will be processed.  And that's the last you heard

   from the EEO Office of the Department of State about this?

5      A.    Correct.

       Q.    Okay, fine.  I'm going to jump ahead in time just

6  for a minute --

       A.    Okay.

7      Q.    -- to close off where you are and what you do now.

   Am I right that it's in June of 2006 that you left ECA and

8  moved to another bureau within the State Department?

       A.    Yes.

9      Q.    And when you made that move in June of 2006, you

   were promoted from a GS-12 to a GS-13?

10     A.    Correct.

       Q.    And what part of the Department of State do you work

11 in now?

       A.    The Bureau of Administration.

12

                    FREE STATE REPORTING, INC.

13                 Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                 Balt. & Annap. (410) 974-0947

15

42

Q.   And you're still a Grant Specialist, right?

1    A.   Correct.

Q.   Who is your supervisor now?

2    A.   I have a team leader, Joanne Snearley, S-N-E-A-R-L-

E-Y, and I think my supervisor of record is an Anne Truitt, T-

3    R-U-I-T-T.

Q.   Okay.  Did you apply for the GS-13 Grant Specialist

4    position in the Bureau of Administration?

A.   Yes, I did.

5    Q.   Did you submit a performance evaluation from ECA as

part of your application?

6    A.   Yes.

Q.   Do you know whether Ms. Allen was contacted in

7    connection with your application for the position in the

Bureau of Administration?

8    A.   No.

Q.   You don't know or --

9    A.   I don't know whether she was contacted, no.

Q.   Okay.  Do you know whether Ms. Allen played any role

10   at all --

A.   No, I don't.

11   Q.   Okay.  Are you aware of any efforts by Ms. Allen to

prevent you from being promoted into this GS-13 position in

12

FREE STATE REPORTING, INC.

13                          Court Reporting   Depositions

D.C. Area (301) 261-1902

14                          Balt. & Annap. (410) 974-0947

15

the Bureau of Administration?

1    A.    Direct knowledge, no.

     Q.    Do you have any suspicion?

2    A.    Yes, I do.

     Q.    What is it based on?

3    A.    Her past history with me.

     Q.    Her past history with you includes getting you an

4    accretion of duties promotion from an 11 to a 12, right?

     A.    Yeah, and it also have a history with me between

5    1999 and 2006.  She -- what's the correct word here?  She's

     prevented me from being promoted.

6    Q.    How has she done that?

     A.    On several occasions.

7    Q.    How?

     A.    Two examples we've been discussing the last half-

8    hour by downgrading to just 13s with her whole office.  I

     believe that other positions -- other jobs I applied for may

9    have inquired with her and I don't know what type of report

     she gave them.  I don't know the facts or I don't have the

10   evidence, but I have my suspicion that if someone had

     contacted her between 1999 and 2006 that she would not have

11   given a rave review of my performance.

     Q.    Did you ever ask her about that, about any of these

12

                         FREE STATE REPORTING, INC.

13                    Court Reporting    Depositions

                      D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

things?

1     A.   No.

     Q.   And you never discussed with her her decision to

2  what you're calling downgrade the GS-13 positions to lower

grades?

3     A.   What was your question?

     Q.   You never discussed that with her either?

4     A.   No.

     Q.   No.  Okay.  Have you received a performance

5  evaluation of the GS-13 level from the Bureau of

Administration?

6     A.   Yes, I have.

     Q.   And what level were you reviewed?

7     A.   The rating I received?

     Q.   Yes.

8     A.   Outstanding.

     Q.   Does the Department of State use a --

9     A.   Four scale.

     Q.   -- a four scale?  And did you get the highest?

10     A.   The highest.

     Q.   Okay.  Now we have to go back to figuring out what

11  happened to get you into court, okay?

     A.   Okay.

12

15

Q.    This is where I get a little confused.

1   (Whereupon, the document that was referred to as Exhibit

Number 2 was marked for identification.)

2        BY MS. LYONS:

Q.    Mr. Hunter, the court reporter has handed you what's

3   now marked as Exhibit Number 2.  Do you recognize this

document?

4        A.    Yes, I do.

Q.    Is that your signature on page 5?

5        A.    Yes, it is.

Q.    And this is a January 9, 2006 -- it looks like a

6   letter, but then it's got numbered paragraphs, so I don't know

what to call it, but let's call it a submission --

7        A.    Okay.

Q.    -- to the Equal Employment Opportunity Commission,

8   right?

A.    Yes.

9        Q.    And this is where you gave notice of an intent to

file suit within 30 days against the Department of State for

10   your age discrimination claim?

A.    Correct.

11       Q.    How did you send it to the EEOC, by what means?

A.    Mail, first-class mail.

12

FREE STATE REPORTING, INC.

13                       Court Reporting   Depositions

D.C. Area (301) 261-1902

14                       Balt. & Annap. (410) 974-0947

15

Q.   Did you give a copy of it to anybody at the State
1  Department?

A.   I don't recall.

2      Q.   What prompted you to send this --

A.   Yes, I did.

3      Q.   Sorry.

A.   I took this over to the Office of Civil Rights.  I
4  recall I took this over to the Office of Civil Rights also.

Q.   Okay.  What prompted you to send this written notice
5  of intent to file suit to the EEOC?

A.   I'm not sure what you -- I understand your question.

6      Q.   Okay.

A.   There was a series of events that took place that
7  led up to this.

Q.   Okay.  What were they?

8      A.   This complaint, Exhibit 1, took place.  From there a
deposition with Ms. Allen.  I think -- I don't know the date
9  on that, and discussions with my lawyer.

Q.   Okay.  And all those things taken together led you
10  to believe that Ms. Allen had discriminated against you on the
basis of your age?

11      A.   Correct, and the fact of what I had been -- the
people that Ms. Allen had been hiring over the past four

12
                    FREE STATE REPORTING, INC.

13                Court Reporting   Depositions

                  D.C. Area (301) 261-1902

14                Balt. & Annap. (410) 974-0947


15

47

years.  As I stated in my complaint, I --

1      Q.    You're looking at Exhibit 1?

       A.    Yes, Exhibit 1, second page, last sentence, first

2  paragraph.

       Q.    Last sentence, first paragraph.  That sentence

3  reads, "ECA has hired women all under the age of 40 to fill

the last five vacant Grant Specialist positions."

4      A.    And that's probably over a three or four year

period.

5      Q.    So when did you first believe you were the victim of

age discrimination?

6      A.    Allen deposition.  When Allen -- when my lawyer

deposed Ms. Allen and a question was asked of her concerning

7  the downgrading of the positions.  That's when the --

       Q.    Okay.  But you had submitted Exhibit 1 months and

8  months before that because Ms. Allen wasn't deposed until

what, June of -- I have it right in front of me.  Ms. Allen

9  was deposed in June of 2005.  Does that sound right to you?

       A.    Yes, it does.

10     Q.    Okay.  So when you filed Exhibit 1 her deposition

had already been taken?

11     A.    Correct.

       Q.    Okay.  The picture's starting to make more sense to

12

15

me which is good.  It means we're doing a good job.  Okay.

1  Was it your intention when you sent the January 9, 2006 letter

to the EEOC to take the age complaint out of your August 25th,

2  2005 EEO complaint?

      A.   Age retaliation, yes.

3        Q.   Age and retaliation?

      A.   Correct.

4  (Whereupon, the document that was referred to as Exhibit

Number 3 was marked for identification.)

5        BY MS. LYONS:

      Q.   Mr. Hunter, the court reporter just handed you

6  what's marked as Exhibit Number 3.  Do you recognize this

document?

7        A.   Yes, I do.

      Q.   Is that your signature on the second page?

8        A.   Yes, it is.

      Q.   This is a motion that you sent to the EEOC in a case

9  you already had pending seeking to amend that complaint,

right?

10        A.   Correct.

      Q.   And this was on August 25th, 2005 that you did that,

11  right?

      A.   Correct.

12

FREE STATE REPORTING, INC.

13  Court Reporting   Depositions

D.C. Area (301) 261-1902

14  Balt. & Annap. (410) 974-0947

15

Q.    Is the -- well, let me ask you this first.  This

1  motion was ultimately denied, correct?

A.    I think so, correct.

2  Q.    Is the subject matter of your motion to amend the

complaint the same as the subject matter of Exhibit Number 2,

3  your January 9th, 2006 --

A.    It looks to be, yes, the same language.

4  Q.    It's the same complaint that you're raising?

A.    Yes.

5  Q.    Okay.

(Whereupon, the document that was referred to as Exhibit

6  Number 4 was marked for identification.)

BY MS. LYONS:

7  Q.    To complete the record, Mr. Hunter, can you take a

look at what's now marked as Exhibit Number 4?

8  A.    Yes.

Q.    Do you recognize this document?

9  A.    Yes, I do.

Q.    This is the order that denied your Motion to

10  Consolidate -- well, it's called that, but it denied the

motion we were just looking at, Exhibit 3?

11  A.    Correct.

Q.    So in August of 2005 you did two things.  You sent

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

an EEO complaint to the Department of State's EEO office.

1      A.    Correct.

       Q.    On the same date you also sought to amend your

2  complaint pending before the EEOC in a different case, right?

       A.    Correct.

3      Q.    The motion at the EEOC in your existing case was

   denied on --

4      A.    Yes.

       Q.    -- the 14th of December 2005?

5      A.    Correct.

       Q.    And did you do anything between that date and

6  January 9th, 2006 administratively to raise that claim of age

   discrimination?

7      A.    I don't recall.

       Q.    Did you ever file a grievance including a claim of

8  age discrimination?

       A.    No.

9      Q.    Okay.

       A.    No.

10     Q.    After your January 9, 2006 submission to the EEOC,

   you got a response from the Department of State, right?

11     A.    I believe so.

   (Whereupon, the document that was referred to as Exhibit

12

                    FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

Number 5 was marked for identification.)

1        BY MS. LYONS:

    Q.   Mr. Hunter, you've now been handed what's marked

2   Exhibit Number 8 -- I mean 5.  It's a March 21, 2006 letter

    from the Department of State to you concerning your age

3   discrimination complaint, correct?

    A.   Correct.

4    Q.   And in this communication Department of State's

    telling you that it's conducted an inquiry and determined that

5   no age discrimination occurred, correct?

    A.   Yes.

6    Q.   And you received this in March of 2006?

    A.   Yes, on or around that date.

7    Q.   Okay.  And then you filed the complaint in this case

    -- actually you had already filed the complaint in this case

8   because you filed it in February of 2006, right?  I'm not

    trying to trick you.

9    A.   Yes, because this was in the -- this document was

    within the 30 day period of the notice, of Exhibit 2.

10   Q.   What do you mean within the 30 day period?

    A.   As Exhibit 2 states, written notice of intent to

11  file suit in 30 days, and this was dated January the 9th, so I

    believe I went down to the court, excuse me, after the 30 days

12

                    FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

period to file suit in court.

1       Q.    Right.  So in January you sent the notice to the

EEOC that's Exhibit 2?

2       A.    Correct.

        Q.    In February you filed the complaint in U.S. District

3   Court?

        A.    Correct.

4       Q.    And in March you got the response from the

Department of State --

5       A.    Correct.

        Q.    -- is that right?

6       A.    Correct.

        Q.    I just want to get the chronology down.

7       A.    Correct.

        Q.    Mr. Hunter, if you don't mind, I'd like to take a

8   little break.  Would that be okay?

        A.    Yes, that would be good.

9                         (OFF THE RECORD)

                          (ON THE RECORD)

10      BY MS. LYONS:

        Q.    All right.  Mr. Hunter, when we broke I took the

11  opportunity to go and get a copy of Ms. Allen's deposition

which I happened to have in my office, and I'll be happy to

12
                    FREE STATE REPORTING, INC.

13                Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                Balt. & Annap. (410) 974-0947


15

show you a copy of it, but Ms. Allen's deposition happened on

1   June 6th, 2005, correct?

        A.   Correct.

2       Q.   And you were present when the deposition was taken?

        A.   Yes.

3       Q.   And you were saying it was on the basis of Ms.

Allen's testimony on June 6th, 2005 that you first believed

4   you were the victim of age discrimination in particular?

        A.   No.

5       Q.   Okay.  What did --

        A.   I am saying that was, using the layman term, the

6   last straw.  I had been believing that I was being

discriminated against because of my age, but hearing it from

7   and directly from my supervisor is what led me to go file.

        Q.   I see the distinction you're drawing.  When did you

8   first believe you were the victim of age discrimination?

        A.   On several occasions when Julie Johnson first came

9   into the office in 2002.

        Q.   What was it about her hiring that made you think you

10  were the victim of age discrimination?

        A.   A young white female.  Excuse me.  There were two

11  others that came on board either around the time that Julie

Johnson was hired or before.

12

15

Q.   Okay.  Who were they?

1    A.   One I know, her name is Darcy Damon.

Q.   Can you spell Darcy?

2    A.   Darcy.  I'm sorry, Darcy, D-A-R-C-Y, Darcy, and

Damon.  And who was the other?  She left.  She was only there

3 for a year.  Kim -- what was Kim's last name?  I can't think

of Kim's last name at this time.

4    Q.   If it comes to you, you can tell me.

A.   Okay.

5    Q.   Her name is not that important.

A.   Okay.

6    Q.   So it was the hiring of three young white females --

A.   Correct.

7    Q.   -- that made you think you were the victim of age

discrimination?

8    A.   Made me start to think that I wasn't going to be

given an opportunity to be promoted in that office because of

9 Ms. Allen's hiring patterns.

Q.   But you were promoted after 1992, correct?

10   A.   This was in 2002.

Q.   Oh, I'm sorry.

11   A.   2002 was when these hirings took place.

Q.   Okay.  But all these women came in -- Ms. Johnson,

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

Ms. Damon and Kim, whoever she is, they came in at a lower GS

1  level that you were, correct?

    A.   Yeah.  Well -- I'm not sure if Kim -- Kim may have

2  come in at a higher.  She may have come in at the 12 level.

    Q.   But you don't know?

3    A.   I don't know.

    Q.   Okay.  Well, what exactly is the -- I don't want to

4  use lingo here, so if you don't understand, just tell me, but

    what exactly is the adverse action you're complaining about

5  that you were victimized on account of your age in this

    lawsuit?

6    A.   The adverse action?

    Q.   Yes.  What did you not get that you should have?

7    A.   A promotion.

    Q.   A promotion to GS-13?

8    A.   Correct.

    Q.   When?  When were you denied the promotion to GS-13?

9   Is that when Ms. Love retired?

    A.   That was one instance.

10    Q.   Okay.  So that's one time when it happened, and that

    was in 2004?

11    A.   Correct, January 2004.

    Q.   Okay.  When the next time you think you got denied a

12

promotion to GS-13?

1      A.   Swann's vacant position.  I believe she left in
either April or May of 2005.

2      Q.   I think I've got it now.  So when Ms. Love retired
from the GS-13 level in --

3      A.   January.

       Q.   -- early 2004 --

4      A.   Correct.

       Q.   -- you believe you should have been put into that
5  GS-13?

       A.   Or at least given an opportunity to compete for that
6  position.

       Q.   Okay.  So it's the decision to downgrade the GS-13
7  position from Ms. Love to a GS-11 or 12 that you're
complaining about?

8      A.   Correct.

       Q.   Okay.  And that happened in February, certainly no
9  later than March, 2004?

       A.   That's when they hired someone to fill that
10 position.

       Q.   Right, but you didn't apply for the position prior
11 to the selection?

       A.   Yes, I did.

12

15

Q.   You did apply for the position?

1     A.   Yes, I did.  The vacant position, the GS-13, I did.

Q.   Yes, yes.  We talked about that at the beginning.

2     A.   Correct.

Q.   That was a position you applied for, but there

3   hadn't been an associated vacancy announcement?

A.   Correct.

4     Q.   And you didn't hear back from that application --

A.   Correct.

5     Q.   -- and you filed a union grievance in May of 2004?

A.   Correct.

6     Q.   And you never filed an EEO complaint about that?

A.   Correct.

7     Q.   Okay.  And then the next instance is when another

GS-13 leaves.  That's Ms. Swann.

8     A.   Correct.

Q.   And that's in --

9     A.   August -- excuse me, May.

Q.   May of 2005?

10    A.   Right, um-hum.

Q.   But you didn't submit an application for the GS-13

11  position in May of 2005, right?

A.   Because of the process that they went about filling

12
                        FREE STATE REPORTING, INC.

13                   Court Reporting   Depositions

                       D.C. Area (301) 261-1902

14                   Balt. & Annap. (410) 974-0947


15

that position.

   1    Q.   Because you found you before you submitted the
application -- as you had previously, you found out that they
   2  were going to make a selection off the list?

        A.   Well, I knew that they was going to advertise --
   3    Q.   Okay.

        A.   -- for the Love position.  I knew they was going to
   4  go out and advertise for a position.

        Q.   How did you know that?
   5    A.   Common knowledge that they wanted to promote Julie
Johnson.

   6    Q.   I'm going to need more than common knowledge that
they --

   7    A.   Well, office gossip.  Let's word it that way, office
gossip that they wanted to promote Julie Johnson.

   8    Q.   When you say they, who are you referring to?

        A.   Let's be specific.  Ms. Allen wanted to promote
   9  Julie Johnson.  Office gossip that Ms. Allen was looking to
promote Julie Johnson.

 10    Q.   Did you ever hear Ms. Allen she wanted to promote
Ms. Johnson directly?

 11    A.   Directly, no.

        Q.   Okay.  I'm trying to get my head wrapped around the

 12

 15

chronology.  So in May of 2005 you find out that Ms. Swann is

1   leaving your bureau to go some place else, right?

      A.   Correct.

2       Q.   She's leaving a GS-13 position to your knowledge,

right?

3       A.   Correct.

      Q.   And you didn't apply for that -- what you perceived

4   to be a vacancy at that point, right?

      A.   Correct.

5       Q.   And you didn't do that because why?

      A.   Because of the previous application that I submitted

6   for Love's position.

      Q.   Well, you didn't hear anything in response to that,

7   right?

      A.   Correct.

8       Q.   So you thought it would be futile to do it again?

      A.   Correct.

9       Q.   Okay.  I want to understand your thought process.

      A.   Yes.

10      Q.   So you didn't do the same thing you had done before?

      A.   Correct.

11      Q.   And instead -- in June Ms. Allen got deposed, of

2005?

12

FREE STATE REPORTING, INC.

13             Court Reporting   Depositions

              D.C. Area (301) 261-1902

14           Balt. & Annap. (410) 974-0947

15

A.    Correct.

1      Q.    And on the basis of her testimony you did the two

things on August 25th that we've looked at in the documents?

2      A.    Correct, along with physically seeing Ms. Gunther

who was hired to fill Swann's.

3      Q.    Right, because that happened in August, as well?

A.    Correct.

4      Q.    She came on board in August of 2005?

A.    Correct.

5      Q.    And you had met her before August 25th, 2005?

A.    No.

6      Q.    You hadn't met her?

A.    No.

7      Q.    Wait a second.

A.    I met her -- well, I had to have.  Whenever she was

8  hired -- whatever her hiring date was had to have been a

couple of weeks before the 25th, so say the first of August.

9      Q.    So sometime in August before the 25th?

A.    I met her, correct.

10     Q.    And you knew she was under 40?

A.    Correct.

11     Q.    Okay.  I think I've at least got the chronology and

your thought process --

12

FREE STATE REPORTING, INC.

13                    Court Reporting    Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

A.    Okay.

1        Q.    -- much better down than I did before, and I

appreciate your patience with me.  Okay.  So this is switching

2  gears here just a little bit.

A.    Sure.

3        Q.    You believe that in the absence of discrimination

you would have been promoted to the GS-13 Grant Specialist

4  position as early as early 2004?

A.    Correct.

5        Q.    Is that your theory?

A.    Correct.

6        Q.    Okay.  And part of your complaint for the damages

that you seek has to do with your non-selection for positions

7  above the GS-13 level, right?

A.    Correct.

8        Q.    One of those positions is a Supervisory Budget

Analyst position --

9        A.    Yes.

Q.    -- in the Division of Budget Execution?

10       A.    Right.  It's the Budget Office for ECA.

Q.    Have I got the name right there?

11       A.    I think so.

Q.    It makes more sense to me the way you called it, but

12

FREE STATE REPORTING, INC.

13                      Court Reporting   Depositions

D.C. Area (301) 261-1902

14                      Balt. & Annap. (410) 974-0947

15

I used the official name.

1    A.   Okay.

    Q.   Is that the first position -- wait, let me ask you

2 this.  Did you apply for that position?

    A.   I inquired with head of Human Resources.

3    Q.   You asked whether essentially you'd be eligible for

the position?

4    A.   I was asking whether the position could be

advertised at a 13/14 level.

5    Q.   Okay.  It was advertised for a GS-14?

    A.   Correct.

6    Q.   And so you asked Human Resources whether --

    A.   Was it possible for it to be announced at the 13/14

7 level.

    Q.   And what were you told?

8    A.   I don't recall the actual wording of the

conversation, but the bottom line is management wanted it

9 posted at the 14 level.  It was going to be posted at the 14

level.

10    Q.   So did you apply?

    A.   No.

11    Q.   Because you knew you wouldn't be eligible --

    A.   Right.

12

FREE STATE REPORTING, INC.

13          Court Reporting   Depositions

D.C. Area (301) 261-1902

14          Balt. & Annap. (410) 974-0947

15

63

Q.    -- with the time and grade at the next lower level?

1      A.    Correct.

Q.    My understanding of that Supervisory Budget Analyst

2  position in the Budget Office for ECA at the GS-14 level is

that no selection was made in February of 2006 when the first

3  Certificate of Eligibles was issued.  Do you have a different

understanding of that or am I right?

4      A.    Today that's the understanding I have, yes.

Q.    Okay.  And I understand that in October of 2006 the

5  position was re-advertised, is that correct?

A.    Correct.

6      Q.    And a person named Yolanda Robinson was selected?

A.    Correct.

7      Q.    Do you know her?

A.    Personally, no.

8      Q.    Have you ever met her?

A.    No.

9      Q.    Do you know whether she's over or under the age of

40?

10     A.    Yes.

Q.    How old is she?

11     A.    She's under 40.

Q.    Was she under 40 at the time of her selection?

12

FREE STATE REPORTING, INC.

13                    Court Reporting  Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

A.   Yes, she was.

1       Q.   Do you believe your qualifications for that
position, other than the grade level, are superior?

2       A.   Yes.

Q.   And what is your belief based on?

3       A.   My experience working in ECA and my interaction with
that office on a day to day basis.  We work in conjunction

4  with that office in administering grant agreements and the
entire budget that ECA receives, Congressional budget that ECA

5  is responsible for.

Q.   What is Ms. Robinson's background?

6       A.   I don't know.

Q.   How do you know that you are superior if you don't

7  know what her background is?

A.   Because of my working knowledge of ECA and its

8  budget, my experience actually working within the bureau and
within the office.

9       Q.   What is your highest level of education, Mr. Hunter?

A.   B.S., Bachelor of Science.

10      Q.   Who is David Whitten?

A.   Former Executive Director for ECA.

11      Q.   So would he formally have been your second or third
level supervisor?

12

FREE STATE REPORTING, INC.

13                 Court Reporting   Depositions

D.C. Area (301) 261-1902

14                 Balt. & Annap. (410) 974-0947

15

A.   Third level.

1     Q.   Third level.  Does he know anything about claims of

age discrimination?

2     A.   I don't know.

Q.   Have you had -- go ahead.

3     A.   I've never mentioned it to him directly, no.

Q.   Why did you identify him in your EEO affidavit as a

4  possible witness?

A.   Because I'm sure that he would have had

5  conversations with Ms. Allen concerning downgrading the

position and her hiring or selection.

6     Q.   When did Mr. Whitten leave ECA?

A.   2004.

7     Q.   When in 2004?

A.   I don't know.

8     Q.   So it's just your belief that he would have had

conversations regarding downgrading the position from 13 to

9  11/12?

A.   Correct, and Ms. Allen's hiring practices.

10    Q.   But you've never discussed these matters with him?

A.   No.

11    Q.   Where is he now?

A.   I'm sorry.  Discussed what matters with him?

12

FREE STATE REPORTING, INC.

13                      Court Reporting   Depositions

D.C. Area (301) 261-1902

14                      Balt. & Annap. (410) 974-0947

15

Q.   Discussed whether he has any knowledge of Ms.

1  Allen's hiring practices or the decision to downgrade the

position.

2       A.   I've had discussions with him about Ms. Allen's

hiring practices.

3       Q.   What has he told you?

A.   I don't recall, to be honest.  I know I've been in

4  his office on several occasions discussing my situation and to

see whether he could intervene in talking with Ms. Allen and

5  finding a way to promote me.

Q.   And what did he tell you about that?

6       A.   He told me he would talk with her and never -- he

never got back to me.  He retired before he was able to get

7  back -- he retired before he got back to me.

Q.   So you had a conversation with him close in time to

8  his retirement?

A.   Correct.

9       Q.   Okay.

A.   Six month period.

10      Q.   So you think he retired in 2004?

A.   Correct.

11      Q.   Is he still in the area to your knowledge?

A.   My understanding, he is back as a consultant or he

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

was back at ECA as a consultant.

1    Q.    When's the last time you spoke to him?

A.    2004, before his retirement.

2    Q.    And was that also concerning your desire to be promoted to GS-13?

3    A.    Correct.

Q.    Did Mr. Whitten ever indicate to you that he

4    believed Ms. Allen engaged in discrimination?

A.    The question never was posed.  The question never

5    came up.

Q.    You never asked him that?

6    A.    Right.

Q.    And he never said anything to you unsolicited that

7    indicated any belief that she engaged in any sort of unlawful discrimination?

8    A.    Would you repeat the question?

Q.    I can try.

9    A.    Okay.

Q.    Did Mr. Whitten ever say anything to you that

10   indicated to you that Mr. Whitten believed that Ms. Allen had engaged in illegal discrimination?

11   A.    Not in our conversations, no.

Q.    Anything in an e-mail?

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

A.   No.

1     Q.   I just wanted to make sure you weren't splitting
hairs for me.

2     A.   Okay.

Q.   How old is Ms. Allen, by the way?

3     A.   I would think over 50.

Q.   Okay.  I haven't met her yet, so I don't know.  Have

4   you ever heard her make any remark or a statement indicating
that she harbors a bias against people over the age of 40

5   other than in the deposition?  I understand you have referred
to that.

6     A.   I've heard her discuss wanting to hire younger
people.

7     Q.   Where have you heard her discuss that?

A.   In just general -- well, I ain't going to say

8   general conversations, maybe in a meeting setting where we
just had a general conversation or just exchanged

9   pleasantries.

Q.   In exchange of pleasantries she's made a remark that

10  indicates she has a bias against people over 40?

A.   I'm saying that she indicated in a conversation --

11  if I'm in a meeting with her and we're sitting beside each
other and we're having a general conversation and the topic of

12

FREE STATE REPORTING, INC.

13                  Court Reporting    Depositions

D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

a vacant position come up in the office, that she mentioned

1  that she wanted to bring in younger people into the office.

    Q.   When did she say that?

2      A.   I would say as earlier as 2002, 2003.  I'm not sure

of the year, but I've had a conversation, at least one, maybe

3  two, with her where she mentioned that she wanted to hire

younger people and to bring younger people into the office.

4      Q.   Did she say younger than whom or younger than what

age?

5      A.   Younger.

    Q.   She used the word younger?

6      A.   Yes, she did.

    Q.   How did you respond when she said that?

7      A.   I just stored it in my brain and went through the

process of dealing with my other issues I had going on with

8  her and -- with Ms. Allen, and it was just stored in my brain.

 I took it for what it was said -- for what was said.

9      Q.   When Ms. Allen uses the word younger, is it possible

that she means younger in terms of their career development?

10     A.   I took it as age.  I really did.

    Q.   My question is is it possible that she meant

11 something different than how you took it?

    A.   Is it possible?

12

15

70

Q.   Yes.

1        A.   Yes, it is.

Q.   Okay.  Have you received training while you've been

2  an employee of the federal government in discrimination

matters?

3        A.   Yes, I have.

Q.   And how long have you known that age discrimination

4  was unlawful?

A.   Probably since -- I don't know.  I can't --

5        Q.   It's been a long time?

A.   It's been a long time.

6        Q.   Did you learn that age discrimination in particular

was unlawful from the EEO training provided by your agency?

7        A.   Yes.  It was a topic in their training, yes.

Q.   Okay.  And did Ms. Allen attend that training, as

8  well?

A.   I have no idea.

9        Q.   You've been working with her since --

A.   I have no idea if she attended that training.

10       Q.   I understand.  I understand that, but you've been

working with her since 1992, correct?

11       A.   '97.  I was with her in another previous -- I was

with her in an office setting in '92.

12

FREE STATE REPORTING, INC.

13               Court Reporting   Depositions

D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

Q.   Right.  You were colleagues in '92?

1          A.   Correct, colleagues in '92 for about a year, and
then reunited in '97.

2          Q.   Oh, I see.  I see.  Okay.

A.   From '92 to '93 colleague.

3          Q.   And then she became your supervisor in '97?

A.   '97, right.

4          Q.   Okay.  I appreciate that clarification.  The
training that you attended both at USIA and the Department of

5    State was mandatory in EEO matters, right?

A.   No, it was not.

6          Q.   It wasn't mandatory?

A.   No, it was not.

7          Q.   You've never had any mandatory training?

A.   No, I have not.

8          Q.   Who is Lawrence Williams?

A.   He is a union representative or union steward.

9          Q.   And would he know about the matters that are at
issue in this lawsuit, if any?

10         A.   He's been counseling me and representing me in my
grievances.

11         Q.   Is he the union steward who handled your May 2005
grievance?

12
                         FREE STATE REPORTING, INC.

13                        Court Reporting   Depositions

                          D.C. Area (301) 261-1902

14                        Balt. & Annap. (410) 974-0947

15

A.   Yes, he is.

1      Q.   Is he still working at the Department of State?

A.   He works for the U.S. AID, Agency for International

2 Development.

Q.   What union are we talking about?

3      A.   Local 1534, which represents three agencies.

Q.   What union?

4      A.   Oh, AFGE.

Q.   Oh, AFGE, okay.

5      A.   I'm sorry, AFGE.

Q.   And it's Local 1534?

6      A.   Correct.

Q.   Okay.  And so he's the union steward?

7      A.   At the time he was the union steward.

Q.   Okay.  Is it fair to say that everything Mr.

8 Williams knows about your complaints of discrimination he

learned from you?

9      A.   No.  He had several meetings with management

officials throughout the Department of State.

10     Q.   Okay.  Has he met directly with Ms. Allen?

A.   Yes, several -- many, many, many times.

11     Q.   Has he to your knowledge met with her to discuss

your grievances regarding or complaints regarding

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

discrimination?

1      A.    Correct, yes.

       Q.    Age discrimination in particular?

2      A.    No.

       Q.    You have been being supervised by Ms. Allen since

3  November of 1997, right?

       A.    Correct.

4      Q.    Can you -- I would be surprised if you could, but

can you sitting here today tell me every person Ms. Allen has

5  hired or promoted since that time?

       A.    Since '97?

6      Q.    Yes, sir, and without -- I mean I would expect the

answer to can you tell me every to be no, probably not, but

7  can you name for me all the people that you know she's been

and whether or not you know they're over or under 40?

8      A.    Yes.

       Q.    Okay, go ahead.

9      A.    Okay.  You're saying when they were hired and

promoted or you want to do two different categories?

10     Q.    Whatever way's easiest for you, if you just want to

list them or if you want to categorize them, either way.

11     A.    Kim Steinburg.  Her last name -- the Kim that I

mentioned earlier.

12

                    FREE STATE REPORTING, INC.

13                 Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                Balt. & Annap. (410) 974-0947

15

Q.   Kim?

A.   Yeah, Steinburg.

Q.   Steinburg, okay.

A.   Steinburg.

REPORTER:  Can you spell their names if you can?

WITNESS:  S-T-E-I-N-B-U-R-G.  I think that's the spelling of her name.

BY MS. LYONS:

Q.   Okay.  And what action did Ms. Allen take with respect to Ms. Steinburg?

A.   She hired her and promoted her.

Q.   And was Ms. Steinburg over or under 40?

A.   Under 40.  She was under 40.

Q.   Okay.  And what year was she hired, if you know?

A.   Before -- it would have had to have been 2001.  She was there before Julie Johnson, it was 2001.

Q.   Okay.  Who else?  I mean you're on this list, right, as having been promoted?

A.   No, I'm not.  You said 2002?

Q.   No.  I said since 1997.

A.   Oh, I'm mistaken then.  Let's go back.

Q.   Okay.

A.   The first ones is Phyllis Swann --

FREE STATE REPORTING, INC.

Court Reporting   Depositions

D.C. Area (301) 261-1902

Balt. & Annap. (410) 974-0947

75

Q.    Okay.

1    A.    -- and Joyce Love was promoted to the GS-13 level.

Q.    Okay.  And when did that happen?

2    A.    December of '99.

Q.    And were they over or under 40 when that happened?

3    A.    They were over 40.

Q.    Okay.  By what mechanism were they promoted to GS-

4    13?

A.    Competitive service -- competitive competition.

5    Q.    So a vacancy announcement?

A.    Vacancy announcement.

6    Q.    Did you apply for that vacancy announcement?

A.    No.

7    Q.    Because you weren't yet a GS-12?

A.    I was one month short --

8    Q.    Okay.

A.    -- of being eligible.

9    Q.    Okay.  Let's go on.

A.    Kim Steinburg would have been the next one.

10   Q.    And she was hired in 2001, you said?

A.    Correct.

11   Q.    And do you know what level she was hired at?

A.    I think at the 11.

12

15

Q.   So she -- and then she was promoted later to a 12?

1    A.   Correct.

Q.   Do you know when that happened?

2    A.   No, I don't.

Q.   Okay.  Who else?

3    A.   Julie Johnson was the next one to come into the office.

4    Q.   All right.  And we talked a lot about her, but just to keep it in this section --

5    A.   Came aboard as a GS-9, and by 2004 was a GS-12, promoted into Joyce Love's position.

6    Q.   So she came in as a 9 in what year?

A.   2002, I think it was.

7    Q.   Okay.  And we know she's under 40?

A.   Yes.

8    Q.   Okay.  Who else?

A.   Darcy Damon.

9    Q.   Okay.

A.   A GS-9, was let go.

10   Q.   She was let go?

A.   Yes.

11   Q.   Ms. Allen terminated her employment?

A.   Correct.

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

Q.    When did that happen, the termination?

A.    Probably in 2003, '04.  I'm not sure.  She was there for about two years, maybe a year-and-a-half.

Q.    And when was she -- oh, well, she was hired in what, 2002?

A.    Yes, around the same time as Julie Johnson.

Q.    Okay.  So Ms. Damon was terminated?

A.    Um-hum.

Q.    And was she over or under 40?

A.    Over 40, I believe.  I believe she was over 40, yeah.

Q.    Is she the one that you weren't too sure of before, I can't remember, or was that Kim?

A.    That was Kim.

Q.    Okay.  And all the positions we've talked about, so far at least, were Grant Specialists, right?

A.    All the positions were Grant Specialists.

Q.    Does Ms. Allen having hiring or supervisory duties over other kinds of employees at the Department of State?

A.    Yes.

Q.    Okay.  Are you familiar with her hiring of folks who aren't Grant Specialists?

A.    Yeah, I think so.

FREE STATE REPORTING, INC.

Court Reporting   Depositions

D.C. Area (301) 261-1902

Balt. & Annap. (410) 974-0947

Q.   Okay, and I don't want you to leave any of those

1   folks off the list --

A.   Okay.

2   Q.   -- we're making at the moment.

A.   Okay.  I'm glad you pointed that out.  I wasn't

3   thinking about them.

Q.   Right.

4   A.   Okay.  Do you want a list of those people?

Q.   We're up to Darcy Damon.

5   A.   Okay.

Q.   Do you want to finish the Grant Specialists first?

6   A.   Yes, let's go to Grant Specialists first.  From

Darcy, Lana Muck.  Then that would be the support staff.  Lana

7   Muck was brought in as a Program Assistant.

Q.   Okay.  What level?

8   A.   7.

Q.   And what year?

9   A.   I want to say 2003.

Q.   And was Ms. Muck over or under 40 when she was

10  hired?

A.   Under 40.

11  Q.   She was under 40?

A.   Um-hum.

12

FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

Q.    Okay.  And has she since been promoted?

1      A.    Yes, she has.

Q.    Do you know what her GS level is today?

2      A.    No.  I believe it's an 11 if she hasn't gotten a 12.

Q.    Ms. Muck has told you that she has a master's

3  degree, correct?

A.    Correct.

4      Q.    Do you know what that master's degree is in?

A.    Probably the same.  I don't recall.

5      Q.    Okay.  All right, I just have a note on that.  All

right.  So she came in in 2003 as a GS-11 under 40?

6      A.    No, GS-7.

Q.    I'm sorry, 7.

7      A.    Right, and was promoted to a GS-11.

Q.    Okay.  Who else?

8      A.    Do you want the -- what are they called -- interns,

other interns?  They're not permanent, okay.

9      Q.    No.  They're not permanent.

A.    You're talking permanent positions.  Lana Muck,

10  that's it.  Alvita -- I do not know Alvita's last name.

Q.    Do you know how to spell Alvita?

11      A.    No.  Alvita.  We call her Al.  I don't know her --

Alvita.  She was just recently hired in 2005 as a Program

12

15

Assistant.

1      Q.   Is Battle --

       A.   Yes.   Thank you.

2      Q.   A little help from the peanut gallery.

       A.   Yeah, Alvita Battle.

3      Q.   Alvita Battle, okay.   She was hired in 2005 by Ms.

Allen --

4      A.   Correct.

       Q.   -- as a Program Assistant?

5      A.   Correct.

       Q.   At what GS level?

6      A.   I think either a 6, GS-6.

       Q.   I'll bet she's under 40, too.

7      A.   Yes, she is.

       Q.   Okay.   Anybody else?

8      A.   And then we get to Gunther and Thompson before I

left.

9      Q.   Right.   We talked about those.

       A.   Okay.

10     Q.   Anybody else?

       A.   No.   I think that's it.   That completes it.

11     Q.   Those are all the ones that you're aware of anyway?

       A.   Correct.

12

                      FREE STATE REPORTING, INC.

13                   Court Reporting   Depositions

                       D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

Q.    Okay.  I'm not sure I asked you this before.  Let me

1  go back.  We got off and sidetracked which is how I got

distracted, but Ms. Allen's deposition was taken in your other

2  pending civil action that you filed in 2004.  Her deposition

was taken on June 6th, 2005, right?

3      A.    Correct.

Q.    And that's when you attended and you heard her

4  testimony?

A.    Correct.

5      Q.    And you filed your EEO complaint on August 25th,

2005?

6      A.    Correct.

Q.    Did you do anything else with regard to

7  discrimination matters between those two dates?  It's not very

long, but --

8      A.    I'm not sure what you're asking.  What matters?  I

did several things.  I attempted to have meetings with all

9  level officials within the Department of State concerning this

issue.

10     Q.    Who did you attempt to have meetings with?

A.    The Executive Director within ECA.

11     Q.    Who was that at the time?

A.    Kathy Chikes.

12

FREE STATE REPORTING, INC.

13                        Court Reporting    Depositions

D.C. Area (301) 261-1902

14                        Balt. & Annap. (410) 974-0947

15

Q.   How do you spell that?

1    A.   C-H-I-K-E-S.

Q.   Okay.  And did you get a meeting with Ms. Chikes?

2    A.   Yes, I did.

Q.   When did --

3    A.   We're talking 2005, correct?

Q.   Right.

4    A.   She was there.

Q.   When did you meet with her?

5    A.   As soon as she came on board, probably a month or
two after she came on board.  I don't know what that date is,

6    though.  It was sometime in 2005 when she came on board.

Q.   Do you know if it was between June 6th, 2005 when

7    Ms. Allen was deposed and August 25th, 2005?

A.   She was already on board.  She was there.  She was

8    --

Q.   She would have already had that meeting?

9    A.   Probably.

Q.   Tell me everything you can recall about the meeting

10   with Ms. --

A.   Just that I wanted to brief her -- I wanted to brief

11   Ms. Chikes since she was the new Executive Director taking
over the bureau.

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

Q.    Right.  What did you tell her?

1    A.    Of all of the issues that had been going on between
me and Ms. Allen, and to see if she would be willing to
2    intervene --

Q.    Okay.

3    A.    -- to find some way of promoting me to a GS-13.

Q.    Okay.  So the primary purpose of your meeting with
4    Ms. Chikes was to seek promotion to GS-13?

A.    Correct.

5    Q.    Okay.  What did you tell her about -- what did you
tell her?

6    A.    Just the history of Fannie and myself, and all of
the steps that I had taken and the complaints that I had
7    filed.

Q.    Okay.  What did you tell her specifically about Ms.
8    Allen?

A.    That I thought she was treating me unfair, that she
9    wasn't giving me an opportunity to be promoted within that
office.

10    Q.    Okay.  Did you tell Ms. Chikes that you believed
that Ms. Allen was not treating you fairly on the basis of
11    your age during that meeting?

A.    No, not during that meeting, no.

12

15

Q.   Okay.  Did you ever tell Ms. Chikes that you

1   believed you were being --

A.   No.

2   Q.   Okay.

A.   No.

3   Q.   You cut me off, but clearly you know what the

question is.

4   A.   Yes.  I'm sorry.

Q.   No, no, that's okay.  Okay.  I'm not trying to --

5   I'm trying to get us out of here quicker today --

A.   Okay.

6   Q.   -- and I really want to focus on that which pertains

to this lawsuit --

7   A.   Okay.

Q.   -- and keep the record as clear as we can of the

8   other issues from some of your other complaints, grievances

and lawsuits.

9   A.   Okay.

Q.   Okay?

10   A.   All right.

Q.   I'm not trying to cut you off really.  I'm just

11   trying to focus on what's most pertinent to this lawsuit.

A.   Okay.

12

15

Q.    Okay?

1      A.    Um-hum.

Q.    So other than Ms. Chikes, who else did you meet with

2  regarding -- anything regarding your complaints of age

discrimination?

3      A.    And this is very vague.  Gregory Smith, who is the

Deputy Director of the Office of Civil Rights at this time, he

4  was Acting Director of that office at one time.  I recall

having a meeting with him.  I just don't recall what I

5  discussed with him.  I know I discussed my issues with him.  I

don't know if age was a part of that discussion.

6      Q.    Do you recall when your discussion with Mr. Smith

took place?

7      A.    It was all around this time that I was going through

the depositions.  I don't recall.  I don't recall.

8      Q.    When you sent your complaint on August 25th, 2005,

you didn't send it to Mr. Smith, right?

9      A.    I think I did.  I think I sent him a copy.  I may

have cc'd him a copy of it or I may have blind cc'd him.

10     Q.    Well, he doesn't appear on Exhibit 1, correct?

A.    No, he does not.

11     Q.    Okay.  But all I'm trying to do is try to refresh

your recollection about whether you talked to him before or

12

after you sent Exhibit Number 1.  That's all I'm trying to do.

1   Does that help you?

         A.    It was probably after.

2        Q.    And what was the result of your meeting with Mr.

Smith?  You already had EEO complaints in process, right?

3        A.    Correct.

         Q.    So anything result from your meeting with Mr. Smith?

4        A.    Nothing.

         REPORTER:  Can we go off the record for one second

5   to change the tape?

         MS. LYONS:  Sure.

6                       (OFF THE RECORD)

                        (ON THE RECORD)

7        BY MS. LYONS:

         Q.    We've been talking, Mr. Hunter, about people that

8   you've discussed or might have discussed any complaint of age

discrimination.  You said you didn't discuss it with Ms.

9   Chikes, but that you might have discussed it with Mr. Smith,

right?

10       A.    Correct.

         Q.    Is there anybody else that you think you may have

11  discussed your complaint of age discrimination with at the

Agency?

12

                    FREE STATE REPORTING, INC.

13                   Court Reporting   Depositions

                     D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

A.    No.  I can't recall anyone else at this time.

1         Q.    Are there any documents that you brought with you

today that would help refresh your recollection about whether

2    you ever had any other discussions or communications with

people concerning your age discrimination claim?

3         A.    No, no.

          Q.    I'd like to go back for a just a minute to talking

4    about the three team leaders in ECA when you were there, Ms.

Stinson, Ms. Ahern and Ms. Swann, okay?

5         A.    Okay.

          Q.    Have you ever heard any of those three individuals

6    make any statements indicating a bias with regard to people

over the age of 40?

7         A.    I didn't have much contact with Ms. Ahern, so no,

with her.  Ms. Stinson, no, no.

8         Q.    No for all three of them?

          A.    I'm sorry.  I just heard two.

9         Q.    Ms. Stinson, Ms. Ahern and Ms. Swann.

          A.    No.

10        Q.    No for all three of them?

          A.    Correct.

11        Q.    Okay.  Have you consulted with a statistician at

all, Mr. Hunter, with regard to Ms. Allen's hiring or

12

15

promotion decisions?

1      A.   No, no.

Q.   How were you harmed by Ms. Allen's decisions to fill

2  positions at the GS-11/12 level, if at all?

A.   I was denied an opportunity to compete for a vacant

3  Gs-13 position twice, in January 2004 and May/June of 2005.

Q.   Right, but just to be clear, the GS-13 position was

4  never advertised as vacant, correct, in either of those cases?

A.   Correct.

5      Q.   Are you married, Mr. Hunter?

A.   Yes, just recently got married.

6      Q.   Congratulations.

A.   Thank you.

7      Q.   When was that?

A.   January.

8      Q.   This year?

A.   Yes.

9      Q.   Wow, outstanding.

A.   January 18th.

10     Q.   Have you been married before?

A.   Yes.

11     Q.   Okay.  Do you have children?

A.   Yes, I do.

12

FREE STATE REPORTING, INC.

13           Court Reporting   Depositions

D.C. Area (301) 261-1902

14           Balt. & Annap. (410) 974-0947

15

Q.   And are they -- where are they at in life?

1    A.   I have a 27 year old who just made it back from

Iraq, and he's home now.  And I have a 19 year -- well, 18

2    year old who is a freshman at Delaware State.  And I have a 13

year old who's in his last year in middle school, three boys.

3    Q.   Do they live with you?

A.   Part of the time.

4    Q.   I mean only the 13 year old, right?  The other two

are --

5    A.   Right.

Q.   -- going to college and one's on his own?

6    A.   He just came home, so he's staying with his mother

at this time.

7    Q.   I only ever ask about these kinds of things to help

identify other sources of stress in people's lives.  Obviously

8    -- I mean I understand that you -- well, I don't like to say

it, but you were upset when you didn't get the GS-13 positions

9    that you thought you deserved?

A.   Correct.

10    Q.   I'm just asking about some other possible sources of

stress in your life.  Certainly having a son in Iraq would

11    qualify, correct?

A.   I think the whole country.

12
                    FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

                D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

Q.    Yeah.  But you specifically and personally had a son

1   over there, right?

A.    Yes, I did.

2       Q.    And how long was he there?

A.    He had two tours, 12 months tours, the first one in

3   2004, and then the last one from 2005 to 2006.

Q.    What branch of the service is he in?

4       A.    Army.

Q.    And what rank does he hold?

5       A.    I think he was -- was it an E-4?  E-4, I think it

is.

6       Q.    You were worried about him when he was in Iraq?

A.    A little, but his duty didn't require him to see

7   front line action.  He was a mechanic, so he was not on the

front line.

8       Q.    Okay.

A.    He was basically at a post away from the action.

9       Q.    Was he stationed in Baghdad?

A.    No, nowhere near Baghdad.

10      Q.    Where was he stationed?

A.    Up north.  All I know is it's north of Baghdad.

11      Q.    Okay.  When did you meet your current wife?

A.    Six years ago.

12
                    FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

Q.   And you got married this January?

1    A.   18th.

Q.   It's a good thing you know that.

2    A.   Yeah.  She reminds me.

Q.   How would you say your health has been in the last

3   five years, Mr. Hunter?

A.   I've been diagnosed with high blood pressure, and I

4   had a slight scare maybe a year ago with my kidney.  I'm not

sure what it was, but they wanted -- they run tests again.

5   Something came up where my kidney was not looking in the best

condition and they wanted to redo some tests, and the second

6   time around came out to be normal.

Q.   For over how long a period did you have concern

7   about your kidney?

A.   The physical took place and for a two week period,

8   two or three week period.

Q.   Did you receive a diagnosis of any kind with regard

9   to your kidney?

A.   Yes, I did and I just don't know what it was called.

10   Q.   Okay, that's fine.

A.   Okay.

11   Q.   Did it cause you pain?

A.   No, it didn't.

12

15

92

    Q.    Okay.  Did you take any medication in connection

1  with it?

    A.    No.

2      Q.    When were you first diagnosed with high blood

pressure?

3      A.    Three years ago is when it first was brought to my

attention.

4      Q.    And was that also during the course of a routine

physical?

5      A.    Correct.  I have one annually.

    Q.    Good for you.  Do you take medication for high blood

6  pressure?

    A.    I just recently started.

7      Q.    And what is that medication?

    A.    I just -- my wife just told me this morning.

8      Q.    She knew I'd ask.

    A.    It started with a T.  That's all I can tell you.

9      Q.    Starts with a T.

    A.    It's a long, long word.

10      Q.    All right, we won't worry about.

    A.    Okay.

11      Q.    When did you start taking it?

    A.    A week ago -- a week -- two weeks ago.

12

FREE STATE REPORTING, INC.

13  Court Reporting   Depositions

D.C. Area (301) 261-1902

14  Balt. & Annap. (410) 974-0947

15

Q.    Oh.

1       A.    Two weeks.

Q.    Two weeks?

2       A.    Yeah.  I just had my physical about a month ago, my

annual physical.

3       Q.    Okay.  Before starting on medication, had you been

attempting to do anything different with regard to your

4   lifestyle to control your blood pressure?

A.    Yes, exercising and attempting to change my diet.

5       Q.    I take it that the latter was harder?

A.    Yes, it was.

6       Q.    I normally ask this in the beginning and now I

really have to ask.  It's gone to be hard for you perhaps, but

7   in the last two weeks when you've been taking this medication

for high blood pressure, have you noticed yourself having any

8   problems with memory?

A.    No.

9       Q.    Okay.

A.    No.

10      Q.    Have you been in any car accidents in the last five

years?

11      A.    No.

Q.    Have you experienced any deaths of close relatives

12

FREE STATE REPORTING, INC.

13                      Court Reporting   Depositions

D.C. Area (301) 261-1902

14                      Balt. & Annap. (410) 974-0947

15

or friends in the last five years?

1      A.    No.

      Q.    What does your wife do?

2      A.    My current wife?

      Q.    Yes.

3      A.    I have an ex.

      Q.    I'd prefer your wife than your ex-wife.

4      A.    Okay.  She is a supervisor with the Washington
Hospital Center.

5      Q.    How did you meet her?

      A.    At a -- what is it called, baptism.  My nephew was

6 being baptized.

      Q.    Good place to meet people.

7      A.    Um-hum.

      Q.    Good for you.  Other than those I've asked you

8 about, Mr. Hunter, are there sources of stress in your life
that you can identify?

9      A.    No.

      Q.    Have you ever been arrested?

10      A.    No.

      Q.    Have you ever been convicted of a crime?

11      A.    No.

      Q.    Mr. Hunter, you brought a variety of documents with

12

13

14

15

you to your deposition here today, correct?

1     A.   Correct.

Q.   And when I came out to the waiting area to greet

2 you, you were actually flipping through them, right?

A.   Correct.

3     Q.   Have you produced in the discovery in this case all

of the documents that you were looking at today?

4     A.   Yes.

Q.   You already have given copies to the government?

5     A.   Yes.  These are mostly documents that I received

under discovery from the Agency.

6     Q.   Oh, okay, okay.  So they're document -- and I want

to be sure that they're in connection with Civil Action 06-

7 326.

A.   Yes, they are.

8     Q.   Okay.  Would you mind handing me the stack of

documents so I can look through it while we go off the record

9 --

A.   Sure.

10    Q.   -- so I can see what you've been looking at?

A.   Sure.

11    Q.   And before I do that, would you please identify for

me any documents in this pile that helped to refresh your

12

FREE STATE REPORTING, INC.

13            Court Reporting    Depositions

D.C. Area (301) 261-1902

14           Balt. & Annap. (410) 974-0947

15

recollection with regard to your testimony here today?

1    A.   Just the application that I submitted for the vacant Joyce Love position.

2    Q.   That's the February 14th, 2004?

A.   Correct.

3    Q.   Okay. Anything else that you would identify in this stack?

4    A.   That helped me --

Q.   That helped you refresh your recollection with

5 regard to the testimony you've given today.

A.   No. That's it.

6    Q.   Okay. We're going to go off the record while I just look through the pile. Is that okay?

7    A.   That's fine.

Q.   All right.

8                (OFF THE RECORD)

                (ON THE RECORD)

9      BY MS. LYONS:

Q.   All right. Mr. Hunter, I have looked through the

10 documents you brought and I appreciate your giving me the opportunity to do that. The only documents I found that I

11 hadn't seen before relate to your union grievance, and just for the sake of completing the record, I'd like to go ahead

12

FREE STATE REPORTING, INC.

13             Court Reporting   Depositions

             D.C. Area (301) 261-1902

14           Balt. & Annap. (410) 974-0947

15

and mark them and get you to tell me what they are, and then
1  we'll add them to the record of this deposition, okay?

     A.   Okay.

2     Q.   Let's start with one that's dated June 25th, 2004.
(Whereupon, the document that was referred to as Exhibit
3  Number 6 was marked for identification.)

          BY MS. LYONS:

4     Q.   It's now marked as Exhibit Number 6.  What is that
document?

5     A.   A Third Step Grievance filed by my union on my
behalf.

6     Q.   Okay.  Who wrote the text of the document that
you're holding?

7     A.   I did.

     Q.   And another person on your behalf sent it to
8  management?

     A.   Correct.

9     Q.   Okay.  When did you write this?

     A.   The date is June 25th, 2004.

10    Q.   So it would have been shortly before that that you
wrote it?

11    A.   Correct.

     Q.   But you would have initiated the process of a

12

                         FREE STATE REPORTING, INC.

13                      Court Reporting   Depositions

                         D.C. Area (301) 261-1902

14                     Balt. & Annap. (410) 974-0947


15

grievance prior to June 25th, 2004?

1     A.   Correct.

Q.   When did you initiate the process?

2     A.   Probably February/March of 2004.

Q.   Okay.  And does Exhibit 6 contain a complete

3 statement of your grievance?

A.   I think it does.

4     Q.   Okay.

(Whereupon, the document that was referred to as Exhibit

5 Number 7 was marked for identification.)

BY MS. LYONS:

6     Q.   Now I'm going to hand you what's marked as Exhibit

7.  It's actually dated May 7th, 2004, and I'm having a little

7 telling what goes with everything, so let me just hand you

this page, Exhibit 7, and ask you what that is?

8     A.   This is a response from the Step 1 of the grievance.

William R. Tetterini (phonetic sp.) responded to my written

9 Step 1 grievance, so we're a little out of order.

Q.   Okay.  Do you have a copy with you today of your

10 written Step 1 grievance?

A.   No.

11     Q.   Okay.  Do you have it anywhere in your possession?

A.   No.

12

15

Q.    Okay.  So Exhibit 7 is his response to your Step I

1  grievance, and Exhibit 6 is your Step 3 grievance?

A.    Correct.

2  Q.    There's a good reason why I don't do this kind of

law.

3  A.    Labor law.

Q.    We're just completing the record, so I don't have to

4  figure this out.

(Whereupon, the document that was referred to as Exhibit

5  Number 8 was marked for identification.)

BY MS. LYONS:

6  Q.    Exhibit 8 appears to me to be the June 17th, 2004

response from management to your Step 2 grievance, is that

7  right?

A.    Correct.

8  Q.    At Step 1 your grievance was rejected?  Is that the

right word?

9  A.    Correct.  Let's see what that language is.  It says

that the -- at Step 1 they concluded that the grievance is

10  procedurally defective.

Q.    Defective?

11  A.    Um-hum.

Q.    What was the procedural defect?

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

A.   It says that this issue was raised previously in an

1   EEO complaint.

Q.   Was that true with regard to your age discrimination

2   complaints, anyway?

A.   No.

3   Q.   It wasn't true with regard to your --

A.   No.

4   Q.   -- age discrimination?

A.   Correct, that's not true.

5   Q.   And when you filed your Step 2 grievance, did you
point out that the age discrimination complaint had not

6   previously been raised?

A.   Could you repeat the question?

7   Q.   Well, let me ask you this.  Do you have a copy of
your Step 2 grievance with you today?

8   A.   No.

Q.   Do you have a copy of your Step 2 grievance in your

9   possession at all?

A.   Yes, I do.  I'm sorry.  Yes, I do at home.

10   Q.   At home you do have that?

A.   Yes.

11   Q.   Would you be willing to send that to me?

A.   Sure.

12

FREE STATE REPORTING, INC.

13                    Court Reporting  Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

Q.    Okay.  Just so we have a complete record.

1       A.    Sure.

Q.    I'm trying to get as much as I can.

2       A.    Sure.

Q.    And whatever your Step 2 grievance says is obviously

3  what it says, but do you recall whether or not you raised the

notion that you had not filed an age discrimination complaint

4  previously?

A.    I'm not understanding your question.

5       Q.    Okay.  I'm not doing a great job.  The response you

got to your Step 1 grievance indicated that your grievance was

6  procedurally defective because the same matter had been

previously raised in the EEO complaint, right?

7       A.    Correct.

Q.    And we've agreed that that wasn't true with regard

8  to your age discrimination complaint in particular, right?

A.    It wasn't true --

9       Q.    It wasn't true that you had complained about age

discrimination previously in an EEO complaint?

10      A.    Correct.

Q.    Okay.  Because the August 25th, 2005 EEO complaint

11 that you sent, which is Exhibit 1, is the first time you

complained about age?

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

A.    Correct.

1    Q.    Okay.  So in your Step 2 grievance, do you recall
whether you pointed out that you had not complained about age
2    discrimination previously?

A.    Had not?

3    Q.    Right.

A.    Your question is a little confusing.

4    Q.    Probably so, kind of embedded.  You know what, when
I get it, I'll be able to tell the answer to the question
5    anyway.

A.    Can I ask -- let me say this.  Throughout the three
6    step process in the grievance, age discrimination was never
mentioned.  It was not mentioned throughout that whole
7    process.

Q.    Not mentioned by whom?

8    A.    Me.  It was not a part of my grievance.

Q.    I thought it was.

9    A.    No, the EEO complaint.  It didn't say that it was
age discrimination.  It was another EEO complaint.

10    Q.    Now I'm completely confused.  Let me ask it this
way.  Did the grievance that you filed complain about
11    discrimination?

A.    The grievance that I filed?

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

Q.    Yes.

A.    We tried to insert that as an element, yes.

Q.    Discrimination, but not on the basis of age?

A.    Correct.

Q.    Okay.  And the Agency responded by saying that it was procedurally defective because you had previously complained about discrimination on the grounds that you were raising in the grievance?

A.    Correct.

Q.    Okay.

A.    Correct.

Q.    And we're up to the response to the second -- so what was the basis of your grievance other than discrimination?

A.    Denial of promotion.

Q.    I understand that's the reason for it, but what did you argue in terms of a violation of the Collective Bargaining Agreement?

A.    Merit promotion procedures, that it violated the merit promotion procedures.

Q.    And how did you believe it violated the merit promotion procedures?

A.    There was a statue [sic] that allowed for a non-

FREE STATE REPORTING, INC.

Court Reporting   Depositions

D.C. Area (301) 261-1902

Balt. & Annap. (410) 974-0947

competitive promotion, that management can use its discretion

1    to promote an employee when merit promotion procedures were

violated.

2        Q.    What merit promotion procedure did you think had

been violated?

3        A.    We were arguing at the time that I was denied

competitive procedures.

4        Q.    But what competitive procedures were you denied?

         A.    By not posting the GS-13 at its current level I was

5    denied an opportunity to compete at that level, so I was

denied.

6        Q.    So what was the discretionary element of it?

         A.    Discretionary?

7        Q.    You mentioned a moment ago that management had some

discretion.

8        A.    Right, yes.

         Q.    I don't understand.

9        A.    Well, under the 5 -- I'm not sure if it's 5 C.F.R.

    -- I don't have -- probably 5 C.F.R. 335103, if that's the

10   correct one, allows for management to use -- allowed for

management to promote --

11       Q.    Non-competitively?

         A.    Non-competitive.

12

FREE STATE REPORTING, INC.

13                     Court Reporting   Depositions

                       D.C. Area (301) 261-1902

14                     Balt. & Annap. (410) 974-0947

15

Q.   And management has a discussion about whether or not

1  to do that under that provision of the federal regulations?

A.   Correct.  That's what our argument was.

2      Q.   And that's what you wanted to have happen?

A.   Correct.

3      Q.   So you wanted management to exercise its discretion

and non-competitively promote you to the GS-13?

4      A.   Correct.

Q.   And you filed a grievance when they declined to

5  exercise that discretion?

A.   I filed it when they refused to post the position at

6  the GS-13 level.  Am I saying that correct?  I filed it when

they denied me an opportunity to compete for the GS-13.

7      Q.   But you weren't seeking to compete.  You were

seeking a non-competitive promotion.

8      A.   Right.

Q.   Okay.

9      A.   Once I realized that the position -- the vacant GS-

13 position, Love's position --

10     Q.   Right.

A.   -- was not going to be posted at the GS-13 level,

11  that's when we started the grievance process.

Q.   Did you know on February 14th, 2004 whether Ms.

12

15

Love's position was going to be advertised at the 13 level?

1    A.   No, I didn't.  I did not.

     Q.   So that was -- February 14th, 2004 is the date you

2 requested this non-competitive promotion?

     A.   Correct.

3    Q.   Tell you what I'm going to do, I'm going to make the

last document -- exhibit a collection of the remaining

4 documents concerning your grievance, okay?

     A.   Okay.

5 (Whereupon, the documents that were referred to as Exhibit

Number 9 were marked for identification.)

6        BY MS. LYONS:

     Q.   This is Number 9, and if you would just take a look

7 through that and put a paper clip on it before we get confused

--

8    A.   Yes.

     Q.   -- and confirm for me that Exhibit 9 consists of

9 other documents associated with the grievance you filed in May

of 2004.

10    A.   Yes.  It's management's response to my third step

grievance.

11    Q.   There are other documents behind it, though, and I

don't know what's an attachment to what and I don't really

12

FREE STATE REPORTING, INC.

13          Court Reporting  Depositions

D.C. Area (301) 261-1902

14          Balt. & Annap. (410) 974-0947

15

care.  If you could just verify that they all relate -- all of

1  the documents in Exhibit Number 9 relate to your grievance.

        A.    Yes, they do.

2     Q.    Okay.

            MS. LYONS:  Can we take another break?

3           REPORTER:  Sure.

                        (OFF THE RECORD)

4                       (ON THE RECORD)

            MS. LYONS:  Okay, Mr. Hunter, while we were away we

5  made some copies of some documents.  I just want to continue

   to try to fill in my chronology.

6  (Whereupon, the document that was referred to as Exhibit

   Number 10 was marked for identification.)

7           BY MS. LYONS:

        Q.    The court reporter has handed you what's now marked

8  as Exhibit Number 10.  This is a SF-50 for Ms. Swann, correct?

        A.    Yes, it is.

9     Q.    And the effective date in the right-hand corner of

   Box 4 is April 3rd, 2005, correct?

10     A.    Yes, it is.

        Q.    And that, to your understanding, would be the --

11 well, that's the date it becomes effective.  If you look down

   on Box 45 --

12

                        FREE STATE REPORTING, INC.

13                      Court Reporting   Depositions

                        D.C. Area (301) 261-1902

14                      Balt. & Annap. (410) 974-0947

15

A.    45, uh-huh.

1    Q.    -- it indicates that she was actually selected for a promotion certificate dated February 9th, 2005, but --

2    A.    Yes.

Q.    -- but in any event, certainly by no later than

3    April 3rd, 2005 you were aware that Ms. Swann was leaving ECA?

A.    Correct.

4    Q.    Are you able after looking at this to be any more specific about when you knew she was going to be leaving?

5    A.    No.  Only I just don't know the date that Ms. Allen announced it in her staff meeting.

6    Q.    But it would have been prior to April 3rd, 2005?

A.    Yes, it would have been.

7    Q.    Okay.

(Whereupon, the document that was referred to as Exhibit

8    Number 11 was marked for identification.)

BY MS. LYONS:

9    Q.    The next document is marked Exhibit Number 11.  Do you recognize this document?

10    A.    Yes, I do.

Q.    This is a SF-50 for Ms. Gunther, correct?

11    A.    Yes.

Q.    And in Box 4 in the upper right-hand corner it

12

15

reflects that she became hired, I guess, as of August 21st,

1   2005, right?

    A.   Correct.

2       Q.   And does that help to refresh your recollection

about when she arrived?

3       A.   It probably was the end of July, first of August of

2005.

4       Q.   When what happened?

    A.   When Ms. Gunther came on board.

5       Q.   You think she --

    A.   Well -- no.  I'm mistaken.  I'm sorry.  This is

6   around the time.  She must have come on board around August

the 21st or after --

7       Q.   Okay.

    A.   -- or after that date.  I'm sorry.

8       Q.   Okay.  Mr. Hunter, is the complaint -- well, your

claims in Civil Action 06-326, that's the action we're here

9   about today, what claims are there in that lawsuit, what kind

of claims?

10       A.   Age discrimination and retaliation.

    Q.   I'm going to show you a copy of the complaint.

11       MS. LYONS:  I'd like this one marked for

identification, as well, but now it's marked.

12

                    FREE STATE REPORTING, INC.

13                   Court Reporting   Depositions

                 D.C. Area (301) 261-1902

14                Balt. & Annap. (410) 974-0947

15

(Whereupon, the document that was referred to as Exhibit

1  Number 12 was marked for identification.)

BY MS. LYONS:

2      Q.   I'm handing you a copy of the complaint which is now

marked as Exhibit Number 12.  Can you show me where in that

3  document you're complaining about retaliation?

A.   I didn't actually use the words.  I think I used it

4  at the beginning.  Let's see here.  On page 1, number 2 ---

Q.   Paragraph 2?

5      A.   Paragraph 2.

Q.   Right.

6      A.   Paragraph 2, I mentioned retaliation for previous

activities, for protected activities.

7      Q.   Right, but you mentioned that the law prohibits

retaliation and also national origin discrimination.  You're

8  not complaining about national origin discrimination in this

case, are you?

9      A.   No.

Q.   And you're not complaining about race discrimination

10  in this case, are you?

A.   No.

11     Q.   And is paragraph 2 the only place that you mention

retaliation?

12

FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

A.    Yes, it looks to be the only place that I used the

1   word retaliation.

Q.    Can you point me to any other words in the complaint

2   that you say would assert a claim of retaliation even if that

word's not used or any facts that are alleged in there?

3        A.    Page 2, number 3.

Q.    Paragraph 3?

4        A.    Yes.

Q.    Now all that mentions is that -- it alleges that on

5   August 25th you filed the complaint of age discrimination that

is the administrative complaint on which this complaint is

6   founded, correct?

A.    Correct.

7        Q.    It doesn't mention any of your prior EEO activity,

correct?

8        A.    Correct.

Q.    So this paragraph doesn't put us on notice that

9   you're complaining about your prior EEO activity as a reason

for -- a problem in this case, right?

10       A.    Correct.

Q.    Let the record reflect you're just continuing to

11  read the complaint and looking.

A.    At the time I was typing this, I believed that

12

FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

retaliation and age was a factor in the decision that

1  management made to downgrade the two positions, the Love

position in 2004, January 2004, and the Swann position in

2  April of 2005.  That's what I was believing were the basis for

them making the decision to downgrade these positions.  It was

3  retaliation and because of my age.

Q.   I understand that that's what you believed, but do

4  you agree with me sitting here today that the complaint that

you filed doesn't include any claim for retaliation?

5  A.   Other than the first paragraph, I agree -- other

than paragraph 2 on page 1, I agree.

6  Q.   Okay, and that's the paragraph we already discussed

that also mentions national origin and race, right?

7  A.   Correct.

Q.   But you didn't believe those were grounds for

8  management's actions when you typed this?

A.   Correct.

9  Q.   Okay.  So this complaint is about the decision to

post the positions at the GS-11/12 level, right?

10  A.   Twice, correct.

Q.   Twice.  Once in 2004 and once in 2005?

11  A.   Correct.

Q.   You've already testified, I believe, today that you

12

FREE STATE REPORTING, INC.

13                      Court Reporting   Depositions

D.C. Area (301) 261-1902

14                      Balt. & Annap. (410) 974-0947

15

never spoke to Ms. Allen or anybody else about their thought

1   process in making the decision, correct?

    A.   Correct.

2       Q.   And you didn't have any other kinds of communication

with Ms. Allen or anybody else associated with the decision on

3   their thought process or their reasons, right?

    A.   For the 2004 position that was downgraded, the

4   grievance identified the Agency's or Ms. Allen's thought

process for downgrading it.

5       Q.   I'm sorry.  I don't understand what you're saying.

    A.   Well, let me back up.  The grievance that I filed on

6   the vacant GS-13 position of Love in January 2004, management

gave reasons for the downgrading of that position as their

7   response to my grievance.

    Q.   Did Ms. Allen provide anything that she signed in

8   connection with your grievance attesting to her reasons for

the decision?

9       A.   Not that I'm aware of, no.

    Q.   Who do you understand made the decision to post

10  those positions at the GS-11/12 level?

    A.   I was under the assumption that it was a

11  consolidation -- not consolidation, but consultation Ms. Allen

had with her superiors.

12

15

Q.   And who would her superiors have been?

1    A.   At that time I think it was Tetterini was acting.

Q.   He was the Executive Director --

2    A.   Acting.

Q.   -- the Acting Executive Director?

3    A.   Correct.

Q.   Anybody else?

4    A.   Kate -- and I don't know the spelling of her last name, Yumayani (phonetic sp.).

5    Q.   Oh, the one with the really long name?

A.   Yes.

6    Q.   Okay, yeah.

A.   She was Deputy.

7    Q.   All right.

A.   She was the Deputy Director at the time, and I think

8    she was Ms. Allen's first line supervisor.

Q.   Okay.  So, as you understand, the decision was made

9    by Ms. Allen in consultation with her first and second level supervisors?

10   A.   And HR.

Q.   And HR.  Do you know anybody in particular in HR who

11   was involved with the processS?

A.   At that time I believe it was Jackie Hill.

12

FREE STATE REPORTING, INC.

13                   Court Reporting   Depositions

                     D.C. Area (301) 261-1902

14                   Balt. & Annap. (410) 974-0947

15

Q.    Do you know from Ms. Hill that she was involved in

1   the decision?

A.    I seen a document that says Ms. Allen consulted with

2   Ms. Hill before making a decision.

Q.    Okay, but you don't have any independent knowledge

3   of their conversation?

A.    No.

4   Q.    Right.  All right.  What was your understanding from

your union grievance of management's reasons for its actions?

5   A.    That it was their choice to reprogram any vacant

position.

6   Q.    Do you see any conflict between that reason and the

reasons that have been provided by Ms. Allen in response to

7   your interrogatories in this lawsuit?

A.    Could you repeat the question?

8   Q.    Do you see -- isn't it true that Ms. Allen's

responses to interrogatories that you propounded in this

9   litigation are perfectly consistent with what you just

described as management's reason in the union grievance?

10  A.    That's -- the reason that management has given is a

standard reason.  I mean that's the reason they give for

11  everything that they do, it's their discretion or they -- I

didn't accept the reasoning.  I was not in agreement with

12

FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

their reason because I don't believe that that was the true

1  motive behind their reason.

Q.    Okay.  What evidence do you have that the decision

2  to post the positions at the GS-11 or 12 level was motivated

by your age?

3  A.    Ms. Allen's past hiring practices and her statement,

wanting to hire younger people.

4  Q.    Anything else?

A.    Today?

5  Q.    Yes.

A.    After reviewing discovery, some of the documents I

6  received from discovery, I have documents here that shows that

Julie Johnson, who was selected for the vacant Joyce Love

7  position, was not the most qualified individual, and that

there was a candidate more qualified than Julie Johnson who

8  was over 40.

Q.    Is it your opinion that this person was more

9  qualified?  How did you come to that?

A.    OPM ranked her higher on the cert.  She was ranked

10  higher on the cert.  Her rating was higher.

Q.    And who is that person?

11  A.    Her name -- it's here.  Give me a second.

Q.    Take your time, Mr. Hunter.

12

FREE STATE REPORTING, INC.

13                        Court Reporting   Depositions

D.C. Area (301) 261-1902

14                        Balt. & Annap. (410) 974-0947

15

A.   Okay.

1    Q.   I think we saw it when we looked through the
documents --

2    A.   Yes.

Q.   -- but I didn't know what age anybody was.

3    A.   Okay.  My documents aren't in order, so it could be
seconds.

4    Q.   Please take your time.  We'll go off the record
while you look.

5                           (OFF THE RECORD)

                          (ON THE RECORD)

6   (Whereupon, the documents that were referred to as Exhibit
Number 13 were marked for identification.)

7          BY MS. LYONS:

Q.   Mr. Hunter, I'm going to hand you know -- we've

8   pulled some documents out of your stack while we on break, and
this is Exhibit Number 13, and these are the documents you say

9   relate to the Certificate of Eligibles for the position for
which Ms. Julie Johnson was selected, correct?

10   A.   Correct.

Q.   And you were telling me about who on the cert list

11  was rated more highly than Ms. Johnson by OPM who was also
over the age of 40.

12

                    FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

A.   Yes.

1    Q.   Who is that person or persons?

A.   Okay.  I'm mistaken.  I don't identify anyone on

2  this particular cert that I am aware of that was over 40.  I

just -- I wanted to present this as evidence to show that Ms.

3  Julie Johnson was not the most qualified candidate from this

list.

4    Q.   Okay.  We'll, I'm going to -- I would object to your

use of the word qualified, but can we use the word ranked?

5    A.   Right.

Q.   Okay.

6    A.   She was not --

Q.   Julie Johnson was not the most highly ranked person

7  that appears on the Certificate of Eligibles?

A.   Correct.

8    Q.   But there's nobody on this list that you're able to

identify who outranks Julie Johnson and is over the age of 40,

9  is that your testimony?

A.   Correct.

10    Q.   Okay.  We'll just leave that as an exhibit.

A.   Um-hum.

11  (Whereupon, the document that was referred to as Exhibit

Number 14 was marked for identification.)

12
                        FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

                      D.C. Area (301) 261-1902

14                   Balt. & Annap. (410) 974-0947

15

BY MS. LYONS:

1    Q.    Okay.  The next document I'm going to show you is what you gave me.  Exhibit Number 14 is now the Certificate of

2    Eligibles that goes with the selection that was made after Ms. Swann left, correct?

3    A.    Correct.  Two positions were filled around the time. One was filled before Ms. Swann left and one was filled after

4    Ms. Swann left.

Q.    One was made before Ms. Swann even left?

5    A.    Correct.

Q.    Oh.  And that was Ms. Gunther who came first?  No,

6    Deborah Thompson came first, right?

A.    Correct.

7    Q.    So Deborah Thompson came before Ms. Swann --

A.    Left.

8    Q.    -- left?

A.    Um-hum.

9    Q.    Okay.

A.    Correct.

10    Q.    Ms. Swann -- I mean Ms. Thompson appears on the Certificate of Eligibles that you're holding?

11    A.    No, not this one.  Lana Muck was selected from this cert.

12

15

Q.    No, no.  I'm just asking you if Ms. Thompson appears

1  on this Certificate of Eligibles?

A.    No, she does not, not on this one, not on Exhibit

2  14.  You may not have --

Q.    So Exhibit Number 14 goes with which selection, Mr.

3  Hunter?

A.    Joyce Love vacant position, Julie Johnson selection.

4  Q.    No.  14?  I thought 13 was that.

A.    Oh, I'm sorry.  You're correct.  This --

5  Q.    Exhibit 14.

A.    Exhibit 14 is a cert from which Lana Muck was

6  selected, and it indicates that there were two vacant

positions.  They advertised for two vacant positions on this

7  particular cert.

Q.    And do you know how old Ms. Muck was when she was

8  selected?

A.    She was under 40.

9  Q.    And what grade level was she selected at?

A.    I believe the 9.

10  Q.    Okay.  Now let me hand you what we're going to mark

as Exhibit 15, but I'm going to note that it is incomplete,

11  and right now all I have is the copy that you gave me,

whatever the complete copy is, but I'll just tell you that I

12

13

14

15

notice that the second page should be what looks like page 104

1   at the bottom and it doesn't appear here, but whatever.  This

is what you had pulled out of your stack as a document that

2   you wanted to use in this deposition, and now it's marked as

Exhibit 15.

3       A.   Right.

(Whereupon, the document that was referred to as Exhibit

4   Number 15 was marked for identification.)

         BY MS. LYONS:

5       Q.   What significance does Exhibit 15 have to your

claims?

6       A.   It indicates that Ms. Gunther was chosen from this

cert and Ms. Thompson was selected from this cert, and that

7   there was a candidate ranked -- rated higher than both

Thompson and Gunther and she was over 40.

8       Q.   And who was that person?

         A.   Her name is Earlene Harper, H-A-R-P-E-R.  Earlene,

9   E-A-R-L-E-N-E.

         Q.   Do you know Ms. Harper?

10      A.   No, I do not.

         Q.   Are you familiar with her qualifications?

11      A.   I reviewed her resume.

         Q.   Okay.  So you haven't work with Ms. Harper ever?

12

                    FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

A.   No.

1     Q.   And you weren't part of the interview of her for the position that Ms. Thompson and Ms. Gunther got, correct?

2     A.   Correct.

Q.   Did you have any involvement with her non-selection

3 of this position?

A.   No.

4     Q.   All right.  You started telling me about this in connection with all of the evidence that you have concerning

5 any motivation relating to age for the decision to post the Grant Specialist positions in ECA at GS-11 or 12, right?

6     A.   Correct.

Q.   So you told me about Ms. Allen's past hiring

7 practices and we've talked today about all that you know about that, correct?

8     A.   All of the evidence that I'm aware of, along with Ms. Allen's deposition, her testimony in her deposition.  Yes,

9 that would be it --

Q.   Okay.

10    A.   -- at this time.

Q.   What evidence do you have that the decision to post

11 at the GS-11 or 12 level was motivated by your prior EEO activity?

12

A.    Management's actions.  Management was aware of my

1   desire to be promoted, and their actions didn't support that.

Q.    Didn't support what?

2   A.    Didn't support promoting me or giving me an

opportunity to be promoted.

3   Q.    Mr. Hunter, would it surprise you to learn that most

federal employees would be interested in promotion?

4   A.    No.

Q.    So you're not really different than anybody else in

5   that regard, are you?

A.    Because of the level of work that I was performing,

6   I believe that I was.

Q.    That's a different issue, and I'm willing to

7   recognize that, but the general desire to be promoted is

something you would agree most employees have, right --

8   A.    Correct.

Q.    -- because they want to be paid more money?

9   A.    Correct.  They want to advance their careers.

Q.    Right.  So what evidence do you have -- has anybody

10  ever made a statement to you about your prior EEO activity

that connected it with your promotion or non-promotion?

11  A.    HR, Jackie Hill and Felicia Gibson.

Q.    What have they said?

12

FREE STATE REPORTING, INC.

13                       Court Reporting   Depositions

D.C. Area (301) 261-1902

14                       Balt. & Annap. (410) 974-0947

15

A.    That management's not going to promote me because of

1  the complaints that I have been filing against ECA management.

Q.    Both Ms. Hill and Ms. Gibbons [sic] have told you

2  that?

A.    Yes.

3  Q.    Did they say why they believed that to be the case?

A.    Because of my previous complaints, management is not

4  going to promote me.

Q.    But it's not their decision, either Ms. Hill or Ms.

5  Gibbons, whether or not you're promoted, correct?

A.    They're head of HR, Human Resources.  In my mind I

6  believe they have a contributing factor.

Q.    Do they have any authority to promote you or deny

7  you a promotion?

A.    Directly, no.

8  Q.    When did they tell you that?

A.    In meetings that I had with them over the course of

9  my complaints.

Q.    Well, that's a long time.  Could you narrow that

10  down for me at all?

A.    Ms. Hill -- let's go with Ms. Hill from 2003.

11  Q.    Ms. Hill made a statement to you in 2003 that she

did not believe you would be promoted because of your prior

12

EEO activity?

1     A.    Correct.

Q.    Any other time that she said that?

2     A.    I heard it more than once in meetings with Ms. Hill.

Q.    How many meetings have you had with Ms. Hill?

3     A.    During that time frame, 50, 60.

Q.    All concerning your non-promotion?

4     A.    Yes.

Q.    If I asked Ms. Hill whether she ever told you that

5 you wouldn't be promoted because of your prior complaints,

would you expect her to tell me that she had said that

6 statement?

A.    I doubt it because we have deposed Ms. Hill in my

7 previous EEO complaint and she wasn't truthful during that

deposition.

8     Q.    Okay.  What about Ms. Gibbons, when did she --

Gibson?  I'm sorry.  Gibson, is that right?

9     A.    Yes.

Q.    Felicia Gibson?

10    A.    Felicia Gibson.

Q.    Your testimony here today is that Ms. Gibson has

11 also told you that you would not be promoted because of your

prior complaints?

12

FREE STATE REPORTING, INC.

13               Court Reporting   Depositions

D.C. Area (301) 261-1902

14               Balt. & Annap. (410) 974-0947

15

A.    Correct.

1       Q.    And when did she tell you that?

A.    Let's go with 2004 through 2006, 40, 50 meetings

2    with her.

Q.    And she said this in each one?

3       A.    No, not in each one, no.

Q.    How many times do you think she's made such a

4    statement?

A.    Once, twice.

5       Q.    And on those occasions when either Ms. Hill or Mr.

Gibson told you that, did you bring that to the attention of

6    an EEO counselor?

A.    I had no -- I was never assigned a counsel -- a

7    counselor.

Q.    Did you make any EEO complaint?

8       A.    Yeah, I made several.  I have several EEO complaints

going on.

9       Q.    I know you have several EEO complaints pending, and

there are a bunch of documents with you here today.  Can you

10   point me to any place where you've said before today that Ms.

Hill or Ms. Gibson made such statements to you?

11      A.    No, I cannot.

Q.    Why is that not in the record of all of your EEO

12

FREE STATE REPORTING, INC.

13                     Court Reporting   Depositions

D.C. Area (301) 261-1902

14                     Balt. & Annap. (410) 974-0947

15

complaints?

1      A.   It's the first time it's been asked of me.  It's the
first time this question's been asked.

2      Q.   I can't believe I'm that good a lawyer, Mr. Hunter.
 You've never been asked before to list all the evidence you

3  have of --

       A.   No.  The question of whether or not I had a

4  conversation with Ms. Gibbons [sic] or Ms. Hill about
retaliation and whether or not they made the statement that I

5  would not be promoted, that's the first time I've heard that
question.

6      Q.   Did they make specific reference to your prior EEO
complaints?

7      A.   They said because of the complaints that I'm filing
against management.

8      Q.   Okay, but those would include grievances that you
filed?

9      A.   Complaints.

       Q.   That would also include an OIG Hotline complaint

10  that you made?

       A.   Complaints.

11     Q.   And they didn't specify which kind?

       A.   Complaints.  They just said complaints, I'm just

12

filing EEO complaints.  As you mentioned, OIG complaints,

1  grievances, complaints.

   Q.   How many total complaints have you filed?

2  A.   Since 2000, three EEO complaints, one OIG complaint,

three grievances.

3  Q.   Have you filed any complaints against your current

supervisors?

4  A.   No.

   Q.   What was the context of the conversations you

5  mentioned earlier with Ms. Allen when she referred to wanting

to bring in younger employees into ECA?

6  A.   The contents?

   Q.   Yeah, context.

7  A.   Context.  As I mentioned, we may have been just in a

meeting sitting beside each other, her talking about the

8  upcoming vacancies and her vision or what she would like to

see happen within the office.

9  Q.   What was that vision?

   A.   To bring in younger people.

10  Q.   What else did she say?

   A.   She talked about the concept, the team concept, of

11  having team leaders and bringing in lower level employees to

train them to move up.

12

13

14

15

Q.    Approximately how long -- I think before you

1    testified there were one or two such conversations you had

with Ms. Allen, right?

2        A.    Concerning?

Q.    Concerning bringing in younger employees, right?

3        A.    Yes, correct.

Q.    How long in total did those conversations last?

4        A.    Two, three minutes.

Q.    And that's both of them together, right?

5        A.    Correct.

Q.    Okay.  Let's go back to talking about what I think

6    you called earlier today office gossip concerning wanting to

promote Ms. Johnson.  Do you recall your testimony in that

7    regard?

A.    Yes.

8        Q.    From whom did you hear or pass on office gossip

about that subject?

9        A.    I talked with -- Janet Yates is one.

Q.    Yates?

10       A.    Yates.

Q.    Y-A-T --

11       A.    Y-A-T-E-S.

Q.    Okay.

12

15

A.    Sarah Smith on occasion, Darcy Damon when she was

1    there.

Q.    By the way, do you know where Ms. Damon is employed

2    today?

A.    Yes.

3    Q.    Where?

A.    Department of State, Bureau of Administration.

4    Q.    Oh, that's the bureau you work in now?

A.    She works in the same office.

5    Q.    Have you talked to her about this lawsuit?

A.    No, I have not.  Let me back -- yes, I have.  I've

6    mentioned that I have lawsuits to Ms. Damon.

Q.    And that would include this one, right?

7    A.    I haven't mentioned age.

Q.    Okay.  So you haven't talked with her in much detail

8    about your lawsuits?

A.    No, I haven't.

9    Q.    Okay.

A.    She just knows in general that I have lawsuits.

10    Q.    Okay.  Does she know anything else that would be

relevant to this case about age discrimination?

11    A.    No.  I haven't talked -- she doesn't even know that

it's an age discrimination.

12

15

Q.   Okay.

1    A.   She just knows that I have complaints.

Q.   Okay.  And you were giving me a list of people who

2    were involved in the office gossip.  We had Janet Yates, Sarah

Smith and Darcy Damon.

3    A.   Right.  Alvita Battles.  Who else?  Joyce Love.

Q.   Is this office gossip that you're talking about, was

4    it happening -- when was it happening?

A.   2003 it started.

5    Q.   Go ahead, Mr. Hunter.

A.   We're talking Julie Johnson, the promotion of Julie

6    Johnson?

Q.   That's what I asked you about originally, yes.

7    A.   Yes.  2003 is when the gossip started about Mrs.

Allen wanting to promote her.

8    Q.   And did the gossip consist of anything more specific

than that?

9    A.   No.  It was just that Mrs. Allen wanted to promote

Julie Johnson.

10   Q.   Who said that?

A.   Joyce Love, Janet Yates, and who else may have

11   mentioned it to me?  Sarah Smith.

Q.   Did they give any reason for believing that Ms.

12

FREE STATE REPORTING, INC.

13                        Court Reporting   Depositions

D.C. Area (301) 261-1902

14                        Balt. & Annap. (410) 974-0947

15

Johnson would be promoted?

1      A.    Ms. Allen likes Julie and her work.

       Q.    Anything else?

2      A.    Not that I can recall.

       Q.    This is kind of a difficult question to ask, so let

3  me take my time here.

       A.    Okay.

4      Q.    You've told me -- this is why it's difficult because

I don't want you to rehash everything that you've already told

5  me.  You've told me about all of the evidence you believe

shows that Mrs. Allen decided to post the GS -- the positions

6  at the GS-11/12 level, right?

       A.    Correct.

7      Q.    You understand that in the course of this lawsuit

Mrs. Allen has provided different reasons than what you've

8  offered as evidence, right?

       A.    Correct.

9      Q.    Do you have any evidence that Mrs. Allen's reasons

are not her true reasons or that her reasons aren't true?

10     A.    I have evidence that Ms. Allen's credibility should

be in question because of an OIG complaint that I filed, and I

11  would love to present that as evidence in this case, as an

exhibit.

12
                       FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                      D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

Q.   Okay.  Well, just one minute.  We'll get there,

1   okay?

A.   Okay.

2   Q.   Do you have any evidence -- I understand from what

you just said that you think Mrs. Allen has a credibility

3   problem.

A.   Correct.

4   Q.   And that's in general, right?

A.   I'm not sure what you mean by in general.

5   Q.   Well, I'm trying to understand whether you believe

she can't --

6   A.   My opinion of her the last four years is that --

five years or so is that she's not a very truthful and honest

7   person.

Q.   Other than as it relates to you in this decision

8   that we're talking about today to downgrade the positions --

A.   No.  It's like a -- it's her practice.

9   Q.   Yeah.  What I'm getting at -- let me finish the

question.

10   A.   Okay.

Q.   Other than what we've talked about today with things

11   that affected you, can you give me any other examples of

instances where Ms. Allen has been less than truthful?

12

13

14

15

A.    Other than me --

Q.    Yes.

A.    -- in these instances, and we're going to talk about the OIG complaint.  That's one instance other than --

Q.    Okay.

A.    -- with me, is the OIG complaint.

Q.    Anything else?

A.    Could you repeat the question?

Q.    Sure.  I'm looking for specific examples that you have of Ms. Allen being less than truthful that don't involve the OIG complaint or the decision to downgrade -- her reasons for the decision to downgrade the position to GS-11/12.

A.    Everything else is hearsay that I have.  Other employees have come to me and mentioned Ms. Allen's practice around the Agency of committing to something and not following through and not being totally truthful, and being sneaky and conniving in her dealings in the way she conducts her business.

Q.    Are there any instances that you're aware of where Ms. Allen testified untruthfully under oath?

A.    I would have to go back and read her deposition again to point out what I believe was a lie.  And yeah, in another EEO complaint that I have against Ms. Allen there's

some documents to show that Ms. Allen lied about my

1   performance, the duties I was performing.

        Q.    Doesn't that have to do with your OIG complaint?

2       A.    No.  That's a totally different --

        Q.    That's a different one?

3       A.    It's a totally different one, and another EEO

complaint where I have documents to show proof that she lied

4   or was not telling the truth about my -- I think it's the '03

-- no, it may be the '03 evaluation or the '04 evaluation.

5   I'm not sure.

        Q.    And how is it that she lied about your duties or

6   performance?

        A.    She -- I performed the duties.  She had one of the

7   team leaders -- the two team leaders to create a document to

make it look at though they were the one performing these

8   duties when, in fact, I performed them.

        Q.    What duties are those?

9       A.    It was a project.  It was a -- what I considered to

be GS-13 duties.

10      Q.    Just please tell me about the project.  What did you

do?

11      A.    It was a Wye River project that the dollar amount on

the program was maybe 15 million.  It had four or five grants

12

                    FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

that needed to be administered to separate or to different

1    grantees, and I was the one who managed that particular

program for the office.

2        Q.   Doesn't that relate to the claims in your first

lawsuit?

3        A.   It is.   It is.

         Q.   And isn't it true that one of the claims in your

4    lawsuit is that your -- for contracting or the grants didn't

go high enough to allow you do a $15 million project?

5        A.   Not true.

         Q.   Okay.   Did you possess the authority to administer a

6    $15 million grant on your own?

         A.   It was not a grant.   It was a program that

7    encompassed several smaller grants.   The 15 was broken up to 5

different organizations.

8        Q.   Were they broken up evenly?

         A.   Different amounts.

9        Q.   Were any of the amounts under a million dollars?

         A.   I don't recall.

10       Q.   It's true, though, that you would not have had

authority to administer a $15 million program, correct?

11       A.   Incorrect.

         Q.   You would have at the time of the Wye River project

12

FREE STATE REPORTING, INC.

13                        Court Reporting   Depositions

D.C. Area (301) 261-1902

14                        Balt. & Annap. (410) 974-0947

15

have had the authority to administer a $15 million project?

1     A.   I was doing that.  I had administered several different projects that was over the $10 million mark.

2     Q.   I'm not asking you about whether you did it.  I'm asking about whether you had the authority.

3     A.   Yes, I had the authority.  It was assigned to me, yes.  These projects were assigned to me.

4     Q.   But you were also on a team, correct?

     A.   Correct.

5     Q.   And you had a team leader?

     A.   Correct.

6     Q.   And who was that?

     A.   Stinson, Connie Stinson.

7     Q.   So your criticism of Ms. Allen is that she incorrectly attributed the Wye River project to somebody other

8 than yourself in your evaluations at the end of the year?

     A.   She -- the two team leaders created a document to

9 make it look as though they were the one who was administering this program when, in fact, I was the one administering this

10 program.

     Q.   So how do you know Ms. Allen directed the two team

11 leaders to create such a document?

     A.   They had no other reason to do it.

12

15

Q.   Wouldn't it have enhanced their own reputation?

1    A.   They already had large programs they were administering.

2    Q.   Do you have the document with you that you're talking about today?

3    A.   It's a part of the first case.

Q.   Is it an exhibit to the summary judgment record?

4    A.   I don't know.  Mr. Snyder (phonetic sp.) prepared that.

5    Q.   Did Ms. Allen sign the document that you're talking about?

6    A.   No.

Q.   Did she attach it to anybody's performance

7    evaluation?

A.   No, not that I'm aware of.

8    Q.   Are there any other instances besides the OIG complaint, and I understand your disagreement with her reasons

9    in this lawsuit, that you're aware of where you believe Ms. Allen has lied --

10    A.   Yes.

Q.   -- that you have direct knowledge of?

11    A.   Yes.  I have evidence -- I don't have this document -- the third case that I have, I have evidence that Ms. Allen

12

has been lying concerning my '04 or '05 evaluation.  I had so

1   many cases going on that if I don't have the documents in

front of me, I can't tell you which one it is.

2       Q.   What's incorrect about your 2004 evaluation?

        A.   I wasn't given the proper or the -- I wasn't given

3   the deserving rating.

        Q.   That doesn't mean she lied.  It means she didn't --

4       A.   No, no, no, no, no, no, it doesn't.  I agree.  I'm

sorry.  I agree.  It's just that I have evidence to show that

5   she was doing -- she was lying to justify her reason for not

giving me an outstanding.

6       Q.   Okay, but that's not part of this lawsuit, right?

        A.   No, it isn't.

7       Q.   Okay.  Has Ms. Allen ever made any comment to you

about the complaints that you've filed?

8       A.   No.

        Q.   And has she ever made any comment to you regarding

9   your age?

        A.   Not that I can recall.

10      Q.   Has she ever made any comment in your presence

regarding any person's age specifically?

11      A.   Any comments concerning anyone [sic] age?

        Q.   Yes.

12

A.    Not that I can recall at this time.  Ms. Allen and I

1  had very limited communications the last four or five years.

Q.    You've made a couple of references to your OIG

2  complaint and you've got a document in front of you.

A.    Correct.

3  Q.    May I just have a quick look at it?  I'm pretty sure

I've seen at least part of it.  Thank you, Mr. Hunter.

4  A.    You're welcome.

Q.    This is what you produced in response to Defendant's

5  Request for Production of Documents, correct?

A.    Yes.

6  Q.    So this is already part of the record in this case?

A.    Yes.

7  Q.    What did you want to say about it here today in your

deposition?

8  A.    It shows that the witnesses that Defendant are

basing their case on, their -- I lost the word, but their

9  credibility should be in question based on this investigation.

Q.    Okay.  The OIG Hotline complaint that you filed is

10  dated October 25th, 2006, correct?

A.    That's not the original date.

11  Q.    Oh, I'm sorry, my -- when did you file the OIG

Hotline complaint?

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

A.    You'd have to go to that document.  I don't have it

1  in front of me.

Q.    Well, let me ask you, how did you make the OIG

2  Hotline complaint?  Did you do it in writing or did you do it

by phone?

3      A.    Written.  I wrote a complaint.

Q.    And did you do that --

4      A.    October --

Q.    October 31, 2005?

5      A.    Correct.

Q.    And you've already produced that in connection with

6  this litigation.  I've seen it before.

A.    Um-hum.

7      Q.    Is there anything else you wanted to say about the

OIG Hotline complaint here today?

8      A.    Just that it's a blatant case of a manager and

employees violating the law.

9      Q.    Which law?

A.    I don't know what the law is, but -- I can't

10  reference it, but they made false claims and committed fraud

when they presented performance evaluation that had work on it

11  that it did not perform.  In their evaluations, three

employees that Ms. Allen supervised, Ms. Allen indicated work

12

FREE STATE REPORTING, INC.

13                     Court Reporting   Depositions

D.C. Area (301) 261-1902

14                     Balt. & Annap. (410) 974-0947

15

in their evaluations that they never, ever performed, and gave
1  them an outstanding rating for that.

   Q.   How do you know that those three employees didn't
2  perform the work?  You weren't their supervisor, right?

   A.   I know it because that function was assigned to
3  another office.  It was never a responsibility of our office.

   Q.   And that's ECA that you're talking about?
4  A.   Correct.  And it was one individual that was
   designated by the Department as the only person responsible
5  for doing those duties.

   Q.   And as a result of these allegedly false performance
6  evaluations, what happened?

   A.   I'm not sure what your question is.
7  Q.   What was the consequence of them, the employees got
   higher reviews than they deserved?

8  A.   And -- correct.  Well, I'm not the evaluator, but
   they received a rating for something they never performed
9  along with awards at the end of the period.

   Q.   Is it possible that their actual performance taking
10 out that work would have justified their evaluation level and
   awards?

11 A.   I can't answer that.  I don't know.

   Q.   Mr. Hunter, when we started today, before we went on

12

the record, I agreed with you that at the end of the day I

1    would let you basically say anything you wanted with regard to

your claims in this lawsuit.  We've spend quite a while

2    talking now.

A.    Yes.

3    Q.    Is there anything else that you'd like to say?

A.    Only a few things.  That in my review of the

4    document I received from the Agency under discovery, I found

some very disturbing actions that took place in the hiring of

5    employees under the age of 40.  And we can reference back to

Exhibit 14 where -- this is the cert from which Lana Muck was

6    chosen, and there was at least five candidates -- four, excuse

me, four candidates that were ranked or rated higher than Lana

7    Muck, and that I do not have the age of these employees

because the Agency did not provide me with their resumes.

8    Q.    Do you know any of the four?

A.    No, I do not.

9    Q.    Okay.  Why do you find it of concern that there were

four candidates that OPM rating more highly, and what's the

10   point differential that you're referring to?

A.    I believe that if I had seen -- if the Agency had

11   produced their resume as an attachment to this cert, I could

have determined their age.

12

FREE STATE REPORTING, INC.

13               Court Reporting   Depositions

D.C. Area (301) 261-1902

14               Balt. & Annap. (410) 974-0947

15

Q.   Okay.  Well, putting their age aside for just a

1   moment, tell me what the -- first tell me what Ms. Muck's

score was?

2        A.   Ms. Muck's score was 98.

Q.   And what about respective scores of the other four

3   people you're talking about now?

A.   We have one at 100, two at 99, and one at 98.

4        Q.   And what are the names of the people listed as rated

at 100?

5        A.   Harper, Earlene Harper.

Q.   Anybody else?

6        A.   No, the only one rated at 100.

Q.   Okay.

7        A.   Oh, excuse me, I did identify Ms. Harper as being

--

8        Q.   You did.  We already talked about her.

A.   -- as being older than -- over 40.

9        Q.   Right.  We've already talked about her.

A.   Okay, okay.  There's two individuals that was ranked

10   -- rated at the 99 level.  You want their names?

Q.   Oh, yes.  Who were they?

11       A.   I'll spell the name.  Last name is B-R-U-N-O, first

name Kathleen -- Catharine.  I'm sorry, Catharine.

12

FREE STATE REPORTING, INC.

13                Court Reporting   Depositions

D.C. Area (301) 261-1902

14                Balt. & Annap. (410) 974-0947

15

Q.   Okay.

1         A.   The second one that was ranked 99, the last name is
T-O-P-F, first name Susan.

2         Q.   Okay.  And who else was rated at 98 with Ms. Muck?

A.   Last name is spelled O-P-U-N-I - M-E-N-S-A-H,

3    Frederick.

Q.   Okay.  Exhibit 14 reflects that Ms. Bruno and Ms.

4    Topf both declined the position, correct?

A.   Correct.

5         Q.   And it also reflects that Frederick Opuni-Mensah
declined the position, as well, correct?

6         A.   Correct.

Q.   So the position was actually offered to them and

7    they didn't get it, right?

A.   Based on handwritten notes to the side of the cert

8         Q.   Right, which is all you had to go on when you
reviewed the document?

9         A.   Correct.

Q.   So there's at most one person who -- Ms. Harper, who

10   was ranked more highly and was over the age of 40?

A.   Correct.

11        Q.   Okay.  Is there anything else?

A.   Exhibit 15.  Ms. Harper appears on this cert from

12
FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

which Ms. Gunther and Ms. Thompson were selected.  Ms. Harper

1   was the highest ranking individual on this cert.

Q.    Did she rank at 100 again?

2   A.    Yes, she did.

Q.    Okay.  You were not an applicant for any of the

3   positions that are reflected in Exhibits 14 and 15, correct?

A.    Correct.

4   Q.    But you believe they contain evidence to support

your claim?

5   A.    Correct, because Ms. Gunther was selected from this

cert to fill Ms. Swann's vacant GS-13 position.  And, also,

6   Sara Swann-Smith [sic] who was the Program Coordinator in our

office was the fourth ranking -- fourth highest ranking

7   candidate on the cert.

Q.    I'm sorry.  Who was that?

8   A.    Sara Swann.  She was a Program Coordinator working

in ECA's Grants Office.

9   Q.    What was her score?

A.    Her score was 97, and she was over 40.

10  Q.    Anything else that you want to say about Exhibit 15?

A.    I'm sorry if I repeat this, but Ms. Harper, I did

11  mention her?

Q.    Right, you mentioned her.

12
                    FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

1
     A.    Okay.  Well, since we have Exhibit 15, there's two
additional pages that are really not a part of the cert that I
attached to Exhibit 15.

2
     Q.    Okay.  And what do they tell you?
     A.    They reference the GS-14 Budget Analyst position

3
that was in ECA's Budget Office.  So we really have two
different certs as Exhibit 15.

4
     Q.    Okay.
     A.    We have one for the Grant Specialist, and we have --

5
the last two pages of Exhibit 15 reference the Supervisory
Budget Analyst 14 position in ECA's Budget Office.

6
     Q.    Is that the one we talked about earlier?
     A.    Yes.

7
     Q.    That's the position we talked about earlier?
     A.    Yes, it is.

8
     Q.    Okay.
     A.    And I would like to --

9
     Q.    Do you want to pull those off of that and make it a
separate exhibit?

10
     A.    We can do that.
     Q.    That would be fine.

11
     A.    Okay.
     Q.    Let's do that.

12

15

MS. LYONS:  Are we up to 16?

1      REPORTER:  Um-hum.

MS. LYONS:  So we're not all confused later.

2      WITNESS:  Okay.

(Whereupon, the document that was referred to as Exhibit

3  Number 16 was marked for identification.)

BY MS. LYONS:

4      Q.   All right.  So now we have made Exhibit 16 which

consists of those last two pages, correct?

5      A.   Correct.

Q.   And this Exhibit 16 relates to the Supervisory

6  Budget Analyst position that we talked about earlier today?

A.   Correct.

7      Q.   Okay.  What role did Ms. Allen play in filling this

vacancy?

8      A.   She didn't.  To my knowledge, she didn't play any

role.

9      Q.   All right.  Anything else you want to say here

today, Mr. Hunter?

10     A.   I think that's it for me.

Q.   Okay.  I just have a few concluding questions then

11  for you, and these are particularly because you're not

represented by counsel here today.

12

A.   Okay.

1       Q.   The transcript that is being taken down reflects our
words, but it doesn't reflect anything about our tones of

2   voices or our conduct or behavior, you understand that, right?

A.   Yes.

3       Q.   Have I behaved at all times today in a way that you
would characterize as professional?

4       A.   Yes, you were professional.

Q.   And have I been courteous with you today?

5       A.   Yes, you have.

Q.   I haven't raised my voice?

6       A.   No.

Q.   And you feel like I've treated you fairly today?

7       A.   Yes.

Q.   Okay.  I just wanted to make sure that's clear.

8       A.   Okay.

Q.   Appreciate that.

9       A.   Yes.

Q.   I think we're done.  You have the ability or the

10   right if you wish to review the statements that have been
taken down today, both my questions and your answers.  You

11   don't have to, but you can.  Would you like an opportunity to
do that?

12

FREE STATE REPORTING, INC.

13                      Court Reporting   Depositions

D.C. Area (301) 261-1902

14                      Balt. & Annap. (410) 974-0947

15

        A.    Yes.  I would like a copy of the transcript.

1       Q.    Okay.

        A.    Um-hum.

2       Q.    All right.  We can go off the record then.

              (Reading and signature not waived.)

3             (Whereupon, at 4:57 p.m., on Monday, March 26, 2007,

    the deposition was concluded.)

4

5

6

7

8

9

10

11

12
                        FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

                        D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

CERTIFICATE

1      I, Heather Kilbourne, a Shorthand Reporter and a Notary

Public, do hereby certify that the foregoing witness,

2  DONALD STEVE HUNTER, SR., was duly sworn on the date

indicated, and that the foregoing is a true and accurate

3  transcription of my stenographic notes and is a true record of

the testimony given by the foregoing witness.

4      I further certify that I am not employed by or related to

any party to this action by blood or marriage and that I am in

5  no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this

6  12th day of April, 2007.


7


                              _____

8                              Heather Kilbourne

                              Notary Public in and for the

9                              District of Columbia


10


11  My commission expires:

February 28, 2011

12

                    FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947


15

1

2

3

4

5

6

7

8

9

10

11

12

FREE STATE REPORTING, INC.

13                Court Reporting    Depositions

D.C. Area (301) 261-1902

14           Balt. & Annap. (410) 974-0947

15